**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION**

| | | |
|---|---|---|
| **MICHAEL D. ROSE and** | ) | |
| **EDWARD L. HARMON, on their own** | ) | |
| **behalf and on behalf of all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** <u>5:22-cv-00405</u> |
| | ) | |
| **BETSY JIVIDEN, individually and in her** | ) | |
| **official capacity as the Commissioner of** | ) | |
| **the West Virginia Division of Corrections** | ) | |
| **and Rehabilitation,** | ) | |
| **MICHAEL FRANCIS, individually as an** | ) | |
| **employee of the West Virginia Division of** | ) | |
| **Corrections and Rehabilitation,** | ) | |
| **LARRY WARDEN, individually as an** | ) | |
| **employee of the West Virginia Division of** | ) | |
| **Corrections and Rehabilitation,** | ) | |
| **The RALEIGH COUNTY** | ) | |
| **COMMISSION,** | ) | |
| **JOHN/JANE DOE EMPLOYEES OF** | ) | |
| **THE RALEIGH COUNTY** | ) | |
| **COMMISSION,** | ) | |
| **The FAYETTE COUNTY** | ) | |
| **COMMISSION,** | ) | |
| **JOHN/JANE DOE EMPLOYEES OF** | ) | |
| **THE FAYETTE COUNTY** | ) | |
| **COMMISSION,** | ) | |
| **The GREENBRIER COUNTY** | ) | |
| **COMMISSION,** | ) | |
| **JOHN/JANE DOE EMPLOYEES OF** | ) | |
| **THE GREENBRIER COUNTY** | ) | |
| **COMMISSION,** | ) | |
| **The MERCER COUNTY** | ) | |
| **COMMISSION,** | ) | |
| **JOHN/JANE DOE EMPLOYEES OF** | ) | |
| **THE MERCER COUNTY** | ) | |
| **COMMISSION,** | ) | |
| **The MONROE COUNTY** | ) | |
| **COMMISSION,** | ) | |
| **JOHN/JANE DOE EMPLOYEES OF** | ) | |

| | |
|---|---|
| **THE MONROE COUNTY** | ) |
| **COMMISSION,** | ) |
| **The SUMMERS COUNTY** | ) |
| **COMMISSION,** | ) |
| **JOHN/JANE DOE EMPLOYEES OF** | ) |
| **THE SUMMERS COUNTY** | ) |
| **COMMISSION,** | ) |
| **The WYOMING COUNTY** | ) |
| **COMMISSION,** | ) |
| **JOHN/JANE DOE EMPLOYEES OF** | ) |
| **THE WYOMING COUNTY** | ) |
| **COMMISSION,** | ) |
| **PRIMECARE MEDICAL OF WEST** | ) |
| **VIRGINIA, INC.,** | ) |
| **JOHN/JANE DOE PRIMECARE** | ) |
| **EMPLOYEES, and** | ) |
| **JOHN/JANE DOE CORRECTIONAL** | ) |
| **OFFICERS,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| _____ | ) |

## CLASS ACTION COMPLAINT

**COME NOW**, Plaintiffs Michael D. Rose and Edward L. Harmon, by counsel, and for their Complaint state and allege as follows:

### I.   JURISDICTION AND VENUE

1.       This action arises under the Civil Rights Act, 42 U.S.C. § 1983.

2.       Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated.

3.       Declaratory and injunctive relief are authorized pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rules of Civil Procedure 57 and 65.

4.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and under its authority to decide pendent state law claims.

5.      Venue is proper because some of the above-named Defendants reside within the Southern District of West Virginia, Beckley Division, and because the incidents giving rise to this Complaint occurred within the Southern District of West Virginia, Beckley Division.

## II.      PARTIES

6.      Plaintiff Michael D. Rose (hereinafter "Plaintiff Rose") was at all times relevant hereto an inmate incarcerated at Southern Regional Jail (hereinafter "SRJ") in Raleigh County, Beaver, West Virginia.

7.      Plaintiff Edward L. Harmon (hereinafter "Plaintiff Harmon") was at all times relevant hereto a pre-trial detainee incarcerated at SRJ in Raleigh County, Beaver, West Virginia.

8.      Defendant Betsy Jividen (hereinafter "Commissioner Jividen") was at all times relevant hereto an employee of the West Virginia Division of Corrections and Rehabilitation (hereinafter "WVDOCR") and was at all times relevant hereto acting within the scope of her employment and under color of law as the Commissioner of the WVDOCR.

9.      The WVDOCR is the administrative division of the West Virginia Department of Military Affairs and Public Safety tasked with administering and exercising direct and effective control over prisons and jails in West Virginia.  Upon information and belief, WVDOCR operates nineteen jail facilities throughout West Virginia, including SRJ in Beaver, West Virginia.

10.     As Commissioner of the WVDOCR, Commissioner Jividen is vested with executive authority and responsibility for the administration, operation, and control of all WVDOCR facilities and employees of WVDOCR facilities.  Commissioner Jividen's duties include establishing, monitoring, and enforcing policy directives and procedures that ensure constitutional confinement and treatment of all individuals in the custody of the WVDOCR.

11.     Among other things, Commissioner Jividen is charged with ensuring that inmates are subjected to appropriate and humane conditions of confinement while housed in any West Virginia jail.  Commissioner Jividen is similarly charged with maintaining and operating the jail facilities in West Virginia in a manner that meets the minimal civilized measure of life's necessities, by providing, *inter alia*, beds and bedding for all inmates, appropriate food and access to drinking water, access to basic hygiene products, toilets, showers, and laundry, and providing living conditions free of mold, sink and toilet water, human waste or sewage, rats, insects, and other contaminants for all inmates housed therein.

12.     Commissioner Jividen is also tasked with ensuring that inmates housed in WVDOCR facilities are reasonably free from violence and sexual assault.

13.     Likewise, Commission Jividen is tasked by law with ensuring that jail facilities in West Virginia, including SRJ, comply with W. Va. CSR § 95-1-10 *et seq*. and W. Va. CSR § 95-1-8 *et seq*.

14.     Commissioner Jividen, who upon information and belief resides in Kanawha County, West Virginia, is sued in both her official and individual capacity.[1]

15.     Defendant Michael Francis (hereinafter "Superintendent Francis") was at all times relevant hereto an employee of the WVDOCR and was at all times relevant hereto acting within the scope of his employment and under color of law as the administrator of SRJ.

16.     Superintendent Francis is tasked by law with the care and custody of all detainees and prisoners incarcerated at SRJ.  Superintendent Francis is vested with authority and responsibility for the safe staffing, administration, operation, and control of SRJ, including, but not limited to, the oversight of all SRJ employees, and the authority to promulgate, amend, and

---

[1] Commissioner Jividen is sued in her official capacity for the purposes of declaratory and injunctive relief.

implement all policies and procedures within SRJ to ensure constitutional confinement and treatment of all individuals incarcerated therein.

17.     Among other things, Superintendent Francis is charged with ensuring that inmates are subjected to appropriate and humane conditions of confinement while housed in SRJ. Superintendent  Francis is similarly charged with maintaining and operating SRJ in a manner that meets the minimal civilized measure of life's necessities, by providing, *inter alia*, beds and bedding for all inmates, appropriate food and access to drinking water, access to basic hygiene products, toilets, showers, and laundry, and providing living conditions free of mold, sink and toilet water, human waste, rats, insects, and other contaminants for all inmates housed therein.

18.     Superintendent Francis is also tasked with ensuring that inmates housed in SRJ are reasonably free from violence and sexual assault.

19.     Likewise, Superintendent Francis is tasked by law with ensuring that jail facilities in West Virginia, including SRJ, comply with W. Va. CSR § 95-1-10 *et seq*. and W. Va. CSR § 95-1-8 *et seq*.

20.     Superintendent Francis, who upon information and belief resides in Raleigh County, West Virginia, is sued only in his individual capacity.

21.     Defendant Larry Warden (hereinafter "Major Warden") was at all times relevant hereto an employee of the WVDOCR and was at all times relevant hereto acting within the scope of his employment and under color of law as the commanding correctional officer at SRJ.

22.     Defendant the Raleigh County Commission is a political subdivision established under the laws of West Virginia and located in Raliegh County, West Virginia.

23.     Defendants John/Jane Doe Employees of the Raleigh County Commission are yet to be identified current and former employees of the Raleigh County Commission.

24.     Defendant the Fayette County Commission is a political subdivision established under the laws of West Virginia and located in Fayette County, West Virginia.

25.     Defendants John/Jane Doe Employees of the Fayette County Commission are yet to be identified current and former employees of the Fayette County Commission.

26.     Defendant the Greenbrier County Commission is a political subdivision established under the laws of West Virginia and located in Greenbrier County, West Virginia.

27.     Defendants John/Jane Doe Employees of the Greenbrier County Commission are yet to be identified current and former employees of the Greenbrier County Commission.

28.     Defendant the Mercer County Commission is a political subdivision established under the laws of West Virginia and located in Mercer County, West Virginia.

29.     Defendants John/Jane Doe Employees of the Mercer County Commission are yet to be identified current and former employees of the Mercer County Commission.

30.     Defendant the Monroe County Commission is a political subdivision established under the laws of West Virginia and located in Monroe County, West Virginia.

31.     Defendants John/Jane Doe Employees of the Monroe County Commission are yet to be identified current and former employees of the Monroe County Commission.

32.     Defendant the Summers County Commission is a political subdivision established under the laws of West Virginia and located in Summers County, West Virginia.

33.     Defendants John/Jane Doe Employees of the Summers County Commission are yet to be identified current and former employees of the Summers County Commission.

34.     Defendant the Wyoming County Commission is a political subdivision established under the laws of West Virginia and located in Wyoming County, West Virginia.

35.     Defendants John/Jane Doe Employees of the Wyoming County Commission are yet to be identified current and former employees of the Wyoming County Commission.

36.     The aforementioned County Commissions shall be hereinafter collectively be referred to as the "County Defendants."

37.     The aforementioned John/Jane Doe Employees of the County Defendants shall hereinafter collectively be referred to as the "John/Jane Doe County Employees."

38.     Upon information and belief, the County Defendants have a contractual agreement with SRJ and/or the WVDOCR to house many, if not most, of their county prisoners.  As a result, many of the County Defendants' prisoners have been, and currently are, housed at SRJ.  Upon information and belief, the County Defendants knew or should have known about the constitutional deprivations and other tortious conduct described herein.

39.     The County Defendants are charged, under W. Va. Code § 7-8-2A(a), with providing their prisoners adequate food, beds and bedding, and basic hygiene products.

40.     Defendant PrimeCare Medical of West Virginia, Inc. (hereinafter "PrimeCare") is a West Virginia corporation with a principal place of business located at 390 Locust Lane, Harrisburg, Pennsylvania, 17109.  Upon information and belief, PrimeCare is a contractor of the WVDOCR and provides medical care to jails and prisons throughout West Virginia.

41.     Defendants John/Jane Doe PrimeCare Employees are yet to be identified current and former employees of PrimeCare who worked, or are still working, at SRJ.

42.     Defendants John/Jane Doe Correctional Officers are yet to be identified current and former correctional officers employed by the WVDOCR who worked, or are still working, at SRJ.

43.     All Defendants, with the exception of PrimeCare, are sued up to the limits of the insurance policy(s) that provides liability coverage for their actions and omissions.

44.     Plaintiffs demand a bench trial on all causes of action and requests for relief asserted herein.

### III.     STATEMENT FACT

45.     Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 44 as though fully set forth herein.

### A.   Conditions Of Confinement At SRJ

46.     Under the Eighth and Fourteenth Amendments to the United States Constitution, jails have a duty to provide inmates with humane conditions of confinement, including, but not limited to, adequate food, clothing, shelter, sanitation, and medical care.  *See Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016);  *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S. Ct. 1861, 1877 (1979); *Dawson v. Kendrick*, 527 F. Supp. 1252, 1282-84 (S.D. W.Va. 1981).

47.     Inmates also have a constitutional right to be reasonably protected from the constant threat of violence and sexual assault while incarcerated.  *See Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973);  *U.S. v. Bailey*, 444 U.S. 394, 423, 100 S. Ct. 624, 641 (1980).

48.     Pursuant to W. Va. CSR § 95-1-10.1, "[j]ail facility authorities shall maintain the facility in a condition that is clean, healthful and sanitary and which conforms to all applicable health laws and rules."

49.     Likewise, pursuant to W. Va. Code § 7-82A, county commissions "shall provide wholesome and sufficient food and clean and sufficient bedding for all prisoners…and shall furnish soaps, disinfectants and other supplies…"

50.     Despite these constitutional and statutory requirements, Defendants have subjected inmates housed at SRJ, including Plaintiffs, to inhumane living conditions and deprived them of basic human necessities.

**i.  _Pervasive Overcrowding_**

51.     Jail overcrowding that causes inmates "to endure genuine privations and hardship over an extended period of time" may give rise to violations of the Eighth and Fourteenth Amendments.  *See Dawson*, 527 F. Supp. at 1294-97 (quoting *Wolfish*, 441 U.S. at 542).

52.     Pursuant to W. Va. CSR § 95-1-8.9, all jail facilities shall provide inmates with access to "a bed above floor level…"

53.     Pursuant to W. Va. CSR § 95-1-8.1, jail facilities "must comply with the provisions of the State Fire Code…"

54.     For at least a decade, SRJ has been dangerously overcrowded, housing significantly more inmates than it was designed to hold.

55.     According to a 2020 PREA (Prison Rape Elimination Act) Facility Audit Report, SRJ was designed to hold <u>468 inmates</u>.  *See* PREA Audit Report, attached hereto as <u>Exhibit 1</u>.

56.     According to the PREA Audit Report, SRJ had a reported population of 711 inmates and a 12-month daily population average of 640 inmates in 2020.  *See id*.

57.     At the time of the PREA Audit, SRJ was at <u>166% capacity</u>.  *See id*.

58.     According to the 2021 Annual Report of the WVDOCR, SRJ had a reported population of 681 inmates and an average daily population of 717 inmates in 2021.  *See* Annual Report, attached hereto as <u>Exhibit 2</u>.

59.     According to the Annual Report, SRJ had an average daily population of 642 inmates in 2020, 633 inmates in 2019, and 603 inmates in 2018.  *See id*.

60.     According to the Annual Report, SRJ has been overcapacity (*i.e.*, housing more than 468 inmates) for <u>over ten (10) years</u>.  *See id*.

- 9 -

61.     According to current and former SRJ correctional officers, overcrowding is a widespread and ongoing problem at SRJ.  *See* Affidavit of Troy Carter (hereinafter "CO Carter"), ¶ 13, attached hereto as <u>Exhibit 3</u>;  Affidavit of Anthony Marks (hereinafter "CO Marks"), ¶ 4, attached hereto as <u>Exhibit 4</u>;  Affidavit of Dean VanDevender (hereinafter "CO VanDevender"), ¶ 10, attached hereto as <u>Exhibit 5</u>;  Affidavit of Scott Moore (hereinafter "CO Moore"), ¶ 4, attached hereto as <u>Exhibit 6</u>.

62.     SRJ is so overcrowded, that three (3) and often (4) inmates are regularly housed in a two-person cell (approximately 120 square feet) for extended periods of time.  *See* Ex. 3 at ¶ 13; Ex. 4 at ¶ 4;  Ex. 5 at ¶ 11;  Ex. 6 at ¶ 4.

63.     CO VanDevender recalls as many as six (6) inmates being housed in one two-person cell at SRJ.  *See* Ex. 5 at ¶ 11.

64.     As a result of persistent overcrowding at SRJ, many inmates are forced to sleep on the floor of their cell.  *See* Ex. 3 at ¶ 12;  Ex. 5 at ¶ 11;  Ex. 6 at ¶ 5;  *see also* SRJ Photographs attached hereto as composite <u>Exhibit 7</u>.

65.     In addition, as a result of persistent overcrowding at SRJ, many inmates are regularly forced to live and sleep on the dayroom floor of their pod.[2]  *See* Ex. 3 at ¶ 14;  Ex. 4 at ¶ 5;  Ex. 5 at ¶ 12;  Ex. 6 at ¶ 6.

66.     CO Carter recalls as many as sixteen (16) inmates living and sleeping on the dayroom floor of a pod at one time.  *See* Ex. 3 at ¶ 19.

67.     Living and sleeping on the dayroom floor exposes inmates at SRJ to a variety of health and safety risks.  *See* Ex. 3 at ¶ 15;  Ex. 4 at ¶ 6;  Ex. 5 at ¶ 14;  Ex. 6 at ¶ 7.

---

[2] A "dayroom" refers to the common, open area in the middle of each pod.

68.     Inmates living on a dayroom floor at SRJ are regularly attacked and physically injured because they are not protected by a locked cell.  *See* Ex. 3 at ¶ 17;  Ex. 4 at ¶ 8;  Ex. 6 at ¶ 9.

69.     Inmates living on a dayroom floor at SRJ are also sexually assaulted or raped because they are not protected by a locked cell.  *See* Ex. 3 at ¶ 18.

70.     Moreover, inmates living in the dayrooms at SRJ have no access to individual sinks or toilets.  *See* Ex. 3 at ¶ 16;  Ex. 4 at ¶ 7;  Ex. 5 at ¶ 13;  Ex. 6 at ¶ 8.

71.     When individual inmate cells are locked down (for instance, six (6) hours at night), inmates living in the dayrooms at SRJ have no access to drinking water or use of a toilet.

72.     The designated "suicide cells" (where suicidal inmates can be properly monitored) at SRJ are also dangerously overcrowded.  *See* Ex. 3 at ¶ 43;  Ex. 4 at ¶ 9;  Ex. 5 at ¶ 52;  Ex. 6 at ¶ 10.

73.     SRJ only has two (2) cells designated for suicidal inmates.  *See* Ex. 3 at ¶ 44;  Ex. 4 at ¶ 10;  Ex. 6 at ¶ 11.[3]

74.     CO Carter recalls as many as sixteen (16) inmates being placed in a single suicide cell (approximately 120 square feet) at once and left there for days.  *See* Ex. 3 at ¶ 44.

75.     CO Marks recalls as many as twelve (12) inmates being placed in a single suicide cell (approximately 120 square feet) at once and left there for days.  *See* Ex. 4 at ¶ 10.

76.     CO VanDevender recalls as many as ten (10) inmates being placed in a single two-person suicide cell for as long as two (2) weeks.  *See* Ex. 5 at ¶ 52.

77.     CO Moore recalls as many as eight (8) inmates being placed in a single two-person suicide cell and left there for days.  *See* Ex. 6 at ¶ 11.

---

[3] When an inmate in placed in a suicide cell, he/she is stripped naked and placed in gown or "pickle suit" (named after its green color).

ii. ___*Faulty Plumbing (Sinks, Toilets, and Showers, etc.)*___

78.    "Functioning sinks, toilets and showers are basic necessities of modern life, particularly within the confines of a wholly self-contained environment such as a jail."  *See Dawson*, 527 F. Supp. at 1287.  "Plumbing which is so inadequate and in such a state of disrepair as to constitute a serious threat to the physical and mental well-being of prisoners" violates the Eighth and Fourteenth Amendments. *See id*. at 1287-88.

79.    Pursuant to W. Va. CSR § 95-1-8.9, all jail facilities shall provide inmates access to "(a) a toilet above floor level which is available for use without staff assistance twenty-four (24) hours a day; (b) a wash basin and drinking water; [and] (c) hot and cold running water…"

80.    Pursuant to W. Va. CSR § 95-1-10.4, "[t]he water supply and plumbing fixtures [at jail facilities] shall meet all applicable codes and be maintained in operable and sanitary condition...[and] [t]he facility shall provide hot and cold running water."

81.    Pursuant to W. Va. CSR § 95-1-10.6, "[j]ail facility floors shall be kept clean, dry, and free of hazardous substances."

82.    Pursuant to W. Va. CSR § 95-1-10.20, "[w]ater temperatures for showers or bathing shall be thematically controlled to ensure the safety of inmates."

83.    Pursuant to W. Va. CSR § 95-1-10.21, "[i]nmates shall have continuous access to a watershed with running hot and cold water."

84.    Pursuant to W. Va. CSR § 95-1-8.9, all jail facilities shall provide inmates with living "[t]empuratures appropriate to the summer and winter comfort zones."

85.    There are widespread and ongoing problems with the plumbing at SRJ.  *See* Ex. 3 at ¶ 22;  Ex. 4 at ¶ 15;  Ex. 5 at ¶ 15;  Ex. 6 at ¶ 20.

86.     At any given time, there are numerous cells at SRJ (often overcrowded) that have no running water.  *See* Ex. 3 at ¶ 23;  Ex. 4 at ¶ 16;  Ex. 5 at ¶ 16;  Ex. 6 at ¶ 21;  *see also* SRJ Videos, attached hereto as <u>Exhibit 8</u>;  *see also*, *infra.*, Ex. 9.

87.     According to CO Marks, there were inmate cells at SRJ that had no running water the entire five (5) months he worked there.  *See* Ex. 4 at ¶ 17.

88.     According to CO VanDevender, there were inmate cells at SRJ that went as long as two (2) weeks with no running water when he worked there.  *See* Ex. 5 at ¶ 16.

89.     Inmates at SRJ who do not have running water in their cell can go up to six (6) hours or longer without access to water during lockdowns.  *See* Ex. 3 at ¶ 24;  Ex. 4 at ¶ 18;  Ex. 5 at ¶ 16;  Ex. 6 at ¶ 22.

90.     In cells that do have running water, many have only hot water.  *See* Ex. 3 at ¶ 25;  Ex. 4 at ¶ 20;  Ex. 5 at ¶ 18;  Ex. 6 at ¶ 23;  *see also*, *infra.*, Ex. 9.

91.     In cells that do have running water, the water often runs constantly (*i.e.*, cannot be turned off).  *See* Ex. 3 at ¶ 26;  Ex. 4 at ¶ 21;  Ex. 5 at ¶ 17;  Ex. 6 at ¶ 24;  *see also* Ex. 8;  *see also*, *infra.*, Ex. 9.

92.     The drinking fountains in inmate pods at SRJ also regularly do not work.  *See* Ex. 5 at ¶ 21.

93.     As a result, inmates who do not have working sinks in their cell have limited or no access to drinking water.  *See* Ex. 5 at ¶ 21.

94.     Water leaking from broken sinks and toilets is also a widespread and ongoing problem at SRJ.  *See* Ex. 3 at ¶ 27;  Ex. 4 at ¶ 27;  Ex. 5 at ¶ 24;  Ex. 6 at ¶ 27;  *see also* Ex. 7;  *see also* Ex. 8;  *see also*, *infra.*, Ex. 9.

95.     At any given time, numerous inmate cells at SRJ have water from a broken sink, toilet, or both leaking onto the floor.  *See* Ex. 3 at ¶ 28;  Ex. 4 at ¶ 28;  Ex. 5 at ¶¶ 25-26;  Ex. 6 at ¶ 28;  *see also* Ex. 7;  *see also* Ex. 8;  *see also*, *infra.*, Ex. 9.

96.     Since virtually all of the inmate cells at SRJ are overcrowded, inmates at SRJ commonly sleep in sink or toilet water (or even toilet waste) on the floor of their cell.  *See* Ex. 3 at ¶ 29;  Ex. 4 at ¶ 29;  Ex. 5 at ¶¶ 26, 28;  Ex. 6 at ¶ 29.

97.     Cells at SRJ that are adjacent to showers also commonly have water seeping in through the ceiling, walls, and floor.  *See* Ex. 3 at ¶ 33;  Ex. 4 at ¶ 30;  Ex. 5 at ¶ 27;  Ex. 6 at ¶ 30;  *see also* Ex. 8;  *see also*, *infra.*, Ex. 9.

98.     Toilets in inmate cells that are broken and do not flush are also a widespread and ongoing problem at SRJ.  *See* Ex. 3 at ¶ 30;  Ex. 4 at ¶ 23;  Ex. 5 at ¶ 20;  Ex. 6 at ¶ 25;  *see also* Ex. 7;  *see also* Ex. 8;  *see also*, *infra.*, Ex. 9.

99.     At any given time, numerous inmate cells at SRJ (often overcrowded) have toilets that do not flush or are otherwise broken.  *See* Ex. 3 at ¶ 31;  Ex. 4 at ¶ 24;  Ex. 6 at ¶ 26;  *see also* Ex. 7;  *see also* Ex. 8;  *see also*, *infra.*, Ex. 9.

100.    Broken toilets at SRJ commonly become infested with bugs or maggots.  *See* Ex. 3 at ¶ 32;  Ex. 4 at ¶ 25;  *see also* Ex. 7;  *see also* Ex. 8.

101.    According to CO Marks, there were inmate cells at SRJ that had no functioning toilet the entire five (5) months he worked there.  *See* Ex. 4 at ¶ 26.

102.    According to CO VanDevender, inmate cells at SRJ often did not having a functioning toilet for weeks when he worked there.  *See* Ex. 5 at ¶ 20.

103.    In fact, some inmate cells at SRJ have the sink or toilet completely torn out of the wall.  *See* Ex. 4 at ¶ 22.

104.    A non-functioning toilet in an inmate cell at SRJ results in inmates (typically in an already overcrowded cell) going up to six (6) hours without a working toilet during nightly lockdown.  *See* Ex. 5 at ¶ 20.

105.    There are even toilets at SRJ that when flushed, the contents come up out of the sink in the cell.  *See*, *infra.*, Ex 9.

106.    Many of the showers at SRJ either do not work, have only hot or cold water, or run constantly.  *See* Ex. 3 at ¶ 34;  Ex. 4 at ¶ 31;  Ex. 6 at ¶ 31;  *see also* Ex. 8;  *see also*, *infra.*, Ex. 9.

107.    Each pod at SRJ is supposed to have two (2) inmate showers.  However, the water to one shower in a pod regularly does not work, often leaving as many as seventy (70) or eighty (80) inmates in an overcrowded pod sharing one shower.  *See* Ex. 5 at ¶ 22.

108.    Due to the ongoing problems with either non-working hot or cold water in pods at SRJ, inmates are regularly forced to take scalding hot showers (even in the summer) or freezing cold showers (even in the winter).  *See* Ex. 5 at ¶ 23.

109.    The heating and air conditioning at SRJ also regularly goes out for weeks at a time.  *See* Ex. 3 at ¶ 38;  Ex. 4 at ¶ 52;  Ex. 5 at ¶ 19.

110.     For inmates living in overcrowded, frequently wet, and sometimes steamy cells (due to constantly running hot water), having no air conditioning creates an unhealthy environment in the summer, as does sleeping on cold, wet floors in the winter without heat.  *See* Ex. 3 at ¶ 38.

111.    "[A]ntiquated, neglected, and unsanitary…plumbing and plumbing fixtures is both punitive and violative of the Fourteenth Amendment rights of…pre-trial detainees and the Eighth Amendment rights of…convicted inmates."  *Dawson*, 527 F. Supp. at 1288.  "It also constitutes a breach of defendants' statutory duties under [W.Va. Code § 95-1-10.1] to keep the jail in a clean, sanitary, and healthful condition…"  *Id*.

### iii. _Unsanitary Living Conditions: Black Mold, Rodent Feces, and General Filth_

112.     "The failure to provide for and require rudimentary housekeeping and cleaning at [a] jail" resulting in an "unnecessarily filthy and denigrating environment" can threaten the "physical and mental well-being of prisoners." _Dawson_, 527 F. Supp. at 1289.

113.     Pursuant to W. Va. CSR § 95-1-10.2, "[j]ail facility authorities shall develop and implement a plan for the maintenance of all areas of the jail facility at an acceptable level of cleanliness and sanitation."

114.     Pursuant to W. Va. CSR § 95-1-10.5, "[i]nmates shall be provided sufficient cleaning equipment to maintain their cells in a clean condition."

115.     Inmates housed at SRJ are forced to live in filthy, unsanitary, and dangerous conditions, and are denied cleaning supplies to remedy said conditions.

116.     The presence of black mold at SRJ is a widespread and ongoing problem. _See_ Ex. 3 at ¶ 35; Ex. 4 at ¶ 39; Ex. 5 at ¶ 29; Ex. 6 at ¶ 34.

117.     The black mold at SRJ is in inmate cells, inmate showers, air vents, and grows on the clothing of inmates. _See_ Ex. 3 at ¶ 36; Ex. 4 at ¶ 40; Ex. 5 at ¶ 30; Ex. 6 at ¶ 35; _see also_ Ex. 7; _see also_ Ex. 8.

118.     Nothing is ever done to remedy the persistent black mold problem at SRJ, other than having inmate trustees paint over it. _See_ Ex. 3 at ¶ 37; Ex. 4 at ¶ 41; Ex. 5 at ¶ 31.

119.     Several inmate pods at SRJ are also infested with rodents and rodent feces. _See_ Ex. 4 at ¶ 51.

120.     Some areas of SRJ are infested with ants or other insects. _See_ Ex. 6 at ¶ 40.

121.     Aside from the black mold, rodents, and insects, inmate cells at SRJ are unnecessarily filthy and create a denigrating environment for inmates to be housed in.  *See* Ex. 7; Ex. 8.

       **iv.**     ***Inadequate Nutrition and Spoiled Food***

122.     "Food sufficient to meet minimum nutritional needs is a basic necessity of life.  The failure to provide adequate and sanitary food service…and to serve food sufficient to meet minimum nutritional needs may give rise to a constitutional deprivation."  *Dawson*, 527 F. Supp. at 1297-98.

123.     At SRJ, inmates are commonly given inadequate portions of food.  *See* Ex. 4 at ¶ 11;  Ex. 6 at ¶ 14.

124.     At SRJ, inmates are regularly given spoiled milk to drink.  *See* Ex. 3 at ¶ 39;  Ex. 4 at ¶ 12;  Ex. 5 at ¶ 8;  Ex. 6 at ¶ 15.

125.     At SRJ, inmates are commonly given what appears to be undercooked or rotten meat.  *See* Ex. 4 at ¶ 13.

126.     At SRJ, inmates are regularly served food on dirty, unsanitary trays.  *See* Ex. 4 at ¶ 14;  Ex. 5 at ¶ 7.

127.     In addition, food provided to certain groups of inmates at SRJ is regularly cut or "thinned."  *See* Ex. 5 at ¶ 5.

128.     Food provided to certain groups of inmates at SRJ is also regularly tampered with or contaminated with saliva, hair, urine, or semen.  *See* Ex. 5 at ¶ 6.

129.     At SRJ, food is supposed to be served to each individual inmate in his or her cell.  *See* Ex. 5 at ¶ 9.

130. However, instead, food trays at SRJ are regularly piled up on tables in the middle of inmate pods and inmates are left to "fend for themselves." As a result, inmates often have to fight for food and some inmates go hungry. *See* Ex. 5 at ¶ 9.

131. Inmates at SRJ also experience inadequate access to drinking water (*see supra*).

132. When an inmate is first incarcerated at SRJ, he or she is supposed to be given a "flex cup" for drinking and a "spork" for eating. *See* Ex. 5 at ¶ 4; Ex. 6 at ¶ 12.

133. However, new inmates at SRJ are regularly not provided flex cups or sporks. Those inmates are left to drink from old milk cartons or plastic bottles (if available) and to eat with their hands. *See* Ex. 5 at ¶ 4; Ex. 6 at ¶¶ 12-13.

### v. *Inadequate Bedding, Hygiene Items, Clothing, and Laundry Services*

134. "The failure to regularly provide prisoners with clean bedding, towels, clothes and sanitary mattresses, as well as toilet articles including soap, razors, combs, toothpaste, toilet paper, accesses to a mirror, and sanitary napkins for female prisoners, constitutes a denial of personal hygiene and sanitary living conditions." *Dawson*, 527 F. Supp. at 1288-89.

135. Pursuant to W. Va. CSR § 95-1-10.7, "[t]he jail facility shall provide each inmate, as part of the admission process, and thereafter as necessary, an adequate supply of soap, toothpaste, toilet paper, toothbrushes, combs, and feminine hygiene supplies."

136. Pursuant to W. Va. CSR § 95-1-10.10, "[e]ach inmate shall be provided with one clean, fire-retardant mattress, two (2) clean sheets, a clean pillow and clean pillow case."

137. Pursuant to W. Va. CSR § 95-1-10.12, "[l]aundry services shall be sufficient to permit the regular exchange of sheets and pillowcases at least weekly."

138. Pursuant to W. Va. CSR § 95-1-10.13, "[c]lean undergarments shall be provided daily and outer garments every other day, or as appropriate."

139.    When an inmate arrives at SRJ, he or she is supposed to be provided a mattress to sleep on.  However, many inmates at SRJ are not provided a mattress for sleeping.  *See* Ex. 3 at ¶ 11.

140.    Since virtually every cell at SRJ is overcrowded, inmates commonly sleep on the wet, concrete floor of their cell with no mattress.  *See* Ex. 3 at ¶ 12; *see also* Ex. 7.

141.    Inmates being given inadequate access to personal hygiene products (*e.g.*, toilet paper, soap, shampoo, tooth paste, etc.) is a widespread and ongoing problem at SRJ.  *See* Ex. 5 at ¶ 32.

142.    At SRJ, personal hygiene products are supposed to distributed frequently (if not daily).  However, this rarely happens.  *See* Ex. 3 at ¶ 47;  Ex. 4 at ¶ 32.

143.    Inmates regularly go weeks or even months without being provided basic personal hygiene items, including toilet paper.  *See* Ex. 5 at ¶ 33.

144.    Inmates are sometimes forced to use rags or socks as toilet paper because none was provided to them.  *See* Ex. 5 at ¶ 33.

145.    Female inmates at SRJ are also regularly not provided an adequate amount of feminine hygiene produces.  *See* Ex. 5 at ¶ 34.

146.    Correction officers at SRJ who are supposed to distribute personal hygiene products regularly falsify records to indicate that hygiene items were distributed to inmates, when in fact none were.  *See* Ex. 5 at ¶ 35.

147.    When hygiene products are distributed, correctional officers commonly pile them up in the middle of a pod and let the inmates "fend for themselves."  This results in inmates fighting over basic hygiene items and some inmates going without.  *See* Ex. 3 at ¶ 48;  Ex. 4 at ¶ 33;  Ex. 5 at ¶ 36.

- 19 -

148.    Personal hygiene products are withheld from inmates at SRJ even though there are sufficient amounts kept in storage at the facility.  *See* Ex. 5 at ¶ 37.

149.    At SRJ, inmates are supposed to be issued two (2) sets of clothing.  However, inmates are often only given one set.  *See* Ex. 5 at ¶ 38;  Ex. 6 at ¶ 16.

150.    CO Moore recalls inmates begging to be given more clothing.  *See* Ex. 6 at ¶ 17.

151.    With only one set of clothing, inmates cannot send clothes out to be laundered.  *See* Ex. 5 at ¶ 39.

152.    When an inmate arrives at SRJ, he or she is supposed to be given a laundry bag.  However, laundry bags are rarely provided to inmates, because the jail regularly runs out and does not order more.  *See* Ex. 3 at ¶ 8;  Ex. 4 at ¶ 33.

153.    Laundry (and laundry bags) are important for inmates.  Without a laundry bag, if an inmate sends his or her clothes out to be washed by the jail, the odds are he or she will not get the correct clothes back.  If an inmate sends his or her personal clothing (purchased with commissary funds) out to be washed without a laundry bag, the odds are he or she will have the personal clothing stolen by other inmates.  *See* Ex. 3 at ¶ 9;  Ex. 4 at ¶ 33.

154.    As a result, the vast majority of inmates at SRJ wash their clothes by hand in a sink, shower, mop bucket, or not at all.  *See* Ex. 3 at ¶ 10;  Ex. 4 at ¶ 33;  Ex. 5 at ¶ 39;  Ex. 6 at ¶ 18.

155.    Inmates that can utilize the laundry service at SRJ usually do not, because the clothes regularly come back wet and musty.  *See* Ex. 6 at ¶ 19.

vi.    ***Inadequate Exercise Time***

156.    "Undue restrictions on prisoners' opportunities for physical exercise may constitute cruel and unusual punishment" in violation of the Eighth and Fourteenth Amendments.  *Dawson*, 527 F. Supp. at 1298-1301.  "[T]he failure to provide any opportunity for exercise constitutes a

serious and unnecessary threat to the physical [and mental] well-being of [stet] prisoners." *Id*. at 1300.

157.    Inmates at SRJ are regularly denied recreation time, sometimes going months without it. *See* Ex. 4 at ¶¶ 49-50;  Ex. 5 at ¶ 57;  Ex. 6 at ¶ 37.

158.    A common trick used by correctional officers at SRJ is to "offer" recreation time during the early hours of the morning, when most inmates are sleeping, and then log that recreation time was offered, but "declined."  *See* Ex. 5 at ¶ 58; Ex. 6 at ¶ 38.

**vii.    *Inadequate Lighting***

159.    "Inadequate lighting has been recognized in a variety of contexts as constituting cruel and unusual punishment violative of the Eighth Amendment, when, in the absence of a valid governmental interest, it unnecessarily threatens the physical and mental well-being of prisoners." *Dawson*, 527 F. Supp. at 1288.

160.    "The failure to provide security quality lighting fixtures of sufficient illumination to permit detainees and convicted inmates to read without injury to their vision constitutes a danger to the health and security of pre-trial detainees and prisoners alike." *Id*.

161.    "When considered in conjunction with the lack of significant exposure to natural sunlight, and the generally dark and idle environment at [a] jail…inadequate lighting constitutes a danger to the eyesight of the prisoners and contributes to the dark and lifeless atmosphere found in [a] jail." *Id*.

162.    There are widespread and ongoing problems with broken lights in and around inmate cells at SRJ, creating a dark environment where it is difficult to see. *See* Ex. 6 at ¶ 36;  Ex. 7;  Ex. 8;  *see also*, *infra.*, Ex 9.

- 21 -

163.    There are also numerous inmate cells at SRJ with lights that constantly flicker or never turn off. *See* Ex. 6 at ¶ 36;  *see*, *infra.*, Ex 9.

**viii.    *Improper Disciplinary Measures (Punishment)***

164.    At SRJ, inmates are commonly placed in overcrowded suicide cells as a form of punishment, even though the inmates are not suicidal. *See* Ex. 3 at ¶ 42;  Ex. 5 at ¶ 51;  Ex. 6 at ¶ 41.

165.    Not only are these suicide cells often dangerously overcrowded (*see supra*), the water in suicide cells often does not work and showers are withheld. *See* Ex. 3 at ¶ 45;  Ex. 5 at ¶ 53.

166.    Inmates at SRJ are also placed in segregation cells – with twenty-three (23) hour per day lockdowns – without justification. *See* Ex. 6 at ¶ 42.

167.    Inmates in segregation cells often go days without running water or being let out for a shower. *See* Ex. 6 at ¶ 43.

168.    One particular inmate – Benjamin Allen – was kept in a segregation cell at SRJ for fourteen (14) months by order of Superintendent Francis for purely punitive reasons. *See* Ex. 6 at ¶ 44.

169.    At SRJ, correctional officers regularly beat inmate with no justification as a form of punishment for filing or attempting to file a grievance, for talking back, for refusing orders, or for simply voicing complaints. *See* Ex. 5 at ¶ 46;  Ex. 6 at ¶ 45.

170.    At SRJ, correctional officers regularly take inmates into cells or showers (where there are no cameras) and beat them as punishment. *See* Ex. 5 at ¶ 47;  Ex. 6 at ¶ 46.

171.    Once an inmate is beaten, he or she is taken to medical, where correctional officers typically tell nursing staff that the inmate "slipped in the shower," "fell down the stairs," or some other obvious lie.  *See* Ex. 5 at ¶ 47.

172.    PrimeCare staff at SRJ are aware that inmates are being beaten by correctional officers without just cause, but do nothing about it.  *See* Ex. 5 at ¶ 47.

173.    Some correctional officers at SRJ even take inmates into medical examination rooms (where there are also no cameras) and beat inmates as punishment.  *See* Ex. 5 at ¶ 48;  Ex. 6 at ¶ 47.

174.    PrimeCare staff at SRJ are aware of this practice as well.  *See* Ex. 5 at ¶ 48.

175.    As a result of these beatings, inmates commonly suffer broken bones, lacerations, bruises, and concussions, but are almost never sent to a hospital for evaluation and treatment.  *See* Ex. 5 at ¶ 49.

176.    Upon information and belief, inmate medical and other related records are falsified to cover-up the violence correctional officers regularly inflict on inmates at SRJ.

177.    Correctional officers at SRJ also falsify "use of force" reports to cover up inmate beatings.  *See* Ex. 5 at ¶ 50;  Ex. 6 at ¶ 48.

178.    Correctional officers who beat inmates regularly falsify use of force reports to make it appear that the force used against an inmate was justified (*e.g.*, claiming the inmate resisted, was belligerent or aggressive, attacked an officer, etc.), even when there was no justification for the beating.  *See* Ex. 5 at ¶ 50;  Ex. 6 at ¶ 48.

### ix.   _Lack of Prisoner Safety_

179.     "Prisoners have the right, secured by the Eighth and Fourteenth Amendments, to be reasonably protected from the threat of violence and sexual assault."  _Dawson_, 527 F. Supp. at 1289.

180.     Inmates at SRJ forced to live and sleep unprotected on the dayroom floor are subjected to both inmate violence and sexual assault (_see supra_).

181.     There is also a widespread and ongoing problem with broken cell doors at SRJ, which is a major safety concern.  _See_ Ex. 3 at ¶ 40;  Ex. 4 at ¶¶ 36-37;  _see also_, _infra._, Ex. 9.

182.     According to CO Carter, at one point, as many as seventy-five percent (75%) of the cell doors at SRJ were broken or did not lock.  _See_ Ex. 3 at ¶ 40.

183.     As a result, instead of being locked down (at night for instance), inmates are free to move around their pod and from cell to cell.

184.     Inmates at SRJ are commonly stabbed or beaten by other inmates because they are not protected by a locked cell door.  _See_ Ex. 3 at ¶ 41;  Ex. 4 at ¶ 38.

185.     Every inmate pod at SRJ has a "tower" where a correctional officer is stationed. Intercoms or "call boxes" from inmate cells are routed to the tower.  This allows inmates to communicate with the correctional officer in the tower and vice versa.  _See_ Ex. 3 at ¶ 4;  Ex. 4 at ¶ 42;  Ex. 5 at ¶ 40.

186.     In many of the inmate cells at SRJ, the intercom or "call box" does not work.  This poses a serious risk for inmates, who are unable to report an emergency (_e.g._, fight, injury, medical problem, etc.).  If an emergency occurs, inmates are only able to kick their cell door or yell for help if they need assistance.  _See_ Ex. 3 at ¶ 5;  Ex. 4 at ¶ 43.

187.    The buttons and intercoms on the communication board/panel in each tower at SRJ are so old and degraded, they either do not work or barely function.  This poses a serious risk for inmates, who are unable to report an emergency (*e.g.*, fight, injury, medical problem, etc.).  *See* Ex. 3 at ¶ 6;  Ex. 4 at ¶ 44;  *see also* Ex. 8.

188.    In inmate cells where the "call box" does work, correctional officers regularly ignore calls from inmates and often mute the intercoms in order to sleep during night shifts.  *See* Ex. 5 at ¶ 41.

189.    At SRJ, correctional officers regularly tell inmates what another inmate is charged with, which is a safety violation.  *See* Ex. 5 at ¶ 54.

190.    Correctional officers at SRJ commonly disclose an inmate's charges to other inmates, knowing that the inmate will likely get attacked by other inmates as a result.  *See* Ex. 5 at ¶ 56.

191.    There are multiple broken windows at any given time at SRJ.  Broken windows allow inmates to make weapons out of pieces of glass and to smuggle items in and out of the jail (often with the help of corrupt correctional officers).  *See* Ex. 7.

    **x.    *Neglectful Medical Care***

192.    "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  In the worst cases, such a failure may actually produce physical 'torture or a lingering death.'…[i]n less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.  The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency… *Dawson*, 527 F. Supp. at 1306 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103-05, 97 S. Ct. 285, 290-91 (1976)).

193.   "[T]he deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  *Id.*

194.   Inmate requests for medical attention or "sick calls" are regularly ignored by correctional officers and PrimeCare staff at SRJ.  *See* Ex. 5 at ¶ 54;  Ex. 6 at ¶ 49.

195.   Inmates with emergent medical needs are commonly ignored by correctional officers and PrimeCare staff at SRJ.

196.   Inmates with serious medical conditions are rarely sent to an outside hospital for treatment.

197.   CO Moore recalls one inmate at SRJ who repeatedly requested medical attention, was ignored, and later died of his illness.  *See* Ex. 6 at ¶ 50.

**xi.**   *Inability to File Grievances*

198.   At SRJ, if an inmate wants to file a grievance, a correctional officer is supposed to provide a form to the inmate to complete and return to the correctional officer.  Once received, the correctional officer is supposed to provide the completed form to a supervisor for filing.  *See* Ex. 3 at ¶ 49;  Ex. 4 at ¶ 46;  Ex. 5 at ¶ 43.

199.   However, inmates at SRJ are regularly denied the ability to file grievances.  *See* Ex. 4 at ¶ 45;  Ex. 5 at ¶ 42.

200.   Paper grievance forms at SRJ are commonly refused to inmates who request them. *See* Ex. 3 at ¶ 50;  Ex. 4 at ¶ 48;  Ex. 5 at ¶ 44.

201.   If a grievance form is provided to an inmate, the completed form is commonly torn up in front of the inmate, thrown in the trash, or not passed on to a supervisor for filing.  *See* Ex. 5 at ¶ 45.

202.    Inmates at SRJ are also commonly beaten by correctional officers for filing a grievance or simply requesting a grievance form (*see supra*).

203.    Superintendent Francis has ordered correctional officers at SRJ to not provide inmates with paper grievance forms.  Instead,  Superintendent Francis has ordered that grievances are to be handled by only one correctional officer, hand-picked by him.  *See* Ex. 3 at ¶ 51;  Ex. 4 at ¶ 47.

204.    Instead of asking any correctional officer for a grievance form, inmates at SRJ are required to "write" this single correctional officer to request one.  *See* Ex. 4 at ¶ 47.

205.    Inmates as SRJ also have the ability to file a grievance using an electronic kiosk.  However, most of the kiosks at SRJ are usually broken (or intentionally turned off by jail staff).  *See* Ex. 3 at ¶ 52;  Ex. 4 at ¶ 42;  Ex. 5 at ¶ 40.

206.    Due to the policies, procedures, and practices regarding grievances at SRJ described hereinabove,  and the  confusion  regarding  the  grievance  procedure  outlined  in  the  Inmate Handbook, grievances were and continue to be "unavailable" to inmates at SRJ.  *See Baxley v. Jividen*, 508 F. Supp. 3d. 28, 41-42 (S.D. W.Va. 2020).

**xii.    *Jail Administration's Knowledge***

207.    Jail administrators and supervising correctional officers – in particular Superintendent Francis and Major Warden – are fully aware of the aforementioned problems at SRJ and have been aware of the issues set forth herein for many years.  *See* Ex. 3 at ¶¶ 7, 46, 54; Ex. 4 at ¶ 53;  Ex. 5 at ¶ 59;  Ex. 6 at ¶ 51.

208.    In fact, Superintendent Francis (with his closest associates) personally does a weekly visual inspection of every inmate pod at SRJ.  *See* Ex. 3 at ¶ 56;  Ex. 4 at ¶ 55;  Ex. 5 at ¶ 59;  Ex. 6 at ¶ 52.

209.    Further, attached hereto as <u>Exhibit 9</u>, is a November 11, 2021 internal SRJ e-mail sent to Superintendent Francis and Major Warden with a cell-by-cell accounting of the ongoing problems at SRJ.

### B.  Class A – Current Inmates

210.    Class A includes all currently incarcerated individuals who, from January 1, 2018 to the present, are or were inmates housed at SRJ.

211.    Class A is so numerous that joinder of all members is impracticable.

212.    Members of Class A are fluid, as new individual members are incarcerated at SRJ daily, and many members are subsequently transferred to another jail or prison facility.

213.    There are questions of law or fact common to the class.

214.    Class A common questions of fact include whether inmates at SRJ are or have been exposed to the horrific conditions described hereinabove and whether the deplorable conditions of the facility violate the minimal standards of decency required to pass Constitutional muster.

215.    Common questions of law applicable to Class A include whether Defendants acted with deliberate indifference to the health and safety of inmates by knowingly exposing them to the conditions of confinement described hereinabove.

216.    The claims of the named Plaintiff are typical of the claims of the class as a whole.

217.    Plaintiff has been subjected to and suffered injury as the result of the same policies and/or lack of policies, same practices and/or lack of practices, and deprivations as the absent class members.

218.    The named Plaintiff will fairly and adequately represent and advance the interests of the class.

219.    By filing this action, the named Plaintiff has displayed a strong interest in vindicating the rights of all who have been similarly harmed by Defendants' actions.  By seeking to remedy the violations of their Constitutional rights, the named Plaintiff will also be advancing and proving the claims and rights of absent class members.

220.    There are no antagonistic interests between Plaintiff and the absent members of the class, and the relief sought by the named Plaintiff will benefit the class generally.

221.    The named Plaintiff is represented by New, Taylor & Associates, the Lupardus Law Office, the Whitten Law Office, and Robert Dunlap & Associates, law firms with substantial experience in class litigation, representing inmates in civil actions, and in representing low-income West Virginians in civil actions.

222.    Counsel for the putative class are knowledgeable about the conditions of confinement in SRJ, the constitutional rights of pre-trial detainees and convicted prisoners, and are skilled in conducting civil rights litigation in federal courts, including the prosecution and management of class action litigation.

223.    Commissioner Jividen, Superintendent Francis, Major Warden, John/Jane Doe County Employees, John/Jane Doe Prime Care Employees, and John/Jane Doe Correctional Officers have acted or refused to act on grounds generally applicable to the class, thereby making final relief with respect to the class as a whole an appropriate remedy.

### *Michael D. Rose – Class A Representative*

224.    Plaintiff Rose was incarcerated at SRJ on or about February 26, 2022.

225.    Plaintiff Rose was first a pre-trial detainee, but later pled guilty to a felony fleeing charge.

226.    Since arriving at SRJ, Plaintiff Rose has been housed in overcrowded cells, with as many as three (3) additional inmates in a two-person cell.

227.    Plaintiff Rose has never been housed in a cell at SRJ with less than two other inmates.

228.    Plaintiff Rose has gone as long as two (2) months without running water in a cell at SRJ.

229.    Plaintiff Rose has been housed in cells at SRJ that only have hot water.

230.    Water from a leaking sink, toilet, or from a wall shared with an adjacent shower has regularly resulted in standing water on the floor of his cells at SRJ.

231.    Plaintiff Rose has been housed in cells at SRJ with broken or otherwise non-functioning toilets.

232.    These non-functioning toilets regularly become infested with bugs.

233.    Plaintiff Rose has been housed in overcrowded pods at SRJ with only one (1) working shower.

234.    Plaintiff Rose has been housed in pods at SRJ with showers that only have cold water.

235.    Plaintiff Rose has been exposed to black mold at SRJ in inmate cells, inmate showers, and through the facility's air vents.

236.    Plaintiff Rose has been housed in pods at SRJ with no air conditioning.

237.    Plaintiff Rose has been housed in pods and inmate cells at SRJ infested with rats, rat feces, and ants.

238.    Plaintiff Rose has been given inadequate portions of food at SRJ.

239.    Plaintiff Rose has been given rotten or undercooked meat at SRJ.

240.    Plaintiff Rose has been given spoiled milk at SRJ.

241.    Plaintiff Rose has been forced to eat from dirty/unsanitary trays at SRJ.

242.    Plaintiff Rose has seen inmates fight over food trays at SRJ.

243.    Plaintiff Rose was not given a flex-cup or spork when he arrived at SRJ.

244.    As a result, Plaintiff Rose has had to drink from an old milk carton and eat with his hands.

245.    Plaintiff Rose was only provided one (1) set of clothing when he arrived at SRJ.

246.    Plaintiff Rose was provided no pillow when he arrived at SRJ.

247.    Plaintiff Rose has rarely been provided basic hygiene items at SRJ.

248.    Plaintiff Rose has gone as long as two (2) weeks without being provided basic hygiene items at SRJ, including toilet paper.

249.    Plaintiff Rose has seen inmates fight over hygiene items at SRJ.

250.    Plaintiff Rose has rarely been given recreation time at SRJ.

251.    Plaintiff Rose gone as long as two (2) weeks without recreation time at SRJ.

252.    Plaintiff Rose has been housed in inmate cells at SRJ that have broken lights, making it dark and difficult to see.

253.    Plaintiff Rose has been housed in inmate cells at SRJ with constantly flickering lights.

254.    Plaintiff Rose has witnesses numerous unjustified inmate beatings at the hands of correctional officers at SRJ.

255.    Plaintiff Rose has been housed in inmate cells at SRJ with doors that are broken or otherwise do not lock.

256. As a result of one such broken cell door, Plaintiff Rose was stabbed in his sleep thirteen (13) times by another inmate during lockdown.

257. Plaintiff Rose has been housed in inmate cells at SRJ with a broken "call box" or a call box that was never answered by correctional officers.

258. Plaintiff Rose has had requests for medical attention or "sick calls" ignored by correctional officers and PrimeCare staff at SRJ.

259. Plaintiff Rose has been denied several of his prescription medications at SRJ.

260. Plaintiff Rose has requested grievance forms from correctional officers at SRJ, but has been refused.

261. The few grievances Plaintiff Rose has been able to submit at SRJ (assuming they were actually filed), have all been ignored.

### C. Class B – Former Inmates

262. Class B includes all former inmates who, from September 21, 2020 to the present, were incarcerated at SRJ.

263. Class B is so numerous that joinder of all members is impracticable.

264. Members of Class B are fluid, as new individual members are released from SRJ or other penal facilities daily.

265. There are questions of law or fact common to the class.

266. Class B common questions of fact include whether former inmates of SRJ were exposed to the horrific conditions described hereinabove and whether the deplorable conditions of the facility violated the minimal standards of decency required to pass Constitutional muster.

267.     Common questions of law applicable to Class B include whether Defendants acted with deliberate indifference to the health and safety of inmates by knowingly exposing them to the conditions of confinement described hereinabove.

268.     The claims of the named Plaintiff are typical of the claims of the class as a whole.

269.     Plaintiff has been subjected to and suffered injury as the result of the same policies and/or lack of policies, same practices and/or lack of practices, and deprivations as the absent class.

270.     The named Plaintiff will fairly and adequately represent and advance the interests of the class.

271.     By filing this action, the named Plaintiff has displayed a strong interest in vindicating the rights of all who have been similarly harmed by Defendants' actions.  By seeking to remedy the violations of their Constitutional rights, the named Plaintiff will also be advancing and proving the claims and rights of absent class members.

272.     There are no antagonistic interests between Plaintiff and the absent members of the class, and the relief sought by the named Plaintiff will benefit the class generally.

273.     The named Plaintiff is represented by New, Taylor & Associates, the Lupardus Law Office, the Whitten Law Office, and Robert Dunlap & Associates, law firms with substantial experience in class litigation, representing inmates in civil actions, and in representing low-income West Virginians in civil actions.

274.     Counsel for the putative class are knowledgeable about the conditions of confinement in SRJ, the constitutional rights of pre-trial detainees and convicted prisoners, and are skilled in conducting civil rights litigation in federal courts, including the prosecution and management of class action litigation.

275.     Commissioner Jividen, Superintendent Francis, Major Warden, John/Jane Doe County Employees, John/Jane Doe Prime Care Employees, and John/Jane Doe Correctional Officers have acted or refused to act on grounds generally applicable to the class, thereby making final relief with respect to the class as a whole an appropriate remedy.

### *Edward L. Harmon – Class B Representative*

276.     Plaintiff Harmon was incarcerated as a pre-trial detainee at SRJ on or about July 16, 2021.

277.     Plaintiff Harmon was never convicted.  The charges against him were dismissed and he was released from SRJ on or about June 2, 2022.

278.     While Plaintiff Harmon was incarcerated at SRJ, he was housed in a two-person cell with between three (3) and five (5) other inmates at a time.

279.     As a result, Plaintiff Harmon regularly slept on the floor during his time at SRJ, often without a mattress.

280.     When Plaintiff Harmon was incarcerated at SRJ, numerous inmates lived on the dayroom floor of his pods.

281.     When Plaintiff Harmon first arrived at SRJ, he was placed in a suicide cell for eight (8) days for no apparent reason.

282.      He was housed in the suicide cell with between eight (8) and twelve (12) other inmates.

283.     While Plaintiff Harmon was in the suicide cell, he was denied access to a shower for eight (8) days.

284.     While in the suicide cell, Plaintiff Harmon was pepper sprayed and beaten by a correctional officer without justification (he was allegedly "standing too close to the door").

285.     Afterwards, Plaintiff Harmon received inadequate medical care for his injuries.

286.     When Plaintiff Harmon was released from the suicide cell, he was given one (1) set of clothing, no mattress, no bedding, no pillow, and no hygiene products.

287.     Plaintiff Harmon was also not given a flex-cup or spork.

288.     During his time at SRJ, one of the pods where Plaintiff Harmon was housed had only one (1) cell with a working sink and toilet.  This cell was kept open at all times so inmates could use the sink and toilet.  The sinks and toilets in all of the other cells where inmates slept were broken.

289.     At SRJ, broken toilets regularly became infested with maggots and other bugs.

290.     While Plaintiff Harmon was incarcerated at SRJ, water leaking from sinks, toilets, and showers was a constant problem.

291.      At SRJ, Plaintiff Harmon was forced to sleep in water on the floor of his cell.

292.     During his time at SRJ, none of the "call boxes" in Plaintiff Harmon's cells worked (or attempted calls were ignored by correctional officers).

293.     While Plaintiff Harmon was incarcerated at SRJ, black mold was everywhere – in his cell, in the showers, and on his clothes.

294.     Cleaning supplies (*e.g.*, bleach, mops, buckets, etc.) were rarely given to inmates to clean their living areas.  When cleaning supplies were provided, they were inadequate.

295.     During his time at SRJ, the pods where Plaintiff Harmon was housed often had only one (1) working shower.

296.     The hot water in the shower was usually broken, sometimes for months at a time.

297.     While Plaintiff Harmon was incarcerated at SRJ, the air conditioning and heat would regularly go out, often for months at a time.

- 35 -

298.    Laundry service at SRJ was rarely offered, so Plaintiff Harmon typically washed his clothes by hand in the shower.

299.    During his time at SRJ, the facility was infested with ants, silverfish, and mice.

300.    Mice (and mice feces) were often seen around used/dirty food trays left in the pod by correctional officers.

301.    While Plaintiff Harmon was incarcerated at SRJ, he was regularly given inadequate amounts of food.

302.    Plaintiff Harmon was often given moldy bread, spoiled milk, and rotten or under cooked meat.

303.    Plaintiff Harm witnessed food trays stacked in the middle of pods by correctional officers, which resulted in inmates fighting over food and some inmates going hungry.

304.    Plaintiff Harmon was regularly forced to eat off of dirty or unsanitary trays.

305.    When Plaintiff Harmon was at SRJ, he was denied access to drinking water.

306.    The water fountains in pods where Plaintiff Harmon was housed were often broken.

307.    If the drinking fountain did work, the water was discolored and had a foul smell/taste.

308.    While Plaintiff Harmon was incarcerated at SRJ, basic hygiene products (including toilet paper) were rarely distributed by correctional officers.

309.    When hygiene items were distributed, correctional officers would throw garbage bags full of hygiene products into the middle of his pod and let the inmates fend for themselves, which resulted in inmates fighting over items and some inmates going without.

310.    Plaintiff Harmon went days without toilet paper in SRJ.

311.    Plaintiff Harmon was sometimes forced to use cut-up socks or clothing to use as toilet paper because none was available to him.

312.    Recreation was almost never offered while Plaintiff Harmon was at SRJ. Correctional officers regularly told inmates who requested recreation time that the "yard was broken."

313.    During his time at SRJ, Plaintiff Harmon lived in an overcrowded cell with no working lights.

314.    Plaintiff Harmon was housed in pods at SRJ that had few (or even no) inmate cell doors that would lock.

315.    When Plaintiff Harmon was incarcerated at SRJ, he was attacked by five (5) other inmates through an unlocked cell door.  As a result, he sustained serious physical injuries, including a broken nose and broken ribs.

316.    Even though he made numerous "sick calls," Plaintiff Harmon was never treated for his injuries.

317.    While at SRJ, Plaintiff Harmon requested psychological care, but was refused for months.

318.    At SRJ, Plaintiff Harmon became very sick with a skin rash/blisters.  He filed numerous "sick calls," but was told by correctional officers and/or PrimeCare staff that "there is nothing wrong with you, you'll be alright."

319.    Plaintiff Harmon now has scars from his untreated rash/blisters.

320.    During his time at SRJ, Plaintiff Harmon was denied the ability to file grievances.

321.    When Plaintiff Harmon requested a grievance form from a correctional officer, he was refused or told the "grievance officer" was not in that day.

322.    At SRJ, kiosks were rarely available to file a grievance.  If Plaintiff Harmon was able to file an electronic grievance, he never received a reply.

## IV.    CAUSES OF ACTION

### COUNT I – EIGHTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983
***Commissioner Jividen, Superintendent Francis, Major Warden, John/Jane Doe Correctional Officers, and the John/Jane Doe PrimeCare Employees***

323.    Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 322 as though fully set forth herein.

324.    Defendants, while acting under color of law and within the scope of their employment, violated the Eighth Amendment right of convicted inmates to be free from cruel and unusual punishment.

325.    The actions of Defendants, described hereinabove, violated the constitutional rights guaranteed to Plaintiffs, and all similarly situated inmates and former inmates, under the Eighth Amendment to the United States Constitution by depriving them of basic human necessities.

326.    Defendants imposed and/or permitted these conditions despite said conditions not being reasonably related to any legitimate non-punitive governmental or penological objective.

327.    Defendants were deliberately indifferent to the health, safety, and other basic needs of Plaintiffs (and all similarly situated inmates and former inmates), as described hereinabove, by having actual knowledge of such conditions and deliberately taking no action to remedy them in a timely or appropriate manner.

328.    PrimeCare, through the John/Jane Doe PrimeCare Employees, deprived Plaintiffs of their Eighth Amendment rights by and through its official policies or customs, *inter alia*, PrimeCare policies and procedures, PrimeCare Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

329.    The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

330.    During the time period at issue, it was clearly established that the serious deprivations of basic human needs at SRJ, as described hereinabove, violated the Eighth Amendment to the United States Constitution.

331.    The actions of Defendants, described hereinabove, deliberately injured Plaintiffs in a way unjustified by any governmental interest.

332.    The actions of Defendants, described hereinabove, shock the conscious.

333.    The actions of Defendants, described hereinabove, were unlawful and unjustified.

334.    As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, Plaintiffs (and all similarly situated inmates and former inmates) suffered a deprivation of their Constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; and the development of associated medical conditions.

335.    In addition to these compensatory damages, Plaintiffs will also seek to recover, under 42 U.S.C. § 1983, attorneys' fees and cost incurred during the course of this litigation.

336.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

## COUNT II – CONSPIRACY TO COMMIT EIGHTH AMENDMENT VIOLATIONS
### UNDER 42 U.S.C. § 1983
*Commissioner Jividen, Superintendent Francis, Major Warden, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, and the John/Jane Doe County Employees*

337.    Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 336 as though fully set forth herein.

338.    Defendants, while acting under color of law and within the scope of their employment, acted jointly and in concert to deprive Plaintiffs of their Eighth Amendment right to be free from cruel and unusual punishment.

339.    Defendants committed overt acts to accomplish the constitutional deprivations and injuries described herein.

340.    The actions of Defendants, described hereinabove, violated the constitutional rights guaranteed to Plaintiffs, and all similarly situated inmates and former inmates, under the Eighth Amendment to the United States Constitution by depriving them of basic human necessities.

341.    Defendants imposed and/or permitted these conditions despite said conditions not being reasonably related to any legitimate, non-punitive, governmental or penological objective.

342.    Defendants were deliberately indifferent to the health, safety, and other basic needs of Plaintiffs (and all similarly situated inmates and former inmates), as described hereinabove, by having actual knowledge of such conditions and deliberately taking no action to remedy them in a timely or appropriate manner.

343.    PrimeCare, through the John/Jane Doe PrimeCare Employees, deprived Plaintiffs of their Eighth Amendment rights by and through its official policies or customs, *inter alia*, PrimeCare policies and procedures, PrimeCare Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

344.     Pursuant to W.Va. Code 29-12A-18(e), by alleging violations of the United States Constitution, the West Virginia Governmental Tort Claims and Insurance Reform Act is inapplicable to the County Defendants and/or the John/Jane Doe County Employees.

345.     The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

346.     During the time period at issue, it was clearly established that the serious deprivations of basic human needs at SRJ, as described hereinabove, violated the Eighth Amendment to the United States Constitution.

347.     The actions of Defendants, described hereinabove, deliberately injured Plaintiffs in a way unjustified by any governmental interest.

348.     The actions of Defendants, described hereinabove, shock the conscious.

349.     The actions of Defendants, described hereinabove, were unlawful and unjustified.

350.     As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, Plaintiffs (and all similarly situated inmates and former inmates) suffered a deprivation of their Constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; and the development of associated medical conditions.

351.     In addition to these compensatory damages, Plaintiffs will also seek to recover, under 42 U.S.C. § 1983, attorneys' fees and cost incurred during the course of this litigation.

352.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

### COUNT III – FOURTEENTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983
*Commissioner Jividen, Superintendent Francis, Major Warden, John/Jane Doe Correctional Officers, and the John/Jane Doe PrimeCare Employees*

353.    Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 352 as though fully set forth herein.

354.    Defendants, while acting under color of law and within the scope of their employment, violated the Fourteenth Amendment right of pretrial detainees to be free of punishment without due process.

355.    The actions of Defendants, described hereinabove, violated the constitutional rights guaranteed to Plaintiffs, and all similarly situated inmates and former inmates, under the Fourteenth Amendment to the United States Constitution by depriving them of basic human necessities, constituting punishment without due process.

356.    Defendants imposed and/or permitted these conditions despite said conditions not being reasonably related to any legitimate non-punitive governmental or penological objective.

357.    Defendants were deliberately indifferent to the health, safety, and other basic needs of Plaintiffs (and all similarly situated inmates and former inmates), as described hereinabove, by having actual knowledge of such conditions and deliberately taking no action to remedy them in a timely or appropriate manner.

358.    PrimeCare, through the John/Jane Doe PrimeCare Employees, deprived Plaintiffs of their Fourteenth Amendment rights by and through its official policies or customs, *inter alia*,

PrimeCare Acceptance of Terms & Conditions and the National Commission on Correctional Healthcare's Jail and Prison Standards.

359.    The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

360.    During the time period at issue, it was clearly established that the serious deprivations of basic human needs at SRJ, as described hereinabove, violated the Fourteenth Amendment to the United States Constitution.

361.    The actions of Defendants, described hereinabove, deliberately injured Plaintiffs in a way unjustified by any governmental interest.

362.    The actions of Defendants, described hereinabove, shock the conscious.

363.    The actions of Defendants, described hereinabove, were unlawful and unjustified.

364.    As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, Plaintiffs (and all similarly situated inmates and former inmates) suffered a deprivation of their Constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; and the development of associated medical conditions.

365.    In addition to these compensatory damages, Plaintiffs will also seek to recover, under 42 U.S.C. § 1983, attorneys' fees and cost incurred during the course of this litigation.

366.     The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

## COUNT IV – CONSPIRACY TO COMMITT FOURTEENTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983

*Commissioner Jividen, Superintendent Francis, Major Warden, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, and the John/Jane Doe County Employees*

367.     Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 366 as though fully set forth herein.

368.     Defendants, while acting under color of law and within the scope of their employment, acted jointly and in concert to deprive Plaintiffs of their Fourteenth Amendment right to be free of punishment without due process.

369.     Defendants committed overt acts to accomplish the Constitutional deprivations and injuries described herein.

370.     The actions of Defendants, described hereinabove, violated the Constitutional rights guaranteed to Plaintiffs, and all similarly situated inmates and former inmates, under the Fourteenth Amendment to the United States Constitution by depriving them of basic human necessities, constituting punishment without due process.

371.     Defendants imposed and/or permitted these conditions despite said conditions not being reasonably related to any legitimate non-punitive governmental or penological objective.

372.     Defendants were deliberately indifferent to the health, safety, and other basic needs of Plaintiffs (and all similarly situated inmates and former inmates), as described hereinabove, by having actual knowledge of such conditions and deliberately taking no action to remedy them in a timely or appropriate manner.

- 44 -

373.    PrimeCare, through the John/Jane Doe PrimeCare Employees, deprived Plaintiffs of their Fourteenth Amendment rights by and through its official policies or customs, *inter alia*, PrimeCare Acceptance of Terms & Conditions and the National Commission on Correctional Healthcare's Jail and Prison Standards.

374.    Pursuant to W.Va. Code 29-12A-18(e), by alleging violations of the United States Constitution, the West Virginia Governmental Tort Claims and Insurance Reform Act is inapplicable to the County Defendants and/or the John/Jane Doe County Employees.

375.    The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

376.    During the time period at issue, it was clearly established that the serious deprivations of basic human needs at SRJ, as described hereinabove, violated the Fourteenth Amendment to the United States Constitution.

377.    The actions of Defendants, described hereinabove, deliberately injured Plaintiffs in a way unjustified by any governmental interest.

378.    The actions of Defendants, described hereinabove, shock the conscious.

379.    The actions of Defendants, described hereinabove, were unlawful and unjustified.

380.    As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, Plaintiffs (and all similarly situated inmates and former inmates) suffered a deprivation of their constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the

physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; and the development of associated medical conditions.

381.    In addition to these compensatory damages, Plaintiffs will also seek to recover, under 42 U.S.C. § 1983, attorneys' fees and cost incurred during the course of this litigation.

382.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

## COUNT V – FAILURE TO INTERVENE/BYSTANDER LIABILITY UNDER 42 U.S.C. §1983
### *Superintendent Francis, Major Warden, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, and the John/Jane Doe County Employees*

383.    Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1 through 382 as though fully set forth herein.

384.    Defendants, while acting under color of law and within the scope of their employment, violated Plaintiffs' constitutional rights  by failing to intervene while the above-referenced constitutional violations occurred.

385.    Defendants were aware that Plaintiffs' Constitutional rights were being violated, as set forth hereinabove, yet purposefully failed and/or refused to take reasonable steps to protect Plaintiffs.

386.    Defendants had opportunities to intervene and protect Plaintiffs (and all similarly situated inmates and former inmates), but chose not to.

387.    The actions of Defendants, described hereinabove, violated the Constitutional rights guaranteed to Plaintiffs under the Eighth and Fourteenth Amendments to the United States Constitution.

- 46 -

388.    Pursuant to W.Va. Code 29-12A-18(e), by alleging violations of the United States Constitution, the West Virginia Governmental Tort Claims and Insurance Reform Act is inapplicable to the County Defendants and/or the John/Jane Doe County Employees.

389.    The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

390.    The actions of Defendants, described hereinabove, were unlawful and unjustified.

391.    As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, Plaintiffs (and all similarly situated inmates and former inmates) suffered a deprivation of their constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; and the development of associated medical conditions.

392.    In addition to these compensatory damages, Plaintiffs will also seek to recover, under 42 U.S.C. § 1983, attorneys' fees and cost incurred during the course of this litigation.

393.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

### COUNT VI – NEGLIGENCE
*Commissioner Jividen, Superintendent Francis, Major Warden, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, and the John/Jane Doe County Employees*

394.    Plaintiff hereby incorporates by reference the allegations made in paragraphs 1 through 393 as though fully set forth herein.

395.    At all times relevant hereto, Defendants owed Plaintiffs (and all similarly situated inmates and former inmates) a duty of care.

396.    As set forth hereinabove, Defendants, while acting within the scope of their employment, breached their duties of care to Plaintiffs.

397.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs (and all similarly situated inmates and former inmates) suffered physical harm and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; and the development of associated medical conditions.

398.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

399.    PrimeCare is vicariously liable for the negligent acts and omissions of its employees committed within the scope of their employment.

400.    The County Defendants are vicariously liable for the negligent acts and omissions of their employees committed within the scope of their employment.

## COUNT VII – GROSS NEGLIGENCE
### *Commissioner Jividen, Superintendent Francis, Major Warden, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, and the John/Jane Doe County Employees*

401.    Plaintiffs hereby incorporate by reference the allegations made in paragraphs 1 through 400 as though fully set forth herein.

402.    At all times relevant hereto, Defendants owed Plaintiffs (and all similarly situated inmates and former inmates) a duty of care.

403.    As set forth hereinabove, Defendants, while acting within the scope of their employment, breached their duties of care to Plaintiffs.

404.    In breaching their duties of care, Defendants displayed a conscious indifference to probable dangerous consequences of their actions.

405.    In breaching their duties of care, Defendants displayed a reckless disregard for the safety of Plaintiffs.

406.    As a direct and proximate result of Defendants' grossly negligent conduct, Plaintiffs (and all similarly situated inmates and former inmates) suffered physical harm and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; and the development of associated medical conditions.

407.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

408.    PrimeCare is vicariously liable for the negligent acts and omissions of its employees committed within the scope of their employment.

409.    The County Defendants are vicariously liable for the negligent acts and omissions of their employees committed withing the scope of their employment.

## COUNT VIII – *PRIMA FACIE* NEGLIGENCE
### *Commissioner Jividen, Superintendent Francis, Major Warden, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, and the John/Jane Doe County Employees*

410.    Plaintiffs hereby incorporate by reference the allegations made in paragraphs 1 through 409 as though fully set forth herein.

411.    As set forth hereinabove, Defendants violated W. Va. CSR § 95-1-10 *et seq*., W. Va. CSR § 95-1-8 *et seq*., and W. Va. Code § 7-8-2A(a).

412.    Because Defendants' violation of W. Va. CSR § 95-1-10 *et seq*., W. Va. CSR § 95-1-8 *et seq*., and W. Va. Code § 7-8-2A(a) proximately caused Plaintiffs' injuries, Defendants are liable under a theory of *prima facie* negligence.

413.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs (and all similarly situated inmates and former inmates) suffered physical harm and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; and the development of associated medical conditions.

414.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

415.    PrimeCare is vicariously liable for the negligent acts and omissions of its employees committed within the scope of their employment.

416.    The County Defendants are vicariously liable for the negligent acts and omissions of their employees committed within the scope of their employment.

**COUNT IX – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
*Commissioner Jividen, Superintendent Francis, Major Warden, John/Jane Doe Correctional*
*Officers, John/Jane Doe PrimeCare Employees, and the John/Jane Doe County Employees*

417.    Plaintiffs hereby incorporate by reference the allegations made in paragraphs 1 through 416 as though fully set forth herein.

418.    Defendants' actions toward Plaintiffs, as described hereinabove, were atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency.

419.    Defendants acted with intent to inflict emotional distress or acted recklessly when it was certain or substantially certain that emotional distress would result from their outrageous conduct.

420.    Defendants' heinous actions caused Plaintiffs (and all similarly situated inmates and former inmates) to suffer severe emotional distress.

421.    The emotional distress was so severe, no reasonable person could be expected to endure it.

422.    As a direct and proximate result of Defendants' reckless, intolerable, and outrageous conduct, Plaintiffs (and all similarly situated inmates and former inmates) suffered physical harm and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; and the development of associated medical conditions.

423.     The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

## COUNT X – CIVIL CONSPIRACY
*Commissioner Jividen, Superintendent Francis, Major Warden, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, and the John/Jane Doe County Employees*

424.     Plaintiffs hereby incorporate by reference the allegations made in paragraphs 1 through 423 as though fully set forth herein.

425.     As set forth hereinabove, Defendants acted jointly and in concert to:

    a.  Negligently injure Plaintiffs;

    b.  Injure Plaintiffs in a grossly negligent manner;

    c.  Negligently violate various statues giving rise to *prima facie* liability; and

    d.  Intentionally inflict emotional distress on Plaintiffs.

426.     As set forth hereinabove, Defendants had a meeting of the minds to accomplish the tortious actions and injuries described herein.

427.     As set forth hereinabove, Defendants committed overt acts to accomplish the tortious actions and injuries described herein.

428.     As a direct and proximate result of Defendants' tortious conduct, Plaintiffs (and all similarly situated inmates and former inmates) suffered physical harm and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; and the development of associated medical conditions.

- 52 -

429.     The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

430.     PrimeCare is vicariously liable for the negligent acts and omissions of its employees committed within the scope of their employment.

431.     The County Defendants are vicariously liable for the negligent acts and omissions of their employees committed within the scope of their employment.

## V.      PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves and other similarly situated current and former inmates at SRJ, request that the Court:

a)  Certify a class pursuant to Federal Rule of Civil Procedure 23;

b)  Declare that Defendants' actions and/or inactions, as described hereinabove, violate the Eighth and Fourteenth Amendments to the United States Constitution;

c)  Enjoin Defendants from engaging in further unconstitutional practices, as described hereinabove, and order Defendants to implement and enforce policies, procedures, and practices necessary to ensure the minimal civilized measure of life's necessities and/or the Constitutional thresholds of confinement are provided to all inmates housed in SRJ;

d)  Award attorney's fees and costs incurred during the course of this litigation, pursuant to 42 U.S.C. § 1983;

e)  Grant any and all relief to which plaintiffs or the class or subclass members may be entitled to in law or equity; and

- 53 -

f)   Any further relief this Honorable Court deems just and proper.

**MICHAEL D. ROSE and EDWARD L. HARMON, on their own behalf and on behalf of all those similarly situated, By Counsel**

*/s/ Russell A. Williams*
Stephen P. New (WVSB No. 7756)
Russell A. Williams (WVSB No. 12710)
New, Taylor & Associates
430 Harper Park Drive
Beckley, West Virginia 25801
Ph: (304) 250-6017
Fax: (304) 250-6012
steve@newtaylorlaw.com
russell@newtaylorlaw.com

Timothy Lupardus (WVSB No. 6252)
The Lupardus Law Office
275 Bearhole Road
Pineville, West Virginia 24874
(304) 732-0250
office@luparduslaw.com

Zachary Whitten (WVSB No. 13709)
The Whitten Law Office
P.O. Box 753
Pineville, West Virginia 24874
zwhittenlaw@gmail.com

Robert Dunlap (WVSB No. 10012)
Robert Dunlap & Associates
208 Main Street
Beckley, West Virginia 25801
(304) 255-4762
robertdunlapesq@gmail.com