**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION**

| | | |
|---|---|---|
| **MICHAEL D. ROSE,** | ) | |
| **CHARLES BLESSARD,** | ) | |
| **ROBERT C. CHURCH, SR.,** | ) | |
| **NICOLE HENRY,** | ) | |
| **EDWARD L. HARMON,** | ) | |
| **THOMAS FLEENOR, JR.,** | ) | |
| **WILLIAM BOHN, and** | ) | |
| **TONYA PERSINGER, on their own** | ) | |
| **behalf and on behalf of all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 5:22-cv-00405** |
| | ) | **(Judge Volk)** |
| **JEFF S. SANDY, individually and in his** | ) | |
| **official capacity as the Cabinet Secretary** | ) | |
| **of the West Virginia Department of** | ) | |
| **Homeland Security,** | ) | |
| **BETSY JIVIDEN, individually as an** | ) | |
| **employee of the West Virginia Division of** | ) | |
| **Corrections and Rehabilitation,** | ) | |
| **BRAD DOUGLAS, individually as an** | ) | |
| **employee of the West Virginia Division of** | ) | |
| **Corrections and Rehabilitation,** | ) | |
| **WILLIAM K. MARSHALL, III,** | ) | |
| **individually and in his official capacity** | ) | |
| **as the Commissioner of the West Virginia** | ) | |
| **Division of Corrections and** | ) | |
| **Rehabilitation,** | ) | |
| **MICHAEL FRANCIS, individually as an** | ) | |
| **employee of the West Virginia Division of** | ) | |
| **Corrections and Rehabilitation,** | ) | |
| **DAVID YOUNG, individually and in his** | ) | |
| **official capacity as the superintendent of** | ) | |
| **Southern Regional Jail,** | ) | |
| **LARRY WARDEN, individually as an** | ) | |
| **employee of the West Virginia Division of** | ) | |
| **Corrections and Rehabilitation,** | ) | |
| **The RALEIGH COUNTY** | ) | |
| **COMMISSION,** | ) | |
| **JOHN/JANE DOE EMPLOYEES OF** | ) | |

THE RALEIGH COUNTY )
COMMISSION, )
The FAYETTE COUNTY )
COMMISSION, )
JOHN/JANE DOE EMPLOYEES OF )
THE FAYETTE COUNTY )
COMMISSION, )
The GREENBRIER COUNTY )
COMMISSION, )
JOHN/JANE DOE EMPLOYEES OF )
THE GREENBRIER COUNTY )
COMMISSION, )
The MERCER COUNTY )
COMMISSION, )
JOHN/JANE DOE EMPLOYEES OF )
THE MERCER COUNTY )
COMMISSION, )
The MONROE COUNTY )
COMMISSION, )
JOHN/JANE DOE EMPLOYEES OF )
THE MONROE COUNTY )
COMMISSION, )
The SUMMERS COUNTY )
COMMISSION, )
JOHN/JANE DOE EMPLOYEES OF )
THE SUMMERS COUNTY )
COMMISSION, )
The WYOMING COUNTY )
COMMISSION, )
JOHN/JANE DOE EMPLOYEES OF )
THE WYOMING COUNTY )
COMMISSION, )
PRIMECARE MEDICAL OF WEST )
VIRGINIA, INC., )
JOHN/JANE DOE PRIMECARE )
EMPLOYEES, )
WEXFORD HEALTH SOURCES, INC., )
JOHN/JANE DOE WEXFORD )
EMPLOYEES, )
JOHN/JANE DOE CORRECTIONAL )
OFFICERS, )
)
    Defendants. )
)
_____ )

## SECOND AMENDED CLASS ACTION COMPLAINT

**COME NOW**, Plaintiffs Michael D. Rose, Charles Blessard, Robert William Church, Sr., Nicole Henry, Edward L. Harmon, Thomas Fleenor, Jr., William Bohn, and Tony Persinger (hereinafter collectively, "Plaintiffs") by the undersigned counsel, and pursuant to Fed. R. Civ. P. 15(a)(2), file this their Second Amended Complaint as follows:

### I.      JURISDICTION AND VENUE

1.      This action arises under the Civil Rights Act, 42 U.S.C. § 1983, and ancillary state law.

2.      Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated.

3.      Declaratory and injunctive relief are authorized pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rules of Civil Procedure 57 and 65.

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and under its authority to decide pendent state law claims.

5.      Venue is proper because some of the above-named Defendants reside within the Southern District of West Virginia, Beckley Division, and because the incidents giving rise to this Complaint occurred within the Southern District of West Virginia, Beckley Division.

### II.      PARTIES

6.      Plaintiff Michael D. Rose (hereinafter "Plaintiff Rose") was at all times relevant hereto an inmate incarcerated at Southern Regional Jail (hereinafter "SRJ") in Raleigh County, Beaver, West Virginia.

7.      Plaintiff Charles Blessard (hereinafter "Plaintiff Blessard") was at all times relevant hereto a pre-trial detainee incarcerated at SRJ in Raleigh County, Beaver, West Virginia.

8.      Plaintiff Robert William Church, Sr. (hereinafter "Plaintiff Church") was at all times relevant hereto an inmate incarcerated at SRJ on Raleigh County, Beaver, West Virginia.

9.      Plaintiff Nicole Henry (hereinafter "Plaintiff Henry") was at all times relevant hereto an inmate incarcerated at SRJ on Raleigh County, Beaver, West Virginia.

10.     Plaintiff Edward L. Harmon (hereinafter "Plaintiff Harmon") was at all times relevant hereto a pre-trial detainee incarcerated at SRJ in Raleigh County, Beaver, West Virginia.

11.     Plaintiff Thomas Fleenor, Jr. (hereinafter "Plaintiff Fleenor") was at all times relevant hereto an inmate incarcerated at SRJ on Raleigh County, Beaver, West Virginia.

12.     Plaintiff William Bohn (hereinafter "Plaintiff Bohn") was at all times relevant hereto an inmate incarcerated at SRJ on Raleigh County, Beaver, West Virginia.

13.     Plaintiff Tonya Persinger (hereinafter "Plaintiff Persinger") was at all times relevant hereto an inmate incarcerated at SRJ on Raleigh County, Beaver, West Virginia.

14.     Defendant Jeff A. Sandy (hereinafter "Cabinet Secretary Sandy") was at all times relevant hereto an employee of the West Virginia Department of Homeland Security (hereinafter the "WVDOHS") and was at all times relevant hereto acting within the scope of his employment and under color of law as the Cabinet Secretary of the WVDOHS.

15.     As Cabinet Secretary of the WVDOHS, Cabinet Secretary Sandy is charged with providing support, oversight, and guidance to the West Virginia Division of Corrections and Rehabilitation (hereinafter "WVDOCR").[1] [2]

16.     Upon information and belief, Cabinet Secretary Sandy oversaw the sham "investigation" into the deplorable conditions at SRJ in the Spring of 2022.

---

[1] According to its website, the WVDOCR "focuses on ensuring public safety and reducing recidivism rates among offenders by providing <u>safe, secure supervision</u> and evidence-based rehabilitation initiatives." (emphasis added).
[2] According to W. Va. Code § 15A-3-1, a purpose of the WVDOCR is to "establish a <u>just</u>, <u>humane</u>, and efficient corrections program" in West Virginia (emphasis added).

17.     Cabinet Secretary Sandy, who upon information and belief resides in Kanawha County, West Virginia, is sued in both his official and individual capacity. [3]

18.     Defendant Betsy Jividen (hereinafter "Former Commissioner Jividen") was an employee of the WVDOCR from January 8, 2018 until August 5, 2022, and was at all times relevant hereto acting within the scope of her employment and under color of law as the Commissioner of the WVDOCR.

19.     The WVDOCR is the administrative division of the West Virginia Department of Military Affairs and Public Safety tasked with administering and exercising direct and effective control over prisons and jails in West Virginia.  Upon information and belief, WVDOCR operates twenty-five (25) correctional facilities throughout West Virginia, including SRJ in Beaver, West Virginia.

20.     As Commissioner of the WVDOCR, Former Commissioner Jividen was vested with executive authority and responsibility for the administration, operation, and control of all WVDOCR facilities and employees of WVDOCR facilities.  Commissioner Jividen's duties included establishing, monitoring, and enforcing policy directives and procedures that ensure constitutional confinement and treatment of all individuals in the custody of the WVDOCR.  *See* W. Va. Code § 15A-3-4;  W. Va. Code § 15A-3-12.

21.     Among other things, Former Commissioner Jividen was charged with ensuring that inmates are subjected to appropriate and humane conditions of confinement while housed in any West Virginia jail.  Commissioner Jividen was similarly charged with maintaining and operating the jail facilities in West Virginia in a manner that meets the minimal civilized measure of life's necessities, by providing, *inter alia*, beds and bedding for all inmates, appropriate food and access

---

[3] Cabinet Secretary Sandy is sued in his official capacity for the purposes of declaratory relief, injunctive relief, and for violations of the American With Disabilities Act.

to drinking water, access to basic hygiene products, toilets, showers, and laundry, and providing living conditions free of mold, sink and toilet water, human waste or sewage, rats, insects, and other contaminants for all inmates housed therein.

22.     Former Commissioner Jividen was also tasked with ensuring that inmates housed in WVDOCR facilities are reasonably free from violence and sexual assault.

23.     Likewise, Former Commissioner Jividen was tasked by law with ensuring that jail facilities in West Virginia, including SRJ, complied with W. Va. CSR § 95-1-10 *et seq*. and W. Va. CSR § 95-1-8 *et seq*.

24.     Former Commissioner Jividen, who upon information and belief resides in Kanawha County, West Virginia, is sued only in her individual capacity.

25.     Defendant Brad Douglas (hereinafter "Former Acting Commissioner Douglas") was an employee of the WVDOCR from August 5, 2022 until January 19, 2023, and was at all times relevant hereto acting within the scope of his employment and under color of law as the Former Acting Commissioner of the WVDOCR.

26.     As Commissioner of the WVDOCR, Former Acting Commissioner Douglas was vested with executive authority and responsibility for the administration, operation, and control of all WVDOCR facilities and employees of WVDOCR facilities.  Former Acting Commissioner Douglas' duties included establishing, monitoring, and enforcing policy directives and procedures that ensure constitutional confinement and treatment of all individuals in the custody of the WVDOCR.  *See* W. Va. Code § 15A-3-4;  W. Va. Code § 15A-3-12.

27.     Among other things, Former Acting Commissioner Douglas was charged with ensuring that inmates are subjected to appropriate and humane conditions of confinement while housed in any West Virginia jail.  Former Acting Commissioner Douglas was similarly charged

with maintaining and operating the jail facilities in West Virginia in a manner that meets the minimal civilized measure of life's necessities, by providing, *inter alia*, beds and bedding for all inmates, appropriate food and access to drinking water, access to basic hygiene products, toilets, showers, and laundry, and providing living conditions free of mold, sink and toilet water, human waste or sewage, rats, insects, and other contaminants for all inmates housed therein.

28.     Former Acting Commissioner Douglas was also tasked with ensuring that inmates housed in WVDOCR facilities are reasonably free from violence and sexual assault.

29.     Likewise, Former Acting Commissioner Douglas was tasked by law with ensuring that jail facilities in West Virginia, including SRJ, complied with W. Va. CSR § 95-1-10 *et seq*. and W. Va. CSR § 95-1-8 *et seq*.

30.     Former Acting Commissioner Douglas, who upon information and belief resides in Kanawha County, West Virginia, is sued only in his individual capacity.

31.     Defendant William K. Marshall, III (hereinafter "Commissioner Marshall") was appointed as Commissioner of the WVDOCR on January 19, 2023, and was at all times relevant hereto acting within the scope of his employment and under color of law as the Commissioner of the WVDOCR.

32.     As Commissioner of the WVDOCR, Commissioner Marshall is vested with executive authority and responsibility for the administration, operation, and control of all WVDOCR facilities and employees of WVDOCR facilities.  Commissioner Marshall's duties include establishing, monitoring, and enforcing policy directives and procedures that ensure constitutional confinement and treatment of all individuals in the custody of the WVDOCR.  *See* W. Va. Code § 15A-3-4;  W. Va. Code § 15A-3-12.

33.     Among other things, Commissioner Marshall is charged with ensuring that inmates are subjected to appropriate and humane conditions of confinement while housed in any West Virginia jail.  Commissioner Marshall is similarly charged with maintaining and operating the jail facilities in West Virginia in a manner that meets the minimal civilized measure of life's necessities, by providing, *inter alia*, beds and bedding for all inmates, appropriate food and access to drinking water, access to basic hygiene products, toilets, showers, and laundry, and providing living conditions free of mold, sink and toilet water, human waste or sewage, rats, insects, and other contaminants for all inmates housed therein.

34.     Commissioner Marshall is also tasked with ensuring that inmates housed in WVDOCR facilities are reasonably free from violence and sexual assault.

35.     Likewise, Commissioner Marshall is tasked by law with ensuring that jail facilities in West Virginia, including SRJ, complied with W. Va. CSR § 95-1-10 *et seq*. and W. Va. CSR § 95-1-8 *et seq*.

36.     Commissioner Marshall, who upon information and belief resides in Wood County, West Virginia, is sued in both his official and individual capacity. [4]

37.     Defendant Michael Francis (hereinafter "Former Superintendent Francis") was at all times relevant hereto an employee of the WVDOCR and was at all times relevant hereto acting within the scope of his employment and under color of law as the administrator of SRJ.

38.     Former Superintendent Francis was tasked by law with the care and custody of all detainees and prisoners incarcerated at SRJ.  Former Superintendent Francis was vested with authority and responsibility for the safe staffing, administration, operation, and control of SRJ, including, but not limited to, the oversight of all SRJ employees, and the authority to promulgate,

---

[4] Commissioner Marshall is sued in his official capacity for the purposes of declaratory relief, injunctive relief, and for violations of the American With Disabilities Act.

amend, and implement all policies and procedures within SRJ to ensure constitutional confinement and treatment of all individuals incarcerated therein. *See* W. Va. Code § 15A-3-5.

39.     Among other things, Former Superintendent Francis was charged with ensuring that inmates are subjected to appropriate and humane conditions of confinement while housed in SRJ. Former Superintendent Francis was similarly charged with maintaining and operating SRJ in a manner that meets the minimal civilized measure of life's necessities, by providing, *inter alia*, beds and bedding for all inmates, appropriate food and access to drinking water, access to basic hygiene products, toilets, showers, and laundry, and providing living conditions free of mold, sink and toilet water, human waste, rats, insects, and other contaminants for all inmates housed therein.

40.     Former Superintendent Francis was also tasked with ensuring that inmates housed in SRJ are reasonably free from violence and sexual assault.

41.     Likewise, Former Superintendent Francis was tasked by law with ensuring that jail facilities in West Virginia, including SRJ, comply with W. Va. CSR § 95-1-10 *et seq*. and W. Va. CSR § 95-1-8 *et seq*.

42.     Former Superintendent Francis, who upon information and belief resides in Raleigh County, West Virginia, is sued only in his individual capacity.

43.     Defendant David Young (hereinafter "Superintendent Young") was at all times relevant hereto an employee of the WVDOCR and was at all times relevant hereto acting within the scope of his employment and under color of law as the administrator of SRJ.

44.     Superintendent Young is tasked by law with the care and custody of all detainees and prisoners incarcerated at SRJ. Superintendent Young is vested with authority and responsibility for the safe staffing, administration, operation, and control of SRJ, including, but not limited to, the oversight of all SRJ employees, and the authority to promulgate, amend, and

implement all policies and procedures within SRJ to ensure constitutional confinement and treatment of all individuals incarcerated therein. *See* W. Va. Code § 15A-3-5.

45.     Among other things, Superintendent Young is charged with ensuring that inmates are subjected to appropriate and humane conditions of confinement while housed in SRJ. Superintendent Young is similarly charged with maintaining and operating SRJ in a manner that meets the minimal civilized measure of life's necessities, by providing, *inter alia*, beds and bedding for all inmates, appropriate food and access to drinking water, access to basic hygiene products, toilets, showers, and laundry, and providing living conditions free of mold, sink and toilet water, human waste, rats, insects, and other contaminants for all inmates housed therein.

46.     Superintendent Young is also tasked with ensuring that inmates housed in SRJ are reasonably free from violence and sexual assault.

47.     Likewise, Superintendent Young is tasked by law with ensuring that jail facilities in West Virginia, including SRJ, comply with W. Va. CSR § 95-1-10 *et seq*. and W. Va. CSR § 95-1-8 *et seq*.

48.     Superintendent Young, who upon information and belief resides in Raleigh County, West Virginia, is sued only in both his official and individual capacity.[5]

49.     Defendant Larry Warden (hereinafter "Former Major Warden") was at all times relevant hereto an employee of the WVDOCR and was at all times relevant hereto acting within the scope of his employment and under color of law as the commanding correctional officer at SRJ.

---

[5] Superintendent Young is sued in his official capacity for the purposes of declaratory relief, injunctive relief, and for violations of the American With Disabilities Act.

50.     Former Major Warden, who upon information and belief resides in Raleigh County, West Virginia, is sued only in his individual capacity.

51.     Defendant the Raleigh County Commission is a political subdivision established under the laws of West Virginia and located in Raleigh County, West Virginia.

52.     Defendants John/Jane Doe Employees of the Raleigh County Commission are yet to be identified current and former employees of the Raleigh County Commission.

53.     Defendant the Fayette County Commission is a political subdivision established under the laws of West Virginia and located in Fayette County, West Virginia.

54.     Defendants John/Jane Doe Employees of the Fayette County Commission are yet to be identified current and former employees of the Fayette County Commission.

55.     Defendant the Greenbrier County Commission is a political subdivision established under the laws of West Virginia and located in Greenbrier County, West Virginia.

56.     Defendants John/Jane Doe Employees of the Greenbrier County Commission are yet to be identified current and former employees of the Greenbrier County Commission.

57.     Defendant the Mercer County Commission is a political subdivision established under the laws of West Virginia and located in Mercer County, West Virginia.

58.     Defendants John/Jane Doe Employees of the Mercer County Commission are yet to be identified current and former employees of the Mercer County Commission.

59.     Defendant the Monroe County Commission is a political subdivision established under the laws of West Virginia and located in Monroe County, West Virginia.

60.     Defendants John/Jane Doe Employees of the Monroe County Commission are yet to be identified current and former employees of the Monroe County Commission.

61.     Defendant the Summers County Commission is a political subdivision established under the laws of West Virginia and located in Summers County, West Virginia.

62.     Defendants John/Jane Doe Employees of the Summers County Commission are yet to be identified current and former employees of the Summers County Commission.

63.     Defendant the Wyoming County Commission is a political subdivision established under the laws of West Virginia and located in Wyoming County, West Virginia.

64.     Defendants John/Jane Doe Employees of the Wyoming County Commission are yet to be identified current and former employees of the Wyoming County Commission.

65.     The aforementioned County Commissions shall be hereinafter collectively be referred to as the "County Defendants."

66.     The aforementioned John/Jane Doe Employees of the County Defendants shall hereinafter collectively be referred to as the "John/Jane Doe County Employees."

67.     Upon information and belief, the County Defendants have a contractual agreement with the State of West Virginia (through the WVDOCR and/or WVDOHS) to house many, if not most, of their county prisoners.  As a result, all of the County Defendants' prisoners have been, and currently are, housed at SRJ.

68.     Upon information and belief, the County Defendants have known for years about the ongoing constitutional deprivations and other tortious conduct at SRJ described herein.

69.     The County Defendants are charged, under W. Va. Code § 7-8-2A(a), with providing their prisoners adequate food, beds and bedding, and basic hygiene products.

70.     Defendant PrimeCare Medical, Inc. is a Pennsylvania corporation with a principal place of business located at 3940 Locust Lane, Harrisburg, Pennsylvania, 17109.  PrimeCare Medical, Inc. is the parent company of PrimeCare Medical of West Virginia, Inc.

71.     Defendant PrimeCare Medical of West Virginia, Inc. is a West Virginia corporation with a principal place of business located at 3940 Locust Lane, Harrisburg, Pennsylvania, 17109. Upon information and belief, PrimeCare Medical of West Virginia, Inc. was a contractor of the WVDOCR and formerly provided medical care to jails and prisons throughout West Virginia, including SRJ.

72.     PrimeCare Medical, Inc. and PrimeCare Medical of West Virginia, Inc. will be collectively referred to herein as "PrimeCare."

73.     Defendants John/Jane Doe PrimeCare Employees are yet to be identified current and former employees of PrimeCare who worked, or are still working, at SRJ.

74.     Defendant Wexford Health Sources, Inc. (hereinafter "Wexford") is a Florida corporation with a principal place of business located at 501 Holiday Drive, Suite 300, Pittsburgh, Pennsylvania, 15220.  Upon information and belief, Wexford is a contractor of the WVDOCR and currently provides medical care to jails and prisons throughout West Virginia, including SRJ.

75.     Defendants John/Jane Doe Wexford Employees are yet to be identified current and former employees of Wexford who worked, or are still working, at SRJ.

76.     Defendants John/Jane Doe Correctional Officers are yet to be identified current and former correctional officers employed by the WVDOCR who worked, or are still working, at SRJ.

77.     All Defendants, with the exception of PrimeCare and Wexford, are sued up to the limits of the insurance policy(s) that provides liability coverage for their actions and omissions, or as permitted by law.

78.     Plaintiffs demand a bench trial on all causes of action and requests for relief asserted herein.

### III.   STATEMENT FACT

79.      Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

### A.   Conditions Of Confinement At SRJ

80.      Under the Eighth and Fourteenth Amendments to the United States Constitution, jails and their staff have a duty to provide inmates with humane conditions of confinement, including, but not limited to, adequate food, clean water, clothing, shelter, sanitation, and medical care.  *See Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016);  *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S. Ct. 1861, 1877 (1979);  *Dawson v. Kendrick*, 527 F. Supp. 1252, 1282-84 (S.D. W.Va. 1981).

81.      Likewise, jails and their staff are not permitted to act with deliberate indifference towards the health and safety of inmates.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016).

82.      Inmates also have a constitutional right to be reasonably protected from the constant threat of violence and sexual assault while incarcerated.  *See Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973);  *U.S. v. Bailey*, 444 U.S. 394, 423, 100 S. Ct. 624, 641 (1980).

83.      Pursuant to W. Va. CSR § 95-1-10.1, "[j]ail facility authorities shall maintain the facility in a condition that is clean, healthful and sanitary and which conforms to all applicable health laws and rules."

84.      Likewise, pursuant to W. Va. Code § 7-8-2A, county commissions "shall provide wholesome and sufficient food and clean and sufficient bedding for all prisoners…and shall furnish soaps, disinfectants and other supplies…"

85.     Despite these constitutional and statutory requirements, Defendants have subjected inmates housed at SRJ, including Plaintiffs, to inhumane living conditions, deprived them of basic human necessities, and acted with deliberate indifference towards the health and safety of inmates.

### i.   *Pervasive Overcrowding*

86.     Jail overcrowding that causes inmates "to endure genuine privations and hardship over an extended period of time" may give rise to violations of the Eighth and Fourteenth Amendments.  *See Dawson*, 527 F. Supp. at 1294-97 (quoting *Wolfish*, 441 U.S. at 542).

87.     Pursuant to W. Va. CSR § 95-1-8.9, all jail facilities shall provide inmates with access to "a bed above floor level…"

88.     Pursuant to W. Va. CSR § 95-1-8.1, jail facilities "must comply with the provisions of the State Fire Code…"

89.     For at least a decade, SRJ has been dangerously overcrowded, housing significantly more inmates than it was designed to hold.

90.     According to a 2020 PREA (Prison Rape Elimination Act) Facility Audit Report, SRJ was designed to hold <u>468 inmates</u>.  *See* PREA Audit Report [ECF NO. 1-1].

91.     According to 2020 the PREA Audit Report, SRJ had a reported population of 711 inmates and a 12-month daily population average of 640 inmates in 2020.  *See id*.

92.     At the time of the 2020 PREA Audit, SRJ was at <u>166% capacity</u>.  *See id*.

93.     According to the 2021 Annual Report of the WVDOCR, SRJ had a reported population of 681 inmates and an average daily population of 717 inmates in 2021.  *See* Annual Report [ECF No. 1-2].

94.     According to the Annual Report, SRJ had an average daily population of 642 inmates in 2020, 633 inmates in 2019, and 603 inmates in 2018.  *See id*.

95.     According to the Annual Report, SRJ has been overcapacity (*i.e.*, housing more than 468 inmates) for <u>over ten (10) years</u>.  *See id*.

96.     According to current and former SRJ correctional officers, overcrowding is a widespread and ongoing problem at SRJ.  *See* Affidavit of Troy Carter (hereinafter "CO Carter"), ¶ 13 [ECF No. 1-3];  Affidavit of Anthony Marks (hereinafter "CO Marks"), ¶ 4 [ECF No. 1-4]; Affidavit of Dean VanDevender (hereinafter "CO VanDevender"), ¶ 10 [ECF No. 1-5];  Affidavit of Scott Moore (hereinafter "CO Moore"), ¶ 4 [ECF No. 1-6].

97.     SRJ is so overcrowded, that three (3) and often (4) inmates are regularly housed in a two-person cell (approximately 120 square feet) for extended periods of time.  *See* ECF No. 1-3 at ¶ 13;  ECF No. 1-4 at ¶ 4;  ECF No. 1-5 at ¶ 11;  ECF No. 1-6 at ¶ 4.

98.     CO VanDevender recalls as many as six (6) inmates being housed in one two-person cell at SRJ.  *See* ECF No. 1-5 at ¶ 11.

99.     As a result of persistent overcrowding at SRJ, many inmates are forced to sleep on the floor of their cell.  *See* ECF No. 1-3 at ¶ 12;  ECF No. 1-5 at ¶ 11;  ECF No. 1-6 at ¶ 5;  *see also* SRJ Photographs [ECF No. 1-7].

100.     In addition, as a result of persistent overcrowding at SRJ, many inmates are regularly forced to live and sleep on the dayroom floor of their pod.[6]  *See* ECF No. 1-3 at ¶ 14; ECF No. 1-4 at ¶ 5;  ECF No. 1-5 at ¶ 12;  ECF No. 1-6 at ¶ 6.

101.     CO Carter recalls as many as sixteen (16) inmates living and sleeping on the dayroom floor of a pod at one time.  *See* ECF No. 1-3 at ¶ 19.

---

[6] A "dayroom" refers to the common, open area in the middle of each pod.

102.    Living and sleeping on the dayroom floor exposes inmates at SRJ to a variety of health and safety risks.  *See* ECF No. 1-3 at ¶ 15;  ECF No. 1-4 at ¶ 6;  ECF No. 1-5 at ¶ 14;  ECF No. 1-6 at ¶ 7.

103.    Inmates living on a dayroom floor at SRJ are regularly attacked and physically injured because they are not protected by a locked cell.  *See* ECF No. 1-3 at ¶ 17;  ECF No. 1-4 at ¶ 8;  ECF No. 1-6 at ¶ 9.

104.    Inmates living on a dayroom floor at SRJ are also sexually assaulted or raped because they are not protected by a locked cell.  *See* ECF No. 1-3 at ¶ 18.

105.    Moreover, inmates living in the dayrooms at SRJ have no access to individual sinks or toilets.  *See* ECF No. 1-3 at ¶ 16;  ECF No. 1-4 at ¶ 7;  ECF No. 1-5 at ¶ 13;  ECF No. 1-6 at ¶ 8.

106.    When individual inmate cells are locked down (for instance, six (6) hours at night), inmates living in the dayrooms at SRJ have no access to drinking water or use of a toilet.

107.    The designated "suicide cells" (where suicidal inmates can be properly monitored) at SRJ are also dangerously overcrowded.  *See* ECF No. 1-3 at ¶ 43;  ECF No. 1-4 at ¶ 9;  ECF No. 1-5 at ¶ 52;  ECF No. 1-6 at ¶ 10.

108.    SRJ only has two (2) cells designated for suicidal inmates.  *See* ECF No. 1-3 at ¶ 44;  ECF No. 1-4 at ¶ 10;  ECF No. 1-6 at ¶ 11.[7]

109.    CO Carter recalls as many as sixteen (16) inmates being placed in a single suicide cell (approximately 120 square feet) at once and left there for days.  *See* ECF No. 1-3 at ¶ 44.

110.    CO Marks recalls as many as twelve (12) inmates being placed in a single suicide cell (approximately 120 square feet) at once and left there for days.  *See* ECF No. 1-4 at ¶ 10.

---

[7] When an inmate in placed in a suicide cell, he/she is stripped naked and placed in gown or "pickle suit" (named after its green color).

111.    CO VanDevender recalls as many as ten (10) inmates being placed in a single two-person suicide cell for as long as two (2) weeks.  *See* ECF No. 1-5 at ¶ 52.

112.    CO Moore recalls as many as eight (8) inmates being placed in a single two-person suicide cell and left there for days.  *See* ECF No. 1-6 at ¶ 11.

ii.     ***Faulty Plumbing (Sinks, Toilets, and Showers, etc.)***

113.    "Functioning sinks, toilets and showers are basic necessities of modern life, particularly within the confines of a wholly self-contained environment such as a jail."  *See Dawson*, 527 F. Supp. at 1287.  "Plumbing which is so inadequate and in such a state of disrepair as to constitute a serious threat to the physical and mental well-being of prisoners" violates the Eighth and Fourteenth Amendments.  *See id*. at 1287-88.

114.    Pursuant to W. Va. CSR § 95-1-8.9, all jail facilities shall provide inmates access to "(a) a toilet above floor level which is available for use without staff assistance twenty-four (24) hours a day; (b) a wash basin and drinking water; [and] (c) hot and cold running water…"

115.    Pursuant to W. Va. CSR § 95-1-10.4, "[t]he water supply and plumbing fixtures [at jail facilities] shall meet all applicable codes and be maintained in operable and sanitary condition...[and] [t]he facility shall provide hot and cold running water."

116.    Pursuant to W. Va. CSR § 95-1-10.6, "[j]ail facility floors shall be kept clean, dry, and free of hazardous substances."

117.    Pursuant to W. Va. CSR § 95-1-10.20, "[w]ater temperatures for showers or bathing shall be thematically controlled to ensure the safety of inmates."

118.    Pursuant to W. Va. CSR § 95-1-10.21, "[i]nmates shall have continuous access to a watershed with running hot and cold water."

119.    Pursuant to W. Va. CSR § 95-1-8.9, all jail facilities shall provide inmates with living "[t]emperatures appropriate to the summer and winter comfort zones."

120.    There are widespread and ongoing problems with the plumbing at SRJ.  *See* ECF No. 1-3 at ¶ 22;  ECF No. 1-4 at ¶ 15;  ECF No. 1-5 at ¶ 15;  ECF No. 1-6 at ¶ 20.

121.    At any given time, there are numerous cells at SRJ (often overcrowded) that have no running water.  *See* ECF No. 1-3 at ¶ 23;  ECF No. 1-4 at ¶ 16;  ECF No. 1-5 at ¶ 16;  ECF No. 1-6 at ¶ 21;  *see also* SRJ Videos [ECF No. 1-8];  *see also*, *infra.*, ECF No. 1-9.

122.    According to CO Marks, there were inmate cells at SRJ that had no running water the entire five (5) months he worked there.  *See* ECF No. 1-4 at ¶ 17.

123.    According to CO VanDevender, there were inmate cells at SRJ that went as long as two (2) weeks with no running water when he worked there.  *See* ECF No. 1-5 at ¶ 16.

124.    Inmates at SRJ who do not have running water in their cell can go up to six (6) hours or longer without access to water during lockdowns.  *See* ECF No. 1-3 at ¶ 24;  ECF No. 1-4 at ¶ 18;  ECF No. 1-5 at ¶ 16;  ECF No. 1-6 at ¶ 22.

125.    In cells that do have running water, many have only hot water.  *See* ECF No. 1-3 at ¶ 25;  ECF No. 1-4 at ¶ 20;  ECF No. 1-5 at ¶ 18;  ECF No. 1-6 at ¶ 23;  *see also*, *infra.*, ECF No. 1-9.

126.    In cells that do have running water, the water often runs constantly (*i.e.*, cannot be turned off).  *See* ECF No. 1-3 at ¶ 26;  ECF No. 1-4 at ¶ 21;  ECF No. 1-5 at ¶ 17;  ECF No. 1-6 at ¶ 24;  *see also* ECF No. 1-8;  *see also*, *infra.*, ECF No. 1-9.

127.    The drinking fountains in inmate pods at SRJ also regularly do not work.  *See* ECF No. 1-5 at ¶ 21.

128.    As a result, inmates who do not have working sinks in their cell have limited or no access to drinking water.  *See* ECF No. 1-5 at ¶ 21.

129.    Water leaking from broken sinks and toilets is also a widespread and ongoing problem at SRJ.  *See* ECF No. 1-3 at ¶ 27;  ECF No. 1-4 at ¶ 27;  ECF No. 1-5 at ¶ 24;  ECF No. 1-6 at ¶ 27;  *see also* ECF No. 1-7;  *see also* ECF No. 1-8;  *see also*, *infra.*, ECF No. 1-9.

130.    At any given time, numerous inmate cells at SRJ have water from a broken sink, toilet, or both leaking onto the floor.  *See* ECF No. 1-3 at ¶ 28;  ECF No. 1-4 at ¶ 28;  ECF No. 1-5 at ¶¶ 25-26;  ECF No. 1-6 at ¶ 28;  *see also* ECF No. 1-7;  *see also* ECF No. 1-8;  *see also*, *infra.*, ECF No. 1-9.

131.    Since virtually all of the inmate cells at SRJ are overcrowded, inmates at SRJ commonly sleep in sink or toilet water (or even toilet waste) on the floor of their cell.  *See* ECF No. 1-3 at ¶ 29;  ECF No. 1-4 at ¶ 29;  ECF No. 1-5 at ¶¶ 26, 28;  ECF No. 1-6 at ¶ 29.

132.    Cells at SRJ that are adjacent to showers also commonly have water seeping in through the ceiling, walls, and floor.  *See* ECF No. 1-3 at ¶ 33;  ECF No. 1-4 at ¶ 30;  ECF No. 1-5 at ¶ 27;  ECF No. 1-6 at ¶ 30;  *see also* ECF No. 1-8;  *see also*, *infra.*, ECF No. 1-9.

133.    Toilets in inmate cells that are broken and do not flush are also a widespread and ongoing problem at SRJ.  *See* ECF No. 1-3 at ¶ 30;  ECF No. 1-4 at ¶ 23;  ECF No. 1-5 at ¶ 20;  ECF No. 1-6 at ¶ 25;  *see also* ECF No. 1-7;  *see also* ECF No. 1-8;  *see also*, *infra.*, ECF No. 1-9.

134.    At any given time, numerous inmate cells at SRJ (often overcrowded) have toilets that do not flush or are otherwise broken.  *See* ECF No. 1-3 at ¶ 31;  ECF No. 1-4 at ¶ 24;  ECF No. 1-6 at ¶ 26;  *see also* ECF No. 1-7;  *see also* ECF No. 1-8;  *see also*, *infra.*, ECF No. 1-9.

135.     Broken toilets at SRJ commonly become infested with bugs or maggots.  *See* ECF No. 1-3 at ¶ 32;  ECF No. 1-4 at ¶ 25;  *see also* ECF No. 1-7;  *see also* ECF No. 1-8.

136.     According to CO Marks, there were inmate cells at SRJ that had no functioning toilet the entire five (5) months he worked there.  *See* ECF No. 1-4 at ¶ 26.

137.     According to CO VanDevender, inmate cells at SRJ often did not having a functioning toilet for weeks when he worked there.  *See* ECF No. 1-5 at ¶ 20.

138.     In fact, some inmate cells at SRJ have the sink or toilet completely torn out of the wall.  *See* ECF No. 1-4 at ¶ 22.

139.     A non-functioning toilet in an inmate cell at SRJ results in inmates (typically in an already overcrowded cell) going up to six (6) hours without a working toilet during nightly lockdown.  *See* ECF No. 1-5 at ¶ 20.

140.     There are even toilets at SRJ that when flushed, the contents come up out of the sink in the cell.  *See*, *infra.*, ECF No. 1-9.

141.     Many of the showers at SRJ either do not work, have only hot or cold water, or run constantly.  *See* ECF No. 1-3 at ¶ 34;  ECF No. 1-4 at ¶ 31;  ECF No. 1-6 at ¶ 31;  *see also* ECF No. 1-8;  *see also*, *infra.*, ECF No. 1-9.

142.     Each pod at SRJ is supposed to have two (2) inmate showers.  However, the water to one shower in a pod regularly does not work, often leaving as many as seventy (70) or eighty (80) inmates in an overcrowded pod sharing one shower.  *See* ECF No. 1-5 at ¶ 22.

143.     Due to the ongoing problems with either non-working hot or cold water in pods at SRJ, inmates are regularly forced to take scalding hot showers (even in the summer) or freezing cold showers (even in the winter).  *See* ECF No. 1-5 at ¶ 23.

144.    The heating and air conditioning at SRJ also regularly goes out for weeks at a time. *See* ECF No. 1-3 at ¶ 38;  ECF No. 1-4 at ¶ 52;  ECF No. 1-5 at ¶ 19.

145.     For inmates living in overcrowded, frequently wet, and sometimes steamy cells (due to constantly running hot water), having no air conditioning creates an unhealthy environment in the summer, as does sleeping on cold, wet floors in the winter without heat.  *See* ECF No. 1-3 at ¶ 38.

146.    "[A]ntiquated, neglected, and unsanitary…plumbing and plumbing fixtures is both punitive and violative of the Fourteenth Amendment rights of…pre-trial detainees and the Eighth Amendment rights of…convicted inmates."  *Dawson*, 527 F. Supp. at 1288.  "It also constitutes a breach of defendants' statutory duties under [W.Va. Code § 95-1-10.1] to keep the jail in a clean, sanitary, and healthful condition…"  *Id*.

### iii.    *Unsanitary Living Conditions: Black Mold, Rodent Feces, and General Filth*

147.    "The failure to provide for and require rudimentary housekeeping and cleaning at [a] jail" resulting in an "unnecessarily filthy and denigrating environment" can threaten the "physical and mental well-being of prisoners."  *Dawson*, 527 F. Supp. at 1289.

148.    Pursuant to W. Va. CSR § 95-1-10.2, "[j]ail facility authorities shall develop and implement a plan for the maintenance of all areas of the jail facility at an acceptable level of cleanliness and sanitation."

149.    Pursuant to W. Va. CSR § 95-1-10.5, "[i]nmates shall be provided sufficient cleaning equipment to maintain their cells in a clean condition."

150.    Inmates housed at SRJ are forced to live in filthy, unsanitary, and dangerous conditions, and are denied cleaning supplies to remedy said conditions.

- 22 -

151.    The presence of black mold at SRJ is a widespread and ongoing problem.  *See* ECF No. 1-3 at ¶ 35;  ECF No. 1-4 at ¶ 39;  ECF No. 1-5 at ¶ 29;  ECF No. 1-6 at ¶ 34.

152.    The black mold at SRJ is in inmate cells, inmate showers, air vents, and grows on the clothing of inmates.  *See* ECF No. 1-3 at ¶ 36;  ECF No. 1-4 at ¶ 40;  ECF No. 1-5 at ¶ 30;  ECF No. 1-6 at ¶ 35;  *see also* ECF No. 1-7;  *see also* ECF No. 1-8.

153.    Nothing is ever done to remedy the persistent black mold problem at SRJ, other than having inmate trustees paint over it.  *See* ECF No. 1-3 at ¶ 37;  ECF No. 1-4 at ¶ 41;  ECF No. 1-5 at ¶ 31.

154.    Several inmate pods at SRJ are also infested with rodents and rodent feces.  *See* ECF No. 1-4 at ¶ 51.

155.    Some areas of SRJ are infested with ants or other insects.  *See* ECF No. 1-6 at ¶ 40.

156.    Aside from the black mold, rodents, and insects, inmate cells at SRJ are unnecessarily filthy and create a denigrating environment for inmates to be housed in.  *See* ECF No. 1-7;  ECF No. 1-8.

### iv.    *Inadequate Nutrition, Spoiled Food, and Contaminated Water*

157.    "Food sufficient to meet minimum nutritional needs is a basic necessity of life.  The failure to provide adequate and sanitary food service…and to serve food sufficient to meet minimum nutritional needs may give rise to a constitutional deprivation."  *Dawson*, 527 F. Supp. at 1297-98.

158.    At SRJ, inmates are commonly given inadequate portions of food.  *See* ECF No. 1-4 at ¶ 11;  ECF No. 1-6 at ¶ 14.

159.    At SRJ, inmates are regularly given spoiled milk to drink.  *See* ECF No. 1-3 at ¶ 39;  ECF No. 1-4 at ¶ 12;  ECF No. 1-5 at ¶ 8;  ECF No. 1-6 at ¶ 15.

160.    At SRJ, inmates are commonly given what appears to be undercooked or rotten meat.  *See* ECF No. 1-4 at ¶ 13.

161.    At SRJ, inmates are regularly served food on dirty, unsanitary trays.  *See* ECF No. 1-4 at ¶ 14;  ECF No. 1-5 at ¶ 7.

162.    In addition, food provided to certain groups of inmates at SRJ is regularly cut or "thinned."  *See* ECF No. 1-5 at ¶ 5.

163.    Food provided to certain groups of inmates at SRJ is also regularly tampered with or contaminated with saliva, hair, urine, or semen.  *See* ECF No. 1-5 at ¶ 6.

164.    At SRJ, food is supposed to be served to each individual inmate in his or her cell. *See* ECF No. 1-5 at ¶ 9.

165.    However, instead, food trays at SRJ are regularly piled up on tables in the middle of inmate pods and inmates are left to "fend for themselves."  As a result, inmates often have to fight for food and some inmates go hungry.  *See* ECF No. 1-5 at ¶ 9.

166.    Inmates at SRJ also experience inadequate access to drinking water (*see supra*).

167.    When an inmate is first incarcerated at SRJ, he or she is supposed to be given a "flex cup" for drinking and a "spork" for eating.  *See* ECF No. 1-5 at ¶ 4;  ECF No. 1-6 at ¶ 12.

168.    However, new inmates at SRJ are regularly not provided flex cups or sporks.  Those inmates are left to drink from old milk cartons or plastic bottles (if available) and to eat with their hands. *See* ECF No. 1-5 at ¶ 4;  ECF No. 1-6 at ¶¶ 12-13.

169.    Upon information and belief, inmates at SRJ are commonly forced to drink contaminated tap water.

170.    Upon information and belief, boil water advisories or other warnings have been issued to SRJ, yet inmates are still forced to drink tap water.

### v. _Inadequate Bedding, Hygiene Items, Clothing, and Laundry Services_

171.     "The failure to regularly provide prisoners with clean bedding, towels, clothes and sanitary mattresses, as well as toilet articles including soap, razors, combs, toothpaste, toilet paper, accesses to a mirror, and sanitary napkins for female prisoners, constitutes a denial of personal hygiene and sanitary living conditions."  _Dawson_, 527 F. Supp. at 1288-89.

172.     Pursuant to W. Va. CSR § 95-1-10.7, "[t]he jail facility shall provide each inmate, as part of the admission process, and thereafter as necessary, an adequate supply of soap, toothpaste, toilet paper, toothbrushes, combs, and feminine hygiene supplies."

173.     Pursuant to W. Va. CSR § 95-1-10.10, "[e]ach inmate shall be provided with one clean, fire-retardant mattress, two (2) clean sheets, a clean pillow and clean pillow case."

174.     Pursuant to W. Va. CSR § 95-1-10.12, "[l]aundry services shall be sufficient to permit the regular exchange of sheets and pillowcases at least weekly."

175.     Pursuant to W. Va. CSR § 95-1-10.13, "[c]lean undergarments shall be provided daily and outer garments every other day, or as appropriate."

176.     When an inmate arrives at SRJ, he or she is supposed to be provided a mattress to sleep on.  However, many inmates at SRJ are not provided a mattress for sleeping.  _See_ ECF No. 1-3 at ¶ 11.

177.     Since virtually every cell at SRJ is overcrowded, inmates commonly sleep on the wet, concrete floor of their cell with no mattress.  _See_ ECF No. 1-3 at ¶ 12;  _see also_ ECF No. 1-7.

178.     Inmates being given inadequate access to personal hygiene products (_e.g._, toilet paper, soap, shampoo, toothpaste, etc.) is a widespread and ongoing problem at SRJ.  _See_ ECF No. 1-5 at ¶ 32.

179.    At SRJ, personal hygiene products are supposed to distributed frequently (if not daily).  However, this rarely happens.  *See* ECF No. 1-3 at ¶ 47;  ECF No. 1-4 at ¶ 32.

180.    Inmates regularly go weeks or even months without being provided basic personal hygiene items, including toilet paper.  *See* ECF No. 1-5 at ¶ 33.

181.    Inmates are sometimes forced to use rags or socks as toilet paper because none was provided to them.  *See* ECF No. 1-5 at ¶ 33.

182.    Female inmates at SRJ are also regularly not provided an adequate amount of feminine hygiene produces.  *See* ECF No. 1-5 at ¶ 34.

183.    Correction officers at SRJ who are supposed to distribute personal hygiene products regularly falsify records to indicate that hygiene items were distributed to inmates, when in fact none were.  *See* ECF No. 1-5 at ¶ 35.

184.    When hygiene products are distributed, correctional officers commonly pile them up in the middle of a pod and let the inmates "fend for themselves."  This results in inmates fighting over basic hygiene items and some inmates going without.  *See* ECF No. 1-3 at ¶ 48;  ECF No. 1-4 at ¶ 33;  ECF No. 1-5 at ¶ 36.

185.    Personal hygiene products are withheld from inmates at SRJ even though there are sufficient amounts kept in storage at the facility.  *See* ECF No. 1-5 at ¶ 37.

186.    At SRJ, inmates are supposed to be issued two (2) sets of clothing.  However, inmates are often only given one set.  *See* ECF No. 1-5 at ¶ 38;  ECF No. 1-6 at ¶ 16.

187.    CO Moore recalls inmates begging to be given more clothing.  *See* ECF No. 1-6 at ¶ 17.

188.    With only one set of clothing, inmates cannot send clothes out to be laundered.  *See* ECF No. 1-5 at ¶ 39.

189.   When an inmate arrives at SRJ, he or she is supposed to be given a laundry bag. However, laundry bags are rarely provided to inmates, because the jail regularly runs out and does not order more.  *See* ECF No. 1-3 at ¶ 8;  ECF No. 1-4 at ¶ 33.

190.   Laundry (and laundry bags) are important for inmates.  Without a laundry bag, if an inmate sends his or her clothes out to be washed by the jail, the odds are he or she will not get the correct clothes back.   If an inmate sends his or her personal clothing (purchased with commissary funds) out to be washed without a laundry bag, the odds are he or she will have the personal clothing stolen by other inmates.  *See* ECF No. 1-3 at ¶ 9;  ECF No. 1-4 at ¶ 33.

191.   As a result, the vast majority of inmates at SRJ wash their clothes by hand in a sink, shower, mop bucket, or not at all.  *See* ECF No. 1-3 at ¶ 10;  ECF No. 1-4 at ¶ 33;  ECF No. 1-5 at ¶ 39;  ECF No. 1-6 at ¶ 18.

192.   Inmates that can utilize the laundry service at SRJ usually do not, because the clothes regularly come back wet and musty.  *See* ECF No. 1-6 at ¶ 19.

### vi.   *Inadequate Exercise Time*

193.   "Undue restrictions on prisoners' opportunities for physical exercise may constitute cruel and unusual punishment" in violation of the Eighth and Fourteenth Amendments.  *Dawson*, 527 F. Supp. at 1298-1301.  "[T]he failure to provide any opportunity for exercise constitutes a serious and unnecessary threat to the physical [and mental] well-being of [stet] prisoners."  *Id*. at 1300.

194.    Inmates at SRJ are regularly denied recreation time, sometimes going months without it.  *See* ECF No. 1-4 at ¶¶ 49-50;  ECF No. 1-5 at ¶ 57;  ECF No. 1-6 at ¶ 37.

195.    A common trick used by correctional officers at SRJ is to "offer" recreation time during the early hours of the morning, when most inmates are sleeping, and then log that recreation time was offered, but "declined."   *See* ECF No. 1-5 at ¶ 58;  ECF No. 1-6 at ¶ 38.

**vii.    *Inadequate Lighting***

196.    "Inadequate lighting has been recognized in a variety of contexts as constituting cruel and unusual punishment violative of the Eighth Amendment, when, in the absence of a valid governmental interest, it unnecessarily threatens the physical and mental well-being of prisoners." *Dawson*, 527 F. Supp. at 1288.

197.    "The failure to provide security quality lighting fixtures of sufficient illumination to permit detainees and convicted inmates to read without injury to their vision constitutes a danger to the health and security of pre-trial detainees and prisoners alike."   *Id.*

198.    "When considered in conjunction with the lack of significant exposure to natural sunlight, and the generally dark and idle environment at [a] jail…inadequate lighting constitutes a danger to the eyesight of the prisoners and contributes to the dark and lifeless atmosphere found in [a] jail."   *Id.*

199.    There are widespread and ongoing problems with broken lights in and around inmate cells at SRJ, creating a dark environment where it is difficult to see.   *See* ECF No. 1-6 at ¶ 36;  ECF No. 1-7;  ECF No. 1-8;  *see also*, *infra.*, ECF No. 1-9.

200.    There are also numerous inmate cells at SRJ with lights that constantly flicker or never turn off.   *See* ECF No. 1-6 at ¶ 36;  *see*, *infra.*, ECF No. 1-9.

viii.     *__Improper Disciplinary Measures (Punishment)__*

201.     At SRJ, inmates are commonly placed in overcrowded suicide cells as a form of punishment, even though the inmates are not suicidal.  *See* ECF No. 1-3 at ¶ 42;  ECF No. 1-5 at ¶ 51;  ECF No. 1-6 at ¶ 41.

202.     Not only are these suicide cells often dangerously overcrowded (*see supra*), the water in suicide cells often does not work and showers are withheld.  *See* ECF No. 1-3 at ¶ 45; ECF No. 1-5 at ¶ 53.

203.     Inmates at SRJ are also placed in segregation cells – with twenty-three (23) hour per day lockdowns – without justification.  *See* ECF No. 1-6 at ¶ 42.

204.     Inmates in segregation cells often go days without running water or being let out for a shower.  *See* ECF No. 1-6 at ¶ 43.

205.     One particular inmate – Benjamin Allen – was kept in a segregation cell at SRJ for fourteen (14) months by order of Superintendent Francis for purely punitive reasons.  *See* ECF No. 1-6 at ¶ 44.

206.     At SRJ, correctional officers regularly beat inmate with no justification as a form of punishment for filing or attempting to file a grievance, for talking back, for refusing orders, or for simply voicing complaints.  *See* ECF No. 1-5 at ¶ 46;  ECF No. 1-6 at ¶ 45.

207.     At SRJ, correctional officers regularly take inmates into cells or showers (where there are no cameras) and beat them as punishment.  *See* ECF No. 1-5 at ¶ 47;  ECF No. 1-6 at ¶ 46.

208.     Once an inmate is beaten, he or she is taken to medical, where correctional officers typically tell nursing staff that the inmate "slipped in the shower," "fell down the stairs," or some other obvious lie.  *See* ECF No. 1-5 at ¶ 47.

209.     PrimeCare and/or Wexford staff at SRJ are aware that inmates are being beaten by correctional officers without just cause, but do nothing about it.  *See* ECF No. 1-5 at ¶ 47.

210.     Some correctional officers at SRJ even take inmates into medical examination rooms (where there are also no cameras) and beat inmates as punishment.  *See* ECF No. 1-5 at ¶ 48;  ECF No. 1-6 at ¶ 47.

211.     PrimeCare and/or Wexford staff at SRJ are aware of this practice as well.  *See* ECF No. 1-5 at ¶ 48.

212.     As a result of these beatings, inmates commonly suffer broken bones, lacerations, bruises, and concussions, but are almost never sent to a hospital for evaluation and treatment.  *See* ECF No. 1-5 at ¶ 49.

213.     Upon information and belief, inmate medical and other related records are falsified to cover-up the violence correctional officers regularly inflict on inmates at SRJ.

214.     Correctional officers at SRJ also falsify "use of force" reports to cover up inmate beatings.  *See* ECF No. 1-5 at ¶ 50;  ECF No. 1-6 at ¶ 48.

215.     Correctional officers who beat inmates regularly falsify use of force reports to make it appear that the force used against an inmate was justified (*e.g.*, claiming the inmate resisted, was belligerent or aggressive, attacked an officer, etc.), even when there was no justification for the beating.  *See* ECF No. 1-5 at ¶ 50;  ECF No. 1-6 at ¶ 48.

   ix.   ***Lack of Prisoner Safety***

216.     "Prisoners have the right, secured by the Eighth and Fourteenth Amendments, to be reasonably protected from the threat of violence and sexual assault."  *Dawson*, 527 F. Supp. at 1289.

217.    Inmates at SRJ forced to live and sleep unprotected on the dayroom floor are subjected to both inmate violence and sexual assault (*see supra*).

218.    There is also a widespread and ongoing problem with broken cell doors at SRJ, which is a major safety concern.  *See* ECF No. 1-3 at ¶ 40;  ECF No. 1-4 at ¶¶ 36-37;  *see also*, *infra.*, ECF No. 1-9.

219.    According to CO Carter, at one point, as many as seventy-five percent (75%) of the cell doors at SRJ were broken or did not lock.  *See* ECF No. 1-3 at ¶ 40.

220.    As a result, instead of being locked down (at night for instance), inmates are free to move around their pod and from cell to cell.

221.    Inmates at SRJ are commonly stabbed or beaten by other inmates because they are not protected by a locked cell door.  *See* ECF No. 1-3 at ¶ 41;  ECF No. 1-4 at ¶ 38.

222.    Every inmate pod at SRJ has a "tower" where a correctional officer is stationed. Intercoms or "call boxes" from inmate cells are routed to the tower.  This allows inmates to communicate with the correctional officer in the tower and vice versa.  *See* ECF No. 1-3 at ¶ 4;  ECF No. 1-4 at ¶ 42;  ECF No. 1-5 at ¶ 40.

223.    In many of the inmate cells at SRJ, the intercom or "call box" does not work.  This poses a serious risk for inmates, who are unable to report an emergency (*e.g.*, fight, injury, medical problem, etc.).  If an emergency occurs, inmates are only able to kick their cell door or yell for help if they need assistance.  *See* ECF No. 1-3 at ¶ 5;  ECF No. 1-4 at ¶ 43.

224.    The buttons and intercoms on the communication board/panel in each tower at SRJ are so old and degraded, they either do not work or barely function.  This poses a serious risk for inmates, who are unable to report an emergency (*e.g.*, fight, injury, medical problem, etc.).  *See* ECF No. 1-3 at ¶ 6;  ECF No. 1-4 at ¶ 44;  *see also* ECF No. 1-8.

225.   In inmate cells where the "call box" does work, correctional officers regularly ignore calls from inmates and often mute the intercoms in order to sleep during night shifts.  *See* ECF No. 1-5 at ¶ 41.

226.   At SRJ, correctional officers regularly tell inmates what another inmate is charged with, which is a safety violation.  *See* ECF No. 1-5 at ¶ 54.

227.   Correctional officers at SRJ commonly disclose an inmate's charges to other inmates, knowing that the inmate will likely get attacked by other inmates as a result.  *See* ECF No. 1-5 at ¶ 56.

228.   There are multiple broken windows at any given time at SRJ.  Broken windows allow inmates to make weapons out of pieces of glass and to smuggle items in and out of the jail (often with the help of corrupt correctional officers).  *See* ECF No. 1-7.

229.   Correctional officers at SRJ commonly fail to protect inmates from known threats of violence and sexual assault.

230.   Correctional officers at SRJ commonly allow inmates to beat other inmates.

231.   Correctional officers at SRJ commonly allow inmates to sexually assault other inmates.

232.   Correctional officers at SRJ commonly fail to protect inmates from inmates/groups of inmates who previously beat or sexually assaulted them, allowing the violence to continue.

   **x.   *Neglectful Medical Care***

233.   "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  In the worst cases, such a failure may actually produce physical 'torture or a lingering death.'…[i]n less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.  The

infliction of such unnecessary suffering is inconsistent with contemporary standards of decency…
*Dawson*, 527 F. Supp. at 1306 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103-05, 97 S. Ct. 285,
290-91 (1976)).

234.    "[T]he deliberate indifference to serious medical needs of prisoners constitutes the
'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  *Id*.

235.    Inmate requests for medical attention or "sick calls" are regularly ignored by
correctional officers and PrimeCare and/or Wexford staff at SRJ, often resulting in serious injuries
or death.  *See* ECF No. 1-5 at ¶ 54;  ECF No. 1-6 at ¶ 49.

236.    Inmates with emergent medical needs are commonly ignored by correctional
officers and PrimeCare and/or Wexford staff at SRJ, often resulting in serious injuries or death.

237.    Inmates with serious medical conditions are commonly ignored and rarely sent to
an outside hospital for treatment, often resulting in serious injuries or death.

238.    CO Moore recalls one inmate at SRJ who repeatedly requested medical attention,
was ignored, and later died of his illness.  *See* ECF No. 1-6 at ¶ 50.

   xi.   ***Inability to File Grievances***

239.    At SRJ, if an inmate wants to file a grievance, a correctional officer is supposed to
provide a form to the inmate to complete and return to the correctional officer.  Once received, the
correctional officer is supposed to provide the completed form to a supervisor for filing.  *See* ECF
No. 1-3 at ¶ 49;  ECF No. 1-4 at ¶ 46;  ECF No. 1-5 at ¶ 43.

240.    However, inmates at SRJ are regularly denied the ability to file grievances.   *See*
ECF No. 1-4 at ¶ 45;  ECF No. 1-5 at ¶ 42.

241.    Paper grievance forms at SRJ are commonly refused to inmates who request them.
*See* ECF No. 1-3 at ¶ 50;  ECF No. 1-4 at ¶ 48;  ECF No. 1-5 at ¶ 44.

242.   If a grievance form is provided to an inmate, the completed form is commonly torn up in front of the inmate, thrown in the trash, or not passed on to a supervisor for filing.  *See* ECF No. 1-5 at ¶ 45.

243.   Inmates at SRJ are also commonly beaten by correctional officers for filing a grievance or simply requesting a grievance form (*see supra*).

244.   Superintendent Francis has ordered correctional officers at SRJ to not provide inmates with paper grievance forms.  Instead, Superintendent Francis has ordered that grievances are to be handled by only one correctional officer, hand-picked by him.  *See* ECF No. 1-3 at ¶ 51; ECF No. 1-4 at ¶ 47.

245.   Instead of asking any correctional officer for a grievance form, inmates at SRJ are required to "write" this single correctional officer to request one.  *See* ECF No. 1-4 at ¶ 47.

246.   Inmates as SRJ also have the ability to file a grievance using an electronic kiosk.  However, most of the kiosks at SRJ are usually broken (or intentionally turned off by jail staff).  *See* ECF No. 1-3 at ¶ 52;  ECF No. 1-4 at ¶ 42;  ECF No. 1-5 at ¶ 40.

247.   Due to the policies, procedures, and practices regarding grievances at SRJ described hereinabove, and the confusion regarding the grievance procedure outlined in the Inmate Handbook, grievances were and continue to be "unavailable" to inmates at SRJ.  *See Baxley v. Jividen*, 508 F. Supp. 3d. 28, 41-42 (S.D. W.Va. 2020).

**xii.   *Jail Administration's Knowledge***

248.   Jail administrators and supervising correctional officers – in particular Former Superintendent Francis and Former Major Warden – were fully aware of the aforementioned problems at SRJ and have been aware of the issues set forth herein for many years.  *See* ECF No. 1-3 at ¶¶ 7, 46, 54;  ECF No. 1-4 at ¶ 53;  ECF No. 1-5 at ¶ 59;  ECF No. 1-6 at ¶ 51.

249.     In fact, Former Superintendent Francis (with his closest associates) personally did a weekly visual inspection of every inmate pod at SRJ.  *See* ECF No. 1-3 at ¶ 56;  ECF No. 1-4 at ¶ 55;  ECF No. 1-5 at ¶ 59;  ECF No. 1-6 at ¶ 52.

250.     Further, on November 11, 2021, an internal SRJ e-mail was sent to Former Superintendent Francis and Former Major Warden with a cell-by-cell accounting of the ongoing problems at SRJ.  *See* ECF No. 1-9.

251.     Approximately four (4) months later, on March 30, 2022, in response to a FOIA request regarding alleged water issues at SRJ, Former Superintendent Francis falsely claimed that he was "NOT AWARE" of any water issues at SRJ, other than what was reported in a recent news article.[8]  *See* ECF No. 1-9.

**xiii.**     ***The WV Department of Homeland Security's Sham SRJ "Investigation"***

252.     In late 2021, word of the deplorable conditions at SRJ began to spread throughout southern West Virginia.

253.     In response, Governor Jim Justice (hereinafter "Governor Justice") tasked Cabinet Secretary Sandy and the WVDOHS to investigate allegations of, *inter alia*, inmates being deprived of water, non-functioning sinks and toilets in inmate cells, inmates forced to sleep on cell floors, and inmates being deprived of basic hygiene items, in particular toilet paper.

254.     Upon information and belief, Cabinet Secretary Sandy and/or the WVDOHS sent "investigators" to SRJ on or around December 21, 2021.

255.     Following its "investigation," the WVDOHS issued a report with its findings.  *See* SRJ Investigation Report [ECF No. 7-1].

256.     The SRJ Investigation Report contains numerous false statements of fact, *inter alia*:

---

[8] Leaked internal email from Southern Regional Jail shows nearly 40 cells without water in November (wvva.com)

- o That "at no time" have inmates been without water in their cells for "longer than a few hours";

- o That "inmates can obtain water 24/7 within their cell using the sink";

- o That there is a working industrial water fountain in "each POD";

- o That "Flex Tumblers" are provided to "each inmate" for drinking;

- o That inmates are provided a beverage at every meal;

- o That the allegation that inmates are deprived of toilet paper is "unfounded"; and

- o That the allegation that inmates are deprived of a mattress for sleeping is "unfounded."

257.    In summary, the SRJ Investigation Report falsely claims that, "the allegations of water deprivation, failure to provide toilet paper, and inmates having to sleep on hard floors without a mattress [were found] to be false."  *See* ECF No. 7-1.

258.    According to correctional officers working at SRJ at the time, WVDOHS "investigators" never entered or observed any inmate pods.

259.     According to correctional officers working at SRJ at the time, WVDOHS "investigators" never entered or observed any inmate cells.

260.    In fact, under "Operational Review," the SRJ Investigation Report does not list "inmate cells" as an area of SRJ that was inspected by WVDOHS "investigators."  *See* ECF No. 7-1.

261.    Virtually all of the findings in the SRJ Investigation Report are contradicted by evidence filed in support of Plaintiffs' original Class Action Complaint.  *See* ECF Nos. 1-3, 1-4, 1-5, 1-6, 1-7, 1-8, and 1-9.

262.    Virtually all of the findings in the SRJ Investigation Report are contradicted by hundreds of interviews of current and former SRJ inmates conducted by Plaintiffs' counsel.

- 36 -

263.   Upon information and belief, the inmates interviewed by WVDOHS "investigators" were not selected randomly, but instead hand-selected by Superintendent Francis.

264.   Upon information and belief, the inmates interviewed by WVDOHS "investigators" were either bribed with favorable treatment or coerced with threats of punishment by Former Superintendent Francis, Former Major Warden, and/or other SRJ staff to provide false answers consistent with the narrative that there was "nothing wrong at SRJ."

265.   Upon information and belief, the correctional officers interviewed by WVDOHS "investigators" were not selected randomly, but instead hand-selected by Superintendent Francis.

266.   Upon information and belief, the correctional officers interviewed by WVDOHS "investigators" were either bribed with favorable treatment or coerced with threats of punishment by Former Superintendent Francis, Former Major Warden, and/or other SRJ staff to provide false answers consistent with the narrative that there was "nothing wrong at SRJ."

267.   Upon information and belief, conditions at SRJ were staged or falsely depicted by SRJ correctional officers or other staff prior to the arrival of WVDOHS "investigators."

268.   For example, before WVDOHS "investigators" arrived at SRJ, black mold was painted over by inmate trustees (at the direction of SRJ correctional officers and/or staff) and hygiene items (previously withheld) were stacked in inmate pods and/or inmate cells so it could be photographed by SRJ correctional officers and/or staff.

269.   In a shameful effort to cover-up the inhumane treatment of inmates at SRJ (predominately citizens of West Virginia) and the deplorable conditions of the jail, Governor Justice's office released a statement echoing many of the false conclusions from the sham SRJ investigation conducted by Cabinet Secretary Sandy and the WVDOHS.  *See* Press Release [ECF No. 7-2].

270.    In the Press Release, Cabinet Secretary Sandy blamed allegations of mistreatment (which are all substantiated by the evidence cited herein) on lying inmates, lying family members and friends of inmates, and disgruntled former correctional officers.  *See* ECF No. 7-2.

271.    In the Press Release, Cabinet Secretary Sandy falsely claimed that, "these allegations appear to be a misguided attempt by some inmates and their family and friends to use the news media to spread false and misleading information as a means of getting released."  *See* ECF No. 7-2.

272.    In the Press Release, Cabinet Secretary Sandy further falsely claimed that, "[t]he sad part about this investigation is that family members were repeatedly lied to by inmates about their access to clothing, food, water, mattresses, medical attention, [and] living conditions…"  *See* ECF No. 7-2.

273.    Cabinet Secretary Sandy even accused the news media of fabricating their reporting on the allegations of mistreatment at SRJ.  *See* ECF No. 7-2.

274.    Governor Justice closed the Press Release by stating, "I continue to have complete confidence in Secretary Sandy, as well as DCR Commissioner Betsy Jividen and all of the leadership at SRJ…"  *See* ECF No. 7-2.

275.    Since the undersigned counsel began investigating the conditions at SRJ in early 2022 and started putting Defendants on notice of a possible lawsuit, Former Commissioner Jividen, Former Superintendent Francis, and Former Major Warden have all conveniently "retired" from their respective posts.

**xiv.    *Understaffing, Overdue Maintenance, And A Billion Dollar Surplus***

276.    For years, West Virginia jails and prisons, including SRJ, have been plagued by chronic understaffing and tens-of-millions of dollars in overdue maintenance.

277.     On December 6, 2021, then WVDOCR Chief of Staff, Former Acting Commissioner Douglas, testified before the West Virginia Legislature.[9]

278.     Former Acting Commissioner Douglas told the West Virginia Legislature that there were more than eight hundred (800) vacancies for correctional positions in West Virginia jails and prisons.  *See id*.

279.     During this hearing before the West Virginia Legislature, Cabinet Secretary Sandy testified that West Virginia jails and prison also have two hundred million dollars ($200,000,000.00) in deferred maintenance needs.  *See id*.

280.     On January 2, 2022, Governor Justice announced that the State of West Virginia had one hundred thirty-six million ($136,000,000.00) budget surplus.[10]

281.     On April 26, 2022, Former Acting Commissioner Douglas again testified before the West Virginia Legislature.[11]

282.     Former Acting Commissioner Douglas reported that the situation in West Virginia's jails and prisons had gotten worse since December 2021.  *See id*.

283.     Former Acting Commissioner Douglas testified that, "[w]e're up to, at the end of March, 887 [correctional] vacancies, which is even worse than it was in December," and further stated that, "[i]t's not getting any better."  *See id*.

284.     When asked if safety was becoming an issue in the wake of wide-spread correctional understaffing, Former Acting Commissioner Douglas replied, "I feel that we will inevitably get to that point, if we're not there already."

---

[9] https://www.wvgazettemail.com/news/state-official-wvs-jails-prisons-more-understaffed-than-during-2017-crisis/article_b3d3517f-fa7e-5ec0-8bea-a55f80232380.html
[10] https://governor.wv.gov/News/press-releases/2022/Pages/Gov.-Justice-West-Virginia-surpluses-keeps-breaking-record-after-record.aspx
[11] https://www.wvgazettemail.com/news/official-jail-staffing-shortage-not-getting-any-better/article_1692be2e-e957-5187-92c8-dcd7635e7634.html

285.    During this hearing, Former Acting Commissioner Douglas also testified that there were two hundred and twenty-seven million dollars ($227,000,000.00) in deferred maintenance needs in West Virginia's jails and prisons.  *See id*.

286.    On May 3, 2022, Governor Justice announced that the State of West Virginia had a record two hundred and fifty-three million dollar ($253,000,000.00) surplus, which brought the State's 2022 total surplus to nine hundred and ninety-three million dollars ($993,000,000.00).[12]

287.    On August 11, 2022, Governor Justice declared a state of emergency in wake of dangerous understaffing in the State's jails and prisons.[13]

288.    On September 30, 2022, roughly twenty-eight million dollars ($28,000,000.00) in federal COVID relief funds designated for state correctional expenditures were transferred to a discretionary account controlled by Governor Justice.[14]

289.    On October 5, 2022, Governor Justice approved a ten million dollar ($10,000,000.00) contribution from his discretionary account to Marshall University (his alma mater) to build a baseball stadium.  *See id*.

290.    This ten million dollar contribution came five (5) days after Governor Justice transferred roughly $28,000,000.00 in COVID relief funds designated for state correctional expenses to the discretionary account he controls.  *See id*.

291.    In October 2022, it was announced that SRJ was under federal investigation.[15]

---

[12] https://governor.wv.gov/News/press-releases/2022/Pages/Governor-Justice-announces-April-2022-record-revenue-collections.aspx
[13] https://www.wvgazettemail.com/news/legal_affairs/justice-declares-state-of-emergency-in-wv-jails-for-second-time-in-5-years/article_c5e27c9d-3d9d-54f4-a688-990360fed9fe.html
[14] https://www.wvgazettemail.com/news/legislative_session/governors-office-28-3m-claim-of-state-corrections-expenses-to-fund-own-account-comes-amid/article_dd6f850b-fc44-5a90-ac08-e60c5fce73b7.html
[15] https://www.wvva.com/2022/10/11/federal-investigation-underway-southern-regional-jail/

292.    On December 6, 2022, Former Acting Commissioner Douglas again testified before the West Virginia Legislature.[16]

293.    According to Former Acting Commissioner Douglas, there were "over 1,000 vacancies" for correctional positions in West Virginia's jails and prisons.  *See id*.

294.    Former Acting Commissioner Douglas testified that "we're in bad shape."  *See id*.

295.    With regard to deferred maintenance, Former Acting Commissioner Douglas testified that, "[t]he story there hasn't changed. We still have millions and millions of dollars in deferred maintenance needs. We've identified about $60 million of that as high-priority, public safety projects."

296.    Former Acting Commissioner Douglas identified "door locks and locking mechanisms" as being of vital importance, and accounting for $27 million out of the $60 million he previously referenced.  *See id*.

297.    By the beginning of 2023, the State of West Virginia had a reported one billion dollar ($1,000,000,000.00) budget surplus.[17]

**B.  Class A – Current Inmates**

298.    Class A includes all currently incarcerated individuals who, from January 1, 2018 to the present, are or were inmates housed at SRJ.[18]

299.    Class A is so numerous that joinder of all members is impracticable.

300.    Members of Class A are fluid, as new individual members are incarcerated at SRJ daily, and many members are subsequently transferred to another jail or prison facility.

---

[16] https://wvpress.org/breaking-news/west-virginia-legislative-interims-oversight-committee-hears-end-of-year-report-regarding-state-jails/
[17] https://www.theintelligencer.net/news/top-headlines/2023/01/west-virginia-heads-into-new-year-with-almost-1-billion-in-surplus-revenue/
[18] Plaintiffs' reserve the right to substitute additional class members to the extend the present class or sub-class representatives are released from jail or transferred to another correctional facility.

301.    There are questions of law or fact common to the class.

302.    Class A common questions of fact include whether inmates at SRJ are or have been exposed to the horrific conditions described hereinabove and whether the deplorable conditions of the facility violate the minimal standards of decency required to pass Constitutional muster.

303.    Common questions of law applicable to Class A include whether Defendants acted with deliberate indifference to the health and safety of inmates by knowingly exposing them to the conditions of confinement described hereinabove.

304.    The claims of the named Plaintiffs are typical of the claims of the class as a whole.

305.    Plaintiffs have been subjected to and suffered injury as the result of the same policies and/or lack of policies, same practices and/or lack of practices, and deprivations as the absent class members.

306.    The named Plaintiffs will fairly and adequately represent and advance the interests of the class.

307.    By filing this action, the named Plaintiffs have displayed a strong interest in vindicating the rights of all who have been similarly harmed by Defendants' actions.  By seeking to remedy the violations of their Constitutional rights, the named Plaintiffs will also be advancing and proving the claims and rights of absent class members.

308.    There are no antagonistic interests between Plaintiffs and the absent members of the class, and the relief sought by the named Plaintiffs will benefit the class generally.

309.    The named Plaintiff is represented by New, Taylor & Associates, the Lupardus Law Office, the Whitten Law Office, and Robert Dunlap & Associates, law firms with substantial experience in class litigation, representing inmates in civil actions, and in representing low-income West Virginians in civil actions.

- 42 -

310.    Counsel for the putative class are knowledgeable about the conditions of confinement in SRJ, the constitutional rights of pre-trial detainees and convicted prisoners, and are skilled in conducting civil rights litigation in federal courts, including the prosecution and management of class action litigation.

311.    Defendants have acted or refused to act on grounds generally applicable to the class, thereby making final relief with respect to the class as a whole an appropriate remedy.

312.    This class may be certified based on discrete sub-issues or bifurcated on the issues of Defendants' liability and individual class member damages.  *See* Fed. R. Evid. 23(c)(4).

1. ***Michael D. Rose – Class A Representative No. 1***

313.    Plaintiff Rose was incarcerated at SRJ on or about February 26, 2022.

314.    Plaintiff Rose was first a pre-trial detainee, but later pled guilty to a felony fleeing charge.

315.    Since arriving at SRJ, Plaintiff Rose has been housed in overcrowded cells, with as many as three (3) additional inmates in a two-person cell.

316.    Plaintiff Rose has never been housed in a cell at SRJ with less than two other inmates.

317.    Plaintiff Rose has gone as long as two (2) months without running water in a cell at SRJ.

318.    Plaintiff Rose has been housed in cells at SRJ that only have hot water.

319.    Water from a leaking sink, toilet, or from a wall shared with an adjacent shower has regularly resulted in standing water on the floor of his cells at SRJ.

320.    Plaintiff Rose has been housed in cells at SRJ with broken or otherwise non-functioning toilets.

321.   These non-functioning toilets regularly become infested with bugs.

322.   Plaintiff Rose has been housed in overcrowded pods at SRJ with only one (1) working shower.

323.   Plaintiff Rose has been housed in pods at SRJ with showers that only have cold water.

324.   Plaintiff Rose has been exposed to black mold at SRJ in inmate cells, inmate showers, and through the facility's air vents.

325.   Plaintiff Rose has been housed in pods at SRJ with no air conditioning.

326.   Plaintiff Rose has been housed in pods and inmate cells at SRJ infested with rats, rat feces, and ants.

327.   Plaintiff Rose has been given inadequate portions of food at SRJ.

328.   Plaintiff Rose has been given rotten or undercooked meat at SRJ.

329.   Plaintiff Rose has been given spoiled milk at SRJ.

330.   Plaintiff Rose has been forced to eat from dirty/unsanitary trays at SRJ.

331.   Plaintiff Rose has seen inmates fight over food trays at SRJ.

332.   Plaintiff Rose was not given a flex-cup or spork when he arrived at SRJ.

333.   As a result, Plaintiff Rose has had to drink from an old milk carton and eat with his hands.

334.   Plaintiff Rose was only provided one (1) set of clothing when he arrived at SRJ.

335.   Plaintiff Rose was provided no pillow when he arrived at SRJ.

336.   Plaintiff Rose has rarely been provided basic hygiene items at SRJ.

337.   Plaintiff Rose has gone as long as two (2) weeks without being provided basic hygiene items at SRJ, including toilet paper.

338.    Plaintiff Rose has seen inmates fight over hygiene items at SRJ.

339.    Plaintiff Rose has rarely been given recreation time at SRJ.

340.    Plaintiff Rose gone as long as two (2) weeks without recreation time at SRJ.

341.    Plaintiff Rose has been housed in inmate cells at SRJ that have broken lights, making it dark and difficult to see.

342.    Plaintiff Rose has been housed in inmate cells at SRJ with constantly flickering lights.

343.    Plaintiff Rose has witnesses numerous unjustified inmate beatings at the hands of correctional officers at SRJ.

344.    Plaintiff Rose has been housed in inmate cells at SRJ with doors that are broken or otherwise do not lock.

345.    As a result of one such broken cell door, Plaintiff Rose was stabbed in his sleep thirteen (13) times by another inmate during lockdown.

346.    Plaintiff Rose has been housed in inmate cells at SRJ with a broken "call box" or a call box that was never answered by correctional officers.

347.    Plaintiff Rose has had requests for medical attention or "sick calls" willfully ignored by correctional officers and PrimeCare and/or Wexford staff at SRJ.

348.    Plaintiff Rose has been denied several of his prescription medications at SRJ.

349.    Plaintiff Rose has requested grievance forms from correctional officers at SRJ, but has been refused.

350.    The few grievances Plaintiff Rose has been able to submit at SRJ (assuming they were actually filed), have all been ignored.

351.    Plaintiff Rose had bodily injuries or other serious medical needs willfully ignored or knowingly neglected by Defendants at SRJ.

### 2.   *Charles Blessard – Class A Representative No. 2*

352.    Plaintiff Blessard was incarcerated at SRJ on or about October 5, 2022.

353.    Plaintiff Blessard is a pre-trial detainee, charged with attempted burglary.

354.    Since arriving at SRJ, Plaintiff Blessard has been housed in overcrowded cells, with as many as three (3) additional inmates in a two-person cell.

355.    Plaintiff Blessard has been housed in cells at SRJ that have only hot or cold water.

356.    Plaintiff Blessard has been denied drinking water at SRJ.

357.    Plaintiff Blessard has been forced to drink brown, contaminated tap water at SRJ.

358.    Water from a leaking sink, toilet, or from a wall shared with an adjacent shower has regularly resulted in standing water on the floor of his cells at SRJ.

359.    Plaintiff Blessard has been housed in cells at SRJ with a leaking, broken, or otherwise non-functioning toilets.

360.    These non-functioning toilets regularly become infested with bugs.

361.    Plaintiff Blessard has been exposed to black mold at SRJ in inmate cells, inmate showers, and through the facility's air vents.

362.    Plaintiff Blessard has seen black mold be painted over at SRJ.

363.    Plaintiff Blessard has been housed in pods at SRJ with no air conditioning.

364.    Plaintiff Blessard has been housed in pods at SRJ with not working heat.

365.    Plaintiff Blessard has been housed in pods and inmate cells at SRJ infested with rats, rat feces, and ants.

366.    Plaintiff Blessard has been given inadequate portions of food at SRJ.

367.   Plaintiff Blessard has been given rotten or undercooked meat at SRJ.

368.   Plaintiff Blessard has been given spoiled milk at SRJ.

369.   Plaintiff Blessard has been forced to eat from dirty/unsanitary trays at SRJ.

370.   Plaintiff Blessard has been forced to drink from a dirty/unsanitary juice jug at SRJ.

371.   Plaintiff Blessard was not given a flex-cup or spork when he arrived at SRJ.

372.   As a result, Plaintiff Blessard has had to drink from an old milk carton and eat with his hands.

373.   Plaintiff Blessard was only provided one (1) set of clothing when he arrived at SRJ.

374.   Plaintiff Blessard was provided no pillow, mattress, or sheets when he arrived at SRJ.

375.   Plaintiff Blessard has been denied basic hygiene items at SRJ.

376.   Plaintiff Blessard has rarely been given recreation time at SRJ.

377.   Plaintiff Blessard has been housed in inmate cells at SRJ that have broken lights, making it dark and difficult to see.

378.   Plaintiff Blessard has been housed in inmate cells at SRJ with exposed electrical wires.

379.   Plaintiff Blessard has witnesses numerous unjustified inmate beatings at the hands of correctional officers at SRJ.

380.   Plaintiff Blessard has been housed in inmate cells at SRJ with doors that are broken or otherwise do not lock.

381.   Plaintiff Blessard has been housed in inmate cells at SRJ with a broken "call box" or a call box that was never answered by correctional officers.

382.    Plaintiff Blessard has had requests for medical attention or "sick calls" willfully ignored by correctional officers and PrimeCare and/or Wexford staff at SRJ.

383.    Plaintiff Blessard has been denied several of his prescription medications at SRJ.

384.    Plaintiff Blessard has requested grievance forms from correctional officers at SRJ, but has been refused.

385.    Plaintiff Blessard has suffered beatings and physical abuse at the hands of other inmates at SRJ.

386.    Plaintiff Blessard has suffered unjustified beatings and physical abuse at the hands of correctional officers at SRJ.

387.    Plaintiff Blessard had bodily injuries or other serious medical needs willfully ignored or knowingly neglected by Defendants at SRJ.

      a.    ***Robert William Church, Sr. – Sub-Class A Representative (ADA Inmates)***

388.    Plaintiff Church was formerly incarcerated at SRJ.

389.    Plaintiff Church is currently incarcerated at St. Mary's Correctional Center.

390.    Plaintiff Church was at all times relevant hereto a "qualified individual with a disability" under the Americans With Disabilities Act, 42 U.S.C. § 1213-1234 (hereinafter, the "ADA").

391.    Plaintiff Church is a single amputee who, upon being incarcerated at SRJ, used a crutch to walk.

392.    While incarcerated at SRJ, Plaintiff Church's crutch was broken by other inmates fighting in his pod.

393.     After his crutch was broken, a correctional officer at SRJ sat Plaintiff Church down in a chair and told him that he would find him another crutch or a wheelchair to help him get around.

394.     This correctional officer never returned to assist Plaintiff Church.

395.     Thankfully, other inmates in Plaintiff Church's pod constructed a makeshift crutch he used to walk.

396.     At SRJ, Plaintiff Church struggled with daily activities due to his disability.

397.     At SRJ, Plaintiff Church was discriminated against due to his disability.

398.     At SRJ, Plaintiff Church was barred from certain jail programs due to his disability. At SRJ, Plaintiff Church was not afforded reasonable accommodations to account for his disability, lack of mobility, and/or physical impairment.

   **b.  *Nichole Henry – Sub-Class A Representative (Female Inmates)***

399.     Plaintiff Henry was incarcerated at SRJ on or around October 15, 2018 on a parole violation.

400.     Plaintiff Henry is currently incarcerated at South Central Regional Jail in Kanawha County, West Virginia.

401.     In addition to being exposed to the inhumane conditions on confinement described hereinabove, Plaintiff Henry was repeatedly beaten and/or attacked by fellow inmates at SRJ.

402.     These beatings and threats of future violence against Plaintiff Henry were known by correctional officers at SRJ, but they refused to take reasonable steps to protect Plaintiff Henry or to prevent future acts of violence against her.

403.     During Plaintiff Henry's time at SRJ, a gang of female inmates controlled the A8 female pod.  This gang was/is known as the "A8 Gladiators."

404.     Correctional staff knew about the A8 Gladiators, were aware of their repeated acts of violence towards other inmates, but allowed beatings and other violent acts by this gang to occur.

405.     Plaintiff Henry was repeatedly beaten by members of the A8 Gladiators with correctional officer staff knowledge.

406.     During her time at SRJ, Plaintiff Henry was also beaten by fellow inmates in an isolation pod, had her face sliced with a razor, but correctional staff refused to break up the fight or remove Plaintiff Henry from the cell.

407.     During her time at SRJ, Plaintiff Henry was assaulted and vaginally penetrated by fellow inmates searching for drugs believed to be inside her body.

408.     Correctional officers knew that this brutal practice was occurring in pod A8, but failed to protect other female inmates, including Plaintiff Henry.

409.     During her time at SRJ, Plaintiff Henry was beaten a second time by the same A8 Gladiators that correctional officers failed to protect her from.

410.     Plaintiff Henry had bodily injuries or other serious medical needs willfully ignored or knowingly neglected by Defendants at SRJ.

### C.  Class B – Former Inmates

411.     Class B includes all former inmates who, from September 21, 2020 to the present, were incarcerated at SRJ. [19]

412.     Class B is so numerous that joinder of all members is impracticable.

413.     Members of Class B are fluid, as new individual members are released from SRJ or other penal facilities daily.

---

[19] Plaintiffs' reserve the right to substitute additional class members.

414.    There are questions of law or fact common to the class.

415.    Class B common questions of fact include whether former inmates of SRJ were exposed to the horrific conditions described hereinabove and whether the deplorable conditions of the facility violated the minimal standards of decency required to pass Constitutional muster.

416.    Common questions of law applicable to Class B include whether Defendants acted with deliberate indifference to the health and safety of inmates by knowingly exposing them to the conditions of confinement described hereinabove.

417.    The claims of the named Plaintiffs are typical of the claims of the class as a whole.

418.    Plaintiffs have been subjected to and suffered injury as the result of the same policies and/or lack of policies, same practices and/or lack of practices, and deprivations as the absent class.

419.    The named Plaintiffs will fairly and adequately represent and advance the interests of the class.

420.    By filing this action, the named Plaintiffs have displayed a strong interest in vindicating the rights of all who have been similarly harmed by Defendants' actions.  By seeking to remedy the violations of their Constitutional rights, the named Plaintiffs will also be advancing and proving the claims and rights of absent class members.

421.    There are no antagonistic interests between Plaintiffs and the absent members of the class, and the relief sought by the named Plaintiffs will benefit the class generally.

422.    The named Plaintiff is represented by New, Taylor & Associates, the Lupardus Law Office, the Whitten Law Office, and Robert Dunlap & Associates, law firms with substantial experience in class litigation, representing inmates in civil actions, and in representing low-income West Virginians in civil actions.

423.    Counsel for the putative class are knowledgeable about the conditions of confinement in SRJ, the constitutional rights of pre-trial detainees and convicted prisoners, and are skilled in conducting civil rights litigation in federal courts, including the prosecution and management of class action litigation.

424.    Defendants have acted or refused to act on grounds generally applicable to the class, thereby making final relief with respect to the class as a whole an appropriate remedy.

425.    This class may be certified based on discrete sub-issues or bifurcated on the issues of Defendants' liability and individual class member damages.  *See* Fed. R. Evid. 23(c)(4).

1. ***Edward L. Harmon – Class B Representative No. 1***

426.    Plaintiff Harmon was incarcerated as a pre-trial detainee at SRJ on or about July 16, 2021.

427.    Plaintiff Harmon was never convicted.  The charges against him were dismissed and he was released from SRJ on or about June 2, 2022.

428.    While Plaintiff Harmon was incarcerated at SRJ, he was housed in a two-person cell with between three (3) and five (5) other inmates at a time.

429.    As a result, Plaintiff Harmon regularly slept on the floor during his time at SRJ, often without a mattress.

430.    When Plaintiff Harmon was incarcerated at SRJ, numerous inmates lived on the dayroom floor of his pods.

431.    When Plaintiff Harmon first arrived at SRJ, he was placed in a suicide cell for eight (8) days for no apparent reason.

432.    He was housed in the suicide cell with between eight (8) and twelve (12) other inmates.

433.    While Plaintiff Harmon was in the suicide cell, he was denied access to a shower for eight (8) days.

434.    While in the suicide cell, Plaintiff Harmon was pepper sprayed and beaten by a correctional officer without justification (he was allegedly "standing too close to the door").

435.    Afterwards, Plaintiff Harmon received inadequate medical care for his injuries.

436.    When Plaintiff Harmon was released from the suicide cell, he was given one (1) set of clothing, no mattress, no bedding, no pillow, and no hygiene products.

437.    Plaintiff Harmon was also not given a flex-cup or spork.

438.    During his time at SRJ, one of the pods where Plaintiff Harmon was housed had only one (1) cell with a working sink and toilet.  This cell was kept open at all times so inmates could use the sink and toilet.  The sinks and toilets in all of the other cells where inmates slept were broken.

439.    At SRJ, broken toilets regularly became infested with maggots and other bugs.

440.    While Plaintiff Harmon was incarcerated at SRJ, water leaking from sinks, toilets, and showers was a constant problem.

441.     At SRJ, Plaintiff Harmon was forced to sleep in water on the floor of his cell.

442.    During his time at SRJ, none of the "call boxes" in Plaintiff Harmon's cells worked (or attempted calls were ignored by correctional officers).

443.    While Plaintiff Harmon was incarcerated at SRJ, black mold was everywhere – in his cell, in the showers, and on his clothes.

444.    Cleaning supplies (*e.g.*, bleach, mops, buckets, etc.) were rarely given to inmates to clean their living areas.  When cleaning supplies were provided, they were inadequate.

445.    During his time at SRJ, the pods where Plaintiff Harmon was housed often had only one (1) working shower.

446.    The hot water in the shower was usually broken, sometimes for months at a time.

447.    While Plaintiff Harmon was incarcerated at SRJ, the air conditioning and heat would regularly go out, often for months at a time.

448.    Laundry service at SRJ was rarely offered, so Plaintiff Harmon typically washed his clothes by hand in the shower.

449.    During his time at SRJ, the facility was infested with ants, silverfish, and mice.

450.    Mice (and mice feces) were often seen around used/dirty food trays left in the pod by correctional officers.

451.    While Plaintiff Harmon was incarcerated at SRJ, he was regularly given inadequate amounts of food.

452.    Plaintiff Harmon was often given moldy bread, spoiled milk, and rotten or under cooked meat.

453.    Plaintiff Harmon witnessed food trays stacked in the middle of pods by correctional officers, which resulted in inmates fighting over food and some inmates going hungry.

454.    Plaintiff Harmon was regularly forced to eat off of dirty or unsanitary trays.

455.    When Plaintiff Harmon was at SRJ, he was denied access to drinking water.

456.    The water fountains in pods where Plaintiff Harmon was housed were often broken.

457.    If the drinking fountain did work, the water was discolored and had a foul smell/taste.

458.    While Plaintiff Harmon was incarcerated at SRJ, basic hygiene products (including toilet paper) were rarely distributed by correctional officers.

459.    When hygiene items were distributed, correctional officers would throw garbage bags full of hygiene products into the middle of his pod and let the inmates fend for themselves, which resulted in inmates fighting over items and some inmates going without.

460.    Plaintiff Harmon went days without toilet paper in SRJ.

461.    Plaintiff Harmon was sometimes forced to use cut-up socks or clothing to use as toilet paper because none was available to him.

462.    Recreation was almost never offered while Plaintiff Harmon was at SRJ. Correctional officers regularly told inmates who requested recreation time that the "yard was broken."

463.    During his time at SRJ, Plaintiff Harmon lived in an overcrowded cell with no working lights.

464.    Plaintiff Harmon was housed in pods at SRJ that had few (or even no) inmate cell doors that would lock.

465.    When Plaintiff Harmon was incarcerated at SRJ, he was attacked by five (5) other inmates through an unlocked cell door.  As a result, he sustained serious physical injuries, including a broken nose and broken ribs.

466.    While at SRJ, Plaintiff Harmon requested psychological care, but was refused for months.

467.    At SRJ, Plaintiff Harmon became very sick with a skin rash/blisters.  He filed numerous "sick calls," but was told by correctional officers and PrimeCare and/or Wexford staff that "there is nothing wrong with you, you'll be alright."

468.    Plaintiff Harmon now has scars from his untreated rash/blisters.

469.    During his time at SRJ, Plaintiff Harmon was denied the ability to file grievances.

470.     When Plaintiff Harmon requested a grievance form from a correctional officer, he was refused or told the "grievance officer" was not in that day.

471.     At SRJ, kiosks were rarely available to file a grievance.  If Plaintiff Harmon was able to file an electronic grievance, he never received a reply.

472.     Plaintiff Harmon had bodily injuries or other serious medical needs willfully ignored or knowingly neglected by Defendants at SRJ.

**2.**     ***Thomas Fleenor, Jr. – Class B Representative No. 2***

473.     Plaintiff Fleenor was incarcerated at SRJ on or about February 4, 2021.

474.     Plaintiff Fleenor was later convicted of domestic battery.

475.     Plaintiff Fleenor was released from SRJ in July 2022.

476.     At SRJ, Plaintiff Fleenor was given inadequate portions of food.

477.     At SRJ, Plaintiff Fleenor was given raw, undercooked, frozen, and spoiled/contaminated food, including spoiled milk.

478.     At SRJ, Plaintiff Fleenor was forced to eat of dirty/unsanitary food trays.

479.     At SRJ, Plaintiff Fleenor was housed in inmate cells with no running water.

480.     At SRJ, Plaintiff Fleenor was housed in inmate cells with no hot water.

481.     At SRJ, Plaintiff Fleenor was denied drinking water.

482.     At SRJ, Plaintiff Fleenor was housed in inmate cells with water leaking from sinks, toilets, and/or from adjacent cells or showers.

483.     At SRJ, Plaintiff Fleenor received inadequate medical care.

484.     At SRJ, Plaintiff Fleenor was denied prescription medications.

485.     At SRJ, Plaintiff Fleenor had bodily injuries or other serious medical needs willfully ignored or knowingly neglected by Defendants.

486.     At SRJ, Plaintiff Fleenor had requests for medical attention or "sick calls" willfully ignored by correctional staff and Wexford and/or PrimeCare staff.

487.     At SRJ, Plaintiff Fleenor was denied or rarely given basic hygiene items, including toilet paper, soap, toothbrush, and toothpaste.

488.     At SRJ, Plaintiff Fleenor was not given a flex-cup or spork.

489.     At SRJ, Plaintiff Fleenor was housed in inmate cells with broken or otherwise nonfunctioning intercoms or "call boxes."

490.     At SRJ, Plaintiff Fleenor was exposed to black mold in his cell, in the showers, and through heating/air ducts.

491.     At SRJ, Plaintiff Fleenor was housed in over-crowed inmate cells, with as many has four (4) inmates in a two (2) person cell.

492.     At SRJ, Plaintiff Fleenor was often forced to sleep on the floor of his inmate cell.

493.     At SRJ, Plaintiff Fleenor was forced to sleep in the dayroom floor of his pod.

494.     While sleeping on the dayroom floor of his pod, a sewer line burst, causing sewage to seep through a drain Plaintiff Fleenor was forced to sleep on.

495.     At SRJ, Plaintiff Fleenor was housed in over-crowded pods with only one working shower.

496.     At SRJ, Plaintiff Fleenor was denied the ability to file grievances, both in paper form and on electronic kiosks.

497.     At SRJ, Plaintiff Fleenor was housed in pods/cells infested with mice or rats.

498.     At SRJ, Plaintiff Fleenor was housed in over-crowded inmate cells with broken or nonfunctioning toilets.

a. ***William Bohn – Sub-Class B Representative (ADA Inmates)***

499.    Plaintiff Bohn was formerly incarcerated at SRJ and released on or around January 2, 2023.

500.    Plaintiff Bohn was at all times relevant hereto a "qualified individual with a disability" under the ADA.

501.    At SRJ, Plaintiff Bohn was denied medical care for his withdrawal symptoms.

502.    At SRJ, Plaintiff Bohn developed a swollen appendix that caused a cyst near his colon.

503.    While at SRJ, this cyst burst, but Plaintiff Bohn was denied medical care by correctional staff, PrimeCare, and/or Wexford employees.

504.    When Plaintiff Bohn complained, instead of providing him with medical care, he was put in a "pickle suit" and placed in an overcrowded isolation cell, where he was forced to sleep on the floor in standing water.

505.    At SRJ, Plaintiff Bohn struggled with daily activities due to his disability.

506.    At SRJ, Plaintiff Bohn was discriminated against due to his disability.

507.    At SRJ, Plaintiff Bohn was barred from certain jail programs due to his disability.

508.    At SRJ, Plaintiff Bohn was not afforded reasonable accommodations to account for his disability, lack of mobility, and/or physical impairment.

b. ***Tonya Persinger – Sub-Class B Representative (Female Inmates)***

509.    Plaintiff Persinger was incarcerated at SRJ on or about July 1, 2021.

510.    Plaintiff Persinger was later convicted of possession with intent to distribute.

511.    Plaintiff Persinger was released from SRJ on or about October 18, 2021.

512.    At SRJ, Plaintiff Persinger was given inadequate portion of food.

513.   At SRJ, Plaintiff Persinger was denied drinking water.

514.   At SRJ, Plaintiff Persinger was housed in inmate pods without a functioning water fountain.

515.   At SRJ, Plaintiff Persinger was housed in inmate cells with broken or constantly flickering lights.

516.   At SRJ, Plaintiff Persinger was denied basic hygiene items, including toilet paper and feminine products.

517.   At SRJ, Plaintiff Persinger was not provided a mattress to sleep on.

518.   At SRJ, Plaintiff Persinger was not issued a flex-cup or spork to eat and drink with.

519.   At SRJ, Plaintiff Persinger was only issued one (1) set of clothing.

520.   At SRJ, Plaintiff Persinger was housed in inmate cells with a broken or otherwise nonfunctioning intercom or "call box."

521.   At SRJ, Plaintiff Persinger was exposed to black mold inmate showers, common areas, and showers.

522.   At SRJ, Plaintiff Persinger was regularly housed in overcrowded inmate cells.

523.   At SRJ, Plaintiff Persinger was housed in a two-person cell with as many as five (5) other inmates.

524.   At SRJ, Plaintiff Persinger had requests for medical attention or "sick calls" willfully ignored by correctional staff and Wexford and/or PrimeCare staff.

525.   At SRJ, Plaintiff Persinger was denied to ability to file grievances, both in paper form and on electronic kiosks.

526.   At SRJ, Plaintiff Persinger was rarely given recreational time.

527.    At SRJ, Plaintiff Persinger was regularly given rotten or spoiled food, including spoiled milk.

528.    At SRJ, Plaintiff Persinger was forced to eat from dirty or otherwise unsanitary food trays.

529.    At SRJ, Plaintiff Persinger was housed in pods and inmate cells infested with mice/rats, insects, ants, and snakes.

530.    At SRJ, Plaintiff Persinger was housed inmate cells with no running water.

531.    At SRJ, Plaintiff Persinger housed in inmate cells with no hot water.

532.    At SRJ, Plaintiff Persinger was housed inmate cells with broken or otherwise nonfunctioning toilets.

533.    At SRJ, Plaintiff Persinger was housed in inmate cells with water leaking from a sink, toilet, or adjacent shower on the floor.

534.    At SRJ, Plaintiff Persinger received inadequate medical care.

535.    At SRJ, Plaintiff Persinger had bodily injuries or other serious medical needs willfully ignored or knowingly neglected by Defendants at SRJ.

536.    At SRJ, Plaintiff Persinger was beaten for physically abused by both fellow inmates and correctional officers.

537.    At SRJ, Plaintiff Persinger was assaulted by another inmate, but was denied medical care for her broken nose and broken teeth.

538.    At SRJ, Plaintiff Persinger was exposed to violence of fellow inmates because her inmate cell door would not lock.

539.     At SRJ, Plaintiff Persinger was aware of correctional officers leaving inmate cell doors open or "popping" the locks on certain cell doors, so inmates can carry out violence against each other.

540.     At SRJ, Plaintiff Persinger was forced by two (2) male correctional officers to perform oral sex on them.

541.     These two officers threatened Plaintiff Persinger with mace, 23-hour lockdowns, no food, and beating her "like a man" if she did not perform oral sex on them.

## IV.     CAUSES OF ACTION

### COUNT I – EIGHTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983
### (Conditions of Confinement)
*Former Commissioner Jividen, Commissioner Marshall, Former Superintendent Francis, Superintendent Young, Former Major Warden, Former Acting Commissioner Douglas, Cabinet Secretary Sandy, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, and John/Jane Doe Wexford Employees*

542.     Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

543.     Defendants, while acting under color of law and within the scope of their employment, violated the Eighth Amendment right of convicted inmates to be free from cruel and unusual punishment.

544.     The actions of Defendants, described hereinabove, violated the constitutional rights guaranteed to Plaintiffs, and all similarly situated inmates and former inmates, under the Eighth Amendment to the United States Constitution by depriving them of basic human necessities.

545.     Defendants imposed and/or permitted these conditions despite said conditions not being reasonably related to any legitimate non-punitive governmental or penological objective.

546.     Defendants were deliberately indifferent to the health, safety, and other basic needs of Plaintiffs (and all similarly situated inmates and former inmates), as described hereinabove, by

having actual knowledge of such conditions and deliberately taking no action to remedy them in a timely or appropriate manner.

547.    Defendant supervisors likewise exhibited supervisory indifference or tacit authorization of the misconduct of subordinates and the constitutional injuries committed by said subordinates.

548.    Defendant supervisors had actual or constructive knowledge that their subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury and the Defendant supervisors' response to said knowledge was so inadequate as to show deliberate indifference or tacit authorization of these constitutional injuries.

549.    PrimeCare, through the John/Jane Doe PrimeCare Employees, deprived Plaintiffs of their Eighth Amendment rights by and through its official policies or customs, *inter alia*, PrimeCare policies and procedures, PrimeCare Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

550.    Wexford, through the John/Jane Doe Wexford Employees, deprived Plaintiffs of their Eighth Amendment rights by and through its official policies or customs, *inter alia*, Wexford policies and procedures, Wexford Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

551.    The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

552.    During the time period at issue, it was clearly established that the serious deprivations of basic human needs at SRJ, as described hereinabove, violated the Eighth Amendment to the United States Constitution.

553.     The actions of Defendants, described hereinabove, deliberately injured Plaintiffs in a way unjustified by any governmental interest.

554.     The actions of Defendants, described hereinabove, shock the conscious.

555.     The actions of Defendants, described hereinabove, were unlawful and unjustified.

556.     As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, Plaintiffs (and all similarly situated inmates and former inmates) suffered a deprivation of their Constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; the physical effect of drinking contaminated water; and the development of associated medical conditions.

557.     In addition to these compensatory damages, Plaintiffs will also seek to recover, under 42 U.S.C. § 1983, attorneys' fees and cost incurred during the course of this litigation.

558.     The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

### COUNT II – EIGHTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983
### (Deliberate Indifference To Serious Medical Needs)
*Former Commissioner Jividen, Commissioner Marshall, Former Superintendent Francis, Superintendent Young, Former Major Warden, Former Acting Commissioner Douglas, Cabinet Secretary Sandy, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, and John/Jane Doe Wexford Employees*

559.     Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

560.    Defendants, while acting under color of law and within the scope of their employment, violated the Eighth Amendment right of convicted inmates to be free from cruel and unusual punishment.

561.    The actions of Defendants, described hereinabove, violated the constitutional rights guaranteed to Plaintiffs, and all similarly situated inmates and former inmates, under the Eighth Amendment to the United States Constitution by acting with deliberate indifference to the serious medical needs of inmates.

562.    As described hereinabove, Defendants routinely fail to promptly provide  necessary and reasonable medical treatment to inmates at SRJ.

563.    Defendants were deliberately indifferent to, and willfully ignored, the serious medical needs of Plaintiffs (and all similarly situated inmates and former inmates), as described hereinabove, by failing to establish, monitor, and/or enforce policy directives and operational procedures to ensure that inmates at SRJ receive prompt and reasonable treatment for their medical needs.

564.    Defendant supervisors likewise exhibited supervisory indifference or tacit authorization of the misconduct of subordinates and the constitutional injuries committed by said subordinates.

565.    Defendant supervisors had actual or constructive knowledge that their subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury and the Defendant supervisors' response to said knowledge was so inadequate as to show deliberate indifference or tacit authorization of these constitutional injuries.

566.    PrimeCare, through the John/Jane Doe PrimeCare Employees, deprived Plaintiffs of their Eighth Amendment rights by and through its official policies or customs, *inter alia*,

PrimeCare policies and procedures, PrimeCare Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

567.    Wexford, through the John/Jane Doe Wexford Employees, deprived Plaintiffs of their Eighth Amendment rights by and through its official policies or customs, *inter alia*, Wexford policies and procedures, Wexford Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

568.    The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

569.    During the time period at issue, it was clearly established that failing to promptly provide necessary and reasonable medical treatment to inmates at SRJ, as described hereinabove, violated the Eighth Amendment to the United States Constitution.

570.    The actions of Defendants, described hereinabove, deliberately injured Plaintiffs in a way unjustified by any governmental interest.

571.    The actions of Defendants, described hereinabove, shock the conscious.

572.    The actions of Defendants, described hereinabove, were unlawful and unjustified.

573.    As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, Plaintiffs (and all similarly situated inmates and former inmates) suffered a deprivation of their Constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of delayed medical treatment; the physical effects of being denied medical treatment; the physical effect of drinking contaminated water; and the development of associated medical conditions.

574.    In addition to these compensatory damages, Plaintiffs will also seek to recover, under 42 U.S.C. § 1983, attorneys' fees and cost incurred during the course of this litigation.

575.     The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

### COUNT III – CONSPIRACY TO COMMITT EIGHTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983

*Former Commissioner Jividen, Commissioner Marshall, Former Superintendent Francis, Superintendent Young, Former Major Warden, Former Acting Commissioner Douglas, Cabinet Secretary Sandy, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, John/Jane Doe Wexford Employees, and John/Jane Doe County Employees*

576.     Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

577.     Defendants, while acting under color of law and within the scope of their employment, acted jointly and in concert to deprive Plaintiffs of their Eighth Amendment right to be free from cruel and unusual punishment.

578.     Defendants committed overt acts to accomplish the constitutional deprivations and injuries described herein.

579.     The actions of Defendants, described hereinabove, violated the constitutional rights guaranteed to Plaintiffs, and all similarly situated inmates and former inmates, under the Eighth Amendment to the United States Constitution by depriving them of basic human necessities and by acting with deliberate indifference to the serious medical needs of inmates.

580.     PrimeCare, through the John/Jane Doe PrimeCare Employees, deprived Plaintiffs of their Eighth Amendment rights by and through its official policies or customs, *inter alia*, PrimeCare policies and procedures, PrimeCare Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

581.     Wexford, through the John/Jane Doe Wexford Employees, deprived Plaintiffs of their Eighth Amendment rights by and through its official policies or customs, *inter alia*, Wexford

policies and procedures, Wexford Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

582.    Pursuant to W.Va. Code 29-12A-18(e), by alleging violations of the United States Constitution, the West Virginia Governmental Tort Claims and Insurance Reform Act is inapplicable to the County Defendants and/or the John/Jane Doe County Employees.

583.    The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

584.    During the time period at issue, it was clearly established that the serious deprivations of basic human needs and acting with deliberate indifference to the serious medical needs of inmates, as described hereinabove, violated the Eighth Amendment to the United States Constitution.

585.    The actions of Defendants, described hereinabove, deliberately injured Plaintiffs in a way unjustified by any governmental interest.

586.    The actions of Defendants, described hereinabove, shock the conscious.

587.    The actions of Defendants, described hereinabove, were unlawful and unjustified.

588.    As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, Plaintiffs (and all similarly situated inmates and former inmates) suffered a deprivation of their Constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; the physical effects of delayed medical treatment; the physical effects of being denied medical

treatment; the physical effect of drinking contaminated water; and the development of associated medical conditions.

589.    In addition to these compensatory damages, Plaintiffs will also seek to recover, under 42 U.S.C. § 1983, attorneys' fees and cost incurred during the course of this litigation.

590.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

### COUNT IV – FOURTEENTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983
#### (Conditions of Confinement)
*Former Commissioner Jividen, Commissioner Marshall, Former Superintendent Francis, Superintendent Young, Former Major Warden, Former Acting Commissioner Douglas, Cabinet Secretary Sandy, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, and John/Jane Doe Wexford Employees*

591.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

592.    Defendants, while acting under color of law and within the scope of their employment, violated the Fourteenth Amendment right of pretrial detainees to be free of punishment without due process.

593.    The actions of Defendants, described hereinabove, violated the constitutional rights guaranteed to Plaintiffs, and all similarly situated inmates and former inmates, under the Fourteenth Amendment to the United States Constitution by depriving them of basic human necessities, constituting punishment without due process.

594.    Defendants imposed and/or permitted these conditions despite said conditions not being reasonably related to any legitimate non-punitive governmental or penological objective.

595.    Defendants were deliberately indifferent to the health, safety, and other basic needs of Plaintiffs (and all similarly situated inmates and former inmates), as described hereinabove, by

having actual knowledge of such conditions and deliberately taking no action to remedy them in a timely or appropriate manner.

596.    Defendant supervisors likewise exhibited supervisory indifference or tacit authorization of the misconduct of subordinates and the constitutional injuries committed by said subordinates.

597.    Defendant supervisors had actual or constructive knowledge that their subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury and the Defendant supervisors' response to said knowledge was so inadequate as to show deliberate indifference or tacit authorization of these constitutional injuries.

598.    PrimeCare, through the John/Jane Doe PrimeCare Employees, deprived Plaintiffs of their Fourteenth Amendment rights by and through its official policies or customs, *inter alia*, PrimeCare policies and procedures, PrimeCare Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

599.    Wexford, through the John/Jane Doe Wexford Employees, deprived Plaintiffs of their Fourteenth Amendment rights by and through its official policies or customs, *inter alia*, Wexford policies and procedures, Wexford Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

600.    The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

601.    During the time period at issue, it was clearly established that the serious deprivations of basic human needs at SRJ, as described hereinabove, violated the Fourteenth Amendment to the United States Constitution.

602.     The actions of Defendants, described hereinabove, deliberately injured Plaintiffs in a way unjustified by any governmental interest.

603.     The actions of Defendants, described hereinabove, shock the conscious.

604.     The actions of Defendants, described hereinabove, were unlawful and unjustified.

605.     As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, Plaintiffs (and all similarly situated inmates and former inmates) suffered a deprivation of their Constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; the physical effect of drinking contaminated water; and the development of associated medical conditions.

606.     In addition to these compensatory damages, Plaintiffs will also seek to recover, under 42 U.S.C. § 1983, attorneys' fees and cost incurred during the course of this litigation

607.     The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

### COUNT V – FOURTEENTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983
### (Deliberate Indifference To Serious Medical Needs)
*Former Commissioner Jividen, Commissioner Marshall, Former Superintendent Francis, Superintendent Young, Former Major Warden, Former Acting Commissioner Douglas, Cabinet Secretary Sandy, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, and John/Jane Doe Wexford Employees*

608.     Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

609.    Defendants, while acting under color of law and within the scope of their employment, violated the Fourteenth Amendment right of pretrial detainees to be free of punishment without due process.

610.    The actions of Defendants, described hereinabove, violated the constitutional rights guaranteed to Plaintiffs, and all similarly situated inmates and former inmates, under the Fourteenth Amendment to the United States Constitution by acting with deliberate indifference to the serious medical needs of inmates.

611.    As described hereinabove, Defendants routinely fail to promptly provide necessary and reasonable medical treatment to inmates at SRJ.

612.    Defendants were deliberately indifferent to, and willfully ignored, the serious medical needs of Plaintiffs (and all similarly situated inmates and former inmates), as described hereinabove, by failing to establish, monitor, and/or enforce policy directives and operational procedures to ensure that inmates at SRJ receive prompt and reasonable treatment for their medical needs.

613.    Defendant supervisors likewise exhibited supervisory indifference or tacit authorization of the misconduct of subordinates and the constitutional injuries committed by said subordinates.

614.    Defendant supervisors had actual or constructive knowledge that their subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury and the Defendant supervisors' response to said knowledge was so inadequate as to show deliberate indifference or tacit authorization of these constitutional injuries.

615.    PrimeCare, through the John/Jane Doe PrimeCare Employees, deprived Plaintiffs of their Fourteenth Amendment rights by and through its official policies or customs, *inter alia*,

PrimeCare policies and procedures, PrimeCare Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

616.    Wexford, through the John/Jane Doe Wexford Employees, deprived Plaintiffs of their Fourteenth Amendment rights by and through its official policies or customs, *inter alia*, Wexford policies and procedures, Wexford Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

617.    The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

618.    During the time period at issue, it was clearly established that failing to promptly provide necessary and reasonable medical treatment to inmates at SRJ, as described hereinabove, violated the Fourteenth Amendment to the United States Constitution.

619.    The actions of Defendants, described hereinabove, deliberately injured Plaintiffs in a way unjustified by any governmental interest.

620.    The actions of Defendants, described hereinabove, shock the conscious.

621.    The actions of Defendants, described hereinabove, were unlawful and unjustified.

622.    As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, Plaintiffs (and all similarly situated inmates and former inmates) suffered a deprivation of their Constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of delayed medical treatment; the physical effects of being denied medical treatment; the physical effect of drinking contaminated water; and the development of associated medical conditions.

623.    In addition to these compensatory damages, Plaintiffs will also seek to recover, under 42 U.S.C. § 1983, attorneys' fees and cost incurred during the course of this litigation.

624.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

### COUNT VI – CONSPIRACY TO COMMITT FOURTEENTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983

*Former Commissioner Jividen, Commissioner Marshall, Former Superintendent Francis, Superintendent Young, Former Major Warden, Former Acting Commissioner Douglas, Cabinet Secretary Sandy, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, John/Jane Doe Wexford Employees, and John/Jane Doe County Employees*

625.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

626.    Defendants, while acting under color of law and within the scope of their employment, acted jointly and in concert to deprive Plaintiffs of their Fourteenth Amendment right of pretrial detainees to be free of punishment without due process.

627.    Defendants committed overt acts to accomplish the constitutional deprivations and injuries described herein.

628.    The actions of Defendants, described hereinabove, violated the constitutional rights guaranteed to Plaintiffs, and all similarly situated inmates and former inmates, under the Fourteenth Amendment to the United States Constitution by depriving them of basic human necessities and by acting with deliberate indifference to the serious medical needs of inmates.

629.    PrimeCare, through the John/Jane Doe PrimeCare Employees, deprived Plaintiffs of their Fourteenth Amendment rights by and through its official policies or customs, *inter alia*, PrimeCare policies and procedures, PrimeCare Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

630.    Wexford, through the John/Jane Doe Wexford Employees, deprived Plaintiffs of their Fourteenth Amendment rights by and through its official policies or customs, *inter alia*,

Wexford policies and procedures, Wexford Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

631.    Pursuant to W.Va. Code 29-12A-18(e), by alleging violations of the United States Constitution, the West Virginia Governmental Tort Claims and Insurance Reform Act is inapplicable to the County Defendants and/or the John/Jane Doe County Employees.

632.    The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

633.    During the time period at issue, it was clearly established that the serious deprivations of basic human needs and acting with deliberate indifference to the serious medical needs of inmates, as described hereinabove, violated the Fourteenth Amendment to the United States Constitution.

634.    The actions of Defendants, described hereinabove, deliberately injured Plaintiffs in a way unjustified by any governmental interest.

635.    The actions of Defendants, described hereinabove, shock the conscious.

636.    The actions of Defendants, described hereinabove, were unlawful and unjustified.

637.    As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, Plaintiffs (and all similarly situated inmates and former inmates) suffered a deprivation of their Constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; the physical effects of delayed medical treatment; the physical effects of being denied medical

treatment; the physical effect of drinking contaminated water; and the development of associated medical conditions.

638.    In addition to these compensatory damages, Plaintiffs will also seek to recover, under 42 U.S.C. § 1983, attorneys' fees and cost incurred during the course of this litigation.

639.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

## COUNT VII – FAILURE TO INTERVENE/BYSTANDER LIABILITY UNDER 42 U.S.C. §1983
*Former Superintendent Francis, Superintendent Young, Former Major Warden, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, John/Jane Doe Wexford Employees, and John/Jane Doe County Employees*

640.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

641.    Defendants, while acting under color of law and within the scope of their employment, violated Plaintiffs' constitutional rights by failing to intervene while the above-referenced constitutional violations occurred.

642.    Defendants were aware that Plaintiffs' Constitutional rights were being violated, as set forth hereinabove, yet purposefully failed and/or refused to take reasonable steps to protect Plaintiffs.

643.    Defendants had opportunities to intervene and protect Plaintiffs (and all similarly situated inmates and former inmates), but chose not to.

644.    The actions of Defendants, described hereinabove, violated the Constitutional rights guaranteed to Plaintiffs under the Eighth and Fourteenth Amendments to the United States Constitution.

645.     Pursuant to W.Va. Code 29-12A-18(e), by alleging violations of the United States Constitution, the West Virginia Governmental Tort Claims and Insurance Reform Act is inapplicable to the County Defendants and/or the John/Jane Doe County Employees.

646.     The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

647.     The actions of Defendants, described hereinabove, were unlawful and unjustified.

648.     As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, Plaintiffs (and all similarly situated inmates and former inmates) suffered a deprivation of their constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; the physical effect of drinking contaminated water; and the development of associated medical conditions.

649.     In addition to these compensatory damages, Plaintiffs will also seek to recover, under 42 U.S.C. § 1983, attorneys' fees and cost incurred during the course of this litigation.

650.     The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

## COUNT VIII – NEGLIGENCE

***Former Commissioner Jividen, Commissioner Marshall, Former Superintendent Francis,
Superintendent Young, Former Major Warden, Former Acting Commissioner Douglas,
Cabinet Secretary Sandy, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare
Employees, John/Jane Doe Wexford Employees, and John/Jane Doe County Employees***

651.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

652.    At all times relevant hereto, Defendants owed Plaintiffs (and all similarly situated inmates and former inmates) a duty of care.

653.    As set forth hereinabove, Defendants, while acting within the scope of their employment, breached their duties of care to Plaintiffs.

654.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs (and all similarly situated inmates and former inmates) suffered physical harm and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; the physical effect of drinking contaminated water; and the development of associated medical conditions.

655.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

656.    PrimeCare and Wexford are vicariously liable for the negligent acts and omissions of their employees committed within the scope of their employment.

657.    The County Defendants are vicariously liable for the negligent acts and omissions of their employees committed within the scope of their employment.

### COUNT IX – GROSS NEGLIGENCE
*Former Commissioner Jividen, Commissioner Marshall, Former Superintendent Francis, Superintendent Young, Former Major Warden, Former Acting Commissioner Douglas, Cabinet Secretary Sandy, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, John/Jane Doe Wexford Employees, and John/Jane Doe County Employees*

658.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

659.    At all times relevant hereto, Defendants owed Plaintiffs (and all similarly situated inmates and former inmates) a duty of care.

660.    As set forth hereinabove, Defendants, while acting within the scope of their employment, breached their duties of care to Plaintiffs.

661.    In breaching their duties of care, Defendants displayed a conscious indifference to probable dangerous consequences of their actions.

662.    In breaching their duties of care, Defendants displayed a reckless disregard for the safety of Plaintiffs.

663.    As a direct and proximate result of Defendants' grossly negligent conduct, Plaintiffs (and all similarly situated inmates and former inmates) suffered physical harm and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; the physical effect of drinking contaminated water; and the development of associated medical conditions.

664.     The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

665.     PrimeCare and Wexford are vicariously liable for the negligent acts and omissions of their employees committed within the scope of their employment.

666.     The County Defendants are vicariously liable for the negligent acts and omissions of their employees committed withing the scope of their employment.

<div align="center">

### COUNT X – *PRIMA FACIE* NEGLIGENCE

*Former Commissioner Jividen, Commissioner Marshall, Former Superintendent Francis, Superintendent Young, Former Major Warden, Former Acting Commissioner Douglas, Cabinet Secretary Sandy, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, John/Jane Doe Wexford Employees, and John/Jane Doe County Employees*

</div>

667.     Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

668.     As set forth hereinabove, Defendants violated W. Va. CSR § 95-1-10 *et seq*., W. Va. CSR § 95-1-8 *et seq*., W. Va. Code § 7-8-2A(a), W. Va. Code § 15A-3-1, and all other statutes intended for the safety and care of inmates who are in the custody of the State.

669.     Because Defendants' violation of W. Va. CSR § 95-1-10 *et seq*., W. Va. CSR § 95-1-8 *et seq*., W. Va. Code § 7-8-2A(a), W. Va. Code § 15A-3-1, and all other statutes intended for the safety and care of inmates who are in the custody of the State proximately caused Plaintiffs' injuries, Defendants are liable under a theory of *prima facie* negligence.

670.     As a direct and proximate result of Defendants' negligent conduct, Plaintiffs (and all similarly situated inmates and former inmates) suffered physical harm and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of

dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; the physical effect of drinking contaminated water; and the development of associated medical conditions.

671.     The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

672.     PrimeCare and Wexford are vicariously liable for the negligent acts and omissions of their employees committed within the scope of their employment.

673.     The County Defendants are vicariously liable for the negligent acts and omissions of their employees committed within the scope of their employment.

### COUNT XI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/TORT OF OUTRAGE
*Former Commissioner Jividen, Commissioner Marshall, Former Superintendent Francis, Superintendent Young, Former Major Warden, Former Acting Commissioner Douglas, Cabinet Secretary Sandy, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, John/Jane Doe Wexford Employees, and John/Jane Doe County Employees*

674.     Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

675.     Defendants' actions toward Plaintiffs, as described hereinabove, were atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency.

676.     Defendants acted with intent to inflict emotional distress or acted recklessly when it was certain or substantially certain that emotional distress would result from their outrageous conduct.

677.     Defendants' heinous actions caused Plaintiffs (and all similarly situated inmates and former inmates) to suffer severe emotional distress.

678.    The emotional distress was so severe, no reasonable person could be expected to endure it.

679.    As a direct and proximate result of Defendants' reckless, intolerable, and outrageous conduct, Plaintiffs (and all similarly situated inmates and former inmates) suffered physical harm and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; the physical effect of drinking contaminated water; and the development of associated medical conditions.

680.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

## COUNT XII – COMMON LAW CIVIL CONSPIRACY
***Former Commissioner Jividen, Commissioner Marshall, Former Superintendent Francis, Superintendent Young, Former Major Warden, Former Acting Commissioner Douglas, Cabinet Secretary Sandy, John/Jane Doe Correctional Officers, John/Jane Doe PrimeCare Employees, John/Jane Doe Wexford Employees, and John/Jane Doe County Employees***

681.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

682.    As set forth hereinabove, Defendants acted jointly and in concert to:

a.  Negligently injure Plaintiffs;

b.  Injure Plaintiffs in a grossly negligent manner;

c.  Negligently violate various statues giving rise to *prima facie* liability; and

d.  Intentionally inflict emotional distress on Plaintiffs.

683.   As set forth hereinabove, Defendants had a meeting of the minds to accomplish the tortious actions and injuries described herein.

684.   As set forth hereinabove, Defendants committed overt acts to accomplish the tortious actions and injuries described herein.

685.   As a direct and proximate result of Defendants' tortious conduct, Plaintiffs (and all similarly situated inmates and former inmates) suffered physical harm and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of loss of sleep and/or exhaustion; nausea and/or vomiting; the physical effects of dehydration and/or malnutrition; the physical effects of exposure to black mold; the physical effects of inadequate lighting; the physical effects of inadequate recreation; the physical effect of living in unsanitary conditions; the physical effect of drinking contaminated water; and the development of associated medical conditions.

686.   The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

687.   PrimeCare and Wexford are vicariously liable for the negligent acts and omissions of their employees committed within the scope of their employment.

688.   The County Defendants are vicariously liable for the negligent acts and omissions of their employees committed within the scope of their employment.

## COUNT XIII – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### *Cabinet Secretary Sandy, Commissioner Marshall, and Superintendent Young*

689.   Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

690.     Plaintiffs Church and Bohn brings this claim on behalf of themselves and a subclass of all similarly situated inmates, *i.e.*, all inmates incarcerated at SRJ within the class period who meet the standards of being a qualified individual with a disability under the ADA.

691.     Title II of the ADA, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of disability, be excluded from any participation in or be denied the benefits of the servicers, programs, or activities of a public entity, or be subject to discrimination by such entity."

692.     The WVDOCR and the WVDOHS are public entities subject to and governed by requirements and prohibitions of Title II of the ADA.

693.     In violation of the ADA and 28 C.F.R. § 35.130(b), Defendants have committed and are continuing to commit unlawful acts of discrimination, including:

(a)     failing to afford qualified individuals with disabilities an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others;

(b)     providing qualified individuals with disabilities with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(c)     utilizing criteria or methods of administration that have:

(i)     the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; and

(ii)     the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities.

(d)     Failing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability;

(e)     Failing to make reasonable accommodations to account for inmates with disabilities; and

(f)     Imposing or applying eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity.

694.    Plaintiffs Church and Bohn and the absent members of the sub-class are qualified persons with disabilities protected against discrimination on the basis of their disabilities by the Americans with Disability Act.

695.    Plaintiffs Church and Bohn and the absent subclass members were and continue to be denied the benefits of services, programs, or activities due to their disabilities, and have otherwise been discriminated against on the basis of their disabilities.

**COUNT XIV – TEMPORARY INJUNCTIVE RELEIF UNDER FED. R. CIV. P. 65**
***Cabinet Secretary Sandy, Commissioner Marshall, and Superintendent Young***

696.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

697.    As set forth hereinabove, Defendants have overseen past and present constitutional deprivations at SRJ regarding inhumane conditions of confinement, deliberate indifference towards the health and safety of inmates, cruel and unusual punishment, and failing to reasonably protect inmates from the constant threat of violence and sexual assault while incarcerated.

698.    Defendants should be temporarily enjoined from allowing these constitutional deprivations to continue, and compelled to make all necessary structural and/or infrastructure repairs, hazard abatements, policy and procedure changes, financial investments, and personnel changes to ensure these constitutional deprivations cease and do not continue in the future.

699.    As set forth hereinabove, West Virginia's jails and prisons, including SRJ, have unsafe, unsanitary, and crumbling infrastructure, including but not limited to, broken or otherwise faulty inmate cell locks and/or locking mechanisms; broken, malfunctioning, or otherwise faulty plumbing and plumbing fixtures; broken or cracked inmate cell windows; broken, malfunctioning, or otherwise faulty lights; broken, malfunctioning, or otherwise faulty heating and air conditioning; broken, malfunctioning, or otherwise faulty intercoms or "call boxes" in inmate cells; and broken, malfunctioning, or otherwise faulty correctional officer tower intercoms.

700.    As set forth hereinabove, and according to Defendants' own admissions, West Virginia jails and prisons, including SRJ, have approximately two hundred and twenty-seven million dollars ($227,000,000.00) in deferred maintenance needs, including sixty million dollars ($60,000,000.00) in high-priority, public safety measures.   These high-priority, public safety repairs include twenty-seven million dollars ($27,000,000.00) for door locks and locking mechanisms.

701.    As set forth hereinabove, the State of West Virginia has approximately one billion dollars ($1,000,000,000.00) in budget surplus money.

702.    Defendants should be temporarily enjoined and compelled to immediately spend state surplus funds (or any other funds) to make all of the required differed maintenance repairs needed at SRJ and other jails/prisons throughout West Virginia.

703.    Upon information and belief, Defendants have in the past, and currently are, interfering with inmates' legal mail and access to legal counsel at SRJ.

704.    Upon information and belief, Defendants have in the past, and currently are, destroying legal mail sent to inmates at SRJ; opening legal mail sent to inmates at SRJ outside of the inmate's presence; photocopying legal mail sent to inmates at SRJ; and destroying pre-paid,

return envelopes from counsel contained in legal mail sent to inmates at SRJ (and then making inmates pay for return postage out of their commissary).

705.    All of the above-referenced actions violate WVDOCR policy, West Virginia law, and/or federal law.

706.    Upon information and belief, Defendants have in the past, and currently are, limiting or hindering legal counsel from conducting in-person meeting with clients incarcerated at SRJ.

707.    Upon information and belief, Defendants have in the past, and currently are, limiting or hindering inmates at SRJ from contacting legal counsel via telephone.

708.    Defendants should be temporarily enjoined from destroying or interfering with legal mail, limiting or hindering in-person meetings with legal counsel, and limiting or hindering contact with legal counsel via telephone at SRJ.

## V.    **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, on behalf of themselves and all other similarly situated current and former inmates at SRJ, request that the Court:

    a) Certify a class and/or subclasses pursuant to Federal Rule of Civil Procedure 23;

    b) Declare under Fed. R. Civ. P. 57 that Defendants' actions and/or inactions, as described hereinabove, violate the Eighth and Fourteenth Amendments to the United States Constitution;

    c) Declare under Fed. R. Civ. P. 57 that Defendants' actions and/or inactions, as described hereinabove, violate the ADA;

d)  Temporarily enjoin, under Fed. R. Civ. P. 65, Defendants from engaging in further unconstitutional practices, as described hereinabove, and compel them to implement and enforce policies, procedures, and practices necessary to ensure the minimal civilized measure of life's necessities and/or the Constitutional thresholds of confinement are provided to all inmates housed in SRJ;

e)  Temporarily enjoin, under Fed. R. Civ. P. 65, Defendants from engaging in further unconstitutional practices, as described hereinabove, and compelled them to make all necessary structural and/or infrastructure repairs, hazard abatements, financial investments, and personnel changes to ensure these constitutional deprivations cease and do not continue in the future.

f)  Temporarily enjoin, under Fed. R. Civ. P. 65, Defendants from engaging in further violations of the ADA, as described hereinabove, and compel Defendants to implement and enforce policies, procedures, and practices necessary to ensure ADA compliance at SRJ;

g)  Temporarily enjoin and compel, under Fed. R. Civ. P. 65, Defendants to spend state budget surplus funds in order to make all of the necessary deferred maintenance repairs required at SRJ;

h)  Award attorney's fees and costs incurred during the course of this litigation, pursuant to 42 U.S.C. § 1983;

i)  Grant any and all relief Plaintiffs or class and/or subclass members may be entitled to in law or equity; and

j)  Any further relief this Honorable Court deems just and proper.

**MICHAEL D. ROSE, CHARLES BLESSARD, ROBERT WILLIAM CHURCH, SR., NICOLE HENRY, EDWARD L. HARMON, THOMAS FLEENOR, JR., WILLIAM BOHN, and TONYA PERSINGER, on their own behalf and on behalf of all those similarly situated,**

**By Counsel**

*/s/ Stephen P. New*

Stephen P. New (WVSB No. 7756)
Amanda J. Taylor(WVSB No. 11635)
New, Taylor & Associates
430 Harper Park Drive
Beckley, West Virginia 25801
Ph: (304) 250-6017
Fax: (304) 250-6012
steve@newtaylorlaw.com
mandy@newtaylorlaw.com

Timothy Lupardus (WVSB No. 6252)
The Lupardus Law Office
275 Bearhole Road
Pineville, West Virginia 24874
(304) 732-0250
office@luparduslaw.com

Zachary Whitten (WVSB No. 13709)
The Whitten Law Office
P.O. Box 753
Pineville, West Virginia 24874
zwhittenlaw@gmail.com

Robert Dunlap (WVSB No. 10012)
Robert Dunlap & Associates
208 Main Street
Beckley, West Virginia 25801
(304) 255-4762
robertdunlapesq@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Plaintiff hereby certifies that a true and correct copy of the foregoing *SECOND AMENDED CLASS ACTION COMPLAINT* was filed with the clerk on July 17, 2023 via the Court's CM-ECF Filing System which will provide electronic notification to all counsel of record.

<div style="margin-left:50%">

*/s/ Stephen P. New*
Stephen P. New (WVSB No. 7756))
New, Taylor & Associates
430 Harper Park Drive
Beckley, West Virginia 25801
Ph: (304) 250-6017
Fax: (304) 250-6012

</div>