**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**MICHAEL D. ROSE, *ET AL*.,**

              **Plaintiffs,**

**vs.**                                        **Civil Action No. 5:22-cv-00405**

**JEFF S. SANDY, individually and
in his official capacity as the Cabinet Secretary of the
West Virginia Department of Homeland Security, *ET AL*.,**

              **Defendants.**

## ORDER AND PROPOSED FINDINGS AND RECOMMENDATION

On October 2, 2023, the parties came before the undersigned for an evidentiary hearing regarding the Plaintiffs' ***Expedited Motion to Compel Defendants Jeff Sandy and Brad Douglas to Respond Fully and Adequately to Discovery and to Deem Requests for Admission Admitted, and Sanctions*** (ECF No. 600)[1] filed on September 1, 2023, and the ***Defendants' Updated Status Report and Objection to Plaintiffs' Expedited Motion to Compel*** (ECF No. 616) filed on

---

[1] Following an earlier hearing held on August 14, 2023, before the undersigned, the Plaintiffs were directed to file a supplemental omnibus discovery motion to supplant or supersede their prior motions to compel to streamline outstanding discovery issues. (See ECF No. 546) Accordingly, for purposes herein, the Plaintiffs' ***Motion to Compel Defendant Brad Douglas to Respond Fully and Adequately to Discovery*** (ECF No. 436), ***Motion to Compel Defendant Jeff Sandy to Respond Fully and Adequately to Discovery*** (ECF No. 450), and ***Supplemental Motion to Compel Defendant Jeff Sandy to Respond Fully and Adequately to Discovery*** (ECF No. 458) are hereby deemed subsumed by the pending ***Expedited Motion***, *supra*, and the Clerk is directed to **TERMINATE** same.

During a subsequent hearing on these matters on September 11, 2023, counsel for the Plaintiffs withdrew that portion of the omnibus motion (ECF No. 600) to Deem Requests for Admission Admitted, however, because the Plaintiffs have still not received all responsive discovery that the Defendants had assured them was forthcoming, the Plaintiffs could not withdraw the motion to compel full and adequate discovery. Further, because of the Defendants' recent disclosure that certain ESI had not been preserved, despite the Plaintiffs' efforts to obtain same and to facilitate its production by way of the ESI protocols, the Plaintiffs could not withdraw the motion for sanctions. Therefore, the undersigned considers this omnibus motion as the precursor to the Plaintiffs' follow up Motion for a Finding of Spoliation and for Sanctions, as discussed herein.

September 8, 2023. After the hearing, the Court directed counsel for the Plaintiffs and the West Virginia Division of Corrections and Rehabilitation ("WVDCR") Defendants to submit briefings for the undersigned's consideration of the appropriate sanctions[2]. In compliance with this directive,  on October 13, 2023, the Plaintiffs filed their **Motion for a Finding of Spoliation and for Sanctions Against Defendants Jeff Sandy, Brad Douglas, Betsy Jividen, and William Marshall, III** (ECF No. 713) and their supporting **Memorandum** (ECF No. 714); on October 20, 2023, the WVDCR Defendants (Sandy[3], Douglas, Jividen, and Marshall) filed their **Response in Opposition** (ECF No. 740), to which the Plaintiffs filed their Reply (ECF No. 754 ) filed October 24, 2023. Consequently, the matters herein are ripe for decision.

For the reasons stated *infra*, the Court hereby **GRANTS** the Plaintiffs' **Expedited Motion to Compel Defendants Jeff Sandy and Brad Douglas to Respond Fully and Adequately to Discovery and to Deem Requests for Admission Admitted, and Sanctions** (ECF No. 600) and **GRANTS** their **Motion for a Finding of Spoliation and for Sanctions Against Defendants Jeff Sandy, Brad Douglas, Betsy Jividen, and William Marshall, III** (ECF No. 713).

### Background

This Court is keenly aware of the issues and procedural events leading up to the Plaintiffs' request for a panoply of sanctions, thus, they will not be reproduced herein. Nevertheless, there is no dispute that the Plaintiffs filed numerous motions to compel, as well as motions for sanctions and spoliation of evidence, and that only *after* having done so, and *after* the Court hosted numerous video conferences and hearings on those matters, and *after* the Court ordered the WVDCR

---

[2] See ECF No. 709 at 180-181.

[3] It is noted that Defendant Sandy is the Cabinet Secretary of the West Virginia Department of Homeland Security, however, for purposes herein, and for the sake of simplicity, he will be referred to collectively at times as a WVDCR Defendant.

Defendants to supplement their discovery responses, did these Defendants **attempt** to produce responsive discovery. (See, e.g., ECF Nos. 117, 373, 436, 450, 458) In spite of this Court's repeated intervention in fairly straightforward discovery matters, these Defendants' efforts did not just fall far short from the Court's and even Counsel's expectations – they have ushered in a dereliction of duty that the undersigned has determined to be a defining characteristic of these Defendants' discovery practices. There are many notable instances in the record that demonstrate the WVDCR Defendants' utter disregard for the Federal Rules of Civil Procedure, let alone their own policies governing the preservation of discovery – to say the Court found the testimony elicited from these Defendants shocking is a gross understatement.

### A Summary of the Testimony

As an initial matter, the Court finds that a summary of the testimonial evidence presented during the hearing held on October 2, 2023, before the undersigned is necessary to highlight the egregious discovery abuses that have plagued this action before the original complaint was filed and ever since. (See generally, ECF No. 709)

The Plaintiffs called seven (7) witnesses, three (3) of whom are named Defendants in this case, and former or current employees of the WVDCR: Douglas, Jividen, and Francis.

Douglas Testimony:

Douglas testified that he had been Chief of Staff since July 1, 2018, however, he was the Interim Commissioner from August 6, 2022, when Jividen terminated her employment, through January 2023. As Chief of Staff, Douglas was one of two individuals (including Molly Mullins, the Director of Technology) as a point of contact for the West Virginia Office of Technology ("WVOT") during the Summer of 2022.

During that time, Douglas confirmed that he was familiar with a document called a

Memorandum of Understanding ("MOU") (ECF No. 704) that was signed by Defendant Sandy on November 2, 2021. Douglas confirmed this document applied to WVDCR prisons and jails during the Summer of 2022, and provided that he or Ms. Mullins would meet on a regular basis to collaborate on ways technology services offered can help the agency meet its business and strategic needs. During the Summer of 2022, when the Plaintiffs preservation letters were sent, neither Douglas nor Ms. Mullins met with WVOT to discuss the technological needs relative to preserve evidence. Douglas admitted there was no reason for not meeting with WVOT regarding evidence preservation at that time. Douglas admitted that the MOU also provided that either he or Ms. Mullins were responsible to work with WVOT to preserve ESI evidence, including email accounts, cell phones, or text messages, but neither Douglas nor Ms. Mullins met with WVOT to discuss preserving this evidence. Douglas admitted there was no excuse for this, he just "[d]idn't think about it."[4]

Douglas testified that he was made aware of the Plaintiffs' preservation letters in June and July 2022 because he was copied on an e-mail. (See ECF No. 704-2) Douglas confirmed that the e-mail chain included Defendant Francis, Marvin Plumley, Jackie Binion, Della Hall, Susan Harding, and Harold Withrow. Douglas stated that Jackie Binion was a regional manager over the SRJ, and Marvin Plumley was his superior. Douglas identified Della Hall as his secretary, and Susan Harding as the Commissioner's Executive Secretary. Major Harold Withrow was the security officer at the SRJ.[5] Douglas confirmed that everyone with the SRJ chain of command knew via email on July 7, 2022, about the Plaintiffs' evidence preservation letter. This included Marvin Plumley, Defendant Jividen, the Assistant Commissioner Paul Simmons, and Sarah

---

[4] See ECF No. 709, p.13, line 14.

[5] Major Withrow replaced the retiring Larry Warden. Id., p. 61, lines 2-5.

Daugherty, the paralegal who works for Phil Sword, counsel for the West Virginia Department of Homeland Security ("DHS").

Douglas testified that he advised Phil Sword that there was "no way we can preserve all video evidence"[6] because of his experience as an administrator at a regional jail and having knowledge of the technological capacity of how the system works. However, Douglas admitted that neither he nor Ms. Mullins contacted WVOT about how to preserve this evidence because "[w]e didn't think of it."[7] Douglas admitted that no steps were taken to preserve the evidence at the SRJ, including e-mails and documents. Douglas did not share any information with others, including Jividen and Francis, as to what steps needed to be taken to preserve evidence, though he could have done so.

Douglas admitted that the email accounts belonging to Jividen, Francis, Larry Warden, and David Young were not preserved. Douglas could not confirm that five years' worth of SRJ inmate grievances as required by the record retention policy have been preserved. Douglas admitted that no steps were taken to preserve any email accounts of former employees of the WVDCR since July 7, 2022. Douglas admitted that nobody, including himself, followed the process concerning litigation holds for discovery or information in the Summer of 2022 because they "[d]idn't think of it."[8] Douglas admitted that it is not up to WVOT to contact the agency about preserving email accounts, but is incumbent upon him or the agency to contact WVOT about preserving such evidence. Douglas testified that he was not aware that the Plaintiffs' law firm agreed to absorb the costs relative to preserving the video evidence at SRJ and he was not aware how much it would

---

[6] Id., p.16, lines 6-7.

[7] Id., p.17, line 5.

[8] Id., p.22, line 1.

have cost to do so; Douglas agreed that the cost to preserve email accounts would not have been significant or to preserve paper documents at the SRJ.

Douglas testified that he was familiar with Policy Directive 105.08 that concerns evidence retention, that was signed by Jividen on October 15, 2021 (ECF No. 704-3). Douglas confirmed that the Policy Directive provided that records shall be preserved when the Legal Department for DHS advises that records relevant to litigation or potential litigation must be preserved, and the Legal Department determines when those records are no longer needed. Douglas confirmed that he was unaware of anyone from the Legal Department, or any other agency determining what evidence might need to be preserved during the Summer of 2022. Douglas confirmed that the Policy Directive concerning destroying records, including paper inmate grievances, required a Document Destruction Request Form to be signed (Id. at 8-10). Douglas testified that he could not find any document destruction requests from the SRJ predating 2022.

Douglas could not confirm that the Policy Directive concerning evidence retention also applies to cell phones issued to employees but did confirm that Defendants Jividen and Francis and Larry Warden had state-issued cell phones. Douglas testified that these individuals retired after the Plaintiffs sent their preservation of evidence letters, and that upon termination of employment, an employee's cell phone is to be turned in to a supervisor. Douglas testified that when Jividen left, she left her cell phone with him, but he could not recall what was done with it and her cell phone cannot be located. Douglas also testified that he was uncertain if Francis' and Warden's cell phones were preserved but is aware the PINs to them are unknown in order to access them. Douglas confirmed that he allowed Jividen's email account to be deprovisioned on August 10, 2022 (ECF No. 704-6), without consulting the Legal Department or WVOT, and aware that there was an evidence hold pursuant to the Plaintiffs' preservation letters. Douglas admitted that the email

account belonging to another former WVDCR employee was deprovisioned after the Plaintiffs filed their lawsuit but could not recall who authorized that.

On cross examination, Douglas testified that he did not intend to deprive the Plaintiffs the opportunity to review Jividen's email account when he authorized it to be deprovisioned. He confirmed that emails from deprovisioned email accounts are still available if they were sent to current WVDCR employees; he confirmed these emails have been produced to the Plaintiffs. Douglas explained the purpose for deprovisioning email accounts is to prevent former employees access to the State computer network. Deprovisioning an email account can be accomplished through authorization, or by inactivity. Douglas did not consider that Jividen's emails to other former employees would be lost when he authorized her account deprovisioned, as he had a lot going on at the time. Douglas testified that the Policy Directive did not include emails or cell phones.[9] Douglas confirmed that just within the past week, the WVDCR instituted a new policy governing ESI (emails, cell phones, and other electronic evidence) preservation because of this lawsuit, they realized there were holes in their procedures and inadequate tracking and preservation of ESI evidence. (ECF No. 704-1)[10]

Douglas testified that he was not aware of any communications from the Plaintiffs' counsel to Phil Sword about the Plaintiffs bearing the costs of preserving the recordings of digital video system at SRJ. Douglas was also unaware of any efforts by the Plaintiffs' counsel to provide any

---

[9] Noting the contradiction in his testimony on direct examination, the undersigned was compelled to question Mr. Douglas further on whether the Policy Directive also encompassed the retention of emails and cell phones. Despite the plain text defining "records" in the Policy Directive, which includes "computer entries, emails, computer files, electronic images or any other information stored on any computer maintained by the Division of Corrections and Rehabilitation," Mr. Douglas maintained that the WVDCR had a "poor practice and a poor procedure" as to how to retain electronic records and intends to fix that problem. (See, ECF No. 709, pp. 49-51)

[10] This exhibit concerns a copy of the recent Policy Directive 109.04, signed on September 25, 2023, by Defendant Marshall.

computer packages to the SRJ to preserve those video recordings.

Douglas confirmed that Francis received one of the Plaintiffs' preservation letters on July 7, 2022, that he had forwarded an email regarding same up the proper chain of command, which included Jividen, and that he forwarded the email down the chain of command, which included Warden. Francis' last day at the SRJ was July 11, 2022. Douglas also confirmed that any emails just between Francis and Jividen no longer exist, just as no emails from any former correctional officers or other former employees just between or among each other no longer exist. Douglas admitted that he did not spend time preserving evidence in the Summer of 2022, and that emails were not properly preserved. While Douglas admitted, when he first became Interim Commissioner, he had a lot going on, he knew he had the assistance of Phil Sword in the Legal Department, the Attorney General's Office, and WVOT had he asked. Douglas also confirmed that by late August 2022 AIG had hired lawyers to try to help preserve evidence to prepare for litigation. Douglas testified he believed the destruction of evidence in this case was due to a "critical failure of communication."[11]

Phil Sword Testimony:

Sword testified that he is employed as an Assistant Attorney General and General Counsel for the DHS and had been employed as Assistant Attorney General since late June 2021. Sword confirmed that the DHS website indicates that there is one embedded Assistant Attorney General aware of issues concerning the DHS, including those impacting litigation. He confirmed receipt of the first of the Plaintiffs' preservation letters in late June 2022. He confirmed that no later than July 7, 2022, he became aware of evidence preservation letters. Sword testified as an Assistant

---

[11] ECF No. 709, p.66, lines 8-12.

Attorney General his role is "[v]ery little" in the preservation of evidence for impending litigation. He recalled that the Plaintiffs' counsel intended to preserve video recording evidence at SRJ by purchasing hard drives. Sword testified that because the Plaintiffs' counsel did not purchase these hard drives, it is their fault for not preserving this video evidence. In response to whether he communicated with the Plaintiffs' counsel about purchasing hard drives, he testified that "[w]e were represented by counsel, so that was the limit of my involvement."[12] Other than providing the WVDCR and DHS with the Plaintiffs' preservation letters, he did not have any meetings with any of the WVDCR Defendants or with WVOT regarding the preservation of evidence. Because they were represented by counsel, Sword did not coordinate those issues.

Sword testified that he was aware of a lot of media reports in March 2022 leading up to the receipt of the Plaintiffs' evidence preservation letters that there were numerous lawsuits that were going to be filed against SRJ, including at least three concerning inmate deaths at the facility.

Sword testified that if the Plaintiffs wanted to certain email accounts preserved, then they would have to give the names on those accounts. Sword explained that because West Virginia law provides that counsel have an opportunity to request materials prior to filing suit, such an incident reports, from those reports, counsel may request that certain email accounts be held from deprovisioning, as WVOT cannot hold these accounts by subject matter, only by name. Sword denied that he would be in a superior position to know which named accounts are to be preserved, because access to those reports would not yield that information.[13] Sword confirmed that if told

---

[12] Id., p.76, lines 4-6.

[13] At this point in the testimony, once again, the Court was compelled to ask this witness how Plaintiffs' counsel is expected to know whose email accounts need to be preserved from incident reports when he himself could not glean that information. The only explanation Mr. Sword provided in response to the Court's inquiry was "that is very time consuming. It would require us to review all of those documents. . .. And that's why we have placed that in the hands of the plaintiffs' attorneys who want to bring a claim." Id., p.84, lines 13-17.

which named accounts are to be preserved, that is easily done.

On cross examination, Sword testified that the hard drives required to preserve video recording evidence would take up significant amounts of space and that there was no capacity for it but had no further involvement in obtaining hard drives since his telephone conversation with the Plaintiffs' counsel. He also confirmed that he had nothing to do with the deprovisioning of email accounts, was unaware the email accounts belonging to Young, Jividen and Francis were deprovisioned in 2022, and did not learn that deprovisioned email accounts cannot be saved until the Summer of 2023. Sword did not personally destroy any evidence and had no intent to deprive the Plaintiffs' or their counsel of evidence.

Betsy Jividen Testimony:

Jividen had been the Commissioner of the WVDCR from January 2018 to August 6, 2022. She had been asked to resign by Defendant Sandy and the Governor's Chief of Staff, Brian Abraham following the death of Transportation Secretary Wriston's nephew, who had been an inmate at the SRJ. Jividen has been a licensed attorney for 43 years and admitted she was well aware of the importance of the preservation of evidence for civil litigation. She testified that she is also aware that a court can impose sanctions, even default judgment, for a party's failure to preserve evidence.

Jividen recalled the discovery issues from the *Baxley v. Jividen* case before this Court, including six motions to compel that were filed against her and a $1,000 daily fine, and testified that they asked for help from the Secretary's Office to assist, and once an Assistant Attorney General was involved, they were able to "streamline the process"[14]; she did not recall there were any issues concerning the destruction of evidence.

---

[14] Id., p.105, line 17.

She confirmed receiving the Plaintiffs' evidence preservation letters beginning in June 2022 as well as being copied on an email dated July 7, 2022, concerning same. She confirmed that she was aware that among those in the email chain, that Francis was going to retire, and that Warden was going to retire, and that by mid-July 2022, she was going to depart the WVDCR as well. She denied upon her departure, of deleting any of her emails, and assumed they would be preserved after she was gone. She recognized that the destruction of any evidence would have gone against their policy. She had no reason to think any of her emails or other evidence would not have been preserved. She did not call for any meetings to ensure evidence preservation but did forward the notices to preserve evidence or made sure the Legal Department was aware. She did not follow up with the Legal Department, but assumed they would work on that.

Jividen agreed that the litigation involving SRJ would be extensive, but testified she had no reason to believe the evidence would not be preserved. She admitted that she would have been copied on emails involving inmate deaths at SRJ. She admitted that she was aware that a Special Operations inspection of the SRJ in April 2022 and that earlier in March, Defendant Sandy visited the SRJ regarding issues concerning toilet paper, mattresses, and water.

She did not save any of her emails to a hard drive upon leaving the WVDCR. She denied knowing of any requests from the SRJ to destroy evidence while she was employed with the WVDCR; she denied knowing any evidence was being destroyed at the SRJ; she denied doing anything intentionally to deprive the Plaintiffs' or their counsel of any evidence.

She confirmed that she had a State-issued cell phone and left it on her desk when she left but denied having any discussions regarding preserving her cell phone or the cell phones belonging to Warden and Francis. Jividen testified that she assumed that they would still be accessible.

<u>Michael Francis Testimony:</u>

11

Francis testified that from May 2013 through July 31, 2022[15], he served as the Superintendent at SRJ. When he retired, he left his State-issued cell phone with Jackie Binion and Marvin Plumley. He denied having any discussions with anyone at WVDCR or DHS about preserving evidence, but assumed nothing would be destroyed. He recalled receiving several preservation letters beginning in November 2021, another in March 2022 concerning an inmate death case, and then the Plaintiffs' preservation letters. Francis recalls the policy concerning preservation of evidence that came out in November 2021. Francis recalled when this policy came out that he discussed it with Warden, knowing that both would retire soon, and figured that because there was a lot of bureaucracy or red tape to go through to get rid of anything, they determined to not get rid of anything.

Francis testified that he sent the July 7, 2022, email up the chain of command because that was protocol. He said when he receives preservation letters, he scans them, and emails them up the chain of command. He testified that he had daily meetings with his staff about things like this, and he recalled that because he would be leaving soon, he spoke with Mr. Withrow, who had taken over Larry Warden's office (who "took care of all the logs, videos, and made sure nothing happened to anything"), and advised him not to get rid of anything.[16]

Francis testified that he was shocked that his email account was deprovisioned. He denied that anyone from the Legal Department, WVDCR, DHS, WVOT or anyone else advised him that his email account would be deprovisioned. He cannot recall the passcode on his former cell phone, but did not provide anyone, including Messrs. Binion and Plumley, with his passcode because he "didn't think that . . . I just thought that they could do whatever they want to with it. It didn't

---

[15] He last worked in this capacity on July 11, 2022, and following a couple of weeks off for vacation, did return briefly having been reassigned to another post. Id., p. 140-141
[16] Id., p. 130, lines 13-18.

matter to me. I was leaving."[17] Francis testified that he did not copy all his emails to a hard drive or save them because that would have been a policy violation.

He confirmed that he was aware of the policy that requires the preservation of internal investigations and grievances for five years and testified that there should be both paper and electronic copies of these documents for the years 2019, 2020, 2021, 2022, and 2023. He testified that when he left, there was a filing cabinet in his office that contained copies of internal investigations provided to him; he also testified that paper copies of inmate grievances would also remain at the facility, in his office, a copy in that inmate's file, and a copy with a case manager, such as John Harvey, Director of Inmate Services. Grievances made on the kiosks would remain in the kiosks. As far as Francis knew, all that information and documents should still be there, and there is no reason why they should not be.

<u>Danielle Cox Testimony:</u>

During the Summer of 2022, Cox worked for WVOT as the Chief Information Security Officer. Her job involves protecting the systems and data for integrity, availability, and confidentiality. Her office assists State agencies such as the WVDCR and DHS to preserve email accounts for outgoing employees, and that doing so is easily done. One method is for a request to come through the Legal Department via a standard form, or through a Customer Relationship Manager or service desk. She testified that the State is not billed for this service. During the Summer of 2022, she did not receive any copies of evidence preservation letters regarding SRJ or any contact from the Legal Department, Sword, Douglas, or anyone else associated with WVDCR or DHS asking that evidence be preserved at SRJ.

Cox explained that her office is a service provider for the email accounts and maintain

---

[17] <u>Id.</u>, p. 132, lines 24-25, p. 133, lines 1-2.

Google Drives; Google Drives contains data that State agencies put on it, though she does not know what type of data or the classification of their data. Cox testified that in August 2023 was the first time her office received a request in this case to produce Google drives, which concerned a list of thirty users. She confirmed that the list contained thirty names, and 156 search terms.[18] Cox noted that while the form requesting a deprovisioning of an outgoing employee's email account does not mention preserving or not deleting any emails from that account, a request to preserve all emails can be made through a separate email, which she can do easily. She testified that such requests have been made previously, and that her office gets about thirty such requests per year. She confirmed she could preserve emails from an email account to be deprovisioned can be accomplished by a click of a button. However, if the preservation option or button is not clicked, then after 30 days, those emails will be deleted and cannot be retrieved – that information is destroyed by being overwritten.

Cox confirmed that her office is familiar with litigation holds and the policy endorsed by the MOU. She denied having seen any such requests for litigation holds from WVDCR or DHS relative to the SRJ.

Marvin Plumley Testimony:

Plumley testified that he has worked for WVDCR as the Assistant Commissioner since July 1, 2018. He admitted he was involved in the decision and discussion to deprovision the email accounts belonging to Francis and Warden but did not understand that the emails from those accounts would eventually no longer be available, though he acknowledged it was considered a good idea to keep those emails for discovery and FOIA requests. (ECF No. 704-9) He denied

---

[18] Counsel for the WVDCR Defendants made it clear to the Court that this concerned the ESI protocol that was agreed to by prior counsel with the Plaintiffs' counsel. Id., p. 152, lines 4-7.

having heard any requests from WVDCR or DHS or WVOT that certain email accounts for the last two years needed to be preserved.

Plumley testified that he had been employed in one capacity or another with WVDCR for over 22 years and has experience being involved in litigation, which included being tasked to preserve emails. He testified that in his experience, when a request for email preservation is made, he advises the facility involved, the regional directors, and chiefs of the possible or pending litigation and have someone access those emails. He denied ever having discussed such matters with WVOT but did not think emails would not have been preserved.

### The Argument for Sanctions

The Plaintiffs argue that under Rule 37(e)(2), they do not need to present any evidence or proof with regard to prejudice, as prejudice is assumed if the Defendants' acts are found to be intentional – the Defendants' testified about their independent protocols for preserving evidence, and have admitted to not only knowing they had a duty to preserve and their blatant failures to do so, is highly indicative of the Defendants' intent in failing to preserve evidence. The Plaintiffs argue that the WVDCR Defendants' egregious conduct warrants default judgment.

Alternatively, the Plaintiffs ask the Court to prohibit the Defendants from introducing evidence that disputes the Plaintiffs and putative class members' testimony regarding their conditions of confinement, the length of time the conditions existed, and evidence that disputes any of the Plaintiffs' testimony regarding the deliberate indifference standard. The Defendants were aware certain ESI had not been preserved and they should have known that sometime in September 2022. The Plaintiffs further note that the testimony elicited during the evidentiary hearing also supports an adverse inference be given that the destroyed and/or lost evidence would have been favorable to the Plaintiffs.

The Plaintiffs also ask the Court to order the Defendants to obtain and pay the costs of an outside expert to access the cell phones they happened to recover, as the Defendants have yet to determine who the former user(s) of the cell phones they have located are in sixteen months.

Finally, the Plaintiffs ask for their attorneys' fees and costs in having to prosecute their numerous motions before this Court.

### The Argument Against Sanctions

The WVDCR Defendants highlight the fact that none of them fully appreciated the deprovisioning of email accounts of departing employees without taking affirmative steps. The Plaintiffs' preservation letters arrived during a chaotic time - Defendant Jividen was replaced by Defendant Douglas as the Interim Commissioner, and then he was subsequently replaced as the Commissioner – and unfortunately, the preservation of certain ESI just was not in the forefront of anyone's mind during the time those accounts were deleted. Still, these Defendants note that much of the deprovisioned accounts have been preserved as they remain in the mailbox of some other WVDCR employee, therefore, the losses to the Plaintiffs have been substantially mitigated. Only the email accounts of Defendants Jividen and Francis are lost, but those emails would be few, as both individuals testified they would rarely email each other without copying other WVDCR personnel.

Regarding the DVR recordings, these Defendants note that they contain a certain fixed amount of storage, and after that is filled, the older video is automatically written over about every fourteen days. Contrary to the Plaintiffs' assertion that his request to preserve same and that they would purchase hard drives to store this information was ignored and the evidence was purged, these Defendants relied upon the Plaintiffs' counsel's representation that they would purchase the

hard drives, but they did not. To that extent, the Plaintiffs have waived or at least estopped, from claiming any right to compel the WVDCR to buy the hard drives to store this information. The Plaintiffs did not follow through on their representations that they would make efforts to preserve this, and their failures should not be borne by the WVDCR Defendants.

Regarding lost grievances and incident reports, these Defendants have produced thousands of pages of paper grievances and provided the Plaintiffs' access to the ESI contained at the SRJ kiosks (which contain electronic grievances). These Defendants produced dozens of investigations which also include videos. Defendant Marshall had nothing to do with the deprovisioning of email accounts because he was not appointed Commissioner until long after the deprovisioning happened.

The Plaintiffs cannot show that the emails connected to Defendants Sandy, Jividen, or Marshall meet the threshold requirements to justify sanctions under Rule 37(e): none of these individuals engaged in conduct that was unreasonable. Defendant Jividen took reasonable steps to ensure that her emails were not deleted and had forwarded the Plaintiffs' preservation letters to the legal department. Defendant Sandy also caused his own ESI to be preserved. Additionally, these Defendants argue that the Plaintiffs cannot show prejudice to them by the loss of the ESI – the Defendants assert that any lost records would have been so cumulative to other extant evidence as to not constitute much, if any, prejudice. For instance, during a recent hearing on class certification, the Plaintiffs produced multiple emails from deprovisioned accounts they argue support their claims; multiple depositions have already taken place, including of these Defendants, and several more are scheduled, including Defendant Marshall's. The Defendants have produced a massive amount of ESI and other discovery, and the Plaintiffs will offer at trial their own testimony.

The Defendants further point out that the Plaintiffs' counsel provided a press interview

wherein he claimed he had strong evidence to support the Plaintiffs' claims, negating their argument that the lost ESI is crucial to their case.

Significantly, there has been no demonstrable intent to warrant the sanctions requested by the Plaintiffs – gross negligence does not constitute intent. Further, the Defendants' failure to comply with their own internal policy of preserving records is not akin to violating a legal duty to preserve and does not show the Defendants intended to fail to preserve evidence. Also, arguably, per Defendant Douglas's testimony, that internal policy does not pertain to emails or cell phones. The Defendants direct the Court's attention to the advisory committee's notes to Rule 37 that instruct courts to be sensitive to the fact that independent obligations to preserve evidence that does not necessarily mean such obligations existed with respect to the litigation or prove that one's efforts to preserve were unreasonable with respect to a particular case. Further, courts are cautioned to consider inadvertent failure to preserve ESI, and a party's unsophistication regarding litigation in evaluating preservation efforts.

The Defendants emphasize that the Plaintiffs rely upon pre-2015 Rule 37(e) cases to support their arguments for sanctions, that the Plaintiffs ignore that courts must only issue sanctions no greater than necessary to cure the prejudice, and that the Plaintiffs ignore the copious other evidence to support their claims that render the lost emails cumulative evidence to what they already have, and will continue to obtain as discovery continues in this action. Even if a court were to find intent to deprive a party of lost evidence, it is not required to impose sanctions: this Court had found that an inadvertent loss of emails did not substantiate intent, and also, the loss was mitigated through remedial efforts taken to reconstitute a vast majority of them. See Knight v. Boehringer Ingelheim Pharms., 323 F.Supp.3d 837 (S.D.W. Va. 2018)(Chambers, J.).

Regarding the Plaintiffs' request that these Defendants pay an outside expert to analyze the

presumptive cell phones of Defendants Jividen, Francis, and Warden, the Defendants assert they already paid an outside expert about $28,000 to attempt to do this, but without the PINs, which the Defendants do not have, nothing can be done. The Defendants are willing to discuss with the Plaintiffs allowing for another expert to attempt to recover the phones' data.

The Defendants ask this Court to deny the Plaintiffs' request for fees and costs because they have not shown these Defendants acted with malice, but are instead trying to press the notion of spoliation over a lack of evidence, and have not shown any prejudice to their claims. The Defendants ask the Court to deny the Plaintiffs' motion.

**Plaintiffs' Reply in Further Support for Sanctions**

The Plaintiffs note that the Defendants here present themselves as being above the law, and that at no time during the transition from Jividen to Douglas at the helm was the WVDCR in danger of being guided by a novice – the Plaintiffs assert that Defendant Douglas was fully aware of his duties, having a couple of decades of experience under his belt, and that he knew exactly what he was obligated to do, in terms of preserving evidence, he simply chose not to. Further, the full extent of lost emails is unknown, because every single email account of every former employee at the SRJ has been purged. This is critical, because those individuals would have documented what these Plaintiffs have been complaining about for several years. The Plaintiffs patently do not believe that none of the cell phones are available or can be accessed, particularly considering the supposed tight budget the Defendants had been operating under.

These WVDCR Defendants have been involved with the operation of its facilities for far too long, and are not novices when it comes to preserving evidence due to litigation holds, yet they incredibly come to this Court acting as if such things were beyond their capacity to think about – this strains credulity when this Court has experience in a similar matter that came before it just last

year.[19] Defendants Sandy, Douglas and Jividen have all testified under oath that there have been long-standing, chronic problems of overcrowding, understaffing and overdue maintenance at the SRJ, and the loss of contemporaneous evidence that supported the Plaintiffs' claims shows just how severely the Plaintiffs have been prejudiced as they have been deprived of the opportunity to develop testimonial and tangible evidence.

In response to the Defendants' assertion that they have provided emails purportedly to duplicate or replace the lost emails to the Plaintiffs, the Plaintiffs point out that the Defendants neglect to mention that those emails are also subject to a voluminous privilege log which shows their ongoing intent to deprive the Plaintiffs of necessary information. As for their sophistication regarding the preservation of ESI, backing up computer data is common knowledge, and the Defendants knew how to go about ensuring this evidence was preserved, and notwithstanding their letting others know that it needed to be preserved, they did nothing further – their experience from the *Baxley* case should have been instructive. Even if Defendant Marshall was not involved in the Summer of 2022, he still bears responsibility for any and all continuing video that is lost. The Defendants have done nothing but shift the blame to others, including to the Plaintiffs' counsel for their own failures to preserve evidence they knew they were obligated to do. The harshest sanctions available should be imposed due to the Defendants' utter failure to uphold their known obligations in this matter.

### Relevant Law

Rule 26(e)(1)(A) of the Federal Rules of Civil Procedure provides the following:

A party who has made a disclosure under Rule 26(a) – or who has responded to an interrogatory, request for production, or request for admission – must supplement

---

[19] The Plaintiffs refer to the undersigned's handling of numerous discovery disputes, and ultimately finding egregious discovery abuses like the ones at bar in *John Baxley, Jr., et al. v. Betsy Jividen, et al.*, No. 3:18-cv-01526, ECF No. 595, (S.D.W. Va. Apr. 14, 2022).

or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Rule 37 of the Federal Rules of Civil Procedure governs the Court's authority for issuing the appropriate sanctions:

If the motion to compel is granted – or if the disclosure or requested discovery is provided after the motion was filed – the court must, after giving the parties an opportunity to be heard, require the party whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorneys' fees. But the court must not order this payment if:

(i)     The movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

(ii)    The opposing party's nondisclosure, response, or objection was substantially justified; or

(iii)   Other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(5)(A).

Rule 37(b)(2)(A) vests courts with a variety of sanctions when a party fails to obey an order to provide or permit discovery, including but not limited to striking pleadings in whole or in part. The Fourth Circuit has instructed district courts to apply a four-part test when determining appropriate sanctions under Rule 37(b): (1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective. Young Again Prods., Inc. v. Acord, 459 Fed. Appx. 294, 301 (4th Cir. 2011); Belk v. Charlotte–Mecklenburg Bd. of Educ., 269 F.3d 305, 348 (4th Cir. 2001).

Additionally, Rule 37(e) governs the failure to preserve electronic information:

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

   (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

   (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

      (A) presume that the lost information was unfavorable to the party;

      (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

      (C) dismiss the action or enter a default judgment.

See Modern Remodeling, Inc. v. Tripod Holdings, LLC, 2021 WL 3852323, at *10 (D. Md. Aug. 27, 2021); In re: Ethicon, Inc., No. 2:12-CV-00497, 2016 WL 5869448, at *3 (S.D.W. Va. Oct. 6, 2016).

Spoliation of evidence refers to "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001)(citing West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)). The kind of prejudice sufficient to trigger Rule 37(e)(1) occurs "when, as a result of the spoliation, the party claiming spoliation cannot present 'evidence essential to its underlying claim.'" Al-Sabah v. Agbodjogbe, 2019 WL 4447235, at *5 (D. Md. Sept. 17, 2019)(quoting Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 522–23 (D. Md. 2010)). To justify the more severe sanctions of Rule 37(e)(2), the moving party must demonstrate that the failure to preserve was motivated by an intent to deprive the moving party of the use of the information in the litigation. Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc., 2020 WL 1809191, at *4 (D. Md. Apr. 9, 2020). Negligent or even grossly negligent behavior will not suffice. Fed. R. Civ. P. 37(e) Advisory Committee Notes. The burden of proof is on the party seeking sanctions, and the standard of proof in the Fourth Circuit appears to be "clear and convincing" evidence where relatively harsh sanctions are sought. Steves and Sons, Inc. v. JELD-WEN, Inc., 327 F.R.D. 96, 104 (E.D. Va. 2018)

Sanctions are justified for spoliation of evidence when a party establishes "that the alleged spoliator had a duty to preserve material evidence." <u>Turner v. United States</u>, 736 F.3d 274, 282 (4th Cir. 2013). Also, a party must also establish "that the alleged destroyer must have known that the evidence was relevant to some issue in the anticipated case." <u>Id</u>. (citing <u>Vodusek v. Bayliner Marine Corp.</u>, 71 F.3d 148, 156 (4th Cir. 1994)). Finally, the alleged destroyer must have "thereafter willfully engaged in conduct resulting in the evidence's loss or destruction" and, "[a]lthough the conduct must be intentional, the party seeking sanctions need not prove bad faith." <u>Id</u>.; see also, <u>Quetel Corp. v. Hisham Abbas</u>, 819 Fed. Appx. 154, 156 (4th Cir. 2020) (unpublished) (citing <u>Turner</u> and affirming the District Court's imposing judgment as a sanction when the defendant purposefully destroyed evidence in bad faith with the intent of depriving the plaintiff of the use of the evidence.)

"In the Fourth Circuit, a District Court may impose sanctions such as dismissal or adverse inference against a party who fails to preserve or produce evidence." <u>Martin v. Aldi, Inc. (Ohio)</u>, No. 3:19-cv-00027, 2021 WL 411513, at *1 (S.D. W. Va. Feb. 5, 2021)(citing <u>Hodge v. Wal-Mart Stores, Inc.</u>, 360 F.3d 446, 450 (4th Cir. 2004)(Chambers, J.).

When considering a motion for attorneys' fees, the Supreme Court has instructed that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983). The Court's assessment of the requested award should include consideration of hours which were spent excessively, redundantly, or unnecessarily. <u>Id</u>. at 434. The starting calculation is referred to as the lodestar amount. <u>Grissom v. The Mills Corp.</u>, 549 F.3d 313 (4th Cir. 2008). There are twelve factors that the Court must consider on the calculation of reasonable attorneys' fees:

(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

Grissom, 549 F.3d at 321. Upon completion of this lodestar calculation, a "court then should subtract fees for hours spent on unsuccessful claims unrelated to successful ones." Grissom, 549 F.3d at 321 (quoting Johnson v. City of Aiken, 278 F.3d 333, 337 (4th Cir. 2002)). "Once the court has subtracted the fees incurred for unsuccessful, unrelated claims, it then awards some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." Johnson, 278 F.3d at 337.

**Discussion**

There is no dispute that the WVDCR Defendants had a duty to preserve the lost ESI and other evidence. "Before litigation begins, courts agree that the receipt of a demand letter, a request for evidence preservation, a threat of litigation, or a decision to pursue a claim will all trigger the duty to preserve evidence." In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig., 299 F.R.D. 502, 512 (S.D.W. Va. 2014)(citing Turner, 736 F.3d at 282; Silvestri, 271 F.3d at 592; and Sampson v. City of Cambridge, Md., 251 F.R.D. 172, 181 (D. Md. 2008)). In this case, clearly that duty arose upon receipt of the Plaintiffs' preservation letters in June 2022 through August 2022, when the Plaintiffs explicitly requested these Defendants to preserve certain ESI (emails, videos, etc.) just prior to the filing of this lawsuit. The Court finds that in addition to former employee email accounts, cell phone information (text messages, voice mail, etc.), and specifically, those belonging to Defendants Jividen and Francis, the WVDCR Defendants were

24

obligated to preserve the DCR recordings. There is no dispute that despite having been formerly advised by the Plaintiffs' counsel in the Summer of 2022 to preserve all evidence pertaining to the conditions of confinement at the SRJ (including email accounts, cell phones, text messages, Criminal Investigation Division ("CID") reports, and other electronic or paper data), no action was taken to preserve all this evidence. This is in spite of the fact that the WVDCR recently implemented its own policy governing the preservation of evidence in late 2021 (See ECF No. 713-1). While the Plaintiffs assert that they have received emails from the Defendants in September 2023, excepting those that had been purged, they contend that even now, these Defendants have failed to produce text message or cell phones for Defendants Jividen, Francis, and Warden.[20]

As to whether this lost ESI was relevant to the Plaintiffs' claims, the Court finds itself in a difficult position trying to evaluate the relevance of lost or destroyed evidence. The Plaintiffs have alleged that the evidence produced thus far has been relevant and probative to their allegations, however, the Defendants assert that not all of the lost ESI would have been relevant, and what they have been able to preserve, the lost ESI does not significantly impact the Plaintiffs' claims. Additionally, the Defendants have shown that the lost ESI has been substantially replaced by the production of other evidence, as the lost emails from Defendants Jividen and Francis were copied to other WVDCR employees, thus the Plaintiffs' alleged prejudice has been substantially mitigated. Nevertheless, what has been lost is no longer retrievable – this is not in dispute.

---

[20] As noted *supra*, during the evidentiary hearing, nobody was able to reliably identify or locate these former WVDCR employees' cell phones. Given the extraordinary circumstances presented here, it would not surprise the Court if these electronic devices have been lost or destroyed as well. Since the hearing, the Defendants represent that there are cell phones presumably belonging to these individuals, but their outside expert cannot glean the information from them without the PINs – the Court is again at a loss as to how this problem can be remedied, but at this stage of the proceedings, the Court is of the opinion that the information contained in those cell phones is for purposes herein, lost or destroyed.

However, it is not lost on the Court that despite all the hearings held on these issues, *not once before late August 2023* did these Defendants advise the Plaintiffs (including this Court) that the email accounts belonging to any former employee of the WVDCR were purged and unable to be retrieved. The Court cannot abide this failure to communicate with not only opposing counsel, but also with the Court during any of the previous video conferences and hearings. This critical omission suggests that the lost evidence was relevant to the Plaintiffs' claims, and further, the *de minimis* actions taken by these Defendants indicate that *they* had reason to believe that the evidence was relevant to the Plaintiffs' claims. To that extent, the Court finds that the lost ESI was relevant.

Moreover, the presumptive cell phones left by outgoing employees appear to be a lost cause, given that no one can provide the PINs to retrieve the information left on the State-issued cell phones. As far as the DCR recordings go, while this Court can appreciate the Defendants' position that the Plaintiffs represented that they would pay for the hard drives to preserve those recordings, the Court takes issue with the fact that the Defendants simply did nothing to inquire further of the Plaintiffs if they wanted that information preserved – or at a minimum, remind the Plaintiffs that they intended to purchase hard drives for the extra storage. The Defendants, as noted *supra*, were put on notice to preserve this evidence, but they made no affirmative steps to do so – this is undisputed.[21]

Regarding any "reasonable steps" to preserve the email accounts, cell phone information,

---

[21] First, the duty to preserve the evidence was the absolute legal obligation of the Defendants. The fact that the Plaintiffs offered to pay for hard drives to preserve the evidence **DID NOT** diminish or alleviate the mandatory requirement that the Defendants had to preserve the video evidence. It is not lost on the Court that even though the Plaintiffs offered to pay for the expense of preserving the video evidence, the Defendants did nothing further to preserve the evidence.  Furthermore, it was suggested that the cost of preserving the evidence was "a" factor that nothing further was done by the Defendants. The Court finds any suggestion that preservation of the video evidence due to lack of financial ability of the Defendants to pay for the same disingenuous at best. (See https://governor.wv.gov/News/press-releases/2023/Pages/Gov.-Justice-says-West-Virginia-shatters-all-time-financial-records-with-close-of-fiscal-year.aspx). (See also, ECF. No. 709, pp 96-100).

DCR recordings, and other ESI, while the Court can appreciate outgoing employees having informed the legal department, the Defendants' collective *laissez-faire* approach to preservation is unjustified, is noncompliant with their own policy concerning evidence preservation, is violative of the Federal Rules of Civil Procedure, and simply cannot be condoned. Again, the Defendants' attitudes are akin to sitting on their hands or doing the bare minimum, and expecting the Plaintiffs to put forth all the effort to preserve ESI that was unquestionably under the custody and control of the Defendants. This is maddening because the Defendants were charged with that obligation under law, and yet they try to convince this Court that the *Plaintiffs* actually bore that duty.

And yet, the undersigned notes that respect to the email accounts, it would have been a very simple step, had anyone bothered to advise the Office of the West Virginia Department of Technology. Danielle Cox, the Chief Information Security Officer, testified that preserving the email accounts of former employees can be easily done, and there is a standard form the WVDCR or the WVDHS can use to accomplish this. Ms. Cox's testimony proved to be particularly troublesome to the undersigned considering the Defendants' conduct in this case because the first her office received notice to preserve an email account was not until *August 2023*.[22] The Defendants *never* advised the Court prior to this time that this was the case or would have been an issue. On that note, the Court is also perplexed that *preserving* government email accounts (including other government communications or video recordings from the regional jails, let alone cell phones) is *not* the default, but that active steps must be taken to ensure its preservation. The fact that publicly funded agencies can lose (and in this case, *has* lost) critical information as to how these agencies are administered, funded, or even governed is beyond the pale. Especially

---

[22] See ECF No. 709, p. 151, lines 4-11.

when that information concerns the well-being of individuals who have been placed in WVDCR custody and control.

While acknowledging how serious the destruction of the ESI evidence is, these Defendants merely state that they had no intention of destroying this evidence and explain that they just "didn't think about it."[23] The fact this was a repeated or common excuse among those individuals who were and are in charge of the SRJ seriously challenges the Court's suspension of disbelief.[24] Even Defendant Douglas conceded that the failure to preserve, while being aware of the duty to preserve and doing nothing to do so, was, at best, "grossly negligent." The Court is not convinced that there was some species of ineptitude that infected every individual in the chain of command regarding evidence preservation, and is reminded of Douglas' bizarre testimony about the revamped WVDCR Policy Directive concerning ESI preservation:

> The Court:       So, e-mails in this policy really mean e-mails, but e-mails for the
>
> other policies didn't mean e-mails; is that what you're telling me?
>
> The Witness:   As a practical matter, sir, yes.

(See ECF No. 709, p. 53, lines 7-10)

The Defendants' discovery misconduct does not stop at the failure to preserve certain ESI,

---

[23] See ECF No. 709, p. 13, line 14. Also notable is Della Hall's testimony, that during the Summer of 2022, she was the executive assistant for the Chief of Staff (Douglas) prior to his transition as the Interim Commissioner, but at no time in June through August 2022 did she take part in any requests or communications with the West Virginia Office of Technology seeking assistance with evidence preservation at the SRJ. (See ECF No. 709, p.147, lines 10-20)

[24] Perhaps the most infuriating testimony came from Phillip Sword, Assistant Attorney General, who stated his involvement with the preservation letters was limited to forwarding them to the respective agencies, but incredibly, he insisted that the failure to preserve electronic evidence was the Plaintiffs' counsel's fault, because they had not provided the hard drives to store this information, despite stating they would pay for them. (See ECF No. 709, p.75 lines 10-25, p.76 lines 1-3). His testimony was even more galling when in response to questions from the bench, that notwithstanding the clear litigation holds that he received and had firsthand knowledge of, and the requirement under law that this evidence was to be preserved, Mr. Sword insisted that the WVDCR/DHS's reliance on the Plaintiffs' counsel's pledge to purchase hard drives essentially allowed them to wash their hands of any responsibility for preserving this evidence, though the State could have purchased the hard drives itself. (Id., pp. 96-100)

the Court heard testimony that paper documents that pre-date 2022 have not been preserved, *including inmate's grievances*.[25] This information should have been maintained in the office of the superintendent at the SRJ, yet not a single witness could explain to the Court why anything predating 2022 is no longer there. Significantly, that information goes to the crux of the Plaintiffs' cause of action. To that extent, the Plaintiffs have sufficiently demonstrated that they have been prejudiced from the loss of this evidence.

The Court notes that several months ago, the Plaintiffs filed their Emergency Motion for Preliminary Injunction or Temporary Restraining Order (ECF No. 117). The impetus behind their Motion concerned the deliberate destruction of evidence, including:

> moving files subpoenaed in a Federal investigation for the purpose of concealment which will likely be relevant in the instant litigation; hiding files subpoenaed in a federal investigation which will likely be relevant in the instant litigation; burning files subpoenaed in a federal investigation which will likely be relevant in the instant litigation; and shredding files subpoenaed in a federal investigation.

(See ECF No. 118 at 2) The fact that numerous files predating 2022 have disappeared without any explanation provides further support for the Plaintiffs' earlier allegations. Not a single WVDCR witness could explain how this evidence was lost or where it went. And each of those witnesses had served or presently serve in the highest positions of authority over the SRJ. That these Defendants would ask this Court to believe that entire file cabinets of evidence disappeared without a trace is an ask too far. To do so, the Court would have to disregard all logic and reason to take these Defendants at their word. The **ONLY** logical explanation for the loss of this evidence, is that it was intentionally destroyed – and this logical explanation has been provided to this Court through an inmate's affidavit who witnessed such events – Charles Mann. (See ECF No. 117-2)

---

[25] The testimony from the October 2, 2023, evidentiary hearing suggests that grievances and internal investigations dating back to 2019 should still be at the SRJ. (See ECF No. 709, p.141, lines 19-25, p.142, lines 1-7).

What happened with the paper evidence sheds a disturbing light on the lost ESI evidence in this case: the Defendants would also have the Court believe that they simply "didn't think about" preserving any of the ESI evidence, despite being fully aware of their duties to do so, is not credible at all. As noted earlier, the head authority figures for the WVDCR and SRJ were fully aware of the litigation holds, and did nothing to ensure the preservation of evidence, despite knowing their legal obligation to do so. This demonstrates at best, willful blindness[26], but when coupled with the so-called unexplainable loss of inmate grievances and other files, this demonstrates intentional and purposeful destruction of evidence. To make matters worse, if that is even possible at this point, the Defendants' defense, in part, is basically, we had no funds to preserve evidence, so our duty to preserve has been extinguished. The Defendants' misconduct begs the question: why have such protocols to preserve ESI, or even the Rules of Civil Procedure at all? If no rules or protocols matter, then the Defendants (or any other party that may come before this Court) could never be sanctioned for failing to comply with any duty to preserve evidence – they could just turn a blind eye, or worse, purposely destroy evidence, and argue their actions were simply not intentional, or they just "didn't think about it."

The foregoing is stunning to say the least, and the unmitigated gall displayed by the Defendants toward the Plaintiffs (and to an extent, this Court) can be summed up in their own words, "They are, therefore, entitled to nothing." (See ECF No. 740 at 19) The Court will not turn a blind eye to the Defendants' blatant arrogance and flippant response to their legal obligations, nor will it condone such behavior by not issuing sanctions.

---

[26] The Court does not use this term loosely or unadvisedly. The Court is aware of the definition of "willful blindness" is the "**deliberate failure** to make a reasonable inquiry of wrongdoing . . . despite suspicion or an awareness of the high probability of its existence." (**Emphasis** added.) (See https://www.merriam-webster.com/legal/willful%20blindness). A common synonym of "deliberate" is "intentional" and vice versa. (See https://www.merriam-webster.com/thesaurus/intentional or https://www.merriam-webster.com/thesaurus/deliberate).

Accordingly, the undersigned **FINDS** by clear and convincing evidence, the paper inmate grievances, CID reports, and any other documents that have not been produced to the Plaintiffs were intentionally destroyed. Therefore, the undersigned **FINDS** that the Plaintiffs have more than sufficiently demonstrated that because of the Defendants' pervasive and ongoing failures to abide by the rules of discovery, and the Defendants' intentional spoliation of evidence, the imposition of sanctions is warranted, including granting default judgment. To be clear, the undersigned **FINDS** that pursuant to <u>Silvestri v. General Motors Corp.</u>, 271 F.3d 583 (4th Cir. 2001)[27], the Defendants' conduct was so egregious, it has caused prejudice to the Plaintiffs to the extent that it substantially denied them the ability to prosecute their claims.

Given the procedural history in this case, the Court "must" issue the appropriate sanction under Rule 37, which includes attorneys' fees. While bad faith is not a factor here, the undersigned is hard-pressed not to find that the Defendants acted in bad faith by failing to preserve the evidence as requested by the Plaintiffs – and especially after not having the decency to advise the Plaintiffs this evidence was not preserved, let alone this Court, which has spent too many hours having to officiate the Plaintiffs' multiple motions to compel. Counsel for the Defendants has represented that the failure to preserve some of the evidence was inadvertent, but that other evidence available to the Plaintiffs cures this mistake. However, there has been no valid explanation as to how this supposed inadvertence was made other than a proverbial "oops." Nor does this account for the total lack of explanation by the Defendants as to the missing hard copies of grievance and CID documents at SRJ. Notwithstanding the lack of adequate explanation, this does not absolve the Defendants from its responsibilities to the Plaintiffs or to this Court. In short, the Defendants'

---

[27] The Fourth Circuit observed that for a court "to justify the harsh sanction of dismissal, the district court must consider both the spoliator's conduct and the prejudice caused and be able to conclude either (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim." <u>Id</u>. at 593.

discovery conduct is not fully mitigated by some alleged oversight when the Federal Rules of Civil Procedure governing discovery and the language employed by this Court through its orders are quite clear as to what is expected of litigants appearing before it.

With regard to the Plaintiffs' surprise of the being recently informed of the spoiled evidence, clearly, this tainted the good faith efforts the Court expects from litigants, and further, the testimonies provided by the Defendants' witnesses shows that the lost evidence was clearly relevant, and likely beneficial to the Plaintiffs' case, and the Defendants' intentional failure to preserve this evidence has denied the Plaintiffs the opportunity to timely present the evidence necessary to certify the class. Moreover, the Plaintiffs have been denied the opportunity to review contemporaneous evidence to support their allegations forever in this case. And perhaps others.

As for the ability of the Defendants to cure the so-called inadvertent mistake, this was relatively easy, as they were able to do so within their own protocols, provided they had taken the simple steps to do so. While the Defendants have extended an offer to the Plaintiffs to have another outside expert review the *presumptive* cell phones issued to its former employees, obviously, that extends the time for this action to remain active on this Court's docket, which necessarily impacts the Court's ability to manage the case. More importantly, however, the fact not a single WVDCR Defendant can provide a usable PIN to access the information contained on those cell phones renders any such offer useless, and ultimately, results in yet another instance of spoliation of evidence.

Finally, the Defendants have repeatedly represented to this Court that their failure to preserve evidence was a regrettable oversight. On one hand, the undersigned is disturbed that the Defendants did not bother to disclose this to the Plaintiffs or even to this Court several months before realizing they failed to preserve it, but on the other hand, the undersigned is outraged: not

only have the Plaintiffs' counsel spent significant time endeavoring to prosecute their claims, this Court spent numerous valuable hours holding hearings, video conferences, researching and drafting orders to facilitate discovery in this matter, and all for nought. While the Defendants recently changed their legal representation, only then did this Court become aware of their failure to preserve evidence expressly requested by the Plaintiffs that it be preserved for this litigation. From the testimonial evidence elicited during the hearing, *supra*, the undersigned is convinced, that at best, these Defendants were simply playing games, but at worst, they have been dishonest with the Court, and with opposing counsel. The sheer amount of wasted time expended by this Court to attempt to mediate numerous contentious discovery disputes cannot be understated. Clearly, the Defendants' actions here have severely prejudiced the Plaintiffs.

### Ruling and Recommendations for Disposition

Regarding the Plaintiffs' request for default judgment, the Court further **FINDS** that this sanction is warranted: while the Plaintiffs themselves acknowledge they have overwhelming evidence of the unconstitutional conditions of overcrowding, understaffing, and deferred maintenance[28], the undersigned refuses to ignore the Defendants' willful blindness, or to put more succinctly, their intentional failure to preserve evidence they were obligated to preserve.[29] More importantly, though the Court is mindful of the caveats endorsed in the 2015 Advisory Committee Notes to Rule 37(e) as pointed out by the Defendants, the Court will not ignore or condone their

---

[28] The Court is not going to equate the Plaintiffs' counsel's posturing to news media with what is to be presented during trial, and the Defendants' invitation that the Court even make such a comparison that is so obviously incomparable is incomprehensible.

[29] With regard to the grievances and CID reports that are missing from SRJ, because the Defendants have no logical explanation as to their whereabouts and the Plaintiffs have provided sworn affidavit by an eyewitness who states that they were shredded (See ECF No. 117-2), the Court refuses to ignore the intentional and purposeful destruction of this evidence as further evidence that recommending that default judgment be granted to the Plaintiffs.

collective failures to preserve evidence. Having seen firsthand WVDCR defendants' indifference and willful misconduct in discovery in the *Baxley* matter, the undersigned finds the Defendants' ongoing discovery abuses outrageous. As noted by Judge Chambers:

> The Court recognizes that in certain instances the effect of discovery improprieties in one case may reverberate throughout subsequent actions that address similar claims against the same group of defendants.

Knight v. Boehringer Ingelheim Pharm., Inc., 323 F.Supp.3d at 859. Although the Defendants argue this lost evidence does not prejudice the Plaintiffs since it appears from the Plaintiffs' own representations that the prejudice is "less acute" as there are other sources from which some of the spoliated evidence can be obtained[30], this does not excuse the Defendants from their intentional discovery abuses herein, and further, having been around this bend before, the undersigned **FINDS** the Defendants' destruction of evidence was indeed intentional. Without the imposition of a severe sanction allowed under Rule 37, anything less this Court were to impose would have no teeth when it comes to these Defendants.[31] Accordingly, the undersigned hereby respectfully **PROPOSES** that the District Judge confirm this foregoing finding and **RECOMMENDS** that the District Judge **GRANT** the Plaintiffs' request for default judgment.[32]

Alternatively, for the foregoing reasons, the Court **FINDS** the Plaintiffs' request that these Defendants be prohibited from introducing evidence that dispute the Plaintiffs and putative class members' testimony regarding the conditions of confinement, the length of time the conditions

---

[30] See Bartlett v. South Carolina Department of Corrections, 2020 WL 5627141, at *3 (D.S.C. Sept. 21, 2020); see also, Knight, 323 F.Supp.3d at 845.

[31] Judge Chambers' clairvoyance as noted *supra* in the *Baxley* matter has proven to be true here. Clearly, these Defendants did not learn the lesson from *Baxley* and apparently thought that that repeating and escalating their discovery abuses in this action would produce similar results as in *Baxley*. However, this Court must establish the line that should never be crossed again by imposing the harshest sanction available.

[32] Because the Plaintiffs have requested certain sanctions that concern matters within the purview of the District Judge, pursuant to 28 U.S.C. § 636, the undersigned makes these as recommendations.

existed, and evidence that disputes any of the Plaintiffs' testimony regarding the deliberate indifference standard is wholly warranted. Because there is no question that these Defendants failed to supplement responsive discovery to the Plaintiffs, and knew at the time that their responses were incomplete and inaccurate (i.e., failed to disclose that email evidence was no longer available, failed to produce video evidence, failed to produce all grievances, failed to produce CID reports), other remedies provided under Rule 37(c), *supra*, is to exclude such evidence at trial. Accordingly, the undersigned hereby respectfully **PROPOSES** that the District Judge confirm this foregoing finding and **RECOMMENDS** that the District Judge **GRANT** the Plaintiffs' request these Defendants be prohibited from introducing evidence that dispute the Plaintiffs and putative class members' testimony regarding the conditions of confinement, the length of time the conditions existed, and evidence that disputes any of the Plaintiffs' testimony regarding the deliberate indifference standard.

As another alternative, again for the reasons aforesaid, the Court **FINDS** that the Plaintiffs' request that an adverse inference be given that the missing and destroyed evidence is consistent with the Plaintiffs' claims regarding the conditions at SRJ, that an adverse inference be given that the missing and destroyed evidence demonstrates the Defendants were aware that the conditions at SRJ presented a substantial risk of harm to the Plaintiffs, and that an adverse inference be given that the missing or destroyed evidence would have been favorable to the Plaintiffs is warranted. The undersigned declines to craft what those instructions could be, given that the Plaintiffs have experienced and knowledgeable Counsel representing them. Accordingly, the undersigned hereby respectfully **PROPOSES** that the District Judge confirm this foregoing finding and **RECOMMENDS** that the District Judge **GRANT** the Plaintiffs' requests for this particular sanction(s).

Finally, both the Plaintiffs' ***Expedited Motion to Compel Defendants Jeff Sandy and Brad Douglas to Respond Fully and Adequately to Discovery and to Deem Requests for Admission Admitted, and Sanctions*** (ECF No. 600) and ***Motion for a Finding of Spoliation and for Sanctions Against Defendants Jeff Sandy, Brad Douglas, Betsy Jividen, and William Marshall, III*** (ECF No. 713) are **GRANTED**: with regard to the Plaintiffs' request for attorneys' fees, the Court **FINDS** that this sanction is not only appropriate, but also mandated by Rule 37 of the Federal Rules of Civil Procedure given the circumstances surrounding the Plaintiffs' Motions. Therefore, pursuant to Rule 37, the Plaintiffs are invited to file the appropriate motion for their reasonable attorneys' fees and costs incurred in prosecuting the ***Expedited Motion to Compel Defendants Jeff Sandy and Brad Douglas to Respond Fully and Adequately to Discovery and to Deem Requests for Admission Admitted, and Sanctions*** (ECF No. 600), the ***Motion for a Finding of Spoliation and for Sanctions Against Defendants Jeff Sandy, Brad Douglas, Betsy Jividen, and William Marshall, III*** (ECF No. 713) the supporting ***Memorandum*** (ECF No. 714), as well as the ***Reply*** (ECF No. 754), and are further instructed to outline the reasons why these fees and costs are appropriate and provide the Court with an accounting of the time Counsel spent in prosecuting the Motions, etc. The Defendants shall be allowed to file an appropriate pleading setting forth any objections to the accounting of time filed by the Plaintiffs. The Plaintiffs' pleading shall be filed within **14 days**. A response by the Defendants shall be filed within **7 days** after the Plaintiffs' pleading. The Plaintiffs may file a reply within **3 days** after the Defendants' response.

Additionally, the Court **ORDERS** the WVDCR shall also be responsible for purchasing at its own cost hard drives to preserve the DCR (video) recordings at the SRJ beginning **IMMEDIATELY** during the pendency of any appeal or objections filed to this Order/Proposed

Findings and Recommendation.[33] Additionally, the WVDCR shall also be responsible for the retention and payment for an expert of the Plaintiffs' choosing to search the cell phones presumably belonging to the Defendants, Jividen, Francis, Warden, and any others that may be discovered as this case proceeds.

In accordance with Rule 72(a) and (b)[34] of the Federal Rules of Civil Procedure, the ruling set forth above on this Motion may be contested by filing within 14 days, objections to this Order with District Judge Frank W. Volk. If objections are filed, the District Court will consider the objections and modify or set aside any portion of the Order found clearly to be erroneous or contrary to law.

The Clerk is requested to distribute a copy of this Order and Proposed Finding and Recommendation to all counsel of record.

## A Postscript

The undersigned has served as a judge in one capacity or another in State and Federal Courts for nearly 15 years. The testimony that was elicited at the evidentiary hearing held on October 2, 2023, stands out as some of the most remarkable testimony that the undersigned has heard. Multiple witnesses took the stand and testified that the law and regulations governing the preservation of evidence were not followed. As detailed above, this the undersigned believes the failure to preserve the evidence that was destroyed in this case was intentionally done and not simply an oversight by the witnesses. The Court does not make that statement flippantly but after

---

[33] Given the $1.8 billion budget surplus, it appears to the Court that paying for hard drives to preserve this evidence would be a *de minimis* cost to the State. See, W.Va. Budget Surplus Spending Destinations Defined - West Virginia Public Broadcasting: West Virginia Public Broadcasting (wvpublic.org). This is especially apparent given that the Plaintiffs have represented that the costs for such hard drives are a mere $259 and can be purchased online. (See ECF No. 709, p.76, line 18)

[34] The Plaintiffs' Motion requests relief that concern both dispositive and non-dispositive matters, however, the deadline for filing any objections is the same.

much thought and reflection of the disturbing testimony that took place that day. The intentional decisions to not preserve evidence, and to allow evidence to be destroyed was not done by low-level employees of the WVDCR but was perpetrated by the highest persons in the chain of command including the Commissioner of the WVDCR, Defendant Douglas. While the undersigned understands the frustration that many in the chain of command at the WVDCR felt that not having the additional funds that they believe necessary to alleviate many of the deficiencies at the SRJ and other correctional facilities, that did not relieve the Defendants of their duty to provide a constitutionally acceptable penal system to house persons incarcerated therein.

In the case of Brown v. Plata, 563 U.S. 493, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011), Supreme Court Justice Anthony Kennedy stated on behalf of the majority:

> As a consequence of their own actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. " 'The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.' " *Atkins* v. *Virginia,* 536 U.S. 304, 311 (2002)  (quoting *Trop* v. *Dulles,* 356 U. S. 86, 100 (1958)  (plurality opinion)).

> To incarcerate, society takes from prisoners the means to provide for their own needs. Prisoners are dependent on the State for food, clothing, and necessary medical care. A prison's failure to provide sustenance for inmates "may actually produce physical 'torture or a lingering death.' " *Estelle* v. *Gamble,* 429 U. S. 97, 103 (1976) (quoting *In re Kemmler,* 136 U. S. 436, 447 (1890)); see generally A. Elsner, Gates of Injustice: The Crisis in America's Prisons (2004). Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.

> If government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation. See *Hutto* v. *Finney,* 437 U. S. 678, 687, n. 9 (1978). Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals. See *Bell* v. *Wolfish,* 441 U. S. 520, 547–548

(1979). Courts nevertheless must not shrink from their obligation to "enforce the constitutional rights of all 'persons,' including prisoners." *Cruz* v. *Beto,* 405 U. S. 319, 321 (1972) *(per curiam).* Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.

Unlike <u>Brown</u>, where the Court granted an equitable remedy requiring the State of California to reduce its prison population, this matter involves a class action civil matter seeking damages to the class because of the conditions of incarceration. However, the observation made by Justice Kennedy, that "[p]risoners retain the essence of human dignity inherent in all persons", is not any less in this case than it was in <u>Brown</u>.

With that said, the undersigned readily acknowledges that the recommendation of default judgment to the District Judge in this case, is extraordinary, but clearly warranted considering the intentional conduct in this case and other cases that came before the undersigned. On that note, and because the undersigned has found that paper records of grievances and investigations were intentionally destroyed at SRJ, the Clerk is further requested to distribute a certified copy of this Order and Proposed Findings and Recommendation to the United States Attorney to consider whether an investigation of the WVDCR is warranted pursuant to 18 U.S.C. §§ 1512(a)(1)(B), 1519.

**ENTER: October 30, 2023.**

Omar J. Aboulhosn
United States Magistrate Judge