## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTIRCT OF WEST VIRGINIA
## BECKLEY DIVISION

| | | |
|---|---|---|
| **MICHAEL D. ROSE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 5:22-cv-405** |
| | ) | |
| | ) | |
| **JEFF S. SANDY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OJBECTION BY NONPARTIES GOVERNOR JAMES C. JUSTICE, II, AND BRIAN ABRAHAM, CHIEF OF STAFF TO THE GOVERNOR, IN THEIR OFFICIAL CAPACITIES, TO DISCOVERY ORDER

Under Federal Rule of Civil Procedure 72(a), nonparties Governor James C. Justice, II, in his official capacity, and Brian Abraham, in his official capacity as Chief of Staff to the Governor, respectfully object, in part, to Magistrate Judge Omar J. Aboulhosn's Order (ECF 772) (the "Discovery Order").

The Discovery Order is clearly erroneous and contrary to law insofar as it compels the Governor and Mr. Abraham to produce three categories of documents that (1) are irrelevant to Plaintiffs' claims and unduly burdensome under Rule 45; (2) invade the executive, or deliberative process, privilege; and (3) violate state sovereign immunity. The Magistrate Judge correctly quashed Plaintiffs' attempted depositions of the Governor and Mr. Abraham. But in striving to provide Plaintiffs with some relief by compelling internal documents from the Governor's Office—which were not actually requested by the subpoenas served on these nonparties—the Magistrate Judge erred.

It is difficult to overstate the unprecedented scope of the Discovery Order. A federal court has issued an order compelling the Governor of a separate sovereign and his chief of staff to disclose internal documents concerning matters clearly committed to the discretion of the State's Chief Executive in the exercise of core constitutional prerogatives. Here, those include documents concerning the Governor's alleged "dismissal" of then-Commissioner Jividen and his "dispatch" of then-Secretary Sandy "to inspect" the Southern Regional Jail on a particular day. And finally, the court also ordered the Governor and Mr. Abraham to produce documents concerning "either['s] involvement or knowledge of ESI preservation"—

yet neither official has been alleged to have any role in the document spoliation subject to a separate sanctions order in this case. In any event, this incursion of the deliberative process privilege and state sovereign immunity—analysis missing from the Discovery Order—is just as inappropriate as the depositions of the Governor and Mr. Abraham would have been had the Magistrate Judge not properly disallowed them.

For several independently sufficient reasons, the Discovery Order should be set aside to the extent that it denied the Governor and Mr. Abraham's motion to quash, which the court should have granted in full.

## BACKGROUND

In September 2022, Plaintiffs commenced this lawsuit against Southern Regional Jail ("SRJ") staff, executives in the Division of Corrections and Rehabilitation (the "WVDCR"), the Secretary of the Department of Homeland Security (the "WVDHS"), employees of various county commissions, and employees of medical providers to the SRJ. Plaintiffs press fourteen causes of action alleging generally that (a) Defendants violated, conspired to violate, and failed to intervene in violation of, Plaintiffs' constitutional rights; (b) Defendants were, and conspired to be, negligent, grossly negligent, and negligent per se; (c) Defendants did, and conspired to, intentionally inflict emotional distress upon Plaintiffs; and (d) Defendants violated Plaintiffs' rights under the ADA. Based upon those allegations, Plaintiffs seek compensatory damages, a declaratory judgment, and injunction to compel Defendants to remedy the conditions at the SRJ.

In September 2023, Plaintiffs served nonparty subpoenas *duces tecum* on the Governor and his Chief of Staff, Brian Abraham. *See* ECF 632-1; 632-2. Those subpoenas command the Governor and Mr. Abraham to submit to deposition and respond to document requests. *See* ECF 629 & 630. Specifically, Plaintiffs seek production of the following:

1. [A]ny and all emails in possession, custody, and/or control of this witness in accordance with the ESI search protocol attached hereto.
2. [A]ny and all text messages sent or received on your state issued cell phone in accordance with the ESI search protocol.
3. [A]ll documents having in any way to do with request (sic) for use of or expenditure concerning CARES Act funding as it relates to corrections in West Virginia, and specifically, Southern Regional Jail.
4. [A]ny and all documentary evidence which causes you, as Governor, to question the validity of Plaintiffs' claims.
5. [T]he reports of Cabinet Secretary Sandy which were required to be sent to you pursuant to Article VII section 18 of the *West Virginia Constitution*, including but not limited to, any information in writing under oath that you ever requested from officers of WVDMAPS/WVDHS; WVDCR/West Virginia Regional Jail Authority, relating to the condition, management, and/or expenses of, or having any way to do with (sic) Southern Regional Jail, as it relates to the allegations in Plaintiffs' Complaint.

ECF 629 at 3.[1] After meeting and conferring, the Governor's Office implemented a search pursuant to the Plaintiff's ESI protocol on the email accounts governor@wv.gov and brian.r.abraham@wv.gov, yielding 134 results.[2] Solely as a matter of good faith courtesy, Governor Justice and Mr. Abraham voluntarily disclosed the non-privileged documents responsive to the subpoenas where those

---

[1] Requests to Mr. Abraham are substantially identical to the requests to the Governor, only replacing references to the Governor with references to the Chief of Staff. ECF 630 at 3.

[2] The Governor and Mr. Abraham do not have state issued cell phones.

3

documents would otherwise be subject to disclosure under the West Virginia Freedom of Information Act, *see* W. Va. Code § 29B–1–1, *et seq*.

When the parties failed to resolve the remaining objections, Plaintiffs filed a motion to compel enforcement of the subpoenas (ECF 717), and the Governor and Mr. Abraham moved to quash the subpoenas in their entirety (ECF 720 & 736). The Magistrate Judge held a hearing on both motions on October 23 and stayed the depositions of the Governor and Mr. Abraham, which had been set for the following day, pending a final determination. ECF 742.

On October 30, the Magistrate Judge issued the Discovery Order. ECF 772. There, the court analyzed the competing motions under two legal standards: Rule 26 and the doctrine limiting the depositions of high-ranking government officials. *See id*. at 6–8. Rule 45 was not mentioned, and state sovereign immunity was not discussed. Ultimately, the court granted the motion to quash as to the depositions, "but **DENIED** [it] to the extent that [the Governor and Mr. Abraham] can avoid disclosing any and all documentation concerning: [1] the dismissal of Defendant Jividen; [2] the dispatch of the Defendant Sandy to inspect the SRJ on March 30, 2023; and [3] either [the Governor or Mr. Abraham's] involvement or knowledge of ESI preservation." *Id*. at 11. The Governor and Mr. Abraham now file this objection requesting that the Discovery Order be set aside in part.

## ARGUMENT

Under Rule of Civil Procedure 72(a), a magistrate judge's nondispositive order should be set aside or modified to the extent it is contrary to the law or clearly

erroneous. Fed. R. Civ. P. 72(a). A factual finding is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Clark v. Milam*, 155 F.R.D. 546, 547 (S.D. W. Va. 1994). On the other hand, a magistrate judge's decision is "contrary to law" when it "fails to apply or misapplies relevant statutes, case law or rules of procedure." *Kingery v. Quicken Loans, Inc.*, 2014 WL 1017180, at *3 (S.D.W. Va. Mar. 14, 2014) (cleaned up). "This means that, for questions of law, there is no practical difference between review under Rule 72(a)'s 'contrary to law' standard and a *de novo* standard." *Felman Prod., Inc. v. Indus. Risk Insurers*, 2010 WL 2944777, at *3 (S.D. W. Va. July 23, 2010) (quoting *Powershare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 15 (1st Cir. 2010)) (cleaned up).[3] Given that none of the errors made by the Magistrate Judge concern factual findings but, rather, hinge on pure questions of law, this Court's review is *de novo*.

## I.     The Discovery Order is contrary to law because it analyzed the motion to quash under the wrong legal standard.

In adjudicating the motion to quash, the court failed to mention or apply Federal Rule of Civil Procedure 45, which controlled the analysis. This was contrary to law, as was the resulting decision to deny the motion to quash in part.

Under Rule 45, a subpoena cannot subject a nonparty to an undue burden or require the disclosure of privileged material. Fed. R. Civ. P. 45(d)(3)(A). When faced with such a subpoena, a court must either modify or quash that subpoena. *Id.*

---

[3] *See Lambert v. Nationwide Mut. Ins.*, 2017 WL 63025, at *2 (S.D. W. Va. Jan. 5, 2017) (citing *PowerShare*); *Blankenship v. Brooks Run Mining*, 2017 WL 1319825, at *1 (S.D. W. Va. Apr. 5, 2017) (same); *HSBC Bank v. Resh*, 2014 WL 317820, at *7 (S.D. W. Va. Jan. 28, 2014) (same).

Although the court chose to modify the subpoenas, it failed to address how that modification brought the nonparty subpoenas within the bounds of Rule 45. It is unlikely that the modification had anything to do with Rule 45(d), as the court did not mention Rule 45 and actually *broadened* the scope of the subpoenas to reach documents not requested. Because the court failed to apply the correct legal standard, and because the modified subpoenas pose an undue burden and otherwise require the production of privileged material in contravention of Rule 45 and controlling caselaw, the Discovery Order should be set aside in part.

### A.   The subpoenas as modified by the Discovery Order impose an undue burden.

Because "[b]ystanders should not be drawn into the parties' dispute without some good reason, even if they have information that falls within the scope of party discovery," Rule 45 imposes a heightened evaluation to determine the propriety of a nonparty subpoena. *Virginia Dept. of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019). The scope of discovery *between* parties is limited to any information "relevant to any party's claim or defense," that is "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The proportionality inquiry asks whether the "burden or expense of the proposed discovery outweighs its likely benefit." *Id.* On the other hand, Rule 45 applies a "more demanding variant of the proportionality analysis" to balance the party's need for the documents against the burden on the nonparty, while giving the "recipient's nonparty status 'special weight.'" *Jordan*, 921 F.3d at 189. If the subpoena "seeks information beyond what the requesting party reasonably requires," the burden of enforcement is not proportional. *Id.* at 190.

Put another way, even if a nonparty has relevant material, it will not be subject to subpoena *unless* the requesting party can show that the material is essential to the case and cannot be obtained elsewhere. *Jordan*, 921 F.3d at 189. As the Fourth Circuit put it, the information sought must "likely (not just theoretically) have . . . benefit in litigating important issues . . . over and above what the requesting party already has." *Id.* If the information is available through other means (like intra-party discovery) then it cannot have such value. Though the party moving to quash a subpoena has the burden of proof and persuasion, "those burdens are not terribly difficult to meet if the requesting party cannot articulate its need for the information and address obvious alternative sources." *Id.* at 189 n.2. To that end, the court must be satisfied that the requesting party "cannot obtain the same information, or comparable information that would also satisfy its needs, from one of the parties to the litigation—or, in appropriate cases, from other third parties that would be more logical targets for the subpoena." *Id.*

When considering the burden imposed on the nonparty, the court must consider — along with the monetary cost — "other cognizable burdens as well." *Jordan*, 921 F.3d at 189. As discussed more fully below, sovereign immunity considerations exist when a federal court seeks to enforce a nonparty subpoena duces tecum against a state constitutional officer. *See Russell v. Jones*, 49 F.4th 507, 513 (5th Cir. 2022). Moreover, the court must consider the burden that would be imposed by subjecting a state executive or member of his staff to nonparty document discovery in any case tangentially related to his high office. *See Cheney v.*

7

*U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004). Members of an executive branch, especially constitutional officers, are highly visible officials whose actions affect countless people and who, as a result, are "easily identifiable target[s]" for lawsuits. *Id.* at 386. Enforcing nonparty subpoenas against such officers burdens their ability to effectively perform their executive function. *Id.* The court should thus carefully weigh the need for the discovery before burdening an executive with the "unnecessary intrusion" into the operation of his office. *Id.* at 387.

In this case, Plaintiffs' subpoenas, as drafted, sought documents and emails regarding conditions at SRJ and discretionary policy decisions by—and constitutionally committed to—the Office of the Governor, on which topics Plaintiffs also sought to depose the Governor and Mr. Abraham. *See* ECF 629; 603. Instead of conducting the heightened proportionality analysis required by Rule 45, the Magistrate Judge assessed the nonparty subpoenas under *Rule 26(b)(2)(C)*. ECF 772 at 6. That was the wrong inquiry, which unfortunately led the court to deny the Governor and Mr. Abraham's motion to quash "to the extent that they can avoid disclosing any and all documentation concerning: the dismissal of the Defendant Jividen; the dispatch of the Defendant Sandy to inspect the SRJ on March 30, 2023; and either Interested Party's involvement or knowledge of ESI preservation" — none of which would actually be responsive to the document requests contained in the subpoenas issued by Plaintiffs. ECF 772 at 11.[4]

---

[4] All non-privileged documents captured by the Plaintiffs' ESI protocol have been turned over. And thus, to the extent that the ESI protocol would return documents responsive to the Court's request, those have been produced.

Because the court failed to construe the actual subpoenas at issues or apply Rule 45, it made no findings regarding the Plaintiffs' need for the material or the burden imposed on the Governor's Office. Had it done so, the court would have reached the inevitable conclusion that because its requested documents have little to no value in the resolution of Plaintiffs' claims, and the same or comparable information is available from parties to the litigation, the burden to the Governor's Office outweighs any potential value to the litigation. Indeed, considering that the same day the Magistrate Judge declined to quash the subpoenas it also recommended that default judgment be entered in this case, the documents subject to the court's modified subpoenas can have no value to resolving Plaintiffs' claims.

Application of the correct legal standard would result in granting the motion to quash in full. Here, Plaintiffs have alleged that the defendants committed constitutional violations and were grossly negligent in their oversight of the SRJ. Turning to the first category of documents compelled by the court, those concerning the alleged "dismissal" of Betsy Jividen, Plaintiffs' counsel asserted at the October 23 hearing that "Brian Abraham reportedly, according to Defendant Jividen, was involved in the decision making of why to fire her." ECF 762 at 13:5-7. Without conducting any Rule 45 analysis as to that information, the Magistrate Judge nonetheless compelled nonparties to turn over documents "concerning . . . the dismissal of the Defendant Jividen." ECF 772 at 11. Yet it is hard to see how any involvement by Mr. Abraham in Jividen's departure from DCR has anything to do with Plaintiffs' claims of negligence or constitutional violations. Neither Plaintiff

9

nor Jividen allege that she was wrongfully terminated, or that her departure from WVDCR was in any way improper. What is more, the sheer volume of litigation tangentially related to the Office of the Governor would render any and all staffing decisions subject to subpoena—forcing the Office of the Governor to spend significant time and resources responding to and litigating such requests. Given the low litigation value of the information sought and the high burden placed on the office of the executive, this modified request should be quashed for this reason alone.

Likewise, the second category of requested documents, those related to "the dispatch of the Defendant Sandy to inspect the SRJ on March 30, [2022]," imposes an undue burden.[5] Information regarding the request to investigate SRJ is available in the report generated from that investigation, which lists the specific areas on which the Governor's Office instructed Secretary Sandy to focus (mattresses, toilets, toilet paper, and water). ECF 7-1 at 2. Defendant Sandy can testify to the instructions he received about that investigation and produce any nonprivileged communications about the same. Getting that information from Mr. Abraham would be cumulative and have no additional value in resolving Plaintiffs' claims. To the extent Plaintiffs wish to explore *why* Mr. Abraham chose to instruct

---

[5] The Order requires production of any documents concerning "the dispatch" of the Defendant Sandy to inspect the SRJ on March 30, *2023*. Jeff Sandy did not conduct an inspection of the SRJ on March 30, 2023, but rather on March 30, 2022, and so there would be no documents responsive to this request. This error appears to have originated in the Plaintiffs response to the Motion to Quash in which it listed potential deposition topics for the Governor and Mr. Abraham. ECF 741 at 16. The Governor and Mr. Abraham disregard this scrivener's error.

Sandy the way that he did—information of no relevance to Plaintiffs' claims in any event—such information would be protected by the deliberative process privilege.

What is more, releasing information concerning the initial decision to investigate a regional jail and information about the scope of that investigation would again burden the executive function of the State's top executive office. The Governor's Office learned of certain complaints and accusations at SRJ and solicited information to help determine what actions to take. If forced to produce internal documents concerning every action taken in response to a complaint leading to litigation, the Governor's Office would be administratively paralyzed by propounding responses to nonparty subpoenas.

Finally, and despite the fact that no party—including Plaintiffs—have alleged that the Governor or Mr. Abraham played a role in WVDCR and WVDHS's alleged failure to preserve electronically stored information, the Magistrate Judge has swept up the nonparties Governor and Mr. Abraham in that inquiry, compelling them to produce "any and all documentation concerning . . . either['s] . . . involvement or knowledge of ESI preservation." ECF 772 at 11. Again, the court conducted no Rule 45 analysis, including regarding how this information would be necessary to resolving Plaintiffs' claims.

The court apparently considers this request relevant because "the recent discovery produced by the Chief of Staff to the Governor that ESI in this matter be preserved, rather than destroyed." *Id.* at 10. The "recent discovery" the court refers to is an email from Jeff Sandy with a footer appended to the signature block that

11

reads "Jeff S. Sandy is a retired state employee. His email is remaining active at the direction of Chief of Staff Brian Abraham until further notice." ECF 752-1. The cited email does nothing more than indicate that an email account *can* be kept open at the request of an agency.[6] But that fact is uncontested. It was also uncontested at the hearing that WVDHS and WVDRC ESI preservation policies were not followed. There has been no allegation or even attempted showing that either Mr. Abraham or the Governor was involved in the failures by WVDHS and WVDCR, and any suggestion to the contrary, including as the apparent basis for this final category of documents request, is entirely unsupported. Such a request is therefore unduly burdensome.

**B. Executive privilege bars an order compelling the production of internal documents from the Governor's Office regarding the alleged "dismissal" of then-Commissioner Jividen and the "dispatch" of then-Secretary Sandy to "investigate" the SRJ.**

The Discovery Order's partial denial of the motion to quash is also contrary to law based on the executive privilege (also called the deliberative process privilege). Rule 45 also instructs that a nonparty subpoena must be quashed or modified if "it requires disclosure of privileged or other protected matter." Fed. R. Civ. P. 45(d)(3)(A)(iii). Here, the executive privilege plainly applies to the documents compelled by the Discovery Order. Although the Governor and Mr. Abraham advanced this argument in support of their motion to quash, the Magistrate Judge

---

[6] At the time Sandy retired as cabinet secretary, on August 1, 2023, neither the Governor nor Mr. Abraham was aware that document preservation policies within the WVDHS and WVDCR were not being followed. Sandy's email was kept active because he continued to do consultant work with the state. The footer was appended by Sandy to ensure that all people with whom he communicated understood that Sandy was a *former* cabinet secretary and not the *current* cabinet secretary.

failed to apply it with respect to those documents it ultimately determined should be compelled.

Executive privilege encompasses the categories of documents compelled by the Discovery Order; the conclusion otherwise is contrary to law. The "necessity and validity of executive privilege has been recognized for almost 200 years." *Pulte Home Corp. v. Montgomery Cnty. Md.*, 2017 WL 2361167 (D. Md. May 31, 2017). "Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of the agency decisions." *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975). The privilege is designed to "insulate[] against the chilling effect likely were officials to be judged not on the basis of their final decisions, but for matters they considered before making up their minds." *City of Va. Beach v. U.S. Dept. of Commerce*, 995 F.2d 1247, 1252–53 (4th 1993). For instance, Congress enshrined this privilege into the Freedom of Information Act, recognizing that "frank discussion of legal or policy matters in writing might be inhibited if the discussion were made public; and that the 'decisions' and 'policies formulated' would be poorer as a result." *Id.* at 150 (cleaned up).

To that end, the deliberative process privilege protects government decisionmakers from revealing "pre-decisional" and "deliberative" documents and communications. *N.L.R.B.*, 421 U.S. 132. A "pre-decisional" document is one "prepared in order to assist an agency decisionmaker in arriving at his decision." *City of Va. Beach*, 995 F.2d at 1253. "Deliberative" material "reflects the give-and-take of the consultative process . . . by revealing the manner in which the agency

13

evaluates possible alternative policies or outcomes." *Id.* Although "purely factual" information is not generally covered by the privilege, it can be protected if "it is inextricably intertwined with policymaking processes such that revelation of the factual material would simultaneously expose protected deliberation." *Id.* at 1253.

The subpoenas as modified through the Discovery Order require production of pre-decisional, deliberative, and nonfactual information. The Magistrate Judge seeks documentation regarding two discretionary decisions made by the Governor's Office—those related to the alleged "dismissal of Defendant Jividen" and "the dispatch of the Defendant Sandy to inspect the SRJ on March 30, [2022]." ECF 772 at 11.

The production of such documents plainly and directly implicates the deliberative process privilege of the highest constitutional, executive authority of a separate sovereign. Any documents or communications concerning the departure of a high-level executive official would have been generated to assist the Governor in his staffing decisions of high-ranking executive officials and would reflect the give-and-take involved in making those discretionary decisions—again, none of which are alleged to be unlawful. An executive official, knowing that he can be required to produce documentation regarding executive staffing decisions every time those decisions are simply *mentioned* in a lawsuit, would be chilled from conducting "frank and open" discussions regarding such decisions and decision-making would naturally suffer.

14

Likewise, documents concerning the "dispatch of Defendant Sandy" to the SRJ on a particular date would, again, be inherently pre-decisional and deliberative. Again, they clearly fall within the discretionary administration of the State's executive branch, and there is no allegation that such action was unlawful. The "dispatch of Defendant Sandy" occurred after the Governor's Office became aware of complaints about conditions at the SRJ. It should go without saying that the Governor's Office should be able to frankly discuss the scope and response to any complaints made with its own subordinate appointees without fear that those policy deliberations will be compelled by order of a federal court.

Ultimately, in this case, the Governor's Office decided to "dispatch" Defendant Sandy to investigate mattresses, toilets, toilet paper, and water at the SRJ, and that investigation was carried out. Any documents leading up the decision to initiate that investigation would reflect the considerations undertaken by the executive in reaching that ultimate decision (in addition, again, to being irrelevant and unduly burdensome). Such requested documents are plainly privileged.

II.     **State sovereign immunity precludes enforcement of the subpoenas.**

In their briefing, the Governor and Mr. Abraham explained that the doctrine of state sovereign immunity (also called Eleventh Amendment immunity) bars enforcement of the subpoenas against them *in full*—including the document request component. *See* ECF 736. Although the Magistrate Judge cited to the leading decision, *Russell v. Jones*, 49 F.4th 507 (5th Cir. 2022), ECF 772, at *8, neither the doctrine of state sovereign immunity nor the Governor and Mr. Abraham's

15

arguments applying it were addressed. The decision to compel enforcement of the subpoenas (even in part), despite state sovereign immunity, was contrary to law.

In our constitutional system, States "retain a residuary and inviolable sovereignty," *Alden v. Maine*, 527 U.S. 706, 715 (1999) (quoting The Federalist No. 39, at 245 (James Madison)), which is confirmed by the Eleventh Amendment, *id.* at 728–29. The doctrine of state sovereign immunity recognizes that "it is neither becoming nor convenient . . . that the course of [a State's] public policy and the administration of their public affairs should be subject to and controlled by the mandates of judicial tribunals, without their consent, and in favor of individual interests." *Ex parte Ayers*, 123 U.S. 443, 505 (1887).

In recognizing the importance of state sovereign immunity as an "essential element of the constitutional design," the Eleventh Amendment confirmed a limit on judicial power that "accords States the respect owed them as members of the federation." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 291 (4th Cir. 2001) (quoting *Puerto Rico Aqueduct v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993)). The Eleventh Amendment was ratified to affirm the States' sovereignty and to "prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Ex parte Ayers*, 123 U.S. at 505. A State may thus be subject to suit only after Congress abrogates sovereign immunity through the Fourteenth Amendment or when the State itself unequivocally consents. *College Sav. Bank. v. Fla. Prepaid*, 527 U.S. 666, 670 (1999).

To give full force to state sovereignty, sovereign immunity serves as immunity from "suit," not just from liability. *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 482 (4th Cir. 2005). States, in other words, "cannot be subjected to *legal proceedings* at law or in equity without their consent." *The Siren*, 74 U.S. (7 Wall.) 152, 154 (1868) (emphasis added). A "suit" is against the sovereign "if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, *or to compel it to act.*" *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (emphasis added).

Where sovereign immunity applies, it applies to the totality of a suit, *which includes discovery. Russell*, 49 F.4th at 514; *see Suarez Corp. Inds v. McGraw*, 125 F.3d 222, 227 (4th Cir. 1997) (recognizing that when sovereign immunity is invoked, the bar is "absolute"). It would be anomalous indeed if a state official not subject to suit as a defendant in a particular case based on state sovereign immunity would be otherwise subject to the coercive judicial power *as a nonparty* in that same case.

A recent case from the Fifth Circuit demonstrates that such an illogical result is contrary to state sovereign immunity. *See Russell*, 49 F.4th at 512–19. In *Russell*, the plaintiffs brought suit in federal court against a local county and its sheriff to enjoin use of a felony-bail system. During the litigation, the plaintiffs served subpoenas on several state court judges seeking information concerning their roles in the creation and use of the system. *Id.* at 510. Consistent with other decisions applying sovereign immunity, the Fifth Circuit held that enforcement of the

17

subpoenas would be the type of conduct that sovereign immunity precludes, looking to Supreme Court decisions recognizing that state sovereign immunity broadly applies either when the state is a defendant or when it is subject to other coercive judicial process, such as the subpoenas at issue in that case. *Id.* at 514–15.

Based on Supreme Court precedent, the Fifth Circuit adduced the following three-part test to determine if the doctrine of state sovereign immunity bars third-party subpoenas in a given case: (1) whether the subpoenaed parties are acting as state officials; (2) whether the third parties were subpoenaed in their official capacities; and (3) whether compliance with the subpoena would "operate against the state in a way that implicates state sovereign immunity." *Russell*, 49 F.4th at 512-13. In this case, these factors are plainly satisfied.

*First*, both the Governor and Mr. Abraham have been subpoenaed to answer questions and provide documents regarding actions taken as part of their official duties. There is no doubt that the subpoenaed parties are acting as state officials under the circumstances presented here. *Second*, the face of the subpoenas and the nature and content of the requests make clear that the subpoenas were issued to the Governor and his Chief of Staff in their official capacities; the same goes for the nature of the categories of documents compelled by the Discovery Order. *Finally*, the subpoenas and the Discovery Order operate directly against the state in a manner that implicates sovereign immunity. Because "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," sovereign immunity generally bars individual suits against state officials in their official

18

capacities. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Sovereign immunity

applies to judicial proceedings, like the third-party subpoenas here, because they

trench on the fisc and otherwise interfere with the public administration—in this

instance, at the highest level of the State's Executive. *E.g.*, *Felix v. Co. of Nassau*,

2023 WL 5978189, at *4–5 (E.D.N.Y. Sept. 12, 2023) (granting motion to quash of

nonparty New York Attorney General based on sovereign immunity).

      To be sure, states-as-*defendants* rather than as third parties are the "usual

recipients" of sovereign immunity. *Russell*, 49 F.4th at 513. But U.S. Supreme

Court precedent makes clear that sovereign immunity "respects a broader berth."

*Id.*; *see Ex parte Ayers*, 123 U.S. at 505 ("It was thought to be neither becoming nor

convenient that the several states of the Union, invested with that large residuum

of sovereignty which had not been delegated to the United States, should be

summoned as defendants . . . , *or that the course of their public policy and the

administration of their public affairs should be subject to and controlled by the

mandates of judicial tribunals, without their consent, and in favor of individual

interests*.") (emphasis added).

      This makes sense, because sovereign immunity is immunity from suit—

which encompasses protection from the burdens of the discovery process. Here, the

Governor and Mr. Abraham would not be subject to Plaintiffs' damages claims as

defendants in their official capacities, because that would be clearly barred by

sovereign immunity.[7] The State's interests served by sovereign immunity—the

---

[7] Nor would Governor and Abraham fall under the *Ex parte Young* exception if named as defendants in this case. *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001). In any event,

protection of sovereign dignity and authority over its prerogatives, whether financial or administrative—are no less valid "when a sovereign is served with a subpoena duces tecum instead of a complaint." *Russell*, 49 F.4th at 515.

Finally, the application of state sovereign immunity to the circumstances presented here does not mean that a state official served in his official capacity with a third-party subpoena will *always* be entitled to the protection of state sovereign immunity such that no subpoena against a state official can ever be enforced. To take one element, a subpoena duces tecum against a state official in his or her official capacity will not inexorably "operate against the state in a way that implicates state sovereign immunity." *Russell*, 49 F.4th at 512–13. So, for instance, if a state official would *not* otherwise be entitled to the protection of sovereign immunity if named as a defendant, then this element would not be satisfied for purposes of third-party discovery. The official could fall under the *Ex parte Young* exception, or the State may have waived sovereign immunity for the claim for which the third-party discovery is sought (or Congress may have done so under its constitutional authority). As none of those circumstances are present here, the sovereign immunity bar applies to preclude enforcement of subpoena duces tecum against the Governor and Mr. Abraham in full. It was therefore contrary to law for the Magistrate Judge to enforce them.

---

Plaintiffs did not argue that the Governor and Abraham could be named as defendants in this case under *Ex parte Young*, so that argument is forfeited.

## CONCLUSION

For the foregoing reasons, this Court should set aside the Discovery Order only to the extent that it denied the motion to quash, which should have been granted in full.

**James C. Justice, II, Governor, and Brian Abraham, Chief of Staff**

**By Counsel.**

/s/ Michael B. Hissam
Michael B. Hissam (WVSB # 11526)
Maureen F. Gleason (WVSB #14452)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
681-265-3802 *office*
304-982-8056 *fax*
mhissam@hfdrlaw.com
mgleason@hfdrlaw.com

*Counsel for Governor James C. Justice, II, and Brian Abraham, Chief of Staff to the Governor*