IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION

MICHAEL ROSE; THOMAS FLEENOR, JR.;
JOHN CRABTREE; STEVEN MARTIN; JACOB
BEAVERS; GARY TOLER; ELGIE ADKINS;
TYLER CHILDERS, and SABRINA EAGLE, on
behalf of themselves and others similarly situated,

                         Plaintiffs,

v.                                          Civil Action No. 5:22-cv-405
                                            The Honorable Frank W. Volk

THE RALEIGH COUNTY COMMISION;DAVID
TOLLIVER, in his capacity as a Raleigh County
Commissioner; LINDA EPLING, in her capacity as
a Raleigh County Commissioner; RON HENRICK, in
his capacity as a Raleigh County Commissioner;
GREGORY DUCKWORTH, in his capacity as a
Raleigh County Commissioner, THE FAYETTE
COUNTY COMMISSION; JOSH BRENEMEN, in
his capacity as a Fayette County Commissioner;
DENIS SCALPH, in her capacity as a Fayette County
Commissioner; THOMAS LOUISOS, in his capacity
as a Fayette County Commissioner; ALLISON
TAYLOR, in her capacity as a Fayette County
Commissioner; THE GREENBRIER COUNTY
COMMISSION; BLAINE PHILLIPS, in his capacity
as a Greenbrier County Commissioner; TAMMY
TINCHER, in her capacity as a Greenbrier County
Commissioner; LOWELL ROSE, in his capacity as a
Greenbrier County Commissioner; THE MERCER
COUNTY COMMISSION; GENE BUCKNER, in his
capacity as a Mercer County Commissioner; GREG
PUCKETT in his capacity as a Mercer County
Commissioner; BILL ARCHER in his capacity as a
Mercer County Commissioner; THE MONROE
COUNTY COMMISSION; WILLIAM MILLER,
in his capacity as a Monroe County Commissioner;
KEVIN MANN in his capacity as a Monroe County
Commissioner; KEVIN GALFORD, in his capacity
as a Monroe County Commissioner; and MELVIN
YOUNG, in his capacity as a Monroe County

1

**Commissioner; THE SUMMERS COUNTY COMMISSION; JACK WOODRUM, in his capacity as a Summers County Commissioner; BILL LIGHTNER, in his capacity as a Summers County Commissioner; CHARLES SAUNDERS, in his capacity as a Summers County Commissioner; MIKE GORE, in his capacity as a Summers County Commissioner; TED KULA, in his capacity as a Summers County Commissioner; THE WYOMING COUNTY COMMISSION; RANDALL ALIFF, in his capacity as a Wyoming County Commissioner; JASON MULLINS, in his capacity as a Wyoming County Commissioner; SAMUEL MUSCARI, SR., in his capacity as a Wyoming County Commissioner; PRIMECARE MEDICAL, INC.; THOMAS WEBER; BRETT BAVINGTON; TODD HESKINS; KRISTA VALLANDINGHAM; MELISSA JEFFERY; BRANDY EASTRIDGE, HELEN PERKINS; JESSICA MILLER; BRANDY EASTRIDGE; WEXFORD HEALTH SOURCES, INC.; MARY STONE;DANIEL CONN; ELAINE GEDMAN; JOHN FROELICH; HUMAYAN RASHID, M.D.; ANGELA NICHOLSON, MSN; APRN, FNP-C; AMBER DUNCAN; LISA MULLENS, LPN; CASSEY BOLEN; JOHN PENNINGTON, MA, LPC, NCC, NCSC; KENNADI SMITH, LPN; RACHEL LEEDY, LPN; ASHLEY VALLANDINGHAM, LPN; BRITTANI MARSHALL, RN; AUTMN BLAIR, RN; JOYE MARTIN, MD; HANNAH WHITE, LPN; ASHLEY STROUP, LPN; DONNA DEAN-CHRIVIA; AND JOHN AND JANE DOE PRIMECARE AND WEXFORD EMPLOYEES.**

**Defendants.**

## THIRD AMENDED CLASS ACTION COMPLAINT

COME NOW Plaintiffs, by undersigned counsel, and bring their Third Amended Class Action Complaint. This Complaint arises from a long-tenured history of inmates and pretrial detainees at Southern Regional Jail ["SRJ"] being subjected to unconstitutional conditions of confinement and medical neglect. For decades, SRJ inmates have been subjected to well-known

2

and systematic overcrowding, correctional understaffing, medical understaffing, medical neglect, deliberate indifference to their serious medical needs. County Commission and County Commissioner Defendants have turned a blind eye to their county inmates living in unconstitutional conditions and receiving insufficient and inadequate nutrition and basic necessities for years. Indeed, these defendants' only concern regarding their county inmates arises from the amount of money they must expend in per diem payments. County Defendants have benefited from a freeze in the per diem rates to the tune of $100 million dollars.

Medical Defendants have continuously chosen to contract with the state and then, in violation of that contract, operate with inadequate, undertrained, and unqualified staff. Further, these defendants have knowingly created a system which results in failure to respond to nurse sick calls timely, if at all, and a gross number of overdue tasks ranging from histories and physicals to labs to EKGs. The actions and inactions of all Defendants are carried out systemically and represent both deliberate indifference and/or medical negligence. Plaintiffs, and all pretrial detainees and inmates, suffer serious harm because of Defendants' decisions to forego their obligations and carry out their obligations in a manner which shows their deliberate indifference for Plaintiffs. These allegations are outlined more fully herein.

## <u>JURISDICTION AND VENUE</u>

1.      This action arises under the Civil Rights Act, 42 U.S.C. § 1983, *et seq*., and ancillary state law claims.

2.      Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and under its authority to decide pendent state law claims.

4.    Venue is proper because certain Defendants reside within the Southern District of West Virginia, Beckley Division and the incidents giving rise to this Complaint occurred within the Southern District of West Virginia, Beckley Division.

## PARTIES

5.    Plaintiff Michael Rose was a pretrial detainee and/or was incarcerated at Southern Regional from January 28-29, 2021; February 26-27, 2021; March 9-10, 2021; December 3-21, 2021; February 2-6, 2022; and January 17-28, 2023.

6.    Plaintiff Michael Rose was, at all times relevant hereto, a resident of Fayette County, West Virginia, who was detained and/or incarcerated for crimes allegedly committed in Fayette County.

7.    For the purposes of per diem payments and other non-delegable statutory and regulatory duties, Michael Rose was a Fayette County inmate.

8.    Plaintiff Thomas Fleenor, Jr., was a pretrial detainee and/or was incarcerated at Southern Regional from February 13, 2021-July 12, 2021 and March 9, 2022-July 22, 2022.

9.    Plaintiff Thomas Fleenor, Jr., was, at all times relevant hereto, a resident of Wyoming County, West Virginia, who was detained and/or incarcerated for crimes allegedly committed in Wyoming County.

10.    For the purposes of per diem payments and other non-delegable statutory and regulatory duties, Thomas Fleenor, Jr., was a Wyoming County inmate.

11.    During his time in SRJ, Thomas Fleenor, Jr., was a patient of PrimeCare Defendants as set forth more fully herein.

12.    Plaintiff Steven Martin was a pretrial detainee and/or was incarcerated at Southern Regional from January 21, 2023-September 6, 2023; and November 13, 2023 – November 27, 2023 or later.

13.    Plaintiff Steven Martin was, at all times relevant hereto, a resident of Mercer County, West Virginia, who was detained and/or incarcerated for crimes allegedly committed in Mercer County.

14.    For the purposes of per diem payments and other non-delegable statutory and regulatory duties, Steven Martin was a Mercer County inmate.

15.    During his time in SRJ, Steven Martin was a patient of Wexford Defendants as set forth more fully herein.

16.    Plaintiff John Crabtree was a pretrial detainee and/or was incarcerated at Southern Regional from at least September 22, 2020-February 10, 2021; July 6, 2021 – October 15, 2021; and October 17, 2022 to February 8, 2023.

17.    Plaintiff John Crabtree was, at all times relevant hereto, a resident of Mercer County, West Virginia, who was detained and/or incarcerated for crimes allegedly committed in Mercer County.

18.    For the purposes of per diem payments and other non-delegable statutory and regulatory duties, John Crabtree was a Mercer County inmate.

19.    During his time in SRJ, John Crabtree was a patient of PrimeCare Defendants and as set forth more fully herein.

20.    Plaintiff Jacob Beavers was a pretrial detainee and/or was incarcerated at Southern Regional from March 21, 2021-March 22, 2021; April 3, 2022-April 11, 2022; April 25, 2022-

April 27, 2022; August 9, 2022-August 23, 2022; October 28, 2022-January 17, 2023; and May 25, 2023-May 30, 2023.

21.    Plaintiff Jacob Beavers was, at all times relevant hereto, a resident of Summers County, West Virginia, who was detained and/or incarcerated for crimes allegedly committed in Summers County.

22.    For the purposes of per diem payments and other non-delegable statutory and regulatory duties, Jacob Beavers was a Summers County inmate.

23.    Plaintiff Gary Toler was a pretrial detainee and/or was incarcerated at Southern Regional from July 15, 2021-December 7, 2022.

24.    Plaintiff Gary Toler was, at all times relevant hereto, a resident of Wyoming County, West Virginia, who was detained and/or incarcerated for crimes allegedly committed in Greenbrier County.

25.    For the purposes of per diem payments and other non-delegable statutory and regulatory duties, Gary Toler was a Greenbrier County inmate.

26.    During his time in SRJ, Gary Toler was a patient of PrimeCare Defendants as set forth more fully herein.

27.    Plaintiff Elgie Adkins was a pretrial detainee and/or was incarcerated at Southern Regional from at least September 22, 2020-September 25, 2020; June 13, 2021-November 19, 2021; and August 26, 2022-December 1, 2022.

28.    Plaintiff Elgie Adkins was, at all times relevant hereto, a resident of Raleigh County, West Virginia, who was detained and/or incarcerated for crimes allegedly committed in Fayette County.

29.     For the purposes of per diem payments and other non-delegable statutory and regulatory duties, Elgie Adkins was a Fayette County inmate.

30.     During his time in SRJ, Elgie Adkins was a patient of Wexford Defendants as set forth more fully herein.

31.     Plaintiff Tyler Childers was a pretrial detainee and/or was incarcerated at Southern Regional from June 23, 2021-June 30, 2021; November 28, 2021-January 21, 2022; and September 18, 2023 to at least November 27, 2023.

32.     Plaintiff Tyler Childers was, at all times relevant hereto, a resident of Taylor County, West Virginia, who was detained and/or incarcerated for crimes allegedly committed in Raleigh County.

33.     For the purposes of per diem payments and other non-delegable statutory and regulatory duties, Tyler Childers was a Raleigh County inmate.

34.     Plaintiff Sabrina Eagle was a pretrial detainee and/or was incarcerated at Southern Regional from June 25, 2022-September 30, 2022.

35.     Plaintiff Sabrina Eagle was, at all times relevant hereto, a resident of Greenbrier County, West Virginia, who was detained and/or incarcerated for crimes allegedly committed in Monroe County.

36.     For the purposes of per diem payments and other non-delegable statutory and regulatory duties, Sabrina Eagle was a Monroe County inmate.

37.     During her time in SRJ, Sabrina Eagle was a patient of Wexford Defendants as set forth more fully herein.

38.     Each Plaintiff brings this action on behalf of themselves and others similarly situated.

39.    Defendants Raleigh, Fayette, Summers, Monroe, Mercer, Greenbrier, and Monroe County Commissions [hereinafter sometimes "County Commission Defendants"] are political subdivisions established under the laws of West Virginia and located in their respective counties.

40.    Denise Scaph; John Brenemen; Thomas Louisos; and Allison Taylor, in their capacities as Fayette County Commissioners, were at all times hereto the elected officials charged with oversight of the Fayette County Commission and the carrying out of all statutory, regulatory, and other nondelegable duties of the Fayette County Commission.

41.    David Tolliver; Linda Epling; Ron Henrick; and Gregory Duckworth, in their capacities as Raleigh County Commissioners, were at all times hereto the elected officials charged with oversight of the Raleigh County Commission and the carrying out of all statutory, regulatory, and other nondelegable duties of the Raleigh County Commission.

42.    Randall Aliff; Jason Mullins; Samuel Muscari, Sr., in their capacities as Wyoming County Commissioners, were at all times hereto the elected officials charged with oversight of the Wyoming County Commission and the carrying out of all statutory, regulatory, and other nondelegable duties of the Wyoming County Commission.

43.    Jack Woodrum; Bill Lightner; Charles Saunders; Mike Gore; Ted Kula, in their capacities as Summers County Commissioners, were at all times hereto the elected officials charged with oversight of the Summers County Commission and the carrying out of all statutory, regulatory, and other nondelegable duties of the Summers County Commission.

44.    Blaine Phillips; Tammy Tincher; Lowell Rose, in their capacities as Greenbrier County Commissioners, were at all times hereto the elected officials charged with oversight of the Greenbrier County Commission and the carrying out of all statutory, regulatory, and other nondelegable duties of the Greenbrier County Commission.

45.    Gene Bucker; Greg Puckett; Bill Archer, in their capacities as Mercer County Commissioners, were at all times hereto the elected officials charged with oversight of the Mercer County Commission and the carrying out of all statutory, regulatory, and other nondelegable duties of the Mercer County Commission.

46.    William Miller; Kevin Mann; Kevin Galford; and Melvin Young, in their capacities as Mercer County Commissioners, were at all times hereto the elected officials charged with oversight of the Mercer County Commission and the carrying out of all statutory, regulatory, and other nondelegable duties of the Mercer County Commission.

47.    County Commissioners had final authority to establish and enforce policy with respect to the actions ordered under applicable West Virginia statutes.

48.    The County Commission Defendants house most, if not all, of their county inmates at Southern Regional Jail.

49.    The County Commission Defendants house most, if not all, of the pretrial detainees at Southern Regional Jail.

50.    Southern Regional Jail serves as a consolidated county jail for the County Commission Defendants.[1]

51.    The County Commission Defendants retain certain nondelegable responsibilities for their respective county inmates under West Virginia law.

52.    PrimeCare Medical, Inc., is a Pennsylvania Corporation with its principal place of business in Harrisburg, Pennsylvania.

---

[1] See Natalie Ortiz, Country Jails at a Crossroads: an Examination of the Jail Population and Pretrial Release, NACo Why Counties Matter Paper Series, Issue 2 (July 2015), at **Exhibit 1**.

53.     PrimeCare Medical, Inc., wholly owns PrimeCare Medical of West Virginia, Inc. [Weber, Vol. II 10:11-22].[2]

54.     PrimeCare Medical of West Virginia, Inc., was responsible for providing medical care to inmates at Southern Regional Jail.

55.     PrimeCare Medical, Inc., has filed for bankruptcy protection, but Plaintiff intends to seek leave to amend this complaint to name PrimeCare Medical of West Virginia, inc., when the automatic stay is lifted.

56.     PrimeCare Medical, Inc., has filed no such bankruptcy action, and claims against it are not stayed.

57.     PrimeCare Medical of West Virginia, Inc. was an alter ego of PrimeCare Medical, Inc.

58.     Specifically, upon information and belief:

   a.   PrimeCare Medical, Inc. comingled funds and other assets with PrimeCare Medical of West Virginia., Inc., including, for example, purchase of insurance policies and payment of premiums on behalf of PrimeCare Medical of West Virginia, Inc.;

   b.   PrimeCare Medical, Inc., wholly owns PrimeCare Medical of West Virginia, Inc.;

   c.   PrimeCare Medical of West Virginia, Inc., failed to maintain minutes, records, and other corporate formalities;

   d.   PrimeCare Medical and PrimeCare Medical of West Virginia, Inc., are owned and managed by the same parties;

---

[2] See Weber Corporate Representative Deposition, Volume II, at **Exhibit 2**.

e.  PrimeCare Medical, Inc., failed to adequately capitalize PrimeCare Medical of West Virginia, Inc., for the reasonable risks of its undertakings;

f.  PrimeCare Medical, Inc., used PrimeCare Medical of West Virginia, Inc., as a mere shell or conduit to operate some particular aspects of its business;

g.  PrimeCare Medical of West Virginia, Inc., used the same offices, letterhead, policies and protocols, employees, attorneys, human resources department, and other resources as PrimeCare Medical, Inc.,

h.  PrimeCare Medical, Inc., actively managed the day-to-day operations of PrimeCare Medical of West Virginia, Inc., including , for example, by creating routine employee schedules and controlling staffing of PrimeCare Medical of West Virginia, Inc.;

i.  PrimeCare Medical of West Virginia, Inc., does not maintain its own website or other marketing operations and is otherwise represented to be the same enterprise as PrimeCare Medical, Inc.,

j.  PrimeCare Medical, Inc., and PrimeCare Medical of West Virginia, Inc., concealed the identity of PrimeCare Medical of West Virginia, Inc.'s, ownership, management, and financial interests;

k.  PrimeCare Medical, Inc., disregarded legal formalities and failed to maintain a proper arm's length relationship with Primecare Medical of West Virginia, Inc.;

l.  PrimeCare Medical, Inc., manipulated assets and liabilities to concentrate assets in itself and liabilities in PrimeCare Medical of West Virginia, Inc.;

m.  PrimeCare Medical, Inc., used PrimeCare Medical of West Virginia, Inc., to enter into a contract with the State of West Virginia from 2016 to 2022 in which

it agreed, among other things, to provide medical and health services to inmate in SRJ that complied with state law, federal law, and met the National Commission on Correctional Health Care's standards knowing that PrimeCare Medical of West Virginia, Inc., could not meet those standards;

n. PrimeCare Medical, Inc., therefore, used PrimeCare Medical of West Virginia, Inc., to contract with the State of West Virginia to avoid the risk of nonperformance of that contract; and

o. PrimeCare Medical of West Virginia, Inc., entered into a contract with the State of West Virginia in which it agreed, among other things, to purchase and maintain liability insurance policies applicable to its operations at SRJ. As noted above, however, PrimeCare Medical, Inc., purchased insurance on behalf of PrimeCare Medical of West Virginia, Inc.

59. Wexford Health Sources, Inc., ["Wexford"] is a Florida corporation with its principal place of business in Pittsburgh, Pennsylvania.

60. From June of 2022 to present Wexford has been the healthcare provider contracted with the West Virginia Department of Corrections for the provision of medical care at Southern Regional Jail.

61. Thomas Weber is and has been the CEO of PrimeCare Medical, Inc., since 2016. [Weber, Vol. II 10:8-19].

62. Thomas Weber holds a one-third ownership share in PrimeCare Medical, Inc. [Weber, Vol. II 10:11-22].

63. Brett Bavington is the President of PrimeCare Medical, Inc.

64. Brett Bavington holds a one-third ownership share in PrimeCare Medical, Inc.

65.    Todd Heskins is the Chief Operating Officer of PrimeCare Medical, Inc.

66.    Todd Heskins holds a one-third ownership share in PrimeCare Medical, Inc.

67.    Defendants Weber, Bavington, and Heskins collectively maintained decision-making authority over policies, actions, and inactions of PrimeCare Medical of West Virginia, Inc., and PrimeCare Medical as set forth herein, and were responsible for PrimeCare and its alter ego PrimeCare of West Virginia, Inc.

68.    Krista Vallandingham was at all times relevant hereto the Vice President of Operations or Regional Manager for PrimeCare Medical, Inc.

69.    Melissa Jeffery was at all times relevant hereto the Assistant Regional Manager for PrimeCare Medical Inc., and, subsequently Wexford Health Sources, Inc.

70.    Jessica Miller was at all times relevant hereto the Regional Manager for PrimeCare Medical, Inc., and, subsequently, Wexford Health Sources, Inc.

71.    Brandy Eastridge was at all times relevant hereto a Health Services Administrator at Southern Regional Jail for PrimeCare Medical, Inc.

72.    Defendant Eastridge also provided medical care to pretrial detainees and inmates at SRJ.

73.    Helen Perkins was at all times relevant hereto a Health Services Administrator at Southern Regional Jail for PrimeCare Medical, Inc., and, subsequently, Wexford Health Service, Inc.

74.    Defendant Perkins also provided medical care to pretrial detainees and inmates at SRJ.

75.    Humayan Rashid, MD, was at all times relevant hereto the Medical Director at Southern Regional Jail employed by PrimeCare and, subsequently, Wexford.

76.    Defendant Rashid provided medical care to pretrial detainees and inmates at SRJ.

77.    Defendants Vallandingham, Jeffery, Miller, Perkins, and Rashid collectively maintained responsibility for ensuring that inmates and pretrial detainees at SRJ received constitutionally adequate medical care which met the applicable standard of care.

78.    Defendant Angela Nicholson, MSN, APRN, FNP-C, was at all times relevant hereto a medical provider employed or contracted by PrimeCare to provide medical services to pretrial detainees and inmates at SRJ.

79.    Defendant Amber Duncan was at all times relevant hereto a medical provider employed or contracted by PrimeCare to provide medical services to pretrial detainees and inmates at SRJ.

80.    Defendant Lisa Mullens, LPN, was at all times relevant hereto a medical provider employed or contracted by PrimeCare to provide medical services to pretrial detainees and inmates at SRJ.

81.    Defendant Cassey Bolen was at all times relevant hereto a medical provider employed or contracted by PrimeCare to provide medical services to pretrial detainees and inmates at SRJ.

82.    Defendant John Pennington, MA, LPC, NCC, NCSC, was at all times relevant hereto a medical provider employed or contracted by PrimeCare to provide medical services to pretrial detainees and inmates at SRJ.

83.    Defendants John/Jane Doe PrimeCare employees were at all times relevant hereto medical providers employed or contracted by PrimeCare to provide medical services to pretrial detainees and inmates at SRJ.

84.     Defendant Kennadi Smith, LPN, was at all times relevant hereto a medical provider employed or contracted by Wexford to provide medical services to pretrial detainees and inmates at SRJ.

85.     Defendant Rachel Leedy, LPN, was at all time relevant hereto a medical provider employed or contracted by Wexford to provide medical services to pretrial detainees and inmates at SRJ.

86.     Defenant Ashley Vallandingham was at all times relevant hereto a medical provider employed or contracted by Wexford to provide medical services to pretrial detainees and inmates at SRJ.

87.     Defendant Brittani Marshall, RN, was at all times relevant hereto a medical provider employed or contracted by Wexford to provide medical services to pretrial detainees and inmates at SRJ.

88.     Defendant Autmn Blair, RN, HSA, all times relevant hereto a medical provider employed or contracted by Wexford to provide medical services to pretrial detainees and inmates.

89.     Defendant Joye Martin, MD, was at all times relevant hereto a medical provider employed or contracted by Wexford to provide medical services to pretrial detainees and inmates.

90.     Defendant Hannah White, LPN, was at all times relevant hereto a medical provider employed or contracted by Wexford to provide medical services to pretrial detainees and inmates.

91.     Defendant Ashley Stroup, LPN, was at all times relevant hereto a medical provider employed or contracted by Wexford to provide medical services to pretrial detainees and inmates at SRJ.

92.    Defendant Donna Dean-Chrivia was at all times relevant hereto a medical provider employed or contracted by Wexford to provide medical services to pretrial detainees and inmates at SRJ.

93.    Defendant Taylor Brooks was at all times relevant hereto a medical provider employed or contracted by Wexford to provide medical services to pretrial detainees and inmates at SRJ.

94.    Defendants John/Jane Doe Wexford Employees were at all times relevant hereto medical providers employer or contracted by Wexford to provide medical services to pretrial detainees and inmates at SRJ.

95.    Defendants Rashid; Perkins; Eastridge; Nicholson; Duncan , Mullens, Bolen, Pennington, Smith, Leedy, Vallandingham, Marshall, Blair, Martin, White, Stroup, Dean-Chrivia, and Brooks were healthcare providers responsible for the provision of medical services to pretrial detainees as Southern Regional Jail[3] which was constitutionally adequate and which met the applicable standard of care.

96.    Mary Stone is the Vice President of Operations of Wexford.

97.    Daniel Conn is the President, CEO, Chairman, and Assistant Secretary of Wexford.

98.    Elaine Gedman is the Executive Vice President, Chief Administrative Officer, and Assistant Secretary of Wexford.

99.    John Froelich is the Senior Vice President, CFO, and Assistant Secretary of Wexford.

100.    Defendants Stone, Conn, Gedman, and Froelich collectively maintained decision-making authority over policies, actions, and inactions of Wexford as set forth herein.

---

[33] Certain medical providers were responsible for care of inmates at SCRJ after their transfer from SRJ – Plaintiffs maintain that Wexford retained a responsibility for this inmate that began at SRJ.

101.     In their respective roles outlined herein, Defendants Weber, Heskins, Bavington, Stone, Conn, Gedman, Froelich, Vallandingham, Jeffery, Miller, Perkins, and Rashid were responsible for the implementation of and adherence to policies intended to provide Constitutionally mandated healthcare that met the applicable standard of care to inmates and pretrial detainees at Southern Regional Jail.

102.     In their respective roles outlined herein, Defendants Weber, Heskins, Bavington, Stone, Conn, Gedman, Froelich, Vallandingham, Jeffery, Miller, Perkins, and Rashid were responsible for providing healthcare that met the applicable standard of care to inmates and pretrial detainees at Southern Regional Jail that met the applicable standard(s) of care.

103.     The County Commission Defendants and County Commissioners are sued up to the limits of the insurance policies that provide liability coverage for their actions and omissions, or as otherwise permitted by law.

## FACTS[4]

104.     Plaintiffs incorporate herein by reference all preceding Paragraphs of their Third Amended Complaint as if set forth fully herein verbatim.

105.     Jails and their contractors are not permitted to act with deliberate indifference toward the health and safety of inmates. See *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016).

106.     Defendants have a duty "[t]o establish a just, humane, and efficient corrections program." See W.Va. Code § 15A-3-1(b)(4).

---

[4] Plaintiffs incorporate herein by reference all prior complaints and allegations asserted against WVDCR Defendants, both for the purpose of preserving these claims and reserving the right to amend if settlement is not approved, and for the purpose of the conspiracy claims set forth herein.

107.     A humane corrections program is one that provides adequate food, clothing, shelter, sanitation, medical care, and personal safety. See Syl. Pt. 2, *Crain v. Bordernkircher*, 178 W.Va. 338, 342 S.E.2d 422 (1986).

### County Commission Defendants

108.     Regional jails are, in essence, "multiple county operated jails."

109.     West Virginia Code § 7-8-1, *et seq*, establishes requirements for county commissions housing their inmates.

110.     W.Va. Code § 7-8-1 has neither been repealed nor rewritten.

111.     By enacting the statute, the "[l]egislature intended to require counties to maintain jails at reasonable and acceptable standards." *Hickson v. Kellison*, 170 W.Va. 732, 296 S.E.2d 855 (W.Va. 1982).

112.     Those standards include the provision of "wholesome and sufficient food and clean and sufficient bedding for all prisoners confined in the county jail." W.Va. Code § 7-8-2a.

113.     "The county commission may provide for the feeding of prisoners on a contract basis with any other county, **state** or municipal government agency which at the time of entering into said contract is required or authorized to provide food services for other purposes." <u>Id</u>. (*emphasis added*).

114.     "Invoices or itemized statements of account from each vendor of food, bedding and other supplies shall be obtained, and payment of such statements or invoices may not be authorized by the county commission **unless and until** the county commission has ascertained that the merchandise has been received and that the terms of purchase **have been complied with on the part of the vendor**." <u>Id</u>. (**emphasis added**).

18

115.    "The county commission shall be required to keep a daily record of food served prisoners and, in all counties having a county health officer, said health officer shall, at least once a month, inspect such lists and make such recommendations and suggest as he may deem proper regarding daily diets and foods **regardless of how the feeding services are provided**." Id. (**emphasis added**).

116.    Any entity contracting with the county commission to provide food services "shall be subject to inspection and regulation by the department of health." Id.

117.    Section 7-8-2a further imposes duty to furnish the soaps, disinfectants and other supplies needed by the jailer in the performance of his duties and to keep the jail in constant and adequate repair.

118.    The face of W.Va. Code § 7-8-1, *et seq*. clearly and unequivocally creates a duty on the part of Defendants to provide nutrition, bedding, clothing, and hygiene items to the county inmates housed at SRJ.  W.Va. Code § 7-8-1, *et seq*; see also *Dawson v. Kendrick*, 527 F.Supp. 1252 (S.D.W.Va. 1981)(though these provisions may be anachronistic, "**they are the law of the state**" and may give rise to liberty and property interests) (**emphasis added).**

119.    West Virginia Code § 15A-3-16 controls funding for the operation of regional jails. Counties within each region "shall incarcerate all persons whom the county would have incarcerated in any jail prior to the availability of the jail facility in the jail facility." W.Va. Code § 15A-3-16(f).

120.    The respective County Commissions "shall pay into this fund a cost per day for each incarcerated individual." W.Va. Code §15A-3-16(g).

121.    The funds received from each county "shall be placed in a separate account and shall be requisitioned from these funds to pay for costs incurred." W.Va. Code § 15A-3-16(e)(4).

122.    Former WVDOCR Commissioner Betsy Jividen testified that the per diem money is used for items such as food, clothing, and medical. [Jividen Deposition 97: 16-22].

123.    W.Va. Code §7-8-1, *et seq*., can be read in pari materia with W.Va. Code § 15A-3-16.

124.    W.Va. Code §7-8-1, *et seq*., is not repugnant to W.Va. Code §15A-3-16, and implied repeal of the former is disfavored.

125.    All County Commission Defendants house their pretrial detainees and inmates at SRJ.

126.    Former WVDCR Chief of Staff, Brad Douglas, testified that the "jails are funded through several funding streams . . . the biggest one being the operational fund that comes in from the per diem from the counties." [Douglas: 34; 17-20][5].

127.    Douglas further testified that the counties pay $54.48 per day per inmate, which aligns with their obligation to feed, house, and clothe inmates prior to being sentenced to a state prison. [Douglas: 47-48; 7-10, 6-14].

128.    Every County Commission, by and through the County Commissioner Defendants, has failed to provide for the basic human needs of their county inmates housed at SRJ for decades.

129.    By this deprivation, County Commission and County Commissioner Defendants have deprived pretrial detainees and inmates of the constitutionally guaranteed rights and breached their duties to these individuals as set forth herein.

130.    Pretrial detainees and inmates have suffered damages as a result of County Commission and County Commissioner Defendants' actions and inactions as set forth more fully herein.

---

[5] See Douglas Deposition Transcript, relevant portions at **Exhibit 3**.

## Prime Care Medical, Inc.

131.    Under the Eighth and Fourteenth Amendments to the United States Constitution, jail officials have a duty to provide inmates with adequate medical care. See *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *Dawson v. Kendrick*, 527 F. Supp. 1252, 1282-1284 (S.D.W.Va. 1981)

132.    "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  In the worst cases, such a failure may actually product physical 'torture or a lingering death.' …[i]n less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.  The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency…" *Dawson*, 527 F. Supp. At 1306 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103-105, 97 S.Ct. 285, 190-291 (1976)).

133.    "[T]he deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id*.

134.    PrimeCare was required to provide inmates "with unimpeded access to a continuum of healthcare services so that their healthcare needs, including prevention and health education, are met in a timely and efficient manner." WVDCR Policy Directive No. 410.00(I)(b); See [Weber, Vol. II 25: 20-24; 26: 1] (Medical provider obligated to comply with WVDCR policies that are applicable to medical).

135.    In April of 2016 the West Virginia Regional Jail Authority (now WVDCR) circulated a Request for Quotation ["2016 RFQ"] for the provision of Inmate Medical Services at regional jails including SRJ.[6]

---

[6] See 2016 RFQ, at **Exhibit 4**.

136.    The 2016 RFQ set forth certain mandatory requirements for vendors placing bids for the provision of inmate medical services.

137.    PrimeCare placed a bid in response to the 2016 RFQ.

138.    For at least a decade, SRJ has been dangerously overcrowded, housing significantly more inmates than it was designed to hold.

139.    Betsy Jividen and Brad Douglas both testified that overcrowding has been at least a decade in the making [Jividen 169-170][7]; [Douglas 136].

140.    SRJ has been overcrowded since fiscal year 2005 and is the worst overcrowded three-pod jail. [Douglas 65: 13-31; 137: 17-20].

141.    This overcrowding persisted and was known to PrimeCare in advance of placing its bid to provide medical services at SRJ in 2016.

142.    In addition to overcrowding, PrimeCare was aware that correctional staffing shortages had historically existed at SRJ. [Weber, Vol. II 42: 14-20] (acknowledging that correctional staffing has been a known problem to PrimeCare for the 38 years it's been in business).

143.    Defendants Weber, Bavington, Heskins, and others completed the bid to respond to the RFP. [Weber, Vol. II 56: 18-24].

144.    Despite knowledge of an ongoing overcrowding concern in West Virginia's regional jails, PrimeCare chose to account for only a ten percent increase in inmate population when placing its 2016 bid with WVDCR. [Weber, Vol. II 54: 6-15].

145.    From 2016 to June 26, 2022, the WVDCR contracted with PrimeCare for the provision of medical services to inmates at SRJ.

---

[7] See relevant portions of Jividen Deposition Transcript, at **Exhibit 5**.

22

146.    As the contracted medical provider for SRJ, PrimeCare was obligated to ensure inmates' constitutional rights to medical care were met.

147.    As the contracted medical provider for SRJ, PrimeCare was obligated to ensure inmates' received medical care that met the applicable standard of care.

148.    The provision of necessary healthcare ensures inmates and pretrial detainees do not face serious injury or death. [Weber, Vol. II 60:8-24; 61: 1-2].

149.    The 2016 RFP dictated that mandatory requirements "**must** be met by the Vendor as part of the submitted quotation." Ex. 3. (**emphasis added**).

150.    PrimeCare was to provide "all personnel, equipment, and supplies necessary for the provision of the comprehensive health care obligations outlined in [the] RFQ." Id., ¶3.1.1.

151.    PrimeCare was to "make every attempt to schedule the delivery of all non-emergency services within the operations and security schedule of each facility." Id.

152.    In the event of any slowdown or full or partial work stoppage, PrimeCare remained responsible for continuing to fulfill its obligations under the contracts. Id., ¶ 3.1.4.

153.    PrimeCare was required to "provide all services necessary to provide comprehensive health care to all inmates." Id., ¶ 3.2.

154.    The provision of necessary care was to include employment and payment of contractual staff and agencies necessary for the provision of such care. Id.

155.    The provision of necessary care including, among other things, Receiving Medical Screening; Health Appraisal; Access to Treatment; Daily Triage of Complaints; Sick call; a Medical Observation Unit. Id.

156.    The Medical Observation Unit at SRJ required a 24 hour on-call physician; 1 Health Service Administrator (RN); 1 Director of Nursing (RN); 3 LPN – Dayshift; 1 MA – Dayshift; 2

23

RN – Evening Shift; 2 LPN – Evening Shift; 1 MA – Evening Shift; 2 LPN – Nights; 1 MA – Nights. Id.

157.    The Medical Observation Unit at SRJ also required a Medical Provider (PA/NP/MD) at thirty (30) hours per week. Id.

158.    The Medical Observation Unit at SRJ also required a Licensed Mental Health professional at forty (40) hours per week and a Psychiatrist of CRNP for 12-16 hours per week. Id.

159.    Defendant Weber and Defendant Vallandingham testified that PrimeCare had a non-delegable, non-contingent duty to provide adequate medical services and healthcare to inmates at SRJ. [Weber, Vol. II 59: 12-22; 73-74]; [Vallandingham 66-68][8]

160.    In other words, PrimeCare had a duty to provide adequate medical care to the inmates at SRJ regardless of correctional or medical staffing, and regardless of the average daily population. [Weber, Vol. II 59: 12-22; 73-74].

161.    PrimeCare had a non-delegable, non-contingent duty to provide timely medical care. [Weber, Vol. II 74: 9-22].

162.    PrimeCare had a duty to inmates and pretrial detainees to provide access to care. [Weber, Vol. II 92: 5-14].

163.    PrimeCare had a duty to inmates and pretrial detainees to eliminate barriers to access to healthcare.

164.    "Access to care" requires that patients be seen timely, by a qualified healthcare professional. NCCHC Standard J-A-01; [Weber, Vol. II 93: 3-6].

---

[8] See Vallandingham Deposition Transcript, at **Exhibit 6**.

165.    "Access to care" means that there is an adequate number of medical staff in each profession in a facility.   NCCHC Standard J-A-01; [Weber, Vol. II 95: 17-19].

166.    "Access to care" means that medical staff practice within the scope of their practice. NCCHC Standard J-A-01; [Weber, Vol. II 95: 14-16].

167.    "Access to care" requires receipt of care that is ordered. NCCHC Standard J-A-01; [Weber, Vol. II 95: 20-21].

168.    Unreasonable barriers to healthcare include medical personnel understaffing.

169.    Barriers to care include shortages in correctional staff.

170.    Any inmate population increase over ten percent resulted in a loss of profits to PrimeCare. [Weber, Vol. II 61: 9-23].

171.    Inmate population at SRJ continued to grow by as many as 134 inmates during PrimeCare's contract at SRJ.

172.    Upon information, during the pendency of PrimeCare's contract Defendants Weber and Bavington raised concerns with WVDCR regarding the inadequacy of PrimeCare's staffing matrix at SRJ.

173.    Regardless of raising these concerns, PrimeCare medical chose never to submit a change order to request additional medical staff at SRJ. [Weber, Vol. II 49: 8-21].

174.    Rather, PrimeCare made the decision to "donate" additional staff hours.

175.    PrimeCare chose not to add any hours for physicians during the life of the contract or add additional physicians or mid-level staff.

176.    The only licensed MD working for PrimeCare maintained the full time equivalent of 0.2 employee.[9]

---

[9] See Staffing Matrices at **Exhibit 7.**

177.    Dr. Rashid has been the only physician at SRJ since 2016; he works roughly twelve hours per week. [Rashid 44; 4-15].

178.    PrimeCare chose not to add any hours for mid-level providers during the life of the SRJ contract. Id.

179.    Mid-level providers only maintained the full-time equivalent of .55 employees. Id.

180.    During the life of PrimeCare's contract the combined hours for medical practitioners never equated to a single full-time employee. Id.

181.    PrimeCare gave no consideration to adding any provider hours during the life of its contract. [Weber, Vol. II 148: 14-18].

182.    PrimeCare never added any hours for RNs or additional RN staff during the life of the contract. [Weber, Vol. II 148: 19-21].

183.    PrimeCare never added hours for any licensed mental health professional during the life of the SRJ contract. [Weber, Vol. II 148: 22-23].

184.    PrimeCare never added hours for dental providers during the life of the contract. [Weber, Vol. II 148: 24; 149: 1].

185.    PrimeCare never added hours for psychiatrists or psychologists during the life of the SRJ Contract. [Weber, Vol. II 149: 2-5].

186.    PrimeCare never gave any significant consideration to adding hours for any of these positions. [Weber, Vol. II 149: 6-8].

187.    PrimeCare failed to add or consider adding providers in these areas despite PrimeCare maintaining a chronic and excessive number of overdue tasks. [Weber, Vol. II 149: 9-16].

188.     PrimeCare's decision was based on its desire to maintain profitability under the contract with WVDCR.

189.     According to PrimeCare and Wexford Director of Medical Services Dr. Humayun Rashid, unreasonable barriers exist at SRJ to inmates' access to health services, namely due to overpopulation at SRJ and the chronic understaffing of not only medical staff, but correctional staff.[10]

190.     Dr. Rashid testified about the negative impacts on the quality of medical care due to the chronic shortage of medical staff. [Rashid 73; 16-23].

191.     During his hours at SRJ, Dr. Rashid goes through his list of "sick call" patients, but majority of time does not get through the list and inmate patients get moved over as an "overdue task." [Rashid 44-45; 20-24; 1-16].

192.     Despite his continually accruing overdue tasks, Dr. Rashid identified no effort on his own part nor PrimeCare's part to ensure that his patients' needs were met.

193.     PrimeCare's decision to maintain a chronically understaffed medical department at SRJ exhibited deliberate indifference to the serious medical needs of inmates and pretrial detainees at SRJ.

194.     PrimeCare's decision to maintain a chronically understaffed medical department at SRJ rises to the level of medical negligence and severely falls below the standard of care.

195.     PrimeCare's decision to maintain a chronically understaffed medical department at SRJ resulted in serious harm to inmates and pretrial detainees as set forth more fully herein.

---

[10] See Rashid Deposition Transcript, at **Exhibit 8**
.

196.    Each week, from at least January of 2021 through June of 2022, PrimeCare's Regional Manager and Assistant Regional Mangers completed Weekly Reports.[11]

197.    The Weekly Reports reflected chronic and ongoing overdue tasks and medical staff shortages at SRJ. Ex. 9.

198.    Weekly Reports were circulated by Defendants Jefferys, Vallandingham, and/or Miller.

199.    Weekly Reports were circulated to PrimeCare's executives Defendant Weber; Defendant Haskins; Defendant Bavington; and Defendant Vallandingham.

200.    Weekly reports were reviewed and discussed on a weekly basis within PrimeCare higher management to discuss what, if any, action to take. [Weber, Vol. II 114: 11-24].

201.    Accordingly, each defendant employed by PrimeCare had knowledge of the ongoing, chronic staffing and overdue task crises at SRJ over a period of years that affected thousands of inmates and pretrial detainees.

202.    Defendant Weber could offer no specifics about anything that was done to alleviate the ongoing overdue tasks reflected in the Weekly Reports because PrimeCare did nothing. [Weber, Vol. II 114-117].

203.    The Weekly Reports also reflect the number of overdue tasks for History & Phsycial; Physician Sick Call; Psychologists; Mental Health; Dental; EKG; and Labs.

204.    PrimeCare continuously and regularly had excessive tasks overdue in each of these areas.

205.    Overdue tasks for History & Physicals were as high as 509 per week during PrimeCare's contract. Ex. 9.

___
[11] See Weekly Reports and summaries, at **Exhibit 9**.

206.    Overdue tasks for physician and physician assistant sick call were as high as 412 per week during PrimeCare's' contract. Id.

207.    Overdue tasks for psychologists appointments were as high as 185 per week during PrimeCare's contract. Id.

208.    Overdue tasks for mental health appointments were as high as 202 per week during PrimeCare's contract. Id.

209.    Overdue tasks for dental appointments were as high as 135 per week during PrimeCare's contract. Id.

210.    Overdue tasks for EKGs were as high as 165 per week during PrimeCare's contract.

211.    Overdue sick calls are not reflected on the Weekly Reports because PrimeCare chose to task sick calls without a due date. [Weber, Vol. II 151: 11-24].

212.    Similarly, PrimeCare failed to accurately and adequately document timing and responses to inmate grievances. [Weber, Vol. II, 152: 1-24; 153: 1-8] (acknowledging concern that PrimeCare documented only 9 of 1,657 grievances submitted to medical from 2020-2022).

213.    Correctional Officer affidavits reflect that inmate requests for "sick calls" were regularly ignored by PrimeCare at SRJ, often resulting in serious injury or death.[12]

214.    In addition to overdue tasks, the Weekly Reports reflect an ongoing, chronic, and systematic shortage of medical staff sufficient to meet the needs of inmates and pretrial detainees at SRJ affecting approximately 11,177 inmates and pretrial detainees.

215.    PrimeCare administration, named herein, was fully aware of the aforementioned problems at SRJ and have been aware of the issues for many years, yet failed to take action to

---

[12] See Affidavits, at **Exhibit 10**.

correct the issues and, worse, expressly decided not to remove barriers to access to care and/or provide adequate access to care.

## Wexford Health Sources, Inc.

216.    Under the Eighth and Fourteenth Amendments to the United States Constitution, jail officials have a duty to provide inmates with adequate medical care. See *Scinto v. Stansberry*, 841 F.3d 219, 225 (4ᵗʰ Cir. 2016); *Dawson v. Kendrick*, 527 F. Supp. 1252, 1282-1284 (S.D.W.Va. 1981).

217.    "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  In the worst cases, such a failure may actually product physical 'torture or a lingering death.' …[i]n less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.  The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency…" *Dawson*, 527 F. Supp. At 1306 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103-105, 97 S.Ct. 285, 190-291 (1976)).

218.    "[T]he deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id*.

219.    From June 26, 2022, to present, WVDCR contracts with Wexford for the provision of medical services to inmates and pretrial detainees at SRJ.

220.    As the contracted medical provider for SRJ, Wexford is obligated to ensure inmates' constitutional rights to medical care were met.

221.    As the contracted medical provider for SRJ, Wexford is obligated to ensure inmates' received medical care that met the applicable standard of care.

222.    Wexford is required to provide inmates "with unimpeded access to a continuum of healthcare services so that their healthcare needs, including prevention and health education, are met in a timely and efficient manner." WVDCR Policy Directive No. 410.00(I)(b).

223.    On May 17, 2021, WVDCR released a request for Proposals ["2021 RFP"] for the provision of medical services at regional jails, inclusive of SRJ.[13]

224.    Wexford made a proposal in response to the 2021 RFP and was awarded the medical contract for all state correctional facilities, inclusive of SRJ.

225.    The 2021 RFP contained certain mandatory requirements for Wexford. Ex. 11.

226.    The goals and objectives of the 2021 RFP included providing high level, responsible comprehensive healthcare services to inmates. Id., ¶ 3.2.1.1.

227.    Wexford "shall provide comprehensive healthcare services to all offenders that meet or exceed the standards of ACA, NCCHC, and the provisions of the Vendor's proposal, not meet the minimum requirements of the RFP." Id., ¶ 3.2.1.4.

228.    Wexford "shall provide comprehensive health care to all offenders in the care and custody of [SRJ].  Comprehensive services include, but are not limited to, medical, mental health, dental, optometry, auditory, pharmaceutical, and diagnostic services." Id., ¶ 3.2.2.1.

229.    Wexford "shall be solely responsible and it shall be included in [Wexford's] base cost bid, to provide all onsite health care services, including, but not limited to, labor, staffing, supplies, etc." as set forth in the 2021 RFP. Id., ¶ 3.2.2.6.

230.    Wexford "shall provide sufficient numbers of properly credentialed, licensed, and qualified healthcare personnel to provide the services listed in [the 2021] RFP.  This shall include, but not be limited to, appropriately licensed and credentialed physicians, QMHP, dental personnel,

---

[13] See 2021 RFP, at **Exhibit 11**.

optometrists, nurses, pharmacists, clerical staff, administrative and all other staff required to comply with the purpose and intent of [the 2021] RFP." Id. ¶ 3.2.2.29.

231.    Wexford's minimum staffing was to include on-call services 24/7 by a physician, nurse practitioner, or physician's assistant with prescribing privileges, as well as 24/7 access to a QMHP. Id.

232.    Wexford was to triage Sick Call requests by a registered nurse within 24 hours.

233.    It is the responsibility of Wexford to eliminate barriers to access to healthcare.

234.    Unreasonable barriers to healthcare include medical personnel understaffing.

235.    Barriers to care include shortages in correctional staff.

236.    Overcrowding is a barrier to access to care.

237.    Regardless of significant increases in inmate population, Wexford had a duty to provide adequate medical services.

238.    Wexford had a duty to provide necessary healthcare to preserve the health and safety of inmates and pretrial detainees.

239.    The provision of necessary healthcare ensures inmates do not face serious injury or death.

240.    Wexford had a duty to provide adequate healthcare services to their patients.

241.    The duty exists regardless of whether SRJ has adequate correctional staff.

242.    That duty exists regardless of the number of medical staff and/or medical providers Wexford elects to have.

243.    Wexford has a duty to provide timely medical care.

244.    Wexford has the duty to provide timely medical care regardless of security staffing, medical staffing, and jail population.

245.    Access to care requires that patients be seen in a timely manner, by qualified healthcare professionals. NCCHC Standard J-A-01

246.    Access to care means that there is an adequate number of medical staff in each profession at each facility. NCCHC Standard J-A-01.

247.    Access to care requires receipt of care that is ordered. NCCHC Standard J-A-01.

248.    Wexford acknowledges that SRJ has been overcrowded since June 26, 2022. [Stone 43:6-11].[14]

249.    Wexford routinely and as a matter of course failed to meet its contractual and other obligations including but not limited to: operating with chronic understaffing and overdue tasks, ignoring sick calls, and ignoring inmates' need for transfer to outside medical facilities.

250.    The medical treatment Wexford has administered since June 26, 2022, has failed in every regard to satisfy the requirements of the Constitution and the standard of care.

251.    Correctional Officer affidavits reflect that inmate requests for "sick calls" were regularly ignored by Wexford at SRJ, often resulting in serious injury or death.

252.    Dr. Rashid testified that overpopulation and chronic understaffing of SRJ and medical has created an unreasonable barrier to Plaintiffs' access to health services. [Rashid 62;21-23; 63-64; 16-24; 1-8; 73; 16-23].

253.    Dr. Rashid has been the only physician at SRJ from 2016-2022; he works roughly twelve hours per week. [Rashid 44; 4-15].

254.    During his hours at SRJ, Dr. Rashid goes through his list of "sick call" patients, but majority of time does not get through the list and inmate patients get moved over as an "overdue task." [Rashid 44-45; 20-24; 1-16].

---

[14] See Stone Deposition, at **Exhibit 12**.

255.   The quality of medical care remains negatively impacted due to the chronic shortage of medical staff. [Rashid 73; 16-23].

256.   Dr. Rashid expressed his concerns to Defendant Wexford about not having a mid-level provider on staff to alleviate some of his concerns. [Rashid 191; 8-17].

257.   Wexford was aware of Dr. Rashid's concerns of being understaffed, as he was the only physician on staff and the mid-level provider position had been vacant for months, resulting in issues with a lengthy sick call list and lengthy chronic care clinic list. [Stone 49: 1-16].

258.   Dr. Rashid expressed his concerns to Defendants Stone, Miller and Jefferey via email on October 12, 2022. To wit: Dr. Rashid expressed that the facility had no mid-level resulting in a lengthy doctor sick call list and list of inmates in chronic care.[15]

259.   Dr. Rashid further raised concerns that inmate grievances over inadequate medical care were growing and that there may be claims of deliberate indifference, inadequate care, or access to medical care. Ex. 13.

260.   Dr. Rashid deemed the circumstances a crisis. Id.

261.   Defendant Stone responded by indicating that it was hard to get work done but that she knew staff was doing "the best they can." Id. No further follow-up is evident.

262.   On May 9, 2023, with his concerns still unaddressed, Dr. Rashid forwarded his October 2022 email to Defendant Mary Stone. Id.

263.   On July 4, 2023, Dr. Rashid emailed Defendants Stone and Perkins to re-communicate his ongoing concerns regarding SRJ.[16] To wit: Dr. Rashid was concerned about the persisting lack of mid-level providers (now at 14 months), ongoing doctor sick call accumulation, increasing grievances and medical requests for inmates. Ex. 14.

---

[15] See October 2022 Rashid email, at **Exhibit 13**.
[16] See July 2023 Rashid email at **Exhibit 14**.

264. No response to Dr. Rashid's July 4, 2023 email is evident.

265. Wexford has chronically been understaffed with medical personnel – for example, the position of Nurse Practitioner was vacant from June 2022 until September 2023.

266. Wexford has had staffing issues since the time it took over the contract at SRJ. [Jeffery 45-46] [17].

267. Wexford's understaffing caused a backlog in overdue tasks that were already significant after inheriting overdue tasks from PrimeCare.

268. Wexford received hundreds overdue tasks from PrimeCare right before the transition, and the nurse practitioner quit, resulting in the chronic care list and the fourteen-day physical list growing. [Jeffery 47].

269. The overdue tasks inherited included 412 physician and mid-level sick calls. [Jeffery 112; 186].

270. Wexford's overdue tasks continue to be significant through the date of this filing.

271. These overdue tasks, combined with Wexford's chronic understaffing, establish that inmates at SRJ continue to be deprived of access to healthcare.

272. If inmates do not have access to care they run a risk of serious injury, illness, or death. [Jeffery 156].

273. As of September 2022, Wexford had 138 chronic care overdue tasks, some of which had been open since January of 2022.[18]

274. For 2023, Wexford had 93 overdue tasks for chronic care. Ex. 16.

275. The length of Wexford's backlogs violates the NCCHC staffing plan requirements. [Jeffery 180].

---

[17] See Jeffery Deposition Transcript, in relevant part, at **Exhibit 15**.
[18] See Wexford Chronic Care Overdue Task Chart, at **Exhibit 16**.

276.     Between July of 2022 and January of 2023, Wexford failed to medically clear 19 individuals on arrival; failed to triage 20 sick calls within 24 hours; failed to see 11 sick calls within 72 hours; failed to timely perform labs on 96 patients. Id.

277.     In 2023, Wexford had 1,583 overdue labs; 736 overdue dental tasks; 180 nurse sick calls that were not seen in 72 hours; and 59 individuals that were not medically cleared on arrival.

278.     In addition, 401 health service requests were not triaged within 24 hours in 2023.

279.     Of 198 outside medical appointments scheduled, only half were completed.

280.     Wexford received 391 inmate grievances regarding medical care.

281.     Wexford failed to track statistics on these grievances.

282.     Approximately 7,556[19] inmates and pretrial detainees have been affected by Wexford's conduct and ignored by Wexford and its administration, named herein.

283.     Wexford was required under its contract with the State of West Virginia to provide all inmates receiving medications at the time of their release from incarceration with a thirty-day supply of medication.

284.     Upon information and belief, Wexford fails to provide the inmates and pretrial detainees of SRJ with a thirty-day supply of medications and has so failed from June 26, 2022, to present.

285.     Defendants' conduct constitutes both deliberate indifference to serious medical needs and failure to meet the requisite standard of care.

286.     Wexford administration, named herein, was fully aware of the aforementioned problems at SRJ and have been aware of the issues for many years, yet failed to take action to

---

[19] As of November 27, 2023, based upon information provided by WVDCR. Wexford continues its pattern and practice of deliberate indifference and medical malpractice through present.

correct the issues and, worse, expressly decided not to remove barriers to access to care and/or provide adequate access to care.

## CLASS ALLEGATIONS

287.    Plaintiffs incorporate all preceding allegations of the Third Amended Complaint as if set forth more fully herein verbatim.

### Class Definition

288.    Plaintiffs propose a class definition of:

> Generally, all current and former pretrial detainees and inmates at Southern Regional Jail from September 22, 2020, to present. As to PrimeCare Defendants, the proposed class period is September 22, 2020 to June 25, 2022. As to Wexford Defendants the proposed class period is June 26, 2022, to present. As to County Defendants, the proposed class period is September 22, 2020-present.

### Class Action Criteria

289.    County Commission defendants housed from 157 up to 1,252 inmates at SRJ annually during the applicable time period.[20]

290.    Medical Defendants were responsible for the provision of healthcare to all SRJ inmates during the applicable time period.

291.    Further, the members of the class are fluid, as new individual members are incarcerated at SRJ daily, and many members are subsequently transferred to another facility or released.

292.    Accordingly, the class is so numerous that joinder of all members is impracticable.

293.    The questions of law and fact set forth herein are common for all putative class members.

---

[20] According to DCR data, over 11,000 inmates were housed at SRJ from September 22, 2020, through November 23, 2023.

294.     Common questions of fact include whether inmates and pretrial detainees at SRJ received adequate nutrition, basic necessities, and constitutionally adequate medical care which met the applicable standard of care.

295.     Common questions of law include whether Defendants acted with deliberate indifference to the health and safety of inmates and pretrial detainees and/or breached a duty of care to inmates and pretrial detainees.

296.     The claims of the class representatives, outlined herein below, are typical of the claims of all putative class members.

297.     The representative parties named herein below will fairly and adequately protect the interests of the class.

298.     There are no antagonist interests between Plaintiffs and the members of the putative class, and the relief sought by the named Plaintiffs will benefit the class generally.

299.     Plaintiffs' counsel has substantial experience in class litigation, representing inmates in civil actions, and representing low-income West Virginians in civil actions.

300.     Defendants have acted or refused to act on grounds generally applicable to the class, thereby making final relief with respect to the class as a whole an appropriate remedy.

301.     This class may be certified based on discrete sub-issues or bifurcated on the issues of Defendants' liability and individual class member damages. Fed. R. Civ. P., Rule 23(c)(4).

## Class Representative Allegations

### A.  Michael Rose – Fayette County Pretrial Detainees/Inmates

302.     Plaintiff Michael Rose was a Fayette County pretrial detainee and/or inmate during the time periods identified herein.

303.    Plaintiff Rose purports to represent a class of similarly situated Fayette County pretrial detainees and inmates.

304.    During his time at SRJ, Plaintiff Rose was given inadequate portions of food.

305.    During his time at SRJ, Plaintiff Rose was given rotten and undercooked meat.

306.    During his time at SRJ, Plaintiff Rose was given spoiled milk.

307.    During his time at SRJ, Plaintiff Rose was forced to eat from dirty/unsanitary trays.

308.    During his time at SRJ, Plaintiff Rose was rarely provided basic hygiene items.

309.    During his time at SRJ, Plaintiff Rose slept on the floor more often than he had a bed.

310.    During his time at SRJ, Plaintiff Rose was never provided a pillow.

311.    No Fayette County Commission Defendant made any effort to ensure that Monroe County inmates received adequate and sufficient nutrition, hygiene items, and bedding from the WVDCR as required by law.

312.    As a direct and proximate result of Fayette County Commission Defendants' actions and inactions, Plaintiff Rose suffered malnutrition, emotional distress, and physical pain and suffering.

**B.  Thomas Fleenor, Jr. -Wyoming County Pretrial Detainees/Inmates, PrimeCare Patients**

313.    Plaintiff Thomas Fleenor, Jr., was a Wyoming County pretrial detainee and/or inmate during the time periods identified herein.

314.    Plaintiff Fleenor purports to represent a class of similarly situated Wyoming County pretrial detainees and inmates.

315.    Plaintiff Fleenor purports to represent a class of similarly situated PrimeCare patients.

316.    During his time at SRJ, Plaintiff Fleenor was given inadequate portions of food.

317.    During his time at SRJ, Plaintiff Fleenor was given raw, undercooked, frozen, and spoiled/contaminated food.

318.    During his time at SRJ, Plaintiff Fleenor was given spoiled milk.

319.    During his time at SRJ, Plaintiff Fleenor was forced to eat off dirty/unsanitary food trays.

320.    During his time at SRJ, Plaintiff Fleenor was denied or rarely given basic hygiene items.

321.    During his time at SRJ, Plaintiff Fleenor was forced to sleep on the floor of his cell.

322.    During his time at SRJ, Plaintiff Fleenor was forced to sleep in the dayroom floor of his pod.

323.    While sleeping in the dayroom floor, Plaintiff Fleenor was forced to sleep in sewage.

324.    During his time at SRJ, Fleenor did not receive a whole sleeping mat, sheet or pillow.

325.    No Wyoming County Commission Defendant made any effort to ensure that Monroe County inmates received adequate and sufficient nutrition, hygiene items, and bedding from the WVDCR as required by law.

326.    As a direct and proximate result of Wyoming County Commission Defendants' actions and inactions, Plaintiff Fleenor suffered malnutrition, emotional distress, and physical pain and suffering.

327.    During his time as a PrimeCare patient, Plaintiff Fleenor was under the care of Defendant Angela Nicholson MSN, APRN, FNP-C; Defendant Rashid; Esther Perkins; Amber Duncan; Lisa Mullens, LPN.

328.    Defendants Nicholson, Rashid, Perkins, Ducan, and/or Mullens failed to ensure that Plaintiff Fleenor received proper and adequate detox checks, and that detox protocol was adhered to.

329.    Defendants Nicholson, Rashid, Perkins, Duncan, and/or Mullens failed to ensure that Plaintiff Fleenor's medications were continued upon incarceration.

330.    As a direct and proximate result of PrimeCare Defendants' actions and inactions, Plaintiff Fleenor suffered emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

### C.  Jonathan Crabtree – Mercer County Pretrial Detainees/Inmates; PrimeCare Patients

331.    Plaintiff Jonathan Crabtree was a Mercer County pretrial detainee and/or inmate during the time periods identified herein.

332.    Plaintiff Crabtree purports to represent a class of similarly situated Mercer County pretrial detainees and inmates.

333.    Plaintiff Crabtree purports to represent a class of similarly situated PrimeCare patients.

334.    During his time at SRJ, Plaintiff Crabtree received inadequate portions of food.

335.    During his time at SRJ, Plaintiff Crabtree was served undercooked or raw food.

336.    During his time at SRJ, Plaintiff Crabtree did not receive a beverage with every meal.

337.    During his time at SRJ, Plaintiff Crabtree did not receive adequate hygiene items such as soap, toilet paper, toothpaste, and toothbrush.

338.    During his time at SRJ, Plaintiff Crabtree did not receive a whole sleeping mat.

339.    During his time at SRJ, Plaintiff Crabtree did not have a bed and was forced to sleep on the dayroom floor.

340.    No Mercer County Commission Defendant made any effort to ensure that Monroe County inmates received adequate and sufficient nutrition, hygiene items, and bedding from the WVDCR as required by law.

341.    As a direct and proximate result of Mercer County Commission Defendants' actions and inactions, Plaintiff Crabtree suffered malnutrition, emotional distress, and physical pain and suffering.

342.    During his time as a PrimeCare patient, Plaintiff Fleenor was under the care of Defendant Cassey Bolen; Defendant John Pennington, MA, LPC, NCC, NCSC; and Defendant Rashid.

343.    Defendants Bolen, Pennington, and Rashid failed to properly schedule and follow up on Plaintiff Crabtree's mental health appointment, resulting in, among other things, a seventy-nine day delay in mental health treatment.

344.    Defendants Bolen and Rashid failed to ensure that Plaintiff's fourteen-day physical was performed at all.

345.    Plaintiff Crabtree's fourteen-day physical task was entered on July 6, 2021, and deleted on October 15, 2021, a 101 day delay that resulted in a failure to perform the evaluation before Plaintiff Crabtree was released from SRJ.

346.     As a direct and proximate result of PrimeCare Defendants' actions and inactions, Plaintiff Crabtree suffered emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

**D.  Steven Martin – Mercer County Pretrial Detainees/Inmates; Wexford Patients**

347.     Plaintiff Steven Martin was a Mercer County detainee and/or inmate during the time periods identified herein.

348.     Plaintiff Martin purports to represent a class of similarly situated Mercer County pretrial detainees and inmates.

349.     Plaintiff Martin purports to represent a class of similarly situated Wexford patients.

350.     During his time at SRJ, Plaintiff Martin was served inadequate food portions.

351.     During his time at SRJ, Plaintiff Martin was served food contaminated with rodent droppings.

352.     During his time at SRJ, Plaintiff Martin was served raw and undercooked food.

353.     During his time at SRJ, Plaintiff Martin had difficulty receiving hygiene items such as razors, soap, toothpaste, and toilet paper.

354.     During his time at SRJ, Plaintiff Martin did not receive a whole sleeping mat.

355.     As a direct and proximate result of Mercer County Commission Defendants' actions and inactions, Plaintiff Crabtree suffered malnutrition, illness, emotional distress, and physical pain and suffering.

356.     During his time as a Wexford patient, Plaintiff Martin was under the care of Defendant Jessica Sparks; Defendant Haley Johnson; Defendant Lesley Green, LPN; Defendant Brittani Marshall; and Defendant Rashid.

357.    Defendants Sparks, Johnson, Green, Marshall, and Rashid failed to timely conduct Plaintiff Martin's EKG.

358.    Plaintiff Martin's EKG was abnormal when conducted.

359.    As a direct and proximate result of Wexford Defendants' actions and inactions, Plaintiff Crabtree suffered emotional distress and increased risk of harm.

**E. Jacob Beavers – Summers County Pretrial Detainees/Inmates**

360.    Plaintiff Beavers was a Summers County pretrial detainee and/or inmate during the time periods set forth herein.

361.    Plaintiff Beavers purports to represent a class of similarly situated Summers County pretrial detainees and inmates.

362.    During his time at SRJ, Plaintiff Beavers received inadequate portions of food.

363.    During his time at SRJ, Plaintiff Beavers was served undercooked or raw food.

364.    During his time at SRJ, Plaintiff Beavers did not receive adequate hygiene items such as soap, razors, toilet paper, toothpaste, and toothbrush.

365.    During his time at SRJ, Plaintiff Beavers did not receive a whole sleeping mat.

366.    During his time at SRJ, Plaintiff Beavers did not receive adequate bedding.

367.    No Summers County Commission Defendant made any effort to ensure that Monroe County inmates received adequate and sufficient nutrition, hygiene items, and bedding from the WVDCR as required by law.

368.    As a direct and proximate result of Summers County Commission Defendants' actions and inactions, Plaintiff Beavers suffered malnutrition, emotional distress, and physical pain and suffering.

**F.  Gary Toler – Greenbrier County Pretrial Detainees/Inmates; PrimeCare Patients**

369.    Plaintiff Toler was a Greenbrier County pretrial detainee and/or inmate during the time periods set forth herein.

370.    Plaintiff Toler purports to represent a class of similarly situated Greenbrier County pretrial detainees and inmates.

371.    Plaintiff Toler purports to represent a class of similarly situated PrimeCare patients.

372.    During his time at SRJ, Plaintiff Toler received inadequate portions of food.

373.    During his time at SRJ, Plaintiff Toler was served discolored food.

374.    During his time at SRJ, Plaintiff Toler rarely received hygiene items including soap, shampoo, and toilet paper.

375.    During his time at SRJ, Plaintiff Toler did not receive adequate bedding.

376.    No Greenbrier County Commission Defendant made any effort to ensure that Monroe County inmates received adequate and sufficient nutrition, hygiene items, and bedding from the WVDCR as required by law.

377.    As a direct and proximate result of Greenbrier County Commission Defendants' actions and inactions, Plaintiff Toler suffered malnutrition, emotional distress, and physical pain and suffering.

378.    During his time as a PrimeCare patient, Plaintiff Toler was under the care of Defendant Rashid and John/Jane Doe PrimeCare employees.

379.    Defendants Rashid and John/Jane Doe failed to properly diagnose and provide follow-up care for Plaintiff Toler's stroke.

380.    Plaintiff Toler suffered from a stroke in mid-August 2021.

45

381.    Plaintiff Toler was transferred back to SRJ from Raleigh General Hospital for stroke treatment.

382.    Plaintiff Toler was returned to SRJ with an order for physical therapy/ rehabilitation and/or neurology follow-up.

383.    Plaintiff Toler was not sent to rehabilitation or a neurologist until October of 2021.

384.    Plaintiff Toler only received six physical therapy, rehabilitation sessions and was discharged with no improvement.

385.    As direct and proximate result of PrimeCare Defendants' actions and inactions Plaintiff Toler including being wheelchair bound, complete loss of use of his right side, frozen face, voice impairment, emotional distress, mental anguish, pain and suffering, and increased risk of harm.

**G.  Elgie Adkins – Fayette County Pretrial Detainee/Inmates; Wexford Patients**

386.    Plaintiff Adkins was a Fayette County pretrial detainee and/or inmate the time period set forth herein.

387.    Plaintiff Adkins purports to represent a class of similarly situated Fayette County pretrial detainees/inmates.

388.    Plaintiff Adkins purports to represent a class of similarly situated Wexford Patients.

389.    During his time at SRJ, Plaintiff Adkins received inadequate nutrition, spoiled milk, and water.

390.    During his time at SRJ, Plaintiff Adkins did not receive adequate hygiene items.

391.    During his time at SRJ, Plaintiff Adkins did not receive adequate bedding.

392.    No Fayette County Commission Defendant made any effort to ensure that Monroe County inmates received adequate and sufficient nutrition, hygiene items, and bedding from the WVDCR as required by law.

393.    As a direct and proximate result of Fayette County Commission Defendants' actions and inactions, Plaintiff Adkins suffered malnutrition, emotional distress, and physical pain and suffering.

394.    During his time as a Wexford patient, Plaintiff Adkins was under the care of Defendant Rashid; Defendant Kennadi Smith, LPN; Defendant Rachel Leedy, LPN; Brandy Eastridge, LPN; Ashley Vallandingham, LPN; Defendant Brittani Marshall, RN; Autmn Blair, R, HSA; Defendant Joye Martin, MD; Defendant Hannah White, LPN; Defendant Esther Perkins; and John/Jane Doe medical providers.

395.    Defendants Smith; Leedy; Eastridge; Vallandingham; Marshall; Blair; Marin; White; Perkins; and John/Jane Doe failed to ensure that Plaintiff Adkins was sent out for proper medical care; failed to ensure that Plaintiff received timely and adequate dental care; failed to practice within their proper scope of practice when providing Plaintiff with care; and failed to conduct Plaintiff's 14-day physical.

396.    On August 26, 2022, Plaintiff Adkins was admitted to SRJ.

397.    At the time of admission, Plaintiff Adkins was scheduled for his 14-day physical.

398.    On October 14, 2022, 49 days after Plaintiff Adkins was admitted, Defendant Perkins rescheduled the 14-day physical.

399.    Plaintiff Adkins' 14-day physical was not completed during his 97 days at SRJ.

400.     On August 26, 2022, Defendant Smith completed Plaintiff Adkins' medical screening.  Defendant Smith noted that "Patient stated he sees Dr. White in Beckley, WV and is supposed to follow up within two weeks for hernia surgery."

401.     On September 26, 2022, Plaintiff was scheduled for a nurse appointment by Hanna Corkrean, LPN.

402.     The same date, Defendant Eastridge changed the appointment to indicate that Plaintiff Adkins was already on pain medication.

403.     On September 27, 2022, Plaintiff was scheduled for provider sick call by Beth Waugh, LPN.

404.     The appointment description for that date indicates "[p]atient has hernia that has doubled in size since last week. Please see."

405.     Over a month after being admitted to SRJ, on September 28, 2022, Defendant Rashid saw Plaintiff Adkins.

406.     Dr. Rashid's notes reflect that Patient Adkins had a large abdominal wall, umbilical hernia and weak abdominal wall.

407.     Dr. Rashid's plan for Plaintiff Adkins included getting a surgical opinion.

408.     Plaintiff Adkins remained in SRJ until December 1, 2022, and for his entire 97 day stay, was never sent out for a surgical consult or received one otherwise.

409.     On December 1, 2022, Plaintiff was transferred to South Central Regional Jail ["SCRJ"] where he remained through at least November 27, 2023.

410.     At SCRJ, plaintiff Adkins remained under the continuous care of Wexford Defendants.

48

411.    Through Plaintiff Adkins release date he was never sent out for a surgical consult for his hernia – he required surgical intervention for at least 458 days and received no such care.

412.    Rather, Wexford gave Plaintiff an abdominal binder in January of 2023 and reordered another in September of 2023.

413.    Plaintiff began putting in sick call requests for dental concerns on November 10, 2022.

414.    Plaintiff placed three dental sick call requests before being seen.

415.    At least one sick call did not receive a face-to-face encounter within the requisite 24-hour period.

416.    Despite the dental sick call forms being marked "NSC with referral to doctor," the dental sick call was completed by Esther Perkins, RN, on November 20, 2022.

417.    Esther Perkins was providing medical care outside the scope of her practice by completing a dental sick call appointment.

418.    Plaintiff Adkins was never seen by a dentist at Southern Regional Jail.

419.    Plaintiff Adkins was not seen by a dentist until February 16, 2023, a total of 98 days after placing his first dental sick call request.

420.    When Plaintiff Adkins was seen by dental he was noted to require extractions in two weeks for multiple teeth.

421.    Plaintiff Adkins was not seen by dental again until August 10, 2023, over 175 days after his initial dental appointment, and 273 days after his first dental sick call request.

422.    As a direct and proximate result of Wexford's actions and inactions Plaintiff Adkins suffered emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

49

### H.  Tyler Childers – Raleigh County Pretrial Detainees/Inmates

423.    Plaintiff Childers was a Raleigh County pretrial detainee and/or inmate for the time period set forth herein.

424.    Plaintiff Childers purports to represent a class of similarly situated Raleigh County pretrial detainees and inmates.

425.    During his time at SRJ, Plaintiff Childers was given rotten and undercooked food.

426.    During his time at SRJ, Plaintiff Childers was given spoiled milk.

427.    During his time at SRJ, Plaintiff Rose was rarely provided basic hygiene items such as toilet paper.

428.    During his time at SRJ, Plaintiff Childers was not provided sufficient bedding.

429.    No Raleigh County Commission Defendant made any effort to ensure that Monroe County inmates received adequate and sufficient nutrition, hygiene items, and bedding from the WVDCR as required by law.

430.    As a direct and proximate result of Raleigh County Commission Defendants' actions and inactions, Plaintiff Childers suffered malnutrition, emotional distress, and physical pain and suffering.

### I.  Sabrina Eagle – Monroe County Pretrial Detainees/Inmates; Prime Care Patients; Wexford Patients

431.    Plaintiff Eagle was a Monroe County pretrial detainee and/or inmate for the time period set forth herein.

432.    Plaintiff Eagle purports to represent a class of similarly situated Monroe County pretrial detainees and inmates.

433.    Plaintiff Eagle purports to represent a class of similarly situated PrimeCare patients.

434.    Plaintiff Eagle purports to represent a class of similarly situated Wexford patients.

435.    During her time at SRJ, Plaintiff Eagle was not given sufficient or adequate nutrition.

436.    During her time at SRJ, Plaintiff Eagle was given rotten and undercooked food.

437.    During her time at SRJ, Plaintiff Eagle was given spoiled milk.

438.    During her time at SRJ, Plaintiff Eagle was rarely provided basic hygiene items such as toilet paper.

439.    During her time at SRJ, Plaintiff Eagle was not provided sufficient bedding.

440.    No Monroe County Commission Defendant made any effort to ensure that Monroe County inmates received adequate and sufficient nutrition, hygiene items, and bedding from the WVDCR as required by law.

441.    As a direct and proximate result of Monroe County Commission Defendants' actions and inactions, Plaintiff Eagle suffered malnutrition, emotional distress, and physical pain and suffering.

442.    During her time as a Wexford patient Plaintiff was under the care of Defendant Rashid; Defendant Ashley Stroup, LPN; Defendant Donna Dean-Chrivia; Defendant Brandy Eastridge, LPN; Defendant Brittani Marshall, RN; Defendant Taylor Brooks.

443.    Defendants Stroup; Dean-Chrivia; Eastridge; Marshall; Brooks; and Rashid failed to ensure that Plaintiff Eagle received timely and adequate mental health care.

444.    During her June 25, 2022, intake screening, Plaintiff Eagle indicated that she was under the care of a mental health provider and/or psychiatrist.

445.    Plaintiff Eagle's intake was neither reviewed by an RN within twenty-four hours, as required by NCCHC standards, nor reviewed by an RN at all prior to her release on September 30, 2022.

446.   Rather, Defendant Stroup, and LPN, reviewed Plaintiff's intake.

447.   By reviewing Plaintiff's intake, Defendant Stroup was practicing outside the scope of practice and in violation of NCCHC standards.

448.   On intake, Plaintiff Eagle was set for a mental health sick call on June 26, 2022.

449.   Plaintiff's June 26, 2022, mental health appointment was rescheduled on August 11, 2022.

450.   Plaintiff's record indicates that a mental health call was completed on August 18, 2023, but the "Mental Health Sick Call" portion of her record reflects that no such appointment was carried out.

451.   Plaintiff's September 23, 2022, 90-day mental health follow up was deleted with the change note reflecting that she was released seven days later on September 30, 2022.

452.   Plaintiff's mental health medications were not verified or administered during her 97 day incarceration.

453.   As a direct and proximate result of Wexford Defendants' actions and inactions, Plaintiff Eagle suffered emotional distress, mental anguish, and increased risk of harm.

## CAUSES OF ACTION

### Count I - 42 U.S.C. § 1983 – Eighth Amendment Violations
### (Conditions of Confinement and Deliberate Indifference to Serious Medical Needs)

454.    Plaintiffs incorporate herein by reference the preceding paragraphs of their Third Amended Complaint as if set forth fully herein verbatim.

455.    Defendants, while acting under the color of law and within the scope of their employment, violated the Eighth Amendment right of convicted inmates to be free from cruel and unusual punishment.

456.    The actions and inactions of Defendants, described hereinabove, violated the constitutional rights guaranteed to Plaintiffs, and all similarly situated former inmates, under the Eighth Amendment to the United States Constitution by depriving them of basic human necessities inclusive of adequate and sufficient nutrition, adequate hygiene items, adequate and sufficient bedding, and adequate medical care.

457.    County Commission Defendants and County Commissioner Defendants adhered to an express policy through formal understandings that they were not responsible for and would not ensure that inmates for their respective counties received adequate and sufficient nutrition, hygiene items, and adequate and sufficient bedding.

458.    The County Commissioner Defendants had final policymaking authority over the County Commissions and elected not to adhere to the County Commission's statutory obligations to ensure that their respective county plaintiffs received adequate and sufficient nutrition, hygiene items, and adequate and sufficient bedding.

459.    Specifically, County Commission meeting minutes and correspondence produced for the relevant time period indicate that County Commissioners' only concern expressed for their respective county inmates was how much their county was paying in per diem.

460.    Indeed, each County Commission defendant has served responses to requests for admissions acknowledging their failures to adhere to the statutory requirements set forth in W.Va. Code § 7-8-2a for years on the basis that the County Defendants believe they have no such obligation.

461.    The County Commission and County Commissioner Defendants' practice of refusal to adhere to their non-delegable statutory duties to ensure adequate food, hygiene items, and bedding for their inmates pervaded their approach to caring for their county inmates and constituted a custom or usage with the force of law.

462.    These policies and customs are evidenced by the County Commissioner's failures to provide for wholesome and sufficient food and clean and sufficient bedding; failure to review invoices and itemized statements for bedding, food, and other supplies prior to authorizing payment; failure to keep a daily record of food served inmates; failure to inspect the list and make recommendations for wholesome and sufficient food; and failure to conduct health inspections. W.Va. Code § 7-8-2a.

463.    The County Commission and County Commissioner Defendants' omissions set forth herein manifest deliberate indifference to the rights of county inmates.

464.    The County Commission and County Commission Defendants' conduct was not reasonably related to any legitimate, non-punitive governmental or penological objective.

465.    Plaintiffs specifically set forth the inadequate nutrition, hygiene, and bedding allegations hereinabove.

466.    The County Commission and County Commission Defendants' omissions set forth herein resulted in harm to Plaintiffs and similarly situated inmates by directly and proximately

causing malnutrition, emotional distress, and physical pain and suffering as enumerated herein above.

467.    PrimeCare, through its employees listed herein, deprived Plaintiffs and others similarly situated of their Eighth Amendment rights by and through its omissions that manifest deliberate indifference so as to constitute an actionable policy or custom.

468.    PrimeCare, deprived Plaintiffs and others similarly situated of their Eighth Amendment Rights through the decisions of Defendants Weber; Heskins; and Bavington, who had final policymaking authority, so as to constitute an actionable policy or custom.

469.    PrimeCare exercised a persistent and widespread custom of remaining understaffed, causing and permitting chronic and excessive overdue tasks and sick calls to accumulate; causing and permitting excessive delays of medical care; causing and permitting systemic failures to adhere to NCCHC standards, PrimeCare policies and procedures; WVDCR policies, and the standard of care; and refusing to send patients for outside care, so as to constitute an actionable policy or custom that deprived Plaintiffs and others similarly situated of their Eighth Amendment Rights.

470.    Defendants Weber; Heskins; Bavington; Vallandingham; Miller; Jeffery; Perkins; Eastridg, and Rashid were responsible for oversight and management of PrimeCare services at SRJ.

471.    Defendants Weber; Heskins; Bavington; Vallandingham, Miller; Jefferey; Eastridge; Perkins; and Rashid have possessed actual or constructive knowledge for many years regarding medical understaffing and chronic and excessive overdue tasks and nurse sick calls – as evidenced, in part, by circulation and receipt of the Weekly Reports.

472.    Each of the foregoing individuals, including those with final policymaking authority, committed acts and decided to make glaring omissions – such as refusal to fully staff medical or to take measures to address chronic and excessive overdue tasks and nurse sick calls – so as to manifest deliberate indifference, constitute a custom or usage, and rise to the level of an actionable policy or custom.

473.    PrimeCare's policy or custom of failing to enforce NCCHC standards, its own policies and procedures, WVDCR policies, and the standard of care resulted in Plaintiff Fleenor, and other similarly situated, not receiving adequate detox checks and protocols that were adhered to.

474.    PrimeCare's policy or custom of permitting short staffing and excessive overdue tasks resulted in Plaintiff Fleenor, and others similarly situated, not receiving psychiatric and other medically necessary medications.

475.    These policies and customs directly and proximately resulted in Plaintiff Fleenor, and others similarly situated, suffering emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

476.    The PrimeCare employees and/or contractors involved in Plaintiff Fleenor's care are identified hereinabove in more detail.

477.    PrimeCare's policies or customs of permitting tasks and sick calls to be chronically and systemically overdue and of failing to enforce NCCHC standards and the standard of care resulted in Plaintiff Crabtree suffering a 79-day delay in mental health treatment.

478.    PrimeCare's policies or customs of permitting tasks and sick calls to be chronically and systematically overdue resulted in Plaintiff Crabtree's 14-day physical being delayed over 101 days.

479.    The PrimeCare employees and/or contractors involved directly in Plaintiff Crabtree's care are identified hereinabove in more detail.

480.    These policies and customs directly and proximately resulted in Plaintiff Crabtree and others similarly situated, suffering emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

481.    PrimeCare's policies or customs of refusing to send patients for outside medical care resulted in Plaintiff Gary Toler suffering a substantial delay in rehabilitation/physical therapy and neurological treatment following a stroke.

482.    This policy and custom directly and proximately resulted in Plaintiff Toler and others similarly situated suffering physical harm, emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

483.    PrimeCare Defendants' conduct was not reasonably related to any legitimate, non-punitive governmental or penological objective.

484.    Wexford, through its employees listed herein, deprived Plaintiffs and others similarly situated of their Eighth Amendment rights by and through its omissions that manifest deliberate indifference so as to constitute an actionable policy or custom.

485.    Wexford deprived Plaintiffs and others similarly situated of their Eighth Amendment Rights through the decisions of Defendants Conn, Gedman, Froelich, and Stone, who had final policymaking authority, so as to constitute an actionable policy or custom.

486.    Wexford exercised a persistent and widespread custom of remaining understaffed, causing and permitting chronic and excessive overdue tasks and sick calls to accumulate; causing and permitting excessive delays of medical care; causing and permitting systemic failures to adhere to NCCHC standards, Wexford policies and procedures; WVDCR policies, and the standard of

57

care; and refusing to send patients for outside care, so as to constitute an actionable policy or custom that deprived Plaintiffs and others similarly situated of their Eighth Amendment Rights.

487.    Defendants Conn, Gedman, Froelich, Stone, Jeffery, Perkins, and Rashid were responsible for oversight and management of Wexford services at SRJ.

488.    Defendants Conn, Gedman, Froelich, Stone, Jeffery, Perkins, and Rashid have possessed actual or constructive knowledge for many years regarding medical understaffing and chronic and excessive overdue tasks and nurse sick calls – as evidenced, in part, by emails and statistical summaries circulated among them reflecting these issues.

489.    Each of the foregoing individuals, including those with final policymaking authority, committed acts and decided to make glaring omissions – such as refusal to fully staff medical or to take measures to address chronic and excessive overdue tasks and nurse sick calls – so as to manifest deliberate indifference, constitute a custom or usage, and rise to the level of an actionable policy or custom.

490.    Wexford's policy or custom of failing to enforce NCCHC standards, its own policies and procedures, WVDCR policies, and the standard of care, as well as its failure to prevent short staffing and excessive overdue tasks resulted in Steven Martin and other similarly situated, not receiving a timely EKG.

491.    These policies and customs directly and proximately resulted in Plaintiff Martin, and others similarly situated, suffering emotional distress and increased risk of harm.

492.    The Wexford employees and/or contractors involved in Plaintiff Martin's care are identified hereinabove in more detail.

493.    Wexford's policies or customs of chronic understaffing, overdue tasks and nurse sick calls, and failure to adhere to policies and the standard of care resulted in Plaintiff Adkins' 14-day physical not being completed during his entire 79-day incarceration at SRJ.

494.    Wexford's policies or customs of chronic understaffing, overdue tasks and nurse sick calls, and failure to adhere to policies and the standard of care resulted in Plaintiff Adkins enduring excessive and untenable delays in medical care.

495.    Wexford's policy and custom of permitting providers to practice outside their proper scope of practice resulted in Plaintiff Adkins' dental sick call being completed by an RN.

496.    Wexford's policy and custom of refusing to send patients for outside care resulted in Plaintiff Adkins' enduring 468 days of incarceration without receiving a medically necessary surgical referral and other necessary care for his hernia.

497.    The Wexford employees and/or contractors involved directly in Plaintiff Adkins' care are identified hereinabove in more detail.

498.    These policies and customs directly and proximately resulted in Plaintiff Adkins and others similarly situated, suffering emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

499.    Wexford's policies or customs of operating understaffed, operating with chronic and excessive overdue tasks and nurse sick calls, and failure to provide timely care resulted in Plaintiff Sabrina Eagle's mental health care and medication being delayed during her entire 97-day incarceration.

500.    This policy and custom directly and proximately resulted in Plaintiff Eagle and others similarly situated suffering emotional distress, mental anguish, and increased risk of harm.

501. Wexford Defendants' conduct was not reasonably related to any legitimate, non-punitive governmental or penological objective.

502. Defendants' actions shock the conscience.

503. Medical Defendants' actions were reprehensible, willful, wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages.

**Count II - 42 U.S.C. § 1983 – Fourteenth Amendment Violations**
**(Conditions of Confinement and Deliberate Indifference to Serious Medical Needs)**

504. Plaintiffs incorporate herein by reference the preceding paragraphs of their Third Amended Complaint as if set forth fully herein verbatim.

505. Defendants, while acting under the color of law and within the scope of their employment, violated the Fourteenth Amendment right of pretrial detainees to be free from cruel and unusual punishment.

506. The actions and inactions of Defendants, described hereinabove, violated the constitutional rights guaranteed to Plaintiffs, and all similarly situated former inmates, under the Fourteenth Amendment to the United States Constitution by depriving them of basic human necessities inclusive of adequate and sufficient nutrition, adequate hygiene items, adequate and sufficient bedding, and adequate medical care.

507. County Commission Defendants and County Commissioner Defendants adhered to an express policy through formal understandings that they were not responsible for and would not ensure that pretrial detainees for their respective counties received adequate and sufficient nutrition, hygiene items, and adequate and sufficient bedding.

508. The County Commissioner Defendants had final policymaking authority over the County Commissions and elected not to adhere to the County Commission's statutory obligations

60

to ensure that their respective county plaintiffs received adequate and sufficient nutrition, hygiene items, and adequate and sufficient bedding.

509.    Specifically, County Commission meeting minutes and correspondence produced for the relevant time period indicate that County Commissioners' only concern expressed for their respective county plaintiffs was how much their county was paying in per diem.

510.    Indeed, each County Commission defendant has served responses to requests for admissions acknowledging their failures to adhere to the statutory requirements set forth in W.Va. Code § 7-8-2a for years on the basis that the County Defendants believe they have no such obligation.

511.    The County Commission and County Commissioner Defendants' practice of refusal to adhere to their non-delegable statutory duties to ensure adequate food, hygiene items, and bedding for their inmates pervaded their approach to caring for their county inmates and constituted a custom or usage with the force of law.

512.    These policies and customs are evidenced by the County Commissioner's failures to provide for wholesome and sufficient food and clean and sufficient bedding; failure to review invoices and itemized statements for bedding, food, and other supplies prior to authorizing payment; failure to keep a daily record of food served inmates; failure to inspect the list and make recommendations for wholesome and sufficient food; and failure to conduct health inspections. W.Va. Code § 7-8-2a.

513.    The County Commission and County Commissioner Defendants' omissions set forth herein manifest deliberate indifference to the rights of county detainees.

514.    The County Commission and County Commission Defendants' conduct was not reasonably related to any legitimate, non-punitive governmental or penological objective.

61

515.    Plaintiffs specifically set forth the inadequate nutrition, hygiene, and bedding allegations hereinabove.

516.    The County Commission and County Commission Defendants' omissions set forth herein resulted in harm to Plaintiffs and similarly situated pretrial detainees by directly and proximately causing malnutrition, emotional distress, and physical pain and suffering as enumerated herein above.

517.    PrimeCare, through its employees listed herein, deprived Plaintiffs and others similarly situated of their Fourteenth Amendment rights by and through its omissions that manifest deliberate indifference so as to constitute an actionable policy or custom.

518.    PrimeCare, deprived Plaintiffs and others similarly situated of their Fourteenth Amendment Rights through the decisions of Defendants Weber; Heskins; and Bavington, who had final policymaking authority, so as to constitute an actionable policy or custom.

519.    PrimeCare exercised a persistent and widespread custom of remaining understaffed, causing and permitting chronic and excessive overdue tasks and sick calls to accumulate; causing and permitting excessive delays of medical care; causing and permitting systemic failures to adhere to NCCHC standards, PrimeCare policies and procedures; WVDCR policies, and the standard of care; and refusing to send patients for outside care, so as to constitute an actionable policy or custom that deprived Plaintiffs and others similarly situated of their Fourteenth Amendment Rights.

520.    Defendants Weber; Heskins; Bavington; Vallandingham; Miller; Jeffery; Perkins; Eastridge, and Rashid were responsible for oversight and management of PrimeCare services at SRJ.

521.    Defendants Weber; Heskins; Bavington; Vallandingham, Miller; Jefferey; Eastridge; Perkins; and Rashid have possessed actual or constructive knowledge for many years regarding medical understaffing and chronic and excessive overdue tasks and nurse sick calls – as evidenced, in part, by circulation and receipt of the Weekly Reports.

522.    Each of the foregoing individuals, including those with final policymaking authority, committed acts and decided to make glaring omissions – such as refusal to fully staff medical or to take measures to address chronic and excessive overdue tasks and nurse sick calls – so as to manifest deliberate indifference, constitute a custom or usage, and rise to the level of an actionable policy or custom.

523.    PrimeCare's policy or custom of failing to enforce NCCHC standards, its own policies and procedures, WVDCR policies, and the standard of care resulted in Plaintiff Fleenor, and other similarly situated, not receiving adequate detox checks and protocols that were adhered to.

524.    PrimeCare's policy or custom of permitting short staffing and excessive overdue tasks resulted in Plaintiff Fleenor, and other similarly situated, not receiving psychiatric and other medically necessary medications.

525.    These policies and customs directly and proximately resulted in Plaintiff Fleenor, and others similarly situated, suffering emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

526.    The PrimeCare employees and/or contractors involved in Plaintiff Fleenor's care are identified hereinabove in more detail.

527.    PrimeCare's policies or customs of permitting tasks and sick calls to be chronically and systemically overdue and of failing to enforce NCCHC standards and the standard of care resulted in Plaintiff Crabtree suffering a 79-day delay in mental health treatment.

528.    PrimeCare's policies or customs of permitting tasks and sick calls to be chronically and systematically overdue resulted in Plaintiff Crabtree's 14-day physical being delayed over 101 days.

529.    The PrimeCare employees and/or contractors involved directly in Plaintiff Crabtree's care are identified hereinabove in more detail.

530.    These policies and customs directly and proximately resulted in Plaintiff Crabtree and others similarly situated, suffering emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

531.    PrimeCare's policies or customs of refusing to send patients for outside medical care resulted in Plaintiff Gary Toler suffering a substantial delay in rehabilitation/physical therapy and neurological treatment following a stroke.

532.    This policy and custom directly and proximately resulted in Plaintiff Toler and others similarly situated suffering physical harm, emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

533.    PrimeCare Defendants' conduct was not reasonably related to any legitimate, non-punitive governmental or penological objective.

534.    Wexford, through its employees listed herein, deprived Plaintiffs and others similarly situated of their Fourteenth Amendment rights by and through its omissions that manifest deliberate indifference so as to constitute an actionable policy or custom.

535.   Wexford deprived Plaintiffs and others similarly situated of their Fourteenth Amendment Rights through the decisions of Defendants Conn, Gedman, Froelich, and Stone, who had final policymaking authority, so as to constitute an actionable policy or custom.

536.   Wexford exercised a persistent and widespread custom of remaining understaffed, causing and permitting chronic and excessive overdue tasks and sick calls to accumulate; causing and permitting excessive delays of medical care; causing and permitting systemic failures to adhere to NCCHC standards, Wexford policies and procedures; WVDCR policies, and the standard of care; and refusing to send patients for outside care, so as to constitute an actionable policy or custom that deprived Plaintiffs and others similarly situated of their Fourteenth Amendment Rights.

537.   Defendants Conn, Gedman, Froelich, Stone, Jeffery, Perkins, and Rashid were responsible for oversight and management of Wexford services at SRJ.

538.   Defendants Conn, Gedman, Froelich, Stone, Jeffery, Perkins, and Rashid have possessed actual or constructive knowledge for many years regarding medical understaffing and chronic and excessive overdue tasks and nurse sick calls – as evidenced, in part, by emails and statistical summaries circulated among them reflecting these issues.

539.   Each of the foregoing individuals, including those with final policymaking authority, committed acts and decided to make glaring omissions – such as refusal to fully staff medical or to take measures to address chronic and excessive overdue tasks and nurse sick calls – so as to manifest deliberate indifference, constitute a custom or usage, and rise to the level of an actionable policy or custom.

540.   Wexford's policy or custom of failing to enforce NCCHC standards, its own policies and procedures, WVDCR policies, and the standard of care, as well as its failure to prevent

65

short staffing and excessive overdue tasks resulted in Steven Martin and other similarly situated, not receiving a timely EKG.

541.    These policies and customs directly and proximately resulted in Plaintiff Martin, and others similarly situated, suffering emotional distress and increased risk of harm.

542.    The Wexford employees and/or contractors involved in Plaintiff Martin's care are identified hereinabove in more detail.

543.    Wexford's policies or customs of chronic understaffing, overdue tasks and nurse sick calls, and failure to adhere to policies and the standard of care resulted in Plaintiff Adkins' 14-day physical not being completed during his entire 79-day incarceration at SRJ.

544.    Wexford's policies or customs of chronic understaffing, overdue tasks and nurse sick calls, and failure to adhere to policies and the standard of care resulted in Plaintiff Adkins enduring excessive and untenable delays in medical care.

545.    Wexford's policy and custom of permitting providers to practice outside their proper scope of practice resulted in Plaintiff Adkins' dental sick call being completed by an RN.

546.    Wexford's policy and custom of refusing to send patients for outside care resulted in Plaintiff Adkins' enduring 468 days of incarceration without receiving a medically necessary surgical referral and other necessary care for his hernia.

547.    The Wexford employees and/or contractors involved directly in Plaintiff Adkins' care are identified hereinabove in more detail.

548.    These policies and customs directly and proximately resulted in Plaintiff Adkins and others similarly situated, suffering emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

549.    Wexford's policies or customs of operating understaffed, operating with chronic and excessive overdue tasks and nurse sick calls, and failure to provide timely care resulted in Plaintiff Sabrina Eagle's mental health care and medication being delayed during her entire 97-day incarceration.

550.    This policy and custom directly and proximately resulted in Plaintiff Eagle and others similarly situated suffering emotional distress, mental anguish, and increased risk of harm.

551.    Wexford Defendants' conduct was not reasonably related to any legitimate, non-punitive governmental or penological objective.

552.    Defendants' actions shock the conscience.

553.    Medical Defendants' actions were reprehensible, willful, wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages.

### Count III - Conspiracy to Commit Eighth and Fourteenth Amendment Violations and Common Law Civil Conspiracy

554.    Plaintiffs incorporate herein by reference all preceding paragraphs of their Third Amended Complaint as if set forth more fully herein verbatim.

555.    Defendants, while acting under color of law and within the scope of their employment, acted jointly and in concert to deprive Plaintiffs of their Eighth and Fourteenth Amendment right to be free from cruel and unusual punishment.

556.    Defendants committed overt acts to accomplish the constitutional deprivations and injuries described herein.

557.    County Commission Defendants purposefully and with intent failed to carry out their statutory obligations of reviewing invoices, conducting food menu reviews, and conducting health department reviews.

558.    By so doing, County Commission Defendants conspired with former WVDCR Defendants to accomplish constitutional deprivations by depriving inmates and pretrial detainees of adequate and sufficient nutrition, hygiene items, and adequate and sufficient bedding.

559.    County Commission Defendants and WVDCR communications during the relevant time period are limited to discussing the amount of per diem pay and the Counties' desire not to pay it or pay less.

560.    A per diem rate freeze from 2018 through July 1, 2023, resulted in the County Commission Defendants saving $100,000,000 - money which would have been utilized to ensure constitutionally adequate nutrition, hygiene items, and bedding for inmates.

561.    Accordingly, Counties and WVDCR conspired to deprive inmates of constitutionally guaranteed nutrition, hygiene items, and bedding.

562.    Medical Defendants had multiple conversations and meetings with former WVDCR Defendants regarding correctional staffing, medical staffing, and the inability to timely and adequately carry out medical tasks and nurse sick call.

563.    During these multiple meetings, former WVDCR Defendants and Medical Defendants overtly acted to maintain an understaffed system that resulted in the deprivation of access to medical care for pretrial detainees and inmates at SRJ.

564.    To wit: Medical Defendants chose to submit no change orders to ensure that medical staffing was sufficient, and elected to make minimal to no changes to their staff matrices and hiring practices to ensure adequate staffing.

565.    Medical Defendants have offered testimony under oath that understaffing was an unreasonable barrier to access to care which they had a duty to remove.

566.    Accordingly, Medical Defendants and WVDCR conspired to deprive inmates of constitutionally guaranteed medical care.

567.    Plaintiffs, and other similarly situated, suffered damages as set forth more fully herein as a result of these constitutional deprivations.

568.    Defendants' actions shock the conscience.

569.    Medical Defendants' actions were reprehensible, willful, wanton, malicious, and in blatant disregard for the rights owed to Plaintiffs, thereby justifying an award of punitive damages.

## Count IV – Medical Negligence under the West Virginia Medical Professional Liability Act
### (Medical Defendants)

570.    Plaintiffs incorporate herein by reference all preceding paragraphs of the Third Amended Complaint as if set forth more fully herein verbatim.

571.    At all times relevant hereto, PrimeCare Defendants and Wexford Defendants owed Plaintiffs (and all similarly situated inmates and former inmates) a duty of care under West Virginia's Medical Professional Liability Act ("MPLA"), West Virginia Code § 55-7B-1, *et seq*. as the applicable health care providers for Plaintiffs and all similarly situated individuals.

572.    PrimeCare Defendants and Wexford Defendants contract with the State of West Virginia to provide inmates and pretrial detainees with constitutionally adequate healthcare which meets the applicable standard of care.

573.    Each and every pretrial detainee and inmate that becomes incarcerated at SRJ is evaluated and treated by the medical provider contracting at SRJ.

574.    PrimeCare Defendants and Wexford Defendants owe each and every patient at SRJ a duty of care as their contracted medical provider.

575.    PrimeCare Defendants and Wexford Defendants deviated from the standard of care, as set forth more fully herein, resulting in deliberate indifference to the serious medical needs of

Plaintiffs and all others similarly situated and directly and proximately causing harm to Plaintiffs and others similarly situated.

576.    Prime Care Defendants and Wexford Defendants failed to meet the applicable standard of care for a correctional healthcare provider by failing to maintain adequate staffing; creating and permitting excessive and chronic overdue tasks and nurse sick call lists; failing to adhere to NCCHC standards, their own standards, and WVDOCR standards; and failing to ensure access to care and removal of barriers to care. These breaches of the standard of care are set forth more fully herein above.

577.    PrimeCare Defendants and its employees listed herein above deviated from the standard of care owed to Plaintiff Fleenor by failing to ensure that Plaintiff Fleenor received proper and adequate detox checks according to Defendant PrimeCare's detox protocol and failing to ensure Plaintiff Fleenor's medications were continued upon incarceration.

578.    PrimeCare Defendants deviated from the standard of care by failing to enforce NCCHC standards, its own policies and procedures, WVDCR policies, which resulted in Plaintiff Fleenor, and other similarly situated, not receiving adequate detox checks and protocols that were adhered to.

579.    PrimeCare Defendants deviated from the standard of care by permitting short staffing and excessive overdue tasks that resulted in Plaintiff Fleenor, and others similarly situated, not receiving psychiatric and other medically necessary medications.

580.    These deviations from the standard of care directly and proximately resulted in Plaintiff Fleenor, and others similarly situated, suffering emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

581.    PrimeCare Defendants deviated from the standard of care by permitting tasks and sick calls to be chronically and systematically overdue, resulting in Plaintiff Crabtree's 14-day physical being delayed over 101 days and Plaintiff Crabtree suffering a 79-day delay in mental health treatment.

582.    These deviations from the standard of care directly and proximately resulted in Plaintiff Crabtree, and others similarly situated, suffering emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

583.    PrimeCare Defendants listed herein above deviated from the standard of care by refusing to send patients for outside medical care resulted in Plaintiff Gary Toler suffering a substantial delay in rehabilitation/physical therapy and neurological treatment following a stroke.

584.    These deviations from the standard of care directly and proximately resulted in Plaintiff Toler and others similarly situated suffering physical harm, emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

585.    Wexford Defendants deviated from the standard of care by permitting short staffing and excessive overdue tasks which resulted in Steven Martin, and other similarly situated, not receiving a timely EKG.

586.    This deviation from the standard of care directly and proximately resulted in Plaintiff Martin, and others similarly situated, suffering emotional distress and increased risk of harm.

587.    Wexford Defendants deviated from the standard of care by its chronic understaffing, overdue tasks and nurse sick calls, causing its failure to adhere to policies which resulted in Plaintiff Adkins' 14- day physical not being completed during his entire 79-day incarceration at SRJ.

588.    Wexford Defendants deviated from the standard of care by its refusing to send patients for outside care, resulting in Plaintiff Adkins' enduring 468 days of incarceration without receiving a medically necessary surgical referral and other necessary care for his hernia.

589.    This deviation from the standard of care directly and proximately resulted in Plaintiff Adkins, and others similarly situated, enduring excessive and untenable delays in medical care, suffering emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

590.    Wexford Defendants deviated from the standard of care by operating understaffed, operating with chronic and excessive overdue tasks and nurse sick calls, and failing to provide timely care which resulted in Plaintiff Sabrina Eagle's mental health care and medication being delayed during her entire 97-day incarceration.

591.    This deviation from the standard of care directly and proximately resulted in Plaintiff Eagle and others similarly situated suffering emotional distress, mental anguish, and increased risk of harm.

592.    By their actions and inactions set forth herein, PrimeCare Defendants and Wexford Defendants failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent correctional healthcare provider.

593.    Defendants PrimeCare and Wexford and their employees listed herein above, with a conscious disregard for the safety of others, negligently, carelessly, recklessly, incompetently, willfully, and wantonly deviated from the appropriate standards of care and failed to provide the appropriate treatment for Plaintiffs and all others similarly situated, thereby entitling Plaintiffs to punitive damages.

## Count V – Negligence and Prima Facie Negligence
### (County Defendants)

594.    Plaintiffs incorporate herein by reference all preceding paragraphs of their Third Amended Complaint as if set forth more fully herein verbatim.

595.    Pursuant to West Virginia Code § 29-12A-4 (c)(2) the County Commissioner Defendants carried out all negligent act alleged herein within the scope of their employment for the County Commission Defendants.

596.    Regional jails are, in essence, "multiple county operated jails."

597.    West Virginia Code § 7-8-1, *et seq*, establishes requirements for county commissions housing their inmates.

598.    W.Va. Code § 7-8-1 has neither been repealed nor rewritten.

599.    By enacting the statute, the "[l]egislature intended to require counties to maintain jails at reasonable and acceptable standards." *Hickson v. Kellison*, 170 W.Va. 732, 296 S.E.2d 855 (W.Va. 1982).

600.    Those standards include the provision of "wholesome and sufficient food and clean and sufficient bedding for all prisoners confined in the county jail." W.Va. Code § 7-8-2a.

601.    "The county commission may provide for the feeding of prisoners on a contract basis with any other county, *state* or municipal government agency which at the time of entering into said contract is required or authorized to provide food services for other purposes." Id. (*emphasis added*).

602.    "Invoices or itemized statements of account from each vendor of food, bedding and other supplies shall be obtained, and payment of such statements or invoices may not be authorized by the county commission **unless and until** the county commission has ascertained that the

73

merchandise has been received and that the terms of purchase **have been complied with on the part of the vendor**." Id. (**emphasis added**).

603.    "The county commission shall be required to keep a daily record of food served prisoners and, in all counties having a county health officer, said health officer shall, at least once a month, inspect such lists and make such recommendations and suggest as he may deem proper regarding daily diets and foods **regardless of how the feeding services are provided**." Id. (**emphasis added**).

604.    Any entity contracting with the county commission to provide food services "shall be subject to inspection and regulation by the department of health." Id.

605.    Section 7-8-2a further imposes duty to furnish the soaps, disinfectants and other supplies needed by the jailer in the performance of his duties and to keep the jail in constant and adequate repair.

606.    The face of W.Va. Code § 7-8-1, *et seq*. clearly and unequivocally creates a duty on the part of Defendants to provide nutrition, bedding, clothing, and hygiene items to the county inmates housed at SRJ.  W.Va. Code § 7-8-1, *et seq*; see also *Dawson v. Kendrick*, 527 F. Supp. 1252 (S.D.W.Va. 1981) (though these provisions may be anachronistic, "**they are the law of the state**" and may give rise to liberty and property interests) (**emphasis added).**

607.    West Virginia Code § 15A-3-16 controls funding for the operation of regional jails. Counties within each region "shall incarcerate all persons whom the county would have incarcerated in any jail prior to the availability of the jail facility in the jail facility." W.Va. Code § 15A-3-16(f).

608.    The respective County Commissions "shall pay into this fund a cost per day for each incarcerated individual." W.Va. Code §15A-3-16(g).

609.     The funds received from each county "shall be placed in a separate account and shall be requisitioned from these funds to pay for costs incurred." W.Va. Code § 15A-3-16(e)(4).

610.     Former WVDOCR Commissioner Betsy Jividen testified that the per diem money is used for items such as food, clothing, and medical.  [Jividen Deposition 97: 16-22].

611.     W.Va. Code §7-8-1, *et seq*., can be read in pari materia with W.Va. Code § 15A-3-16.

612.     W.Va. Code §7-8-1, *et seq*., is not repugnant to W.Va. Code  §15A-3-16, and implied repeal of the former is disfavored.

613.     All County Commission Defendants house their pretrial detainees and inmates at SRJ.

614.     Former WVDCR Chief of Staff, Brad Douglas, testified that the "jails are funded through several funding streams . . . the biggest one being the operational fund that comes in from the per diem from the counties." [Douglas: 34; 17-20].

615.     Douglas further testified that the counties pay $54.48 per day per inmate, which aligns with their obligation to feed, house, and clothe inmates prior to being sentenced to a state prison. [Douglas: 47-48; 7-10, 6-14].

616.     Every County Commission, by and through the County Commissioner Defendants, has failed to provide for the basic human needs of their county inmates housed at SRJ for decades.

617.     By this deprivation, County Commission and County Commissioner Defendants have deprived pretrial detainees and inmates of the constitutionally guaranteed rights and breached their duties to these individuals as set forth herein.

618.    Pretrial detainees and inmates have suffered damages as a result of County Commission and County Commissioner Defendants' actions and inactions as set forth more fully herein above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief including, but not expressly limited to:

1. A finding of alter ego so as to pierce the corporate veil with respect to PrimeCare Defendants;

2. Compensatory damages;

3. Damages for pain, suffering, emotional distress, mental anguish, and increased risk of harm;

4. Nominal damages;

5. Statutory penalties;

6. Punitive damages;

7. Attorneys' costs and fees; and

8. All such other and further relief as allowable by law.

**PLAINTIFFS SEEK A BENCH TRIAL.**

**PLAINITFFS,**

**By Counsel**

/s/ Stephen P. New
Stephen P. New (WVSB No. 7756)
Emilee B. Wooldridge (WVSB No. 14310)
Stephen New & Associates
430 Harper Park Drive
Beckley, West Virginia 25801
Ph: (304) 250-6017
Fax: (304) 250-6012
steve@newlawoffice.com

Amanda J. Taylor (WVSB No. 11635)

Taylor, Hinkle & Taylor, Inc.
115 ½ South Kanawha Street
Beckley, WV 25801
O: (304) 894-8733
F: (681) 245-6236

Timothy Lupardus (WVSB No. 6252)
The Lupardus Law Office
275 Bearhole Road
Pineville, West Virginia 24874
(304) 732-0250
office@luparduslaw.com

Zachary Whitten (WVSB No. 13709)
The Whitten Law Office
P.O. Box 753
Pineville, West Virginia 24874
zwhittenlaw@gmail.com

Robert Dunlap (WVSB No. 10012)
Robert Dunlap & Associates
208 Main Street
Beckley, West Virginia 25801
(304) 255-4762
robertdunlapesq@gmail.com