STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## BECKLEY DIVISION

BRYAN STAFFORD, Executor of the
Estate of THOMAS FLEENOR, JR., et al.,

        **Plaintiffs,**

v.                        **Civil Action No. 5:22-cv-00405**

PRIMECARE MEDICAL, INC., et al.,

        **Defendants.**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AS TO PRIMECARE DEFENDANTS

COME NOW Plaintiffs, by undersigned counsel, and in further support of *Plaintiffs'*
*Motion for Class Certification as to PrimeCare Defendants* state as follows:

This putative class action seeks redress for 5,308 patients who were denied access to
adequate medical care at Southern Regional Jail ("SRJ") due to the systematic failure of PrimeCare
Defendants between September 22, 2020, and June 26, 2022.  Months of investigation followed
by over two years of litigation has uncovered chronic, systemic, and unchecked failure by
PrimeCare to provide adequate medical care constitutionally guaranteed to its patients at SRJ due
to irrefutable understaffing, unabated overdue tasks, and an abiding indifference which, in the face
of PrimeCare's clear understanding of its shortcomings, can only be explained as deliberate.

## FACTUAL BACKGROUND

Approximately six-thousand (6,000) individuals are incarcerated annually at SRJ.  See *WV*
*Division of Corrections and Rehabilitation FY 2023 Annual Report*, at **Exhibit 1**. Statistics
provided by the West Virginia Division of Corrections and Rehabilitation [DOCR] at the time of
its settlement in this action establish that PrimeCare Defendants were responsible for providing

1

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

access to care for five thousand three hundred and eight (5,308) individuals at SRJ. Each of these individuals had a constitutional right to access adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976). A correctional medical provider that is deliberately indifferent to the serious medical needs of the inmate and detainee population through systemic and gross deficiencies in staffing, facilities, equipment, or procedures violates the constitutional rights of those inmates and detainees. *Id.*; *Baxley v. Jividen*, 508 F. Supp. 3d 28, 55 (S.D. W. Va. 2020) (quoting, *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

Utilizing these metrics, PrimeCare was deliberately indifferent and medically negligent respecting the Class. Specifically, the *Third Amended Complaint* [TAC] avers:

> PrimeCare exercised a persistent and widespread custom of remaining understaffed, causing and permitting chronic and excessive overdue tasks and sick calls to accumulate; causing and permitting excessive delays of medical care; causing and permitting systemic failures to adhere to NHCCHC standards, PrimeCare policies and procedures; WVDCR policies, and the standard of care; and refusing to send patients for outside care, so as to constitute an actionable policy or custom that deprived Plaintiffs […] and others.

[ECF 946, ¶ 469].

PrimeCare was awarded a multi-million-dollar contract to provide medical care to all patients at Southern Regional Jail with the DOCR in 2016. See *Contract*, at **Exhibit 2**. PrimeCare's obligations and duties under the contract were in accordance with the Request for Quotation issued by DOCR. *Id*. PrimeCare extended the contract multiple times, allegedly under the same terms and conditions, through June of 2022. See *Bavington Letter*, at **Exhibit 3**. Despite the testimonial claim by PrimeCare CEO Tom Weber that PrimeCare was consistently losing money under the DOCR contract, [Weber <u>Vol. III, p. 53-55</u>], at **Exhibit 4**, PrimeCare chose to perpetuate serious understaffing and did not seek contract revision or additional DOCR funding.

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

Ex. 4; see also Ex. 3.

The duties PrimeCare owed its SRJ patients derived from the National Commission on Correctional Health Care ["NCCHC"] Standards for Health Services in Jails; PrimeCare's own policies (which mirror NCCHC standards); the DOCR Contract terms; and the standard of care for correctional facilities. See *NCCHC Standards*, at **Exhibit 5**. PrimeCare's deliberate indifference to the serious medical needs of the Class and its breach of the standard of care for correctional healthcare, the terms of its Contract, NCCHC Standards, and PrimeCare's own adopted standards is abundantly clear. One need read no further than page 3 of the NCCHC Standards to recognize that PrimeCare failed to meet the first and most essential obligation to its SRJ patients, that of ensuring *Access to Care*. See *J-A-01, NCCHC Standards*, at Ex.5.

The NCCHC defines *Access to Care* to mean that "in a timely manner, a patient is seen by a qualified healthcare professional, is rendered a clinical judgment, and receives the care that is ordered." Ex. 5, p. 3. The NCCHC deems *Access to Care* an "essential" standard, and Brent Bavington, PrimeCare's President, testified that he recognizes it as being of "utmost importance." [Bavington 26; 13-16], at **Exhibit 6**. Mr. Bavington further acknowledged that "access to care helps prevent the risk of serious injury, illness, or death in the patient population." [Bavington 27; 16-19]. As part of this standard, the NCCHC requires that barriers to access to care be avoided and specifies unreasonable barriers to include "[h]aving an understaffed, underfunded, or poorly organized system with the result that it is not able to provide appropriate and timely access to care." Ex. 5, p. 3.

The NCCHC designates *Staffing* an "important" standard and requires that the responsible health authority (PrimeCare, in this instance) "ensure sufficient numbers and types of health staff to care for the inmate population." Ex. 5, p. 60. Sufficiency of staffing is measured by timely and

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

thorough physician encounters and **the length of the backlog**. *Id*, p. 61 (emphasis added).

PrimeCare's backlog was enormous due to its large-scale, chronic pattern of understaffing and failure to provide SRJ patients' access to care in breach of their Contract, NCCHC standards, and the standard of care. See *Mathis Report*, at **Exhibit 7**. Substantial evidence of PrimeCare's breach comes from its own Weekly Reports completed by PrimeCare regional managers from January 2021 through June 25, 2022. See *Quarterly Weekly Reports and Summaries* at **Exhibit 8** through **Exhibit 13**. The weekly reports provided statistics for overdue tasks for necessary categories of patient care, including H&P (14-day initial health assessment); PA/DR sick calls; Psychiatrist sick calls; mental health sick calls; Dental sick calls; EKGs; and labs. *Id*.   PrimeCare's internal reports reflect excessive overdue tasks in every category. *Id*. Krista Vallandingham, Regional VP of Operations for PrimeCare, alarmingly testified that PrimeCare had actual knowledge of its abundant deficiencies up through its entire chain of command regarding the number of overdue tasks. [Vallandingham, p. 143, ll. 21-24], at **Exhibit 14**. Despite this knowledge, PrimeCare astonishingly did nothing to abate the increased risk it posed to SRJ patients.

Relying on its own reports, up to 71% of PrimeCare's SRJ patients had 14-day History and Physicals overdue *per week*.  Ex. 9 – Ex. 14. As many as 412 inmates per week, or 60.5% of patients, had an overdue physician sick call. *Id*. As many as 185 inmates, or 27% of patients, had an overdue psychology appointment. *Id*. Overdue tasks for mental health appointments were as high as 202 per week, constituting 30% of PrimeCare's patients. *Id*. Overdue tasks for dental appointments were as high as 135 per week, or 20% of PrimeCare's patients. *Id*. Similarly, EKGs were overdue for up to 76% of the average daily population at SRJ. *Id*. All other categories of overdue tasks reveal a similar pattern. These statistics bear out that even the most basic and

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

necessary medical care was not being provided at SRJ to provide for and meet the medical needs of inmates. *Id.* Further, Plaintiffs have reviewed a sample of medical records provided by PrimeCare. Of forty-nine (49) randomly selected PrimeCare patients, zero that were incarcerated for over 14 days had a timely 14-day physical. Of the inmates with identifiable "MD Sick Call," one was seen timely by a physician, with many being seen by an LPN practicing outside the scope of practice or not at all. Likewise, nearly every patient with a mental health or dental sick call was seen untimely, if at all, and often by an unqualified provider.

PrimeCare's own statistics and a sampling of Class Members' medical records prove the Plaintiffs' actions meritorious. The high numbers and percentages of overdue tasks carried week to week, year to year, without improvement reflects the severity of PrimeCare's indifference to its patients at SRJ. PrimeCare had actual knowledge up through its entire chain of command regarding the number of overdue tasks, exhibiting the knowledge of that indifference. See, [Vallandingham, p. 143, ll. 21-24], at Ex. 14. If that is not sufficient alone, the NCCHC proscribed as *essential* PrimeCare's duty to use these reports in monthly meetings, the minutes or summaries of which " … should include problems identified, corrective actions initiated, problems resolved since the last meeting, and problems with corrective actions." *NCCHC*, pg. 9, at Ex.5. In more than two years of litigation, no evidence has surfaced that PrimeCare actually corrected understaffing or overdue tasks at SRJ.

PrimeCare's lack of *essential* corrective actions at SRJ reflects an institutional and deliberate indifference, and is further reflected by the recent testimony of PrimeCare's SRJ Health Services Administrator that she does not know NCCHC standards, has no recollection of PrimeCare training its employees on NCCHC standards, cannot recall ever reading the NCCHC standards, and does not recall whether she even possesses a copy of NCCHC standards or had read

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

the contract outlining the services for which she was supervisory on site. [Perkin's Depo, III, pp106-108], at **Exhibit 15**.

The length of the backlogs further establishes deviation from the NCCHC Staffing standard. Ex. 5, pp. 60-61. Further deviations from the Staffing requirements are evidenced by the Weekly Reports. Every week for the final 18 months of PrimeCare's contract, the "corrective action" entry for the overdue tasks reflects staffing shortages. These staffing shortages are supported by the testimony of Dr. Humayan Rashid, the sole physician employed by SRJ during Primecare's contracts:

Q:    [Y]ou also talked about chronic shortage of medical staff at the jail as well, correct?

A:    That is correct.

Q:    And that obviously has a negative impact on the quality of medical care provided at the jail; do you agree with that?

A:    That is correct.

[Rashid p. 73, ll. 16-23], at **Exhibit 16**.

Q:    How many times would you say you alerted the higher ups at PrimeCare to your perceived medical understaffing at Southern Regional Jail?

A:    I would say several times verbally and at least three or four times via written request.

[Rashid, p. 77, ll. 22-24, p. 78, ll. 1-2].

Brent Bavington was assigned responsibility at PrimeCare for the West Virginia region. Mr. Bavington testified to the importance of adequate health care staffing:

Q:    Is it important that the correctional health care provider have sufficient staff?

A:    Ok. Same question I think. But yes, it is important.

Q:    Why?

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

A:      So that we can render the care needed for our patient population.

[Bavington 31; 14-20] Melissa Jeffery, Former Assistant Regional Manager for PrimeCare and current Assistant Regional Manager for Wexford, testified that she agreed that a correctional healthcare entity like PrimeCare is obligated to ensure that sufficient numbers of qualified health personnel of various types are available at each correctional healthcare site and the numbers must be sufficient to deliver adequate healthcare services to all patients consistent with corrections standards of healthcare. [Jeffrey, January 12, 2024, p. 78], at **Exhibit 17**.  Further, Jeffery testified that in the seven quarters that she was Assistant Regional Manager for PrimeCare at SRJ, there was never a staffing analysis conducted. [Jeffrey, p. 103]. Jeffery was aware of Dr. Rashid's concerns about understaffing and backlog of overdue tasks. See, Emails from Dr. Rashid, at **Exhibit 18**.

PrimeCare's corporate representative testimony further establishes PrimeCare's need to obtain more staffing and its failure to do so:

Q:      If there is a swing of 10 percent or less [in Average Daily Population], PrimeCare, the staffing matrix and the proposal that it submits is unchanged if the swing is 10 percent or less?

A:      Generally, yes.

Q:      And so if the change is 10 percent or more that is when PrimeCare then needs to consider adjusting its staffing matrices and other resources?

A:      Yes.

[Weber, Vol. II, 5; 1-11] at **Exhibit 19**.  The Average Daily Population at SRJ increased from 583 considered in PrimeCare's 2016 bid to 717 inmates over the relevant period. Ex. 1. This 30% adjustment in the Average Daily Population was not met with any meaningful adjustment to the staffing matrix. See Staffing Matrices, at **Exhibit 20**.  When questioned about only minor

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

adjustments considering the overwhelming overdue task statistics, PrimeCare testified:

> Q:    Using the ADP during that contract, the population at Southern Regional Jail continues to grow by 134 inmates?
>
> A:    Yes. Eventually.
>
> Q:    The FTE on [the staffing matrix] stands for Full-Time Equivalent.
>
> A:    Yes.
>
> Q:    And PrimeCare adds the Full Time Equivalent of 3.8 additional employees of that time – the life of the contract?
>
> A:    Yes.
>
> Q:    PrimeCare never adds any hours for doctors?
>
> A:    Correct.
>
> Q:    And for the entire contract, the medical director and only licensed MD to work for PrimeCare maintains the full time equivalent of 0.2 employees?
>
> A:    Yes.  Eight hours per week.
>
> Q:    PrimeCare never adds any mid-levels or mid-level hours?
>
> A:    No, not above the 22 hours.
>
> Q:    And the [2]2 hours is full time equivalent of .55 employees?
>
> A:    Yes.
>
> Q:    Combined[,] the hours for anyone capable of fulfilling the role of a practitioner never equate to a single full time employee during the life of this contract?
>
> A:    A medical practitioner, correct.
>
> Q:    And that's even under the best of circumstances if the staffing matrix hours are fulfilled?
>
> A:    Yes.

[Weber, Vol. II, 145-147].

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

Q:    What, if any, consideration was given by PrimeCare given the number of overdue tasks for the PA and the doctor during the life of the contract to adding PA or physician hours?

[…]

Q:    Is the answer that PrimeCare gave no consideration to adding any provider hours during the life of the contract?

A:    Not significant consideration, if any, was given, correct.

Q:    PrimeCare never adds hours during the life of the contract for RNs?

A:    Correct.

Q:    Licensed mental health professional?

A:    Correct.

Q:    Dental?

A:    Correct.

Q:    Psychiatrists?

A:    Correct.

Q:    Or psychologists?

A:    Correct.

Q:    Did PrimeCare give any consideration to adding any hours for any of those positions?

A:    That was not – not significantly, no.

Q:    [A]nd that's true even with the number of overdue tasks in the areas that overdue tasks are in?

A:    Yes.

[Weber, Vol. II, 148-149]. As it relates to the Southern Regional Jail being overcrowded in 2020, 2021, and the first half of 2022, Weber stated that there was "an increased strain on staff, so we had to augment staff in providing more care . . . the system that we were being paid for was not

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

the system we were providing." [Weber, Vol. III, p. 54], at Ex. 4.

Mr. Weber's testimony is even more problematic considering PrimeCare VP of Operations and former Regional Manager Krista Vallandingham's testimony that the sufficiency of the staffing plan was not adequate for providers at PrimeCare based solely upon the number of overdue tasks:

> Q:    [T]he sufficiency of the staffing plan as it relates to providers were judged by having an adequate number of prescribers, PrimeCare's staffing plan was not adequate for providers at this time?
>
> A:    If you look at it solely off of these numbers that you've put in front of me, yes.

[Vallandingham, p. 149, ll. 1-6]. Despite this answer, Ms. Vallandingham indicated she could not recall a single action taken by PrimeCare to address provider overdue tasks. [Vallandingham145; 19-23], at Ex. 14.

PrimeCare's failure to act was confirmed by the testimony of former SRJ Superintendent, Michael Francis, who frequently complained about the manner in which PrimeCare conducted its duties, raising overdue tasks with Brent Bavington and taking concerns over untreated inmates to the medical director. [Francis pp. 231-2, 233-4]at **Exhibit 21.** Francis further testified that PrimeCare never seemed to improve – that they were shorthanded all the time [Francis pp 231-236] at *Id.*

In summary, the facts discovered from over two years of litigation unequivocally point to the conclusion that PrimeCare failed its essential duty to provide timely access to care by properly qualified medical professionals and that PrimeCare's conduct reflects deliberate indifference to the heightened risk of harm to this Class. These Plaintiffs and the putative class members, who instead of receiving timely and adequate medical care, got lost in a sea of overdue tasks in a system poorly organized, poorly staffed, and poorly trained to fulfill its obligations.

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

## <u>DISCUSSION OF PLAINTIFFS' CONSITUTIONAL CLAIMS</u>

When determining whether class certification is proper, the Court may consider the merits of class claims "only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgon Inc., v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *Jonathan R. v. Justice*, 344 F.R.D. 294 (S.D. W. Va. 2023).  As such, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlise & Jacquelin*, 417 U.S. 156, 178 (1974) (internal quotation marks and citation omitted). The following discussion of Plaintiffs' claims is presented in that light.[1] Plaintiffs assert Cruel and Unusual Punishment under the Eighth Amendment and Violation of the Fourteenth Amendment's Due Process Clause.

The government is required to provide medical care to inmates. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976). "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.* "The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation." *Id.* at 103, 290. "[D]eliberate indifference to serious medical needs of prisoners" is prohibited by the Eighth Amendment. *Id.* at 104, 291. Furthermore, "a pretrial detainee makes out a due process violation if he shows 'deliberate indifference to serious medical needs.'" *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988) (citations omitted). The Fourth Circuit applies different standards for assessing violations of the Eighth and Fourteenth Amendments. Eighth Amendment violations require proof of both an objective standard and a

---

[1] Thus, even if the defendants raise issues with the meritoriousness of Plaintiff's claims or failure of proof of an element of the Plaintiff's cause, the Court considering class certification should "…accept the evidence for class certification purposes regardless of the challenges made by the defendant …" *Rhodes v. E.I. Dupont De Nemours & Co.*, No. 06-cv-00530, 2008 U.S.Dist LEXIS 46519, at 31 (S.D.W.Va. June 11, 2008).

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

subjective standard, while a Fourteenth Amendment requires proof based upon an objective standard. See, *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023).

In a challenge to the policies of an institution in a class action "'[d]eliberate indifference to inmates' health needs may be shown, for example, by proving that there are "such systemic and gross deficiencies in staffing, facilities, equipment or procedures that the inmate population is effectively denied access to adequate medical care.""" *Baxley v. Jividen*, 508 F. Supp. 3d 28, 55 (S.D. W. Va. 2020) (quoting, *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).   This is at the heart of Plaintiffs' Constitutional claims herein.

A two-prong test is used to determine whether an Eighth Amendment violation exists. The two-prong test consists of a subjective and objective requirement. *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016). "First, the inmate must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury, or a substantial risk thereof." *Id.* (citation and internal quotation marks omitted); See also, *Thompson v. Commonwealth*, 878 F.3d 89, 107 (4th Cir. 2017) (citation and internal quotation marks omitted) (showing exposure to a substantial risk of serious harm required to prove deliberate indifference)."Second, an inmate must show that the prison official had a sufficiently culpable state of mind, which, in this context, consists of deliberate indifference to inmate health or safety." *Id.* at 127-28 (citations and internal quotation marks omitted); See also, *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citation and internal quotation marks omitted) (existence of a substantial risk of serious harm must be shown).

In establishing the objective prong "[i]n inadequate medical care cases, the Fourth Circuit has 'require[d] plaintiffs to demonstrate officials' deliberate indifference to a "serious" medical need that has either "been diagnosed by a physician as mandating treatment or . . . is so obvious

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

that even a lay person would easily recognize the necessity for a doctor's attention."'" *Baxley v. Jividen*, 508 F. Supp. 3d at 55 (quoting, *Scinto v. Stansberry,* 841 F.3d 219, 225 (4th Cir. 2016)(quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)).

To establish the subjective prong in an action based upon the Eighth Amendment, "'a prison official [must] actually know of and disregard an objectively serious condition, medical need, or risk of harm.'" *Baxley v. Jividen*, 508 F. Supp. 3d at 56 (quoting, *De'Lonta v. Angelone,* 330 F.3d 630, 634 (4th Cir. 2003)). Deliberate indifference equates to "recklessness of the subjective type used in criminal law." *Id*. (quoting, *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995)).

To establish deliberate indifference based upon the Fourteenth Amendment,

> a pretrial detainee must [prove] that (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023).

As PrimeCare is a private corporation, Plaintiffs "must also show that the deprivation of rights resulted from application of an official policy or custom." *Taylor v. Wexford Health Sources, Inc.,* No. 2:23-cv-00475, 2024 U.S. Dist. LEXIS 105363, at *32-33 (S.D. W. Va. June 13, 2024) (citing, *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999) (applying the "principles of § 1983 municipal liability articulated in *Monell* and its progeny" to private corporations)). A policy or custom can exist:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citation and internal quotation marks omitted).

Evidence of understaffing and the failure to take steps to correct the understaffing and resulting substantial risks of harm also can give rise to liability. See, *Stephens v. S.C. Dep't of Corr.*, Civil Action No. 4:17-03482-JFA-MGB, 2020 U.S. Dist. LEXIS 253406, at *53 (D.S.C. July 22, 2020) (the risks included contraband and assaults).

Supervisory liability is also alleged. The necessary elements of supervisory liability are:

1) The supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; 2) The supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices;' and 3) There was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injuries suffered by the plaintiff.

*Mabry v. Jividen*, No. 2-19-cv-00424, 2022 U.S. Dist. LEXIS 105114, **12-13 (S.D. W. Va. May 3, 2022) (quoting, *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). Generally, a pervasive and unreasonable risk of harm is established when the evidence demonstrates that "the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (citation and internal quotation marks omitted). Secondly, deliberate indifference is shown by evidence of "a supervisor's continued inaction in the face of documented widespread abuses." *Id*. (citation and internal quotation marks omitted). Lastly, causation is proven either directly, "where the policy commands the injury of which the plaintiff complains" or, alternatively, "may be supplied by the tort principle that holds a person liable for the natural consequences of his actions." *Id*. at 226-227 (citation and internal quotation marks omitted).

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

In contrast, although the case law setting forth the standard for a deliberate indifference claim for a pretrial detainee incorporates standards arising from Eighth Amendment claims, complaints regarding the conditions of a pretrial detainee's confinement are not measured against the standards of the Eighth Amendment. As the Supreme Court has found, the state is without the "power to punish with which the Eighth Amendment is concerned [unless] . . . it [first] secured a formal adjudication of guilt in accordance with due process of law." *Lyons v. Powell*, 838 F.2d 28, 29 (1st Cir. 1988) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671-672 (1977)). Rather, the Due Process Clause of the Fourteenth Amendment provides the appropriate standards for the conditions of pretrial confinement. *Id*. (citation omitted).

Under this standard, conditions that amount to punishment of the detainee deprive the detainee of his liberty without due process of law. *Lyons*, 838 F.2d at 29 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). To determine whether a condition amounts to a punishment, [a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. *Id*. (citation omitted). Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. *Id*. at 30 (quoting *Bell*, 441 U.S. at 538). Accordingly, "[i]f a restriction appears to be unrelated to a legitimate governmental objective, and is, for example, arbitrary or purposeless, then a court may infer that it is intended to be punishment." *Id*. at 29 (citing *Bell*, 441 U.S. at 539).

Invariably, if a violation of the Eighth Amendment is proven in correctional facilities that houses both convicted inmates and pretrial detainees, a violation of the Fourteenth Amendment

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

will also have been proven for the pretrial detainees. A 2015 United States Supreme Court case "held that the plaintiff detainee did not have to show the defendant officer acted with subjective intent." *Baxley v. Jividen*, 508 F. Supp. 3d 28, 54 (S.D. W. Va. 2020) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 391, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015). The *Baxley* Court noted that *Bell* was recognized by the United States Supreme Court as standing for "the proposition that pretrial detainees can prevail on Due Process claims by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.*

## LEGAL STANDARD FOR CLASS CERTIFICATION REVIEW

Rule 23(a) of the Federal Rules of Civil Procedure establishes four class certification requirements:

> (1) a class so numerous that joinder of all members is impracticable (the "numerosity" requirement);
>
> (2) questions of law or fact common to the class (the "commonality" requirement);
>
> (3) the representative parties' claims and defenses are typical of the class's claims and defenses (the "typicality" requirement); and
>
> (4) the representative parties that will fairly and adequately protect the class's interests (the "adequacy of representation" requirement).

Fed. R. Civ. P., 23(a); *Monroe v. City of Charlottesville*, 579 F.3d 380, 384 (4th Cir. 2009).

In addition to these four requirements, a plaintiff must also demonstrate that the proposed class action fits into one of three forms permitted by Rule 23(b). *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 163 (1974).

## LEGAL STANDARD FOR ISSUE-BASED CLASS CERTIFICATION

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

In addition to satisfying the requirements of Federal Rule of Civil Procedure 23(a) and (b), Plaintiff respectfully requests that this Court certify the proposed class under Rule 23(c)(4) with respect to specific issues in the case. Rule 23(c)(4) permits the Court to certify a class action on particular issues even if other aspects of the case do not satisfy all of the typical prerequisites for class certification. By certifying certain issues like liability for class treatment, the Court can streamline the litigation and resolve common questions of law or fact on a class-wide basis, thereby enhancing judicial efficiency and promoting the fair and efficient resolution of the underlying claims.

### A. Legal Standard for Certification of an Issues-Based Class.

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." The Rule allows the Court to sever particular issues from the broader case and certify them for class-wide treatment, even where the class may not meet all of the requirements for certification as to the entire action. Courts have wide discretion to exercise this authority, particularly when the class action presents common legal or factual questions that are capable of resolution on a class-wide basis, and doing so will contribute to the fair and efficient resolution of the claims.

Rule 23(c)(4) is designed to address situations in which class-wide adjudication of certain issues can resolve significant aspects of the case, even if the case as a whole may not lend itself to class-wide treatment. This Rule promotes efficiency and judicial economy, prevents the risk of inconsistent outcomes, and allows parties to avoid the burden of trying individual issues that could be resolved through class-wide determination.

### B. Application of Rule 23(c)(4) to the Current Case

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

Plaintiffs respectfully submit that the Court should exercise its discretion under Rule 23(c)(4) to certify specific issues like liability under 42 U.S.C. § 1983 in this case for class treatment. The underlying action involves over 5,000 class members who all suffered from the same deprivation of constitutionally guaranteed rights to access to medical care at SRJ under the tenure of PrimeCare.  There are several key legal and factual issues that are common to all class members.  These issues are uniform and capable of being resolved on a class-wide basis.

Here, the predominant issues common to all members of the SRJ inmate patient class are that PrimeCare exercised systemic policies that unconstitutionally deprived SRJ inmates of humane conditions of confinement through deliberate indifference by PrimeCare's failures to meet NCCHC standards, contractual obligations, PrimeCare's own internal standards, and the standard of care for correctional healthcare, and further by perpetuating chronic understaffing, failing to take corrective action in the face of chronic and lengthy overdue task lists, delayed or no access to care, through what was an underfunded, poorly organized and under-trained healthcare delivery system that was not even responsive to the repeatedly pleas of its own medical director that more needed done to deliver adequate healthcare to the patients at SRJ.

The Fourth Circuit already requires giving "Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and . . . promote judicial efficiency." *In re A.H. Robins Co.*, 880 F.2d 709, 740 (4th Cir. 1989), *cert. denied*, *Anderson v. Aetna Casualty & Surety Co.,* 493 U.S. 959, 110 S. Ct. 377, 107 L. Ed. 2d 362, 1989 U.S. LEXIS 5323 (1989).

Nevertheless, the commonality requirements for issue-based Class Certification are less stringent than those of a 23(b)(3) analysis, and the Fourth Circuit aggressively endorses and encourages the use of Civ. R. 23(c)(4). *In re A.H. Robins Co.*, 880 F.2d 709, 740 (4th Cir. 1989).

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

The provision should be utilized "in order to promote the use of the class device and to reduce the range of disputed issues, [and] courts should take full advantage of the provision in subsection (c)(4) permitting class treatment of separate issues in the case." *Id*. Here, more than 5,000 putative class members share every single legal issue and predominantly common liability fact issues that have been raised by Named Plaintiffs.

Plaintiffs seeking certification "must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.*; *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (noting that plaintiff bears the burden of proving it has complied with Rule 23). The Court may consider the merits of class claims "only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgon Inc., v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). As such, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlise & Jacquelin*, 417 U.S. 156, 178 (1974) (internal quotation marks and citation omitted).[2]

The Fourth Circuit requires giving "Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and . . . promote judicial efficiency." *In re A.H. Robins Co.*, 880 F.2d 709, 740 (4th Cir. 1989), *cert. denied*, *Anderson v. Aetna Casualty & Surety Co.,* 493 U.S. 959, 110 S. Ct. 377, 107 L. Ed. 2d 362, 1989 U.S. LEXIS 5323 (1989) (internal quotation marks omitted); *See also Muhammad v. PNC Bank, N.A.*, No. 2:15-cv-16190, 2016 U.S. Dist. LEXIS

---

[2] Nevertheless, "the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." EQT, 764 F.3d at 358 (quoting *Wal-Mart*, 564 U.S. at 350-51). While the "rigorous analysis" may overlap with assessing the merits of the plaintiff's underlying claim," *Wal-Mart*, 564 U.S. at 351, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlise & Jacquelin*, 417 U.S. 156, 178 (1974) (internal quotation marks and citation omitted); *Jonathan R. v. Justice,* 344 F.R.D. 294 (S.D. W. Va. 2023).

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

137404, at *4 (S.D. W. Va. Oct. 4, 2016) (citations and internal quotation marks omitted) ("The Fourth Circuit reads Rule 23 liberally and applies it flexibly to best serve the ends of justice for affected parties and promote judicial efficiencies."). Any question as to whether a case should proceed as a class in a doubtful case should be resolved in favor of allowing class certification. *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968), *cert. denied*, 394 U.S. 928 (1969) ("the interests of justice require that in a doubtful case…any error, if there is to be one, should be committed in favor of allowing the class action.").

There are a number of important benefits served by allowing claims to proceed as a class action. Class certification enables courts to treat common claims together, obviating the need for repeated adjudication of the same issues. *See General Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982). In addition to efficiency, class actions protect the defendants from inconsistent obligations, protect the interest of absentees, provide a convenient and economical means for disposing of similar lawsuits, and facilitate the spreading of litigation costs among numerous litigants with similar claims. *U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 402-03 (1980).

Plaintiffs believe that class certification in this case is appropriate. However, if this Court disagrees, the Fourth Circuit also endorses and encourages the use of Civ. R. 23(c)(4) to decide liability. *In re A.H. Robins Co.*, 880 F.2d 709, 740 (4th Cir. 1989). The provision should be utilized "in order to promote the use of the class device and to reduce the range of disputed issues, [and] courts should take full advantage of the provision in subsection (c)(4) permitting class treatment of separate issues in the case." *Id*.

## ARGUMENT

## I.    PLAINTIFF PRIMECARE PATIENTS CONSITUTE A DEFINABLE AND ASCERTAINABLE CLASS.

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

As a threshold matter, the proposed class here satisfies the implicit Rule 23 requirement of ascertainability.  A class definition is sufficient if it is administratively feasible for the court to determine whether a particular individual is a member of the class, based on objective criteria, without extensive and individualized fact-finding or mini-trials. *See* Charles Alan Wright & Arthur R. Miller, 7A *Federal Practice and Procedure* § 1760 (3d ed. 2020 update) ("The proposed class definition must not depend on subjective criteria or the merits of the case or require an extensive factual inquiry to determine who is a class member."); *See also Manual for Complex Litigation, Fourth* (2004), Section 21.222, at 270 ("The definition must be precise, objective, and presently ascertainable. . . . An identifiable class exists if its members can be ascertained by reference to objective criteria.)

Plaintiffs propose a class definition in the precise, objective manner required:

**Generally, all current and former pretrial detainees and inmates at Southern Regional Jail from September 22, 2020, to present.  As to PrimeCare Defendants, the proposed class period is September 22, 2020, to June 25, 2022**.

[ECF 946, p. 37] [the "Class"]. Additionally, as with the DOCR settlement class, Plaintiffs propose that inmates incarcerated for more than two (2) days during the class period be made part of the class. This readily calculable class consists of five-thousand three-hundred and eight (5,308) members. These definitions appropriately restrict the boundaries of the class to those who have suffered unconstitutional and inhumane conditions alleged. The Class as defined is represented by named Plaintiffs and is appropriate for class certification.

## II.     PLAINTIFF PRIMECARE SRJ PATIENTS MEET THE REQUIREMENTS OF RULE 23(A).

### A.     The Plaintiff Class is So Numerous that Joinder is Impracticable.

The proposed class of more than 5,000 former PrimeCare inmate patients meets Rule 23(a)(1)'s numerosity requirement, as it is "so numerous that joinder of all members is

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

impracticable." Fed. R. Civ. P. 23(a)(1).  A class with "40 or more members raises a presumption of impracticability based on numbers alone." William Rubenstien, *Newberg on Class Actions* § 3:12 (5th ed. June 2020 Update); See also *Fain v. Crouch*, 342 F.R.D. 109, 114 (S.D. W. Va. 2022) ("courts have generally found numerosity present when a class has 40 or more members. *Baxley v. Jividen*, 338 F.R.D. 80, 86 (S.D.W. Va. 2020) (citing *Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984))").

Similarly, the United States District Court for the Southern District of West Virginia found that 6,000 foster care children satisfied the numerosity requirement. *Jonathon R., et al. v. Jim Justice, et al.*, 344 F.R.D. 294 (S.D.W.Va. 2023).

Likewise, here the Class consists of over five-thousand (5,000) former inmates at Southern Regional Jail from September 22, 2020, to June 26, 2022. Ex. 1.  The Class clearly meets the numerosity requirement.  PrimeCare contracted to provide medical services to each of these individuals. Ex. 2.

### B.    The Putative Class Members Share Common Questions of Law and Fact.

To meet the commonality requirement, there must be "questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2).  Even a single common question will suffice to meet the requirement for class certification for the determination of law or fact. See, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). "To satisfy Rule 23(a)(2), plaintiffs must show their claims involve a common question or contention 'of such a nature that it is capable of class-wide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1038 (8th Cir. 2018) (quoting *Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 998 (8th Cir. 2016) (quoting *Wal-Mart*, 564 U.S. at 350)). What matters is "the

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (citations and emphasis omitted).

Furthermore, it is not necessary that all questions be common. *Ebert v. General Mills, Inc*., 823 F.3d 472 (8th Cir. 2016) (reaffirming that "a single common question 'will do' for purposes of Rule 23(a)(2)."); *Dukes*, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do.") (internal quotation marks and alterations omitted).

In civil rights cases, "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members," *Armstrong,* 275 F.3d at 868, even if the challenged policy or practice will affect individual class members in different ways. See, e.g., *Postawko*, 910 F.3d at 1038-1039 (finding commonality satisfied where "all class members share the common question of whether Defendants' policy or custom . . . constitutes deliberate indifference to a serious medical need" and while the "physical symptoms eventually suffered by each class member may vary . . . the question asked by each class member is susceptible to common resolution.") (internal quotation marks and alterations omitted); *Braggs v. Dunn*, 317 F.R.D. 634, 656 (M.D. Ala. 2016) (finding commonality "because being subjected to a substantial risk of serious harm is an actionable constitutional injury, even when a prisoner's physical or mental condition has not yet been detrimentally impacted.").

Not all questions of law or fact must be common to every member of the class, as even a single common question will satisfy the commonality requirement. *Jonathan R.,* 344 F.R.D. 294 at 304. Therefore, factual differences among class members' cases will not preclude certification if the class members share the same legal theory. *See Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 344 (4th Cir. 1998) ("We . . . do not suggest that the commonality and typicality elements

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

of Rule 23 require that members of the class have identical factual and legal claims in all respects.").

In the context of inadequate health care, differences among class members with respect to the specific incidents of inadequate health care or disability discrimination that they have suffered do not undermine commonality. See *Postawko,* 910 F.3d at 1039 (quoting *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) ("although a presently existing risk may ultimately result in different future harm for different inmates . . . every inmate suffers exactly the same constitutional injury when he is exposed to a single . . . policy or practice that creates a substantial risk of serious harm") (emphasis added)); *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (abrogated on other grounds by *Johnson v. California*, 543 U.S. 499, 125 S. Ct. 1141 (2005)) (rejecting defendant's argument that class was improperly certified in prison case alleging several forms of systemic disability discrimination where unique disabilities existed).

Thus, the commonality requirement is satisfied as Plaintiffs alleged that Defendants have systemic policies that unconstitutionally deprive them of humane conditions of confinement, or that Defendants otherwise fail to follow their own policies willfully. The *Rentschler* Court also noted that "[c]lass certification is often proper for cases involving prisoners' rights." *Id.* (citations omitted). With respect to Eighth Amendment claims, courts are required to "consider the totality of the circumstances." *Mitchell v. Rice*, 954 F.2d at 191 (citations omitted). Inmate-patients, similar to the 6,000 foster children that met the class requirements for certification, ". . . in the State's custody have a constitutional right to be free from an undue risk of harm, or, the same thing stated another way, a right to reasonably safe living conditions." *M.D. v. Perry*, 294 F.R.D. 7, 45 (S.D. Tex. 2013); *Doe v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 175 (4th Cir. 2010). "A plaintiff in state custody need not wait until the risk of harm is realized before seeking relief from the courts.

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

*M.D.*, 294 F.R.D. at 34; see also *Baxley v. Jividen*, 338 F.R.D. 80, 85 (S.D. W. Va. 2020) (explaining that the incarcerated plaintiffs, challenging West Virginia Division of Corrections and Rehabilitation's uniform healthcare policies and procedures, did not need to show that every class member was actually injured by the healthcare system, as the risk of harm was a sufficient injury); *Parsons v. Ryan*, 754 F.3d at 676-77 (9th Cir. 2014)(explaining that inmates may challenge unsafe prison conditions before tragedy occurs). Additionally, "[t]he policy or practice that a plaintiff identifies need not be formal or officially-adopted." *M.D.*, 294 F.R.D. at 26

The totality of the circumstances, as demonstrated by Plaintiffs, establish that the named Plaintiffs and other pretrial detainees and inmates suffered harm and/or were subjected to a substantial risk of harm by the institution wide policies of the Defendants. PrimeCare was aware of the overwhelming number of overdue tasks at SRJ though the highest levels in its chain of command. [Vallandingham 143: 21-24]. Furthermore, PrimeCare admits the more inmates that are on the overdue task list, the longer an inmate will have to wait to be seen. [Weber II 123: 10-13]. Accordingly, PrimeCare admits a violation of the *Access to Care* standard inasmuch as it requires timeliness. Ex. 5, p. 3.  By the admissions of its own managerial employees, this failure results in risk of serious injury, illness, or death. [Vallandingham 91: 1-23]; [Bavington 27: 16-22]. Moreover, PrimeCare cannot point to any measures that it underwent to improve access to care or correct these continuing constitutional violations. [Weber II], *supra*.

The understaffing of medical staff at SRJ adversely affected the medical care provided to inmates. Dr. Rashid was concerned about being understaffed as he was the only physician on staff and the mid-level provider position had been vacant for months resulting in a lengthy sick call list and lengthy chronic care clinic. [Rashid 5;9-19], at Ex. 16. The chronic shortage of medical staff negatively impacts the quality of medical care provided at the jail [Rashid 73; 16-23]. Dr. Rashid

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

complained about the understaffing to PrimeCare and Wexford through various verbal discussion and three or four times by written request to the Assistant Regional Manager and/or Regional Manager. [Rashid, 78; 2-22, 85-86; 14-24, 1-24]. The understaffing affected Dr. Rashid's performance, duties, and ability to see patients. [Rashid, 84:4-15]. The understaffing was also interfering with new inmates getting screened in a timely fashion. [Francis, 231-232: 7-24, 1-5], at Ex. 21. Many inmates and their family members complained about the inmates not getting the medications they required. [Francis, 233:4-10].

The discovery completed to date demonstrates that the PrimeCare Defendants through the highest levels of PrimeCare Medical, Inc. were aware of the medical understaffing and excessive, accumulating number of overdue tasks. PrimeCare Defendants individually and collectively failed to alleviate these circumstances in any meaningful way. This policy and custom continued for more than two years of the class period under PrimeCare. These conditions continually subjected the Class to substantial risks of harm.

Commonality is easily proven in this case.

C.    **The Claims of the Named Plaintiff Inmate Patients are Typical**

To meet the typicality requirement, the claims of the named plaintiffs must be "typical of the claims or defenses of the class." Rule 23(a)(3). The typicality requirement is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Armstrong*, 275 F.3d at 868 (citations omitted). The injuries do not have to be identical but must be similar and arise from the same course of conduct. *Id.* The representative parties must "'possess the same interest and suffer the same injury' as the class members." *Jonathan R. v. Justice*, 344 F.R.D. 294 at 314 *citing Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982). Their claims,

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

however, need not "be perfectly identical or perfectly aligned." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James v. City of Dall.*, 254 F.3d 551, 571 (5th Cir. 2001) (quoting 5 James William Moore, et al., *Moore's Federal Practice* § 23.24 (3d ed. 2000)).

As demonstrated in the commonality analysis, Plaintiffs' legal theories are based upon the prevailing medical practices, policies, and conditions at SRJ arising from PrimeCare's deliberate indifference to understaffing, overdue tasks, and an abject failure to take action to avoid these barriers to patient access to care. Plaintiffs allege violations of the Eighth and Fourteenth Amendments on behalf of themselves and other SRJ inmates subjected to PrimeCare's tenure as Responsible Health Authority at SRJ. The Plaintiffs and putative class members were patients of PrimeCare and were each and all subjected to deliberate indifference and inadequate medical care. The typicality requirement is satisfied.

Named Plaintiffs each alleged that medical staffing and overdue tasks increased their risk of harm – an admission supported by PrimeCare's own managerial testimony. Thomas Fleenor, Jr., was incarcerated from February 13, 2021 to July 12, 2021 and March 9, 2022 to July 22, 2022. During his time as a PrimeCare patient, Mr. Fleenor did not receive adequate detox checks and PrimeCare Defendants failed to adhere to proper detox protocol. Further, Mr. Fleenor's medications were not continued upon incarceration. Lisa Mullens, a PrimeCare employee, treated patients including but not limited to class representative Fleenor. Mullens agreed that for someone who requires medications for detox, such as Mr. Fleenor who was detoxing from alcohol and benzos during his incarceration, there is a risk to that inmate patient if they don't get their detox

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

medications. [Mullens, p. 32], at **Exhibit 22**.  Nevertheless, Mr. Fleenor and other similarly situated inmates failed to get detox medications consistently during their incarceration and were chronically subjected to many missed and/or rescheduled detox checks that were never conducted by PrimeCare.

Jonathan Crabtree's 14-day physical was never completed during his entire 101-day incarceration. He also suffered a 97-day delay to be seen by mental health after requesting a mental health sick call during his intake screening. Cassey Bolen (Wriston), one of PrimeCare's employees treating Mr. Crabtree, testified that she believed a 97-day delay in getting someone to see mental health is unacceptable, and could be harmful to someone's mental health for the delay in treatment. [Cassey Wriston , pg. 17-20], at **Exhibit 23**. Further, Cassey Wriston was responsible for rescheduling Mr. Crabtree's 14-day physical that took 101 days to complete. *Id.*

Gary Toler was not provided proper follow up and care for a stroke. He was released from Raleigh General Hospital in August of 2021 with orders for physical therapy, rehabilitation, and a neurology follow-up. PrimeCare Defendants did not send Mr. Toler to rehabilitation or a neurologist until October of 2021 at which time he received only six physical therapy/rehabilitation sessions and was discharged with no improvement.  As a result of PrimeCare Defendants' negligence and deliberate indifference, Mr. Toler suffered increased risk of harm – resulting in serious impediments which could have been avoided through timely physical therapy.  On deposition, Mr. Toler stated that he brought this action as a class representative because he knew that he was not alone in not receiving timely physical therapy and outside facility appointments. [Gary Toler, 46], at **Exhibit 24.**

Sabrina Eagle entered incarceration on June 25, 2022 – the last day of PrimeCare's contract.  Despite indicating that she was under the care of a mental health provider in the

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

community, Ms. Eagle never received appropriate mental status evaluation during her incarceration.  Further, Ms. Eagle's intake was neither reviewed by an RN or within twenty-four hours as required by NCCHC standards, a mechanism that could have detected her need for additional care.

Accordingly, each putative class member represents a class of individuals that did not receive care as a result of PrimeCare Defendants' chronic understaffing and overdue tasks, thereby suffering an increased risk of harm. Their claims exhibit the commonality and typicality elements for class certification, and render class certification as to constitutional violations and medical negligence appropriate.

> **D.    Named Plaintiffs Will Adequately Represent the Class**

> **a. Proposed class representatives**

Federal Rule of Civil Procedure 23(a)(4) requires that representative parties "fairly and adequately protect the interests of the class." "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)); *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 238 (S.D. W. Va. 2005) ("No conflict of interest exists as all members of the settlement class desire to recover damages immediately for injuries allegedly caused by the purchase or ingestion of Serzone.")).

The requirement in Rule 23(a)(4) looks to whether any real and material conflicts of interest exist between the named parties and the class they seek to represent. See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157-58, n. 13 (1982)). As the Fourth Circuit has noted:

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

> For a conflict of interest to defeat the adequacy requirement, that conflict must be fundamental. A conflict is not fundamental when, as here, all class members share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants]. Moreover, a conflict will not defeat the adequacy requirement if it is "merely speculative or hypothetical."

*Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010 (citation and internal quotation marks omitted).

The Named Plaintiffs and the putative class members all share the same interests seeking redress for PrimeCare's deliberate indifference to their right to access to medical care that meets Constitutional standards and the standard of care for correctional healthcare. The inadequacy of the medical care; the medical understaffing: the overdue task lists; and the deliberate indifference to their serious medical needs are all conditions that Plaintiffs endured and for which they seek remedy. These are conditions one would not wish on one's worst enemy and fall below the threshold of minimally acceptable living conditions. Further, the Named Plaintiffs and the putative class members all desire compensation for their injuries. The Named "Plaintiffs do not seek relief for themselves different in quality or character from the relief sought for the class as a whole." See, *Scott v. Clarke*, 61 F. Supp. 3d. 569, 589 (W.D. Va. 2014). These interests are aligned, not conflicting.

The named Plaintiffs have already demonstrated that they "have the ability and commitment to prosecute the action vigorously" See, *Thomas v. La.-Pacific Corp.*, 246 F.R.D. 505, 509 (D.S.C. 2007) in that they have each already answered written discovery requests and given testimony by deposition.[3]

---

[3] Plaintiff Fleenor appears now by the Administrator of his Estate, Brian Stafford, who is a professional Physician's Assistant, well positioned through his education, training and experience to understand the issues which impacted the class which Fleenor represents. Brian Stafford worked many years as a PA in a Wyoming County healthcare practice where he became all too familiar with the risks inherent to unsupervised drug and alcohol detoxification and is well-educated and experienced to understand the issues posed by unmonitored detoxification of SRJ inmates under PrimeCare's tenure.

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

**b. Plaintiffs' Counsel Meet the Requirements of Rule 23(g) and Should Be Appointed Class Counsel.**

Counsel for the named Plaintiffs request to be appointed counsel for the class, pursuant to

Federal Rule of Civil Procedure 23(g). That Rule provides in pertinent part:

(1) Appointing Class Counsel. Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

(A) must consider:

i. the work counsel has done in identifying or investigating potential claims in the action;

ii. counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

iii. counsel's knowledge of the applicable law; and iv. the resources that counsel will commit to representing the class;

(B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class . . . .

(2) Standard for Appointing Class Counsel. When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4) .

(4) Duty of Class Counsel. Class counsel must fairly and adequately represent the interests of the class.

*Fed. R. Civ. P.* 23(g).

Class counsel are fiduciaries to the absent members of the class. See *Rodriguez v. W. Pub.*

*Co.*, 563 F.3d 948, 968 (9th Cir. 2009). The duty of adequate representation requires counsel to

represent the class competently, vigorously, and without conflicts of interest with the class. See

*Amchem Prods.*, 521 U.S. at 626 n. 20. *See also*, *Blenko v. Cabell Huntington Hosp., Inc.*, No.

3:21-0315, 2022 U.S. Dist. LEXIS 142637, * 14 (S.D. W. Va. Aug. 10, 2022) (citation and internal

quotation marks omitted ("This analysis takes into consideration (1) whether there is conflict

between the representatives and class members, and (2) whether the representatives will

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

vigorously prosecute the matter on behalf of the class."). The named plaintiffs' attorneys must be "competent, dedicated, qualified, and experienced enough to be able to conduct the litigation" in a vigorous manner. *In re Serzone*, 231 F.R.D. at 238 (citation omitted).

Class counsel will more than adequately represent the interests of the class. Plaintiffs' counsel has extensive experience handling class action litigation, mass tort litigation, and other complex civil litigation matters. *See* Fed. R. Civ. P. 23(g)(1)(A)(ii). Class Counsel's experience in handling class action and other complex civil litigation matters have been previously submitted before this Court and referenced at ECF 849, specifically 849-5.

Plaintiffs' counsel has been on the front lines of identifying and investigating potential claims in this class action litigation. *See* Fed. R. Civ. P. 23(g)(1)(A)(i). Plaintiffs' counsel spent *hundreds* of hours investigating this case before the original Complaint was filed and continue to vigorously litigate and investigate this matter. Since early 2022, Plaintiffs have engaged in discovery and depositions resulting in countless numbers of documents and hours of testimony, all of which continue to drive this matter toward resolution or trial.

Counsel have demonstrated they have the requisite qualifications to prosecute this class action. Based on this showing, and the reasons stated above, counsel request this Court appoint them as class counsel pursuant to Federal Rule of Civil Procedure 23(g).

## II. The Proposed Class Meets the Requirements for Certification under Federal Rule of Civil Procedure 23(b)(3).

Under Rule 23(b)(3), an action that satisfies the threshold prerequisites for certification may be maintained as a class action if the court finds that: (1) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. A class action is the superior method of resolving large-scale claims if it will

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

achieve economies of time, effort, and expenses, as well as promote uniformity of decision as to persons similarly situated. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997). Rule 23(b)(3) further provides that:

> The matters pertinent to these findings include:
>
> > (A)   the class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> >
> > (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> >
> > (D) the likely difficulties in managing a class action.

### A.    Predominance.

The Rule 23(b)(3) predominance requirement [. . . ] tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *Gray v. Hearst Communs., Inc.,* 444 F. App'x 698, 701 (4th Cir. 2011), quoting *Amchem Prods.*, 521 U.S. at 623 (internal quotation marks omitted). Common questions predominate over individual when economies of time, effort, and expense, and a uniformity of decision as to persons similarly situated exist. *Id*. When "claims arise out of a common course of conduct" by the Defendants and "the only significant individual issues involve damages, which rarely present predominance problems," certification is appropriate. *In re Capital One Consumer Data Sec. Breach Litig.*, No. 1:19-md-2915 (AJT/JFA), 2022 U.S. Dist. LEXIS 234943, at *16-17 (E.D. Va. Sep. 13, 2022). The Fourth Circuit has "embraced the view that the mass tort action for damages may be appropriate for class action, either partially or in whole." *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 424 (4th Cir. 2003) (citation and internal quotation marks omitted).

### B.    Superiority.

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

In determining whether a class action is superior,

the court initially must consider what other procedures, if any, exist for disposing of the dispute before it. The court must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court.

*Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 274 (4th Cir. 2010) quoting 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1779 (3d ed. 2005).

The *Stillmock* Court concluded that the superiority requirement was met when no indication existed that the "class members would have a strong interest in individual litigation." *Id.* at 275. The Court reasoned that "certification promotes consistency of results giving [the defendant] the benefit of finality and repose." *Id.* (citing *Gunnells,* 348 F.3d at 429). Defendants have each expressed concerns in this matter regarding litigation at other West Virginia facilities and by other inmates – certainly, Defendants would have much graver concerns if each SRJ inmate were forced to bring their claims individually.

Additionally, where the "allegations establish that a large group of individuals endured the same event[s] and that their claims center on essentially the same constitutional violation," resolution by a means other than a class action "has little reason." *Fobbs v. Hunt*, No. 3:21cv26 (DJN), 2021 U.S. Dist. LEXIS 87094, at *54-55 (E.D. Va. May 5, 2021). This is especially true in the case of inmates who are incarcerated "and would have substantial difficulties bringing individual actions on their own." *Id*. A class action is the most efficient device when the predominant issues "will be the existence and constitutionality of the defendants' alleged policies" since "the legality of the policies can be determined in one proceeding." *Parish v. Sheriff of Cook Cty*., No. 07 4369, 2008 U.S. Dist. LEXIS 87140, at * 15 (N.D. Ill. Oct. 24, 2008).

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

The Plaintiffs in the case *sub judice* allege that Defendants had and continue to have practices and polices that deprive Plaintiffs and the putative class members of their constitutional rights. The inmates and those formerly incarcerated would have little ability to pursue individual claims due to their confinement and/or limited resources. Indeed, the Court has recognized that Plaintiffs' counsel have undertaken representation of a class of Plaintiffs that may have been undesirable clients for many attorneys. Moreover, even the presence of individual damage issues does not preclude certification as "Rule 23 [. . .] provides enough flexibility to deal with that while still certifying a class." *Parish* at * 16.

## III. The Proposed Classes Meet Requirements for One or More Issue-Based Classes under Federal Rule of Civil Procedure 23(c)(4).

Alternatively, if this Court should find that class certification is not appropriate, then Plaintiffs proposed defining the following issue-based classes:

### Issue Class 1

Did PrimeCare Defendants violate the Eighth and Fourteenth Amendment Rights of the Class by being deliberately indifferent to their serious medical needs through systemic and gross deficiencies in staffing, facilities, equipment, and/or procedures?

### Issue Class 2

Did PrimeCare Defendants breach the standard of care for correctional medical providers?

### Issue Class 3

Did the Defendants conspire with one another to violate the class members' constitutional Eighth and Fourteenth Amendment rights?

Federal Rule of Civil Procedure 23(c)(4) permits a class action to be maintained with respect to particular issues.

Consistent with the text of Rule 23(c)(4), one commentator recently observed as follows: 'Although traditional claims brought under Rule 23(b) involve "an all-or-nothing decision to aggregate individual cases," Federal Rule of Civil Procedure 23(c)(4) allows litigants to resolve <u>specific issues</u> in a case on a class-wide basis.' Joseph Seiner, <u>The Issue Class</u>, 56 B.C. L. Rev. 121, 132 (2015) (quoting Jon Romberg, <u>Half A Loaf Is Predominant</u>

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

and Superior to None: Class Certification of Particular Issues Under Rule 23(c)(4)(A), 2002 Utah L. Rev. 249, 251 n.96) (emphasis added).

*Good v. Am. Water Works Co*., 310 F.R.D. 274, 295-96 (S.D. W. Va. 2015).

The separation of issues for decision is not unique to class actions. Federal Rule of Civil Procedure 42(a)(1) provides that "[i]f actions before the court involve a common question of law or fact, the court may join for hearing or trial any or all matters at issue in the action."

In the Fourth Circuit, "if the action includes multiple claims, one or more of which might qualify as a certifiable class claim, the court may separate such claims from other claims in the action and certify them under the provisions of subsection (c)(4)." *In re A.H. Robins Co.*, 880 F.2d 709, 728 (4th Cir. 1989) (citing 1 *Newberg on Class Actions*, § 4.20, pp. 310-1 (2d ed. 1985)). This procedure achieves economies of trial. *Id*. at 713. Each subclass on the separate issues under Rule 23(c)(4) are required to independently meet the requirements of Rule 23(a) and one of the categories in Rule 23(b). *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir. 1993).

Plaintiffs propose, if this Court determines that class certification is not appropriate for the entire action, that this Court certify one or more issue classes as previously delineated. Plaintiffs propose an issue class to determine whether the convicted inmates and pretrial detainees were subject to cruel and unusual punishment by virtue of the practices, policies, and actions of PrimeCare Defendants. A separate issue class is proposed to determine that issue with respect to PrimeCare Defendants' breach of the standard of care. A third and final issue class is proposed to ascertain whether medical defendants conspired with one another or with the former defendants to commit these violations. These three classes would allow this Court to separately address the differing standards under these counts of the Third Amended Complaint.

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

Plaintiffs delineated the facts supporting the conclusion that their motion for class certification should be granted. Those same facts would be applicable to each issue class proposed by the Plaintiffs, and, in fact, provide the necessary prerequisite findings to support each of the proposed issue classes.

All Plaintiffs were or are housed in one correctional facility and limited to PrimeCare Defendants as their sole method of receiving medical care. The issues created by understaffing and excessive overdue tasks are experienced by each of them. PrimeCare Defendants' actions toward Plaintiffs are the same. Adequate representation by the class representative exists as one cannot imagine any inmate desiring to be subjected to deliberately indifferent medical care which breaches the standard of care for correctional healthcare. Class counsel has been established as adequate. Resolution of any of the proposed issues will apply to all Plaintiffs and putative class members. The issues predominate each class and a single litigation is superior to any other form, including the filing of numerous separate lawsuits. Thus, certification would drive the economies of trial.

## **CONCLUSION**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court GRANT *Plaintiffs' Motion for Class Certification as to PrimeCare Defendants* and enter an order certifying that this case may proceed against PrimeCare Defendants as a class action as set forth herein.

**PLAINTIFFS**
**By Counsel,**

*/s/ Stephen P. New*
Stephen P. New (WVSB No. 7756)
Emilee B. Wooldridge (WVSB 14310)
Stephen New & Associates
430 Harper Park Drive
Beckley, West Virginia 25801
Ph: (304) 250-6017

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

Fax: (304) 250-6012
steve@newtaylorlaw.com

Amanda J. Taylor (WVSB No. 11635)
Taylor, Hinkle & Taylor
115 ½ S. Kanawha St.
Beckley, WV 25801
304.894.8733 (P)
681.245.6236 (F)
amanda@thtwv.com


Timothy Lupardus (WVSB No. 6252)
The Lupardus Law Office
275 Bearhole Road
Pineville, West Virginia 24874
(304) 732-0250
office@luparduslaw.com

Zachary Whitten (WVSB No. 13709)
The Whitten Law Office
P.O. Box 753
Pineville, West Virginia 24874
zwhittenlaw@gmail.com

Robert Dunlap (WVSB No. 10012)
Robert Dunlap & Associates
208 Main Street
Beckley, West Virginia 25801
(304) 255-4762
robertdunlapesq@gmail.com

STRICKEN PURSUANT TO THE #1196 ORDER ENTERED 12/3/2024

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**BECKLEY DIVISION**

**BRYAN STAFFORD, Executor of the**
**Estate of THOMAS FLEENOR, JR., et al.,**

        **Plaintiffs,**

**v.**                                 **Civil Action No. 5:22-cv-00405**

**PRIMECARE MEDICAL, INC., et al.,**

        **Defendants.**

### **CERTIFICATE OF SERVICE**

Undersigned counsel for Plaintiffs does hereby certify that the foregoing *Memorandum of Law in Support of Plaintiffs' Motion for Class Certification as to PrimeCare Defendants* was filed with the clerk on <u>November 22, 2024</u> via the Court's CM-ECF Filing System which will provide electronic notification to all counsel of record.

                                   /s/ Stephen P. New
                                   Stephen New (WVSB#7756)