# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### BECKLEY DIVISION

**BRYAN STAFFORD, Executor of the
Estate of THOMAS FLEENOR, JR., et al.,**

         **Plaintiffs,**

**v.**                             **Civil Action No. 5:22-cv-00405**

**PRIMECARE MEDICAL, INC., et al.,**

         **Defendants.**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AS TO WEXFORD DEFENDANTS

COME NOW Plaintiffs, by undersigned counsel, and in further support of *Plaintiffs' Motion for Class Certification as to Wexford Defendants* state as follows:

### FACTUAL AND PROCEDURAL HISTORY

Approximately six-thousand individuals are incarcerated annually at Southern Regional Jail ["SRJ"]. See *WV Division of Corrections and Rehabilitation FY 2023 Annual Report*, at **Exhibit 1**. Statistics provided by the West Virginia Division of Corrections and Rehabilitation [DOCR] at the time of its settlement in this action establish that Wexford Defendants were responsible for providing access to care for over five thousand (5,000) individuals at SRJ. Each of these individuals had, and in Wexford's case continue to have, a constitutional right to access adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976). A correctional medical provider that is deliberately indifferent to the serious medical needs of the inmate and detainee population through systemic and gross deficiencies in staffing, facilities, equipment, or procedures violates the constitutional rights of those inmates and detainees. *Id.*;

*Baxley v. Jividen*, 508 F. Supp. 3d 28, 55 (S.D. W. Va. 2020) (quoting, *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

Utilizing these metrics, Wexford was deliberately indifferent and medically negligent respecting the Class. Specifically, the *Third Amended Complaint* [TAC] avers:

> Wexford exercised a persistent and widespread custom of remaining understaffed, causing and permitting chronic and excessive overdue tasks and sick calls to accumulate; causing and permitting excessive delays of medical care; causing and permitting systemic failures to adhere to NHCCHC standards, Wexford policies and procedures; WVDCR policies, and the standard of care; and refusing to send patients for outside care, so as to constitute an actionable policy or custom that deprived Plaintiffs […] and others.

[ECF 946, ¶ 486].

Wexford contracted with the West Virginia Department of Corrections and Rehabilitation [DOCR] to provide medical care at SRJ during the class period from June 26, 2022, to present. See *Contract*, at **Exhibit 2**. Wexford's obligations and duties under the contract were in accordance with the Request for Quotation issued by DOCR. *Id.*

In addition to the Contract, Wexford was bound by the National Commission on Correctional Health Care ["NCCHC"] Standards for Health Services in Jails; Wexford's own policies (which mirror NCCHC standards); and the standard of care for correctional facilities. See *NCCHC Standards*, at **Exhibit 3**. Wexford failed in every regard to meet its obligations under the Contract, NCCHC Standards, Wexford Standards, and the standard of care to provide adequate healthcare services to the inmates at SRJ. Wexford's deliberate indifference to the serious medical needs of the class and breach of the standard of care for correctional healthcare is abundantly clear.

The NCCHC defines *Access to Care* to mean that "in a timely manner, a patient is seen by a qualified healthcare professional, is rendered a clinical judgment, and receives the care that is ordered." Ex. 3, p. 3. The NCCHC deems *Access to Care* an "essential" standard. As part of this

standard, the NCCHC requires that barriers to access to care be avoided. <u>Ex. 3</u>, p. 3. Unreasonable barriers including "[h]aving an understaffed, underfunded, or poorly organized system with the result that it is not able to provide appropriate and timely access to care." *Id*.

The NCCHC designates its *Staffing* standard "important" and requires that the responsible health authority (Wexford, in this instance) "ensure sufficient numbers and types of health staff to care for the inmate population." <u>Ex. 3,</u> p. 60. Sufficiency of staffing is measured by timely and thorough physician encounters and the length of the backlog. *Id*.

Wexford has exhibited large-scale and continuing patterns of failure to provide access to care and adequate staffing to their patient population at SRJ which satisfies the Contract, NCCHC standards, and the standard of care. See *Mathis Report*, at **Exhibit 4**. Wexford took over the contract for medical care at Southern Regional Jail from PrimeCare, inheriting PrimeCare's significant list of overdue tasks. Melissa Jeffery, Wexford's current Assistant Regional Manager and PrimeCare's former Assistant Regional Manager, testified that Wexford received overdue tasks right before the transition, and stated that the nurse practitioner quit, which caused the "chronic care list to add up and some of the 14-day physicals." [Jeffery 47], at **Exhibit 5**. Despite transitioning from PrimeCare's Assistant Regional Manager to Wexford's Assistant Regional Manager, Jeffery could not recall the number of overdue tasks that PrimeCare handed off to Wexford on June 25, 2022. [Jeffery, 111]. The overdue tasks became Wexford's mess to clean up, including 412 physician and mid-level sick calls. [Jeffery 112; 186]. Wexford's overdue tasks continue to be significant. See, *infra*. The overdue tasks, in combination with Wexford's chronic understaffing, reveal that inmates at SRJ have been and continue to be deprived of adequate healthcare. Jeffery agreed that if inmates don't have access to care they run a risk of serious injury, illness or even death. [Jeffery, 156]. Wexford produced 138 chronic care overdue tasks in

September 2022, some tasks still open from January 2022. **Exhibit 6.** Jeffery testified that the length of backlogs violated the NCCHC staffing plan. [Jeffery, 180].

Wexford inherited the PrimeCare overdue 14-day physicals tasks and did no better as reflected in their own data. See *Wexford Overdue Tasks*, at **Exhibit 7**.



The attached chart sets forth Wexford's medical tasks at SRJ from July 2022 to January 2023. Ex. 7. From July 2022 to January 2023, 19 individuals were not medically cleared upon arrival; 20 sick calls were not triaged within 24 hours with 11 not seen within 72 hours; and 96 labs were overdue in December 2022. Id. Only two EKGs were conducted from July 2022 to January 2023.

Moreover, Wexford had 93 overdue tasks for chronic care in 2023. Ex. 7. Additionally, Wexford had 1,583 labs overdue in 2023; 736 overdue tasks related to dental in 2023; 180 nurse sick calls not seen within 72 hours in 2023; and 59 were not medically clear upon arrival. Id. Additionally, 198 outside medical appointments were scheduled, and only 100 completed. Id. Wexford's chart shows 391 inmate grievances received by the Commissioner's office regarding medical care, without giving statistics of the outcome of the grievance. Id. There were 401 health service requests not triaged within 24 hours in 2023. Id. From May to December 2023, 477 health assessments were not completed within a 14-day window. Id. These numbers of individuals are significant, the medical conditions serious, and hundreds, if not thousands, of patients at SRJ have been neglected by Defendant Wexford. Numerosity and commonality are easily established by Wexford's own internal tracking documents. Importantly, Dr. Ayne Amjad[1], the DOCR Medical

---

[1] These opinions as to Wexford's breach of the standard of care and NCCHC standards and the resulting increased risk of harm to patients come from a neutral physician, not hired by either party. Dr. Amjad served as the WV DOCR medical director in charge in nurse auditors to carry out the State's *Baxley* agreement obligations and oversee Wexford's care.

Director, opined that Wexford's overdue tasks violate their contract, NCCHC standards, and the standard of care, creating increased risk of harm. See, Amjad Deposition, pp 33,34, 51-52 at **Exhibit 8.** Dr. Amjad further opined that the longer Wexford's overdue task lists exists, the worse the risk harm becomes. Despite the inmate population dropping from 715 in 2022 to 468 as of the date of this statement, Wexford still cannot manage to catch up on its chronic overdue tasks.

Wexford obstructed inmates' access to adequate medical care by failing to address issues with the numbers of sick calls and grievances and despite having knowledge of the repeated issues of inmates being denied access to medical care.

Wexford has also chronically been understaffed with medical personnel. Currently, the State of West Virginia is deducting millions of dollars from Wexford's contract payments for continued chronic understaffing – an amount estimated to reach $5,000,000 in staffing shortages and contract noncompliance through the end of 2024. See *Overage Email*, at **Exhibit 9**. By way of example, Nurse Practitioner was vacant from June 2022 until May 2023. According to Dr. Humayun Rashid, PrimeCare and Wexford Director of Medical Services, unreasonable barriers exist at SRJ to inmates' access to health services due to overpopulation at SRJ and the chronic understaffing of medical staff. [Rashid 62;21-23; 63-64; 16-24; 1-8; 73; 16-23], at **Exhibit 10**.

Dr. Rashid was the only physician at SRJ, and worked only roughly twelve hours per week. [Rashid 44; 4-15]. During his hours at SRJ, Dr. Rashid goes through his list of "sick call" patients, but most of the time does not get through the list and inmate patients get moved over as an "overdue task." [Rashid 44-45; 20-24; 1-16]. Dr. Rashid testified about the negative impacts on the quality of medical care due to the chronic shortage of medical staff. [Rashid 73; 16-23]. As with PrimeCare, Dr. Rashid expressed his concerns about understaffing to Wexford management verbally and in writing. [Rashid 85; 13-19]. Dr. Rashid also expressed his concerns to Defendant

Wexford about not having a mid-level provider on staff to alleviate some of his concerns. [Rashid 191; 8-17]. In October of 2022, Dr. Rashid emailed his concerns to Mary Stone, Wexford Director of Operations:

> Hi, Ms. Stone,
>
> As the on-site medical director at SRJ, I want to bring up some of my concerns.
>
> I work at the facility on Monday and Wednesday for approximately (6) hours each day. As you may be aware, the facility has not had a mid-level provider for the past (4-1/2) months. This has resulted in length DSCall list and list of inmates in CC. As it is,
>
> I am unable to see all inmates during my time at the facility, and I have to prioritize the inmates that need to be evaluated earlier. Added to the sickcall list are inmates that the on-call providers have requested to be evaluated. There are BP, accuchecks
>
> Evaluations, wounds that require evaluation during dressing changes, review of labs/medical records, collegial meetings, employment physical examinations, urgent evaluations (chest pain, trauma from altercations etc.,) other urgent and sometimes
>
> Emergent situations that need my attention. With growing sick-call list, there are more inmate grievances, that may lead to claims of **"Deliberate Indifference, Inadequate Care, or Access to Medical Care."**
>
> I have expressed my concerns in earlier communications to appropriate administrative Wexford-staff, and I feel that it is crucial that I bring this to your attention. This scenario can easily result in medical errors, inadvertent omissions in medical care, and burn-out of medical/nursing staff.
>
> I do not believe that I can provide adequate medical care/attention to inmates in these circumstances. I request your attention and input regarding this matter.

See *Rashid Email 1* at **Exhibit 11**. (**emphasis** added). Ms. Stone responded by acknowledging that medical was short staffed, making it hard to get work done, and advised that she knew medical staff was doing "the best they can." Id. No further response or solution was provided. Id. Indeed, the issue was not reapproached until Dr. Rashid forwarded his email again in May of 2023 asking about a compensation adjustment to account for his ongoing concerns. See *Rashid Email 2*, at

**Exhibit 12**.  At that juncture – Ms. Stone forwarded the email and, for the first time, inquired about filling the NP/PA position. Id. No further action was taken by Wexford or its corporate higher-ups.

Melissa Jeffery further stated that there have been staffing issues for Wexford since it got the contract, notably, having agency take over as Wexford has never been able to fill positions, such as nurse practitioner. [Jeffery, 45-46].  Helen Perkins, current Wexford HSA and former PrimeCare HSA, testified that Wexford uses agencies to fill staffing vacancies. [Perkins 104], at **Exhibit 13**.  Perkins testified in August 2023, as Wexford's corporate representative, Wexford did not have a mid-level provider, and eventually Wexford filled this position with a telehealth provider. [Perkins, 104-105]. In terms of improvement for overdue tasks now that this position is filled, Perkins stated, "We are trying and it depends on the day as to what you see as to how many overdue there is, honestly." [Perkins, 107]. Perkins further agreed that relative to the midlevel tasks and chronic care, urgent, emergent, non-emergent, and physician tasks, tasks fell behind when there was no nurse practitioner. [Perkins, 108]. On August 3, 2022, Perkins sent in an email "We are still in dire need of nurses for our facility," and further clarified she was referring to Wexford staff. [Perkins 141]. Further, related to staffing, Perkins said on August 30, 2022, "[w]e've been in a pickle so many times and for so long you might as well call us dill, lol." [Perkins, 143]. When discussing recruiting, Perkins stated, "We are desperate." [Perkins, 145]. Both Perkins and Jeffery agreed that a correctional healthcare entity like Wexford is obligated to ensure that sufficient numbers of qualified health personnel of various types are available at that healthcare site and that those numbers must be sufficient for adequate healthcare services to all inmate patients consistent with the standards of healthcare. [Perkins, 21]; [Jeffery 78]. Wexford's documents speak for themselves. Wexford's chart shows the staffing shortages in the year of 2023 with respect to RNs,

LPNs, mid-level providers, and other medical professionals. Ex. 9. The staffing shortages are also reflected in Wexford's overdue task list, further detailed above.

Further, Plaintiffs have reviewed a sample of medical records provided by Wexford. Of one hundred and forty-eight (148) randomly selected Wexford patients, **zero** that were incarcerated for over 14 days had a timely 14-day physical. Of the inmates with identifiable "MD Sick Call," none were seen timely by a physician. Only two patients located were seen by a physician, with many being seen by an LPN practicing outside the scope of practice. Likewise, no patient with dental sick call was seen timely by a dentist, with many appointments being closed out untimely by either an RN or LPN practicing outside their permissible scope of practice.

This is not surprising given that Helen Perkins (the HSA for a portion of PrimeCare's tenure and all of Wexford's tenure at SRJ) testified that she does not know NCCHC standards, has no recollection of training on NCCHC standards from either PrimeCare or Wexford, cannot recall ever reading the NCCHC standards, and does not recall whether she possesses even a copy of NCCHC standards or the Wexford contract outlining the services for which she is supervisory on site. [Perkin's Depo, III, pp106-108], at **Exhibit 14**.

### *LEGAL STANDARDS*

#### A. *Constitutional Violations*

Plaintiffs' claims are based on violations of the Eighth and Fourteenth Amendments to the United States Constitution.

#### 1. Cruel and Unusual Punishment under the Eighth Amendment and Violation of the Fourteenth Amendment's Due Process Clause

The government is required to provide medical care to inmates. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976). "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id*. "The infliction of

such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation." *Id*. at 103, 290. "[D]eliberate indifference to serious medical needs of prisoners" is prohibited by the Eighth Amendment. *Id*. at 104, 291. Furthermore, "a pretrial detainee makes out a due process violation if he shows 'deliberate indifference to serious medical needs.'" *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988) (citations omitted). The Fourth Circuit applies different standards for assessing violations of the Eighth and Fourteenth Amendments. Eighth Amendment violations require proof of both an objective standard and a subjective standard, while a Fourteenth Amendment requires proof based upon an objective standard. See, *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023).

In a challenge to the policies of an institution in a class action "'[d]eliberate indifference to inmates' health needs may be shown, for example, by proving that there are "such systemic and gross deficiencies in staffing, facilities, equipment or procedures that the inmate population is effectively denied access to adequate medical care."'" *Baxley v. Jividen*, 508 F. Supp. 3d 28, 55 (S.D. W. Va. 2020) (quoting, *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

A two-prong test is used to determine whether an Eighth Amendment violation exists. The two-prong test consists of a subjective and objective requirement. *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016). "First, the inmate must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury, or a substantial risk thereof." *Id*. (citation and internal quotation marks omitted); See also, *Thompson v. Commonwealth*, 878 F.3d 89, 107 (4th Cir. 2017) (citation and internal quotation marks omitted) (showing exposure to a substantial risk of serious harm required to prove deliberate indifference). "Second, an inmate must show that the prison official had a sufficiently culpable state of mind, which, in this context, consists of

deliberate indifference to inmate health or safety." *Id*. at 127-28 (citations and internal quotation marks omitted); See also, *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citation and internal quotation marks omitted) (existence of a substantial risk of serious harm must be shown).

In establishing the objective prong "[i]n inadequate medical care cases, the Fourth Circuit has 'require[d] plaintiffs to demonstrate officials' deliberate indifference to a "serious" medical need that has either "been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."'" *Baxley v. Jividen*, 508 F. Supp. 3d at 55 (quoting, *Scinto v. Stansberry,* 841 F.3d 219, 225 (4th Cir. 2016)(quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)).

To establish the subjective prong in an action based upon the Eighth Amendment, "'a prison official [must] actually know of and disregard an objectively serious condition, medical need, or risk of harm.'" *Baxley v. Jividen*, 508 F. Supp. 3d at 56 (quoting, *De'Lonta v. Angelone,* 330 F.3d 630, 634 (4th Cir. 2003)). Deliberate indifference equates to "recklessness of the subjective type used in criminal law." *Id*. (quoting, *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995)).

To establish deliberate indifference based upon the Fourteenth Amendment,

> a pretrial detainee must [prove] that (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023).

As Wexford is a private corporation, Plaintiffs "must also show that the deprivation of rights resulted from application of an official policy or custom." *Taylor v. Wexford Health Sources, Inc.*, No. 2:23-cv-00475, 2024 U.S. Dist. LEXIS 105363, at *32-33 (S.D. W. Va. June 13, 2024)

(citing, *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999) (applying the "principles of § 1983 municipal liability articulated in *Monell* and its progeny" to private corporations)). A policy or custom can exist:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citation and internal quotation marks omitted).

Evidence of understaffing and the failure to take steps to correct the understaffing and resulting substantial risks of harm also can give rise to liability. See, *Stephens v. S.C. Dep't of Corr.*, Civil Action No. 4:17-03482-JFA-MGB, 2020 U.S. Dist. LEXIS 253406, at *53 (D.S.C. July 22, 2020) (the risks included contraband and assaults).

Supervisory liability is also alleged. The necessary elements of supervisory liability are:

> 1) The supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; 2) The supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices;' and 3) There was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injuries suffered by the plaintiff.

*Mabry v. Jividen*, No. 2-19-cv-00424, 2022 U.S. Dist. LEXIS 105114, **12-13 (S.D. W. Va. May 3, 2022) (quoting, *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).  Generally, a pervasive and unreasonable risk of harm is established when the evidence demonstrates that "the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (citation and internal quotation marks omitted). Secondly, deliberate indifference is shown by evidence of "a supervisor's continued inaction in the

face of documented widespread abuses." *Id*. (citation and internal quotation marks omitted). Lastly, causation is proven either directly, "where the policy commands the injury of which the plaintiff complains" or, alternatively, "may be supplied by the tort principle that holds a person liable for the natural consequences of his actions." *Id*. at 226-227 (citation and internal quotation marks omitted).

In contrast, although the case law setting forth the standard for a deliberate indifference claim for a pretrial detainee incorporates standards arising from Eighth Amendment claims, complaints regarding the conditions of a pretrial detainee's confinement are not measured against the standards of the Eighth Amendment. As the Supreme Court has found, the state is without the "power to punish with which the Eighth Amendment is concerned [unless] . . . it [first] secured a formal adjudication of guilt in accordance with due process of law." *Lyons v. Powell*, 838 F.2d 28, 29 (1st Cir. 1988) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671-672 (1977)). Rather, the Due Process Clause of the Fourteenth Amendment provides the appropriate standards for the conditions of pretrial confinement. *Id*. (citation omitted).

Under this standard, conditions that amount to punishment of the detainee deprive the detainee of his liberty without due process of law. *Lyons*, 838 F.2d at 29 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). To determine whether a condition amounts to a punishment, [a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. *Id*. (citation omitted). Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. *Id*. at 30 (quoting *Bell*, 441 U.S. at 538). Accordingly, "[i]f a

restriction appears to be unrelated to a legitimate governmental objective, and is, for example, arbitrary or purposeless, then a court may infer that it is intended to be punishment." *Id*. at 29 (citing *Bell*, 441 U.S. at 539).

Invariably, if a violation of the Eighth Amendment is proven in correctional facilities that houses both convicted inmates and pretrial detainee, a violation of the Fourteenth Amendment will also have been proven for the pretrial detainees. A 2015 United States Supreme Court case "held that the plaintiff detainee did not have to show the defendant officer acted with subjective intent." *Baxley v. Jividen*, 508 F. Supp. 3d 28, 54 (S.D. W. Va. 2020) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 391, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015). The *Baxley* Court noted that *Bell* was recognized by the United States Supreme Court as standing for "the proposition that pretrial detainees can prevail on Due Process claims by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.*

## LEGAL STANDARD FOR CLASS CERTIFICATION REVIEW

Rule 23(a) of the Federal Rules of Civil Procedure establishes four class certification requirements:

(1) a class so numerous that joinder of all members is impracticable (the "numerosity" requirement);

(2) questions of law or fact common to the class (the "commonality" requirement);

(3) the representative parties' claims and defenses are typical of the class's claims and defenses (the "typicality" requirement); and

(4) the representative parties that will fairly and adequately protect the class's interests (the "adequacy of representation" requirement).

Fed. R. Civ. P., 23(a); *Monroe v. City of Charlottesville*, 579 F.3d 380, 384 (4th Cir. 2009).

In addition to these four requirements, a plaintiff must also demonstrate that the proposed class action fits into one of three forms permitted by Rule 23(b). *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 163 (1974).

## LEGAL STANDARD FOR ISSUE-BASED CLASS CERTIFICATION

In addition to satisfying the requirements of Federal Rule of Civil Procedure 23(a) and (b), Plaintiff respectfully requests that this Court certify the proposed class under Rule 23(c)(4) with respect to specific issues in the case. Rule 23(c)(4) permits the Court to certify a class action on particular issues even if other aspects of the case do not satisfy all of the typical prerequisites for class certification. By certifying certain issues like liability for class treatment, the Court can streamline the litigation and resolve common questions of law or fact on a class-wide basis, thereby enhancing judicial efficiency and promoting the fair and efficient resolution of the underlying claims.

### A. Legal Standard for Certification of an Issues-Based Class.

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." The Rule allows the Court to sever particular issues from the broader case and certify them for class-wide treatment, even where the class may not meet all of the requirements for certification as to the entire action. Courts have wide discretion to exercise this authority, particularly when the class action presents common legal or factual questions that are capable of resolution on a class-wide basis, and doing so will contribute to the fair and efficient resolution of the claims.

Rule 23(c)(4) is designed to address situations in which class-wide adjudication of certain issues can resolve significant aspects of the case, even if the case as a whole may not lend itself to

class-wide treatment. This Rule promotes efficiency and judicial economy, prevents the risk of inconsistent outcomes, and allows parties to avoid the burden of trying individual issues that could be resolved through class-wide determination.

### B. Application of Rule 23(c)(4) to the Current Case

Plaintiffs respectfully submit that the Court should exercise its discretion under Rule 23(c)(4) to certify specific issues like liability under 42 U.S.C. § 1983 in this case for class treatment. The underlying action already involves over 5,000 members of a growing class who have suffered from the same deprivation of constitutionally guaranteed rights to access to medical care at SRJ under the tenure of Wexford.  There are several key legal and factual issues that are common to all class members.  These issues are uniform and capable of being resolved on a class-wide basis.

Here, the predominant issues common to all members of the SRJ inmate patient class are that Wexford exercised policies that unconstitutionally deprived SRJ inmates of humane conditions of confinement through deliberate indifference to their patients' serious medical needs. Wexford exercised this deliberate indifference through its own prevalent and ongoing failures to meet NCCHC standards, contractual obligations, and the standard of care for correctional healthcare, as reflected in Nurse Auditor Reports and confirmed by DOCR Medical Director, Ayne Amjad, M.D. [Amjad, pp. 33-34, 45-47] at Ex.8. Wexford further exercised this deliberate indifference by perpetuating chronic understaffing[2], maintaining chronic and lengthy overdue task lists[3], and providing delayed or no access to care, through an underfunded, poorly organized and

---

[2] Since Dr. Amjad became DOCR Medical Director, Wexford has never provided full medical staffing to patients at SRJ. [Amjad pg. 29] at Ex. 8.
[3] In breach of contract, NCCHC standards, and the standard of care.  [Amjad, pp. 33-34] at Ex. 8.

under-trained healthcare delivery system that was not even responsive to its' own Director of Medicine's repeated requests for additional providers.[4]

The Fourth Circuit already requires giving "Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and . . . promote judicial efficiency." *In re A.H. Robins Co.*, 880 F.2d 709, 740 (4th Cir. 1989), *cert. denied*, *Anderson v. Aetna Casualty & Surety Co.,* 493 U.S. 959, 110 S. Ct. 377, 107 L. Ed. 2d 362, 1989 U.S. LEXIS 5323 (1989). Nevertheless, the commonality requirements for issue-based Class Certification are less stringent than those of a 23(b)(3) analysis, and the Fourth Circuit aggressively endorses and encourages the use of Civ. R. 23(c)(4). *In re A.H. Robins Co.*, 880 F.2d 709, 740 (4th Cir. 1989). The provision should be utilized "in order to promote the use of the class device and to reduce the range of disputed issues, [and] courts should take full advantage of the provision in subsection (c)(4) permitting class treatment of separate issues in the case." *Id*. Here, more than 5,000 putative class members share every single legal issue and predominantly common liability fact issues that have been raised by Named Plaintiffs.

Plaintiffs seeking certification "must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.*; *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (noting that plaintiff bears the burden of proving it has complied with Rule 23). The Court may consider the merits of class claims "only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgon Inc., v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). As such, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather

---

[4] Dr. Amjad also testified that Wexford breached their duty by failing to fill the nurse practitioner position at SRJ from June of 2022 through December of 2022 and for six to eight months beyond that. [Amjad, pp. 16-17] at Ex. 8.

whether the requirements of Rule 23 are met." *Eisen v. Carlise & Jacquelin*, 417 U.S. 156, 178 (1974) (internal quotation marks and citation omitted).[5]

The Fourth Circuit requires giving "Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and . . . promote judicial efficiency." *In re A.H. Robins Co.*, 880 F.2d 709, 740 (4th Cir. 1989), *cert. denied*, *Anderson v. Aetna Casualty & Surety Co.,* 493 U.S. 959, 110 S. Ct. 377, 107 L. Ed. 2d 362, 1989 U.S. LEXIS 5323 (1989) (internal quotation marks omitted); *See also Muhammad v. PNC Bank, N.A.*, No. 2:15-cv-16190, 2016 U.S. Dist. LEXIS 137404, at *4 (S.D. W. Va. Oct. 4, 2016) (citations and internal quotation marks omitted) ("The Fourth Circuit reads Rule 23 liberally and applies it flexibly to best serve the ends of justice for affected parties and promote judicial efficiencies."). Any question as to whether a case should proceed as a class in a doubtful case should be resolved in favor of allowing class certification. *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968), *cert. denied*, 394 U.S. 928 (1969) ("the interests of justice require that in a doubtful case…any error, if there is to be one, should be committed in favor of allowing the class action.").

There are many important benefits served by allowing claims to proceed as a class action. Class certification enables courts to treat common claims together, obviating the need for repeated adjudication of the same issues. *See General Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982).  In addition to efficiency, class actions protect the defendants from inconsistent obligations, protect the interest of absentees, provide a convenient and economical means for disposing of similar

---

[5] Nevertheless, "the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." EQT, 764 F.3d at 358 (quoting *Wal-Mart*, 564 U.S. at 350-51).  While the "rigorous analysis" may overlap with assessing the merits of the plaintiff's underlying claim," *Wal-Mart*, 564 U.S. at 351, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlise & Jacquelin*, 417 U.S. 156, 178 (1974) (internal quotation marks and citation omitted); *Jonathan R. v. Justice,* 344 F.R.D. 294 (S.D. W. Va. 2023).

lawsuits, and facilitate the spreading of litigation costs among numerous litigants with similar claims. *U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 402-03 (1980).

Plaintiffs believe that class certification in this case is appropriate under Rule 23(a) and (b). However, if this Court disagrees, the Fourth Circuit also endorses and encourages the use of Civ. R. 23(c)(4) to decide liability. *In re A.H. Robins Co.*, 880 F.2d 709, 740 (4th Cir. 1989). The provision should be utilized "in order to promote the use of the class device and to reduce the range of disputed issues, [and] courts should take full advantage of the provision in subsection (c)(4) permitting class treatment of separate issues in the case." *Id.*

## ARGUMENT

### I.   PLAINTIFFS WHO WERE WEXFORD PATIENTS CONSITUTE A DEFINABLE AND ASCERTAINABLE CLASS.

As a threshold matter, the proposed class here satisfies the implicit Rule 23 requirement of ascertainability.  A class definition is sufficient if it is administratively feasible for the court to determine whether a particular individual is a member of the class, based on objective criteria, without extensive and individualized fact-finding or mini-trials. *See* Charles Alan Wright & Arthur R. Miller, 7A *Federal Practice and Procedure* § 1760 (3d ed. 2020 update) ("The proposed class definition must not depend on subjective criteria or the merits of the case or require an extensive factual inquiry to determine who is a class member."); *See also Manual for Complex Litigation, Fourth* (2004), Section 21.222, at 270 ("The definition must be precise, objective, and presently ascertainable. . . . An identifiable class exists if its members can be ascertained by reference to objective criteria.)

Plaintiffs propose a class definition in the precise, objective manner required:

**Generally, all current and former pretrial detainees and inmates at Southern Regional Jail from September 22, 2020, to present.  As to Wexford Defendants, the proposed class period is June 25, 2022 to present**.

19

[ECF 946, p. 37] [the "Class"]. Additionally, as with the DOCR settlement class, Plaintiffs propose that inmates incarcerated for more than two (2) days during the class period be made part of the class. This readily calculable class consists of more than five-thousand members. These definitions appropriately restrict the boundaries of the class to those who have suffered unconstitutional and inhumane conditions alleged. The Class as defined is represented by named Plaintiffs and is appropriate for class certification.

## II.    PLAINTIFFS WHO WERE WEXFORD PATIENTS MEET THE REQUIREMENTS OF RULE 23(a).

### A.    The Plaintiff Class is So Numerous that Joinder is Impracticable.

The proposed class of more than 5,000 former, current and present Wexford inmate patients meets Rule 23(a)(1)'s numerosity requirement, as it is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  A class with "40 or more members raises a presumption of impracticability based on numbers alone." William Rubenstien, *Newberg on Class Actions* § 3:12 (5th ed. June 2020 Update); See also *Fain v. Crouch*, 342 F.R.D. 109, 114 (S.D. W. Va. 2022) ("courts have generally found numerosity present when a class has 40 or more members. *Baxley v. Jividen*, 338 F.R.D. 80, 86 (S.D.W. Va. 2020) (citing *Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984))").

Similarly, the United States District Court for the Southern District of West Virginia found that 6,000 foster care children satisfied the numerosity requirement. *Jonathon R., et al. v. Jim Justice, et al.*, 344 F.R.D. 294 (S.D.W.Va. 2023).

Likewise, here the Class consists of over five-thousand (5,000) former, current and future inmates at Southern Regional Jail beginning June 26, 2022. The Class clearly meets the numerosity

requirement. Wexford is contracted to provide medical services to each of these individuals. <u>Ex.</u> <u>2</u>.

**B.      The Putative Class Members Share Common Questions of Law and Fact.**

To meet the commonality requirement, there must be "questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2).  Even a single common question will suffice to meet the requirement for class certification for the determination of law or fact. See, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). "To satisfy Rule 23(a)(2), plaintiffs must show their claims involve a common question or contention 'of such a nature that it is capable of class-wide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1038 (8th Cir. 2018) (quoting *Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 998 (8th Cir. 2016) (quoting *Wal-Mart*, 564 U.S. at 350)). What matters is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (citations and emphasis omitted).

Furthermore, it is not necessary that all questions be common. *Ebert v. General Mills, Inc.*, 823 F.3d 472 (8th Cir. 2016) (reaffirming that "a single common question 'will do' for purposes of Rule 23(a)(2)."); *Dukes*, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do.") (internal quotation marks and alterations omitted).

In civil rights cases, "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members," *Armstrong,* 275 F.3d at 868, even if the challenged policy or practice will affect individual class members in different ways. See, e.g., *Postawko*, 910 F.3d at 1038-1039 (finding commonality satisfied where "all class members share the common question of whether Defendants' policy or custom . . . constitutes deliberate

indifference to a serious medical need" and while the "physical symptoms eventually suffered by each class member may vary . . . the question asked by each class member is susceptible to common resolution.") (internal quotation marks and alterations omitted); *Braggs v. Dunn*, 317 F.R.D. 634, 656 (M.D. Ala. 2016) (finding commonality "because being subjected to a substantial risk of serious harm is an actionable constitutional injury, even when a prisoner's physical or mental condition has not yet been detrimentally impacted.").

Not all questions of law or fact must be common to every member of the class, as even a single common question will satisfy the commonality requirement. *Jonathan R.*, 344 F.R.D. 294 at 304. Therefore, factual differences among class members' cases will not preclude certification if the class members share the same legal theory. *See Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 344 (4th Cir. 1998) ("We . . . do not suggest that the commonality and typicality elements of Rule 23 require that members of the class have ***identical factual and legal claims*** in all respects.")(***emphasis added***).

In the context of inadequate health care, differences among class members with respect to the specific incidents of inadequate health care or disability discrimination that they have suffered do not undermine commonality. See *Postawko,* 910 F.3d at 1039 (quoting *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) ("although a presently existing risk may ultimately result in different future harm for different inmates . . . every inmate suffers exactly the same constitutional injury when he is exposed to a single . . . policy or practice that creates a substantial risk of serious harm") (emphasis added)); *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (abrogated on other grounds by *Johnson v. California*, 543 U.S. 499, 125 S. Ct. 1141 (2005)) (rejecting defendant's argument that class was improperly certified in prison case alleging several forms of systemic disability discrimination where unique disabilities existed).

Thus, the commonality requirement is satisfied as Plaintiffs alleged that Wexford Defendants have systemic policies that unconstitutionally deprive them of humane conditions of confinement, or that Defendants otherwise fail to follow their own policies willfully. All of which is and has been known by the upper echelons of the corporation since Wexford assumed its contract with WVDCR. The *Rentschler* Court also noted that "[c]lass certification is often proper for cases involving prisoners' rights." *Id*. (citations omitted). With respect to Eighth Amendment claims, courts are required to "consider the totality of the circumstances." *Mitchell v. Rice*, 954 F.2d at 191 (citations omitted). Inmate-patients, similar to the 6,000 foster children that met the class requirements for certification, ". . . in the State's custody have a constitutional right to be free from an undue risk of harm, or, the same thing stated another way, a right to reasonably safe living conditions." *M.D. v. Perry*, 294 F.R.D. 7, 45 (S.D. Tex. 2013); *Doe v. S.C. Dep't of Soc. Servs*., 597 F.3d 163, 175 (4th Cir. 2010). "A plaintiff in state custody need not wait until the risk of harm is realized before seeking relief from the courts. *M.D*., 294 F.R.D. at 34; see also *Baxley v. Jividen*, 338 F.R.D. 80, 85 (S.D. W. Va. 2020) (explaining that the incarcerated plaintiffs, challenging West Virginia Division of Corrections and Rehabilitation's uniform healthcare policies and procedures, did not need to show that every class member was actually injured by the healthcare system, as the risk of harm was a sufficient injury); *Parsons v. Ryan*, 754 F.3d at 676-77 (9th Cir. 2014)(explaining that inmates may challenge unsafe prison conditions before tragedy occurs). Additionally, "[t]he policy or practice that a plaintiff identifies need not be formal or officially-adopted." *M.D*., 294 F.R.D. at 26

The totality of the circumstances, as demonstrated by Plaintiffs, establish that the named Plaintiffs and other pretrial detainees and inmates suffered harm and/or were subjected to increased substantial risk of harm by the institution wide policies of the Wexford. Wexford had actual

knowledge of the overwhelming number of overdue tasks at SRJ though its highest levels of command thanks to DOCR audits [Jeffery II, November 8, 2024, pp 65-66], at **Exhibit 15**. Those audits caused Wexford's HSA Administrator Helen Perkins to author joint reports with Assistant Regional Manger Jeffery served directly to Mary Stone. *Id.*

The understaffing of medical staff at SRJ adversely affected the medical care provided to inmates. Dr. Rashid was concerned about being understaffed as he was the only physician on staff and the mid-level provider position had been vacant for months resulting in a lengthy sick call list and lengthy chronic care clinic. [Rashid 5;9-19], at Ex. 10. The chronic shortage of medical staff negatively impacts the quality of medical care provided at the jail [Rashid 73; 16-23]. Dr. Rashid complained about the understaffing to Wexford through various verbal discussion and by written request which did reach Wexford's Mary Stone. See, Ex 11.  The understaffing affected Dr. Rashid's performance, duties, and ability to see patients. [Rashid, 84:4-15]. The resulting overdue tasks breached standard of care and increased health risks to patients.  For instance, Dr. Ayne Amjad explained that Wexford's astonishing 1,589 overdue labs in 2023 created a risk to patients because "You can't follow up the care for what you're treating this." [Amjad pg. 33, ln 13-14] at Ex. 8.

The discovery completed to date demonstrates that the Wexford Defendants through the highest corporate levels were aware of and had actual knowledge of the medical understaffing and excessive, and dangerous overdue tasks. Wexford Defendants individually and collectively failed to alleviate these circumstances in any meaningful way. These failures began in June of 2022, and are continuing as  Wexford remains out of compliance in all the same ways as its predecessor even now in the face of quarterly audits by the State.   These conditions continually subject the Class to substantial risks of harm, as well as actual harm in most instances.

Commonality is easily proven in this case.

### C.    The Claims of the Named Plaintiff Inmate Patients are Typical

To meet the typicality requirement, the claims of the named plaintiffs must be "typical of the claims or defenses of the class." Rule 23(a)(3). The typicality requirement is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Armstrong*, 275 F.3d at 868 (citations omitted). The injuries do not have to be identical but must be similar and arise from the same course of conduct. *Id.* The representative parties must "'possess the same interest and suffer the same injury' as the class members." *Jonathan R. v. Justice*, 344 F.R.D. 294 at 314 *citing Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982). Their claims, however, need not "be perfectly identical or perfectly aligned." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James v. City of Dall.*, 254 F.3d 551, 571 (5th Cir. 2001) (quoting 5 James William Moore, et al., *Moore's Federal Practice* § 23.24 (3d ed. 2000)).

As demonstrated in the commonality analysis, Plaintiffs' legal theories are based upon the prevailing medical practices, policies, and conditions at SRJ arising from Wexford's deliberate indifference to understaffing, overdue tasks, and failure to take action to avoid these barriers to patient access to care. Plaintiffs allege violations of the Eighth and Fourteenth Amendments on behalf of themselves and other SRJ inmates subjected to Wexford's tenure as Responsible Health Authority at SRJ. The Plaintiffs and putative class members were patients of Wexford and were each and all subjected to well-known deliberate indifference and inadequate medical care. The typicality requirement is satisfied.

Named Plaintiffs each alleged that medical staffing and overdue tasks increased their risk of harm or resulted in actual harm to them. During Steven Martin's time as a Wexford patient, Plaintiff Martin was under the care of Wexford Defendants. Wexford Defendants failed to timely conduct Plaintiff Martin's EKG. Plaintiff Martin's EKG was abnormal when it was finally conducted. Like many others, Mr. Martin and other similarly situated inmates failed to receive EKGs or have them conducted on time during their incarceration and were chronically subjected to many missed and/or rescheduled EKGs. This pattern of ongoing conduct by the Wexford Defendants increased the risk of serious harm to these inmate-patients. Martin and other similar situated individuals are a harmful number of inmates who make up Wexford's overdue task list.

Further, with respect to Plaintiff Elgie Adkins, Wexford Defendants failed to ensure that he was sent out for proper medical care; failed to ensure that he received timely and adequate dental care; failed to practice within their proper scope of practice when providing Plaintiff with care; and failed to conduct Plaintiff's 14-day physical timely.

On August 26, 2022, Plaintiff Adkins was admitted to SRJ. At the time of admission, Plaintiff Adkins was scheduled for his 14-day physical. On October 14, 2022, 49 days after Plaintiff Adkins was admitted, Defendant Perkins rescheduled the 14-day physical. Plaintiff Adkins' 14-day physical was not completed at all during his 97 days at SRJ. Plaintiff's expert, Dr. Mathis, opined that "Wexford violated the standard of care repeatedly with its inability to perform Adkins' 14-day physical health assessment." See, Ex. 4.  Typical of other Wexford patients, Mr. Adkins did not receive a 14-day physical health assessment timely.

On August 26, 2022, Defendant Smith completed Plaintiff Adkins' medical screening. Defendant Smith noted that "Patient stated he sees Dr. White in Beckley, WV and is supposed to follow up within two weeks for hernia surgery." On September 26, 2022, Plaintiff was scheduled

for a nurse appointment by Hanna Corkrean, LPN. The same date, Defendant Eastridge changed the appointment to indicate that Plaintiff Adkins was already on pain medication. On September 27, 2022, Plaintiff was scheduled for provider sick call by Beth Waugh, LPN. The appointment description for that date indicates "[p]atient has hernia that has ***doubled in size since last week. Please see***." [***emphasis added***]. Over a month after being admitted to SRJ, on September 28, 2022, Defendant Rashid saw Plaintiff Adkins. Dr. Rashid's notes reflect that Patient Adkins had a large abdominal wall, umbilical hernia and weak abdominal wall. Dr. Rashid's plan for Plaintiff Adkins included getting a surgical opinion.  Plaintiff Adkins remained in SRJ until December 1, 2022, and for his entire 97 day stay, was never sent out for a surgical consult or received one otherwise. On December 1, 2022, Plaintiff was transferred to South Central Regional Jail ["SCRJ"] where he remained through at least November 27, 2023. At SCRJ, plaintiff Adkins remained under the continuous care of Wexford Defendants. Through Plaintiff Adkins release date, he was never sent out for a surgical consult for his hernia – he required surgical intervention for at least 458 days and Wexford completely failed to ensure he received that care.

Additionally, Plaintiff Adkins began putting in sick call requests for dental concerns on November 10, 2022. Plaintiff placed three dental sick call requests before being seen. At least one sick call did not receive a face-to-face encounter within the requisite 24-hour period. Despite the dental sick call forms being marked "NSC with referral to doctor," the dental sick call was completed by Esther Perkins, RN, on November 20, 2022. Esther Perkins was providing medical care outside the scope of her practice by completing a dental sick call appointment. She is not a dentist. Plaintiff Adkins was never seen by a dentist at Southern Regional Jail. Plaintiff Adkins was not seen by a dentist until February 16, 2023, a total of 98 days after placing his first dental sick call request. When Plaintiff Adkins was, eventually, seen by dental he was noted to require

extractions in two weeks for multiple teeth. Plaintiff Adkins was not seen by dental again until August 10, 2023, over 175 days after his initial dental appointment, and 273 days after his first dental sick call request. Plaintiff's expert, Dr. Mathis, stated in his report that, "The prolonged and unnecessary delays in the evaluation of Adkin's dental concerns are a violation of the standard of care." See, Ex. 4.

Plaintiffs' concerns are typical of the class members. Of one hundred and forty-eight (148) randomly selected Wexford patients' medical records Plaintiffs' counsel reviewed, **zero** that were incarcerated for over 14 days had a timely 14-day physical. Of the inmates with identifiable "MD Sick Call," none were seen timely by a physician. Only two patients located were seen by a physician, with many being seen by an LPN practicing outside the scope of practice. Likewise, no patient with dental sick call was seen timely by a dentist, with many appointments being closed out untimely by either an RN or LPN practicing outside their permissible scope of practice, having never seen an actual dentist. Despite Wexford Defendants' assertions that something like dental pain is a de minimis injury, the class members who suffered through days, weeks, or months of dental pain would beg to differ.

Sabrina Eagle entered incarceration on June 25, 2022 – the last day of PrimeCare's contract prior to the start of Wexford's contract. Wexford seamlessly assumed control of the medical records systems, retained the same HSA, Helen Perkins, and maintained employment of virtually all of the PrimeCare nursing staff at SRJ. Despite indicating that she was under the care of a mental health provider in the community, Ms. Eagle never received appropriate mental status evaluation during her incarceration. Further, Ms. Eagle's intake was neither reviewed by an RN or within twenty-four hours as required by NCCHC standards, a mechanism that could have detected her need for additional care. Plaintiff Eagle's intake was neither reviewed by an RN within

twenty-four hours, as required by NCCHC standards, nor reviewed by an RN at all prior to her release on September 30, 2022. On intake, Plaintiff Eagle was set for a mental health sick call on June 26, 2022. Plaintiff's June 26, 2022, mental health appointment was rescheduled on August 11, 2022. Plaintiff's record indicates that a mental health call was completed on August 18, 2023. PsiMed, Wexford's contracted mental health provider, employee Donna Dean Chrivia was tasked with clearing the backlog of overdue tasks that PrimeCare left when its contract ended. Chrivia testified, "My clinical director asked me to review some of the PrimeCare tasks that were previous that I was not aware of, to review those and see if any of those folks that still had the PrimeCare task in that backlog, if they had I could delete that old task. If they had not been seen by somebody in mental health at that point I was asked to reschedule that tasks to a PsiMed task. In other words, a mental health sick call that would show up on our task list so they could be seen." [Chrivia, pg. 22], **Exhibit 16.** This was the only mental health evaluation Ms. Eagle received during her incarceration. Plaintiff's September 23, 2022, 90-day mental health follow up was deleted with the change note reflecting that she was released seven days later on September 30, 2022. Plaintiff's mental health medications were not verified or administered during her 97-day incarceration. Plaintiff's expert, Dr. Mathis, opined that Wexford breached the standard of care, and the violations of the standard of care prevented Eagle's access to care." See, Ex. 4.

Accordingly, each putative class member represents a class of individuals that did not receive care as a result of Wexford Defendants' chronic understaffing and overdue tasks, thereby suffering an increased risk of harm. Their claims exhibit the commonality and typicality elements for class certification and render class certification as to constitutional violations and medical negligence appropriate.

Accordingly, each putative class member represents a class of individuals that did not receive care as a result of Wexford Defendants' chronic understaffing and overdue tasks, thereby suffering an increased risk of harm. Their claims exhibit the commonality and typicality elements for class certification and render class certification as to constitutional violations and medical negligence appropriate.

### D.    Named Plaintiffs Will Adequately Represent the Class

### a. Proposed Class Representatives

Federal Rule of Civil Procedure 23(a)(4) requires that representative parties "fairly and adequately protect the interests of the class." "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)); *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 238 (S.D. W. Va. 2005) ("No conflict of interest exists as all members of the settlement class desire to recover damages immediately for injuries allegedly caused by the purchase or ingestion of Serzone.")).

The requirement in Rule 23(a)(4) looks to whether any real and material conflicts of interest exist between the named parties and the class they seek to represent. See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157-58, n. 13 (1982)). As the Fourth Circuit has noted:

> For a conflict of interest to defeat the adequacy requirement, that conflict must be fundamental. A conflict is not fundamental when, as here, all class members share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants]. Moreover, a conflict will not defeat the adequacy requirement if it is "merely speculative or hypothetical."
>
> *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010 (citation and internal quotation marks omitted).

The Named Plaintiffs and the putative class members all share the same interests seeking redress for Wexford's deliberate indifference to their right to access to medical care that meets Constitutional standards and the standard of care for correctional healthcare. The inadequacy of the medical care; the medical understaffing: the overdue task lists; and the deliberate indifference to their serious medical needs are all conditions that Plaintiffs endured and for which they seek remedy.[6] These are conditions one would not wish on one's worst enemy and fall below the threshold of minimally acceptable living conditions. Further, the Named Plaintiffs and the putative class members all desire compensation for their injuries. The Named "Plaintiffs do not seek relief for themselves different in quality or character from the relief sought for the class as a whole." See, *Scott v. Clarke*, 61 F. Supp. 3d. 569, 589 (W.D. Va. 2014).   These interests are aligned, not conflicting.

The named Plaintiffs have already demonstrated that they "have the ability and commitment to prosecute the action vigorously" See, *Thomas v. La.-Pacific Corp.*, 246 F.R.D. 505, 509 (D.S.C. 2007) in that they have each already answered written discovery requests and given testimony by deposition.

### b. Plaintiffs' Counsel Meet the Requirements of Rule 23(g) and Should Be Appointed Class Counsel.

Counsel for the named Plaintiffs request to be appointed counsel for the class, pursuant to Federal Rule of Civil Procedure 23(g). That Rule provides in pertinent part:

(1) Appointing Class Counsel. Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

(A) must consider:

---

[6] The DOCR Director of Medicine opined that each of these Wexford failures constituted breach of contract, breach of NCCHC standards, and breach of the standard of care See, Amjad at Ex. 8.

i. the work counsel has done in identifying or investigating potential claims in the action;

ii. counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

iii. counsel's knowledge of the applicable law; and iv.  the resources that counsel will commit to representing the class;

(B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class . . . .

(2) Standard for Appointing Class Counsel. When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4) .

(4) Duty of Class Counsel. Class counsel must fairly and adequately represent the interests of the class.

*Fed. R. Civ. P.* 23(g).

Class counsel are fiduciaries to the absent members of the class. See *Rodriguez v. W. Pub. Co.*, 563 F.3d 948, 968 (9th Cir. 2009). The duty of adequate representation requires counsel to represent the class competently, vigorously, and without conflicts of interest with the class. See *Amchem Prods.*, 521 U.S. at 626 n. 20. *See also*, *Blenko v. Cabell Huntington Hosp., Inc.*, No. 3:21-0315, 2022 U.S. Dist. LEXIS 142637, * 14 (S.D. W. Va. Aug. 10, 2022) (citation and internal quotation marks omitted ("This analysis takes into consideration (1) whether there is conflict between the representatives and class members, and (2) whether the representatives will vigorously prosecute the matter on behalf of the class."). The named plaintiffs' attorneys must be "competent, dedicated, qualified, and experienced enough to be able to conduct the litigation" in a vigorous manner. *In re Serzone*, 231 F.R.D. at 238 (citation omitted).

Class counsel will more than adequately represent the interests of the class. Plaintiffs' counsel has extensive experience handling class action litigation, mass tort litigation, and other complex civil litigation matters.  *See* Fed. R. Civ. P. 23(g)(1)(A)(ii).  Class Counsel's experience

in handling class action and other complex civil litigation matters have been previously submitted before this Court and referenced at ECF 849, specifically 849-5.

Plaintiffs' counsel has been on the front lines of identifying and investigating potential claims in this class action litigation. *See* Fed. R. Civ. P. 23(g)(1)(A)(i). Plaintiffs' counsel spent *hundreds* of hours investigating this case before the original Complaint was filed and continue to vigorously litigate and investigate this matter. Since early 2022, Plaintiffs have engaged in discovery and depositions resulting in countless numbers of documents and hours of testimony, all of which continue to drive this matter toward resolution or trial.

Counsel have demonstrated they have the requisite qualifications to prosecute this class action. Based on this showing, and the reasons stated above, counsel request this Court appoint them as class counsel pursuant to Federal Rule of Civil Procedure 23(g).

## II.    The Proposed Class Meets the Requirements for Certification under Federal Rule of Civil Procedure 23(b)(3).

Under Rule 23(b)(3), an action that satisfies the threshold prerequisites for certification may be maintained as a class action if the court finds that: (1) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. A class action is the superior method of resolving large-scale claims if it will achieve economies of time, effort, and expenses, as well as promote uniformity of decision as to persons similarly situated. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997). Rule 23(b)(3) further provides that:

The matters pertinent to these findings include:

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

### A.    Predominance.

The Rule 23(b)(3) predominance requirement [. . . ] tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *Gray v. Hearst Communs., Inc.,* 444 F. App'x 698, 701 (4th Cir. 2011), quoting *Amchem Prods.*, 521 U.S. at 623 (internal quotation marks omitted). Common questions predominate over individual when economies of time, effort, and expense, and a uniformity of decision as to persons similarly situated exist. *Id*. When "claims arise out of a common course of conduct" by the Defendants and "the only significant individual issues involve damages, which rarely present predominance problems," certification is appropriate. *In re Capital One Consumer Data Sec. Breach Litig*., No. 1:19-md-2915 (AJT/JFA), 2022 U.S. Dist. LEXIS 234943, at *16-17 (E.D. Va. Sep. 13, 2022). The Fourth Circuit has "embraced the view that the mass tort action for damages may be appropriate for class action, either partially or in whole." *Gunnells v. Healthplan Servs*., 348 F.3d 417, 424 (4th Cir. 2003) (citation and internal quotation marks omitted).

### B.    Superiority.

In determining whether a class action is superior,

the court initially must consider what other procedures, if any, exist for disposing of the dispute before it. The court must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court.

*Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 274 (4th Cir. 2010) quoting 7AA

Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1779 (3d ed. 2005).

The *Stillmock* Court concluded that the superiority requirement was met when no indication existed that the "class members would have a strong interest in individual litigation." *Id.* at 275. The Court reasoned that "certification promotes consistency of results giving [the defendant] the benefit of finality and repose." *Id.* (citing *Gunnells,* 348 F.3d at 429). Defendants have each expressed concerns in this matter regarding litigation at other West Virginia facilities and by other inmates – certainly, Defendants would have much graver concerns if each SRJ inmate were forced to bring their claims individually.

Additionally, where the "allegations establish that a large group of individuals endured the same event[s] and that their claims center on essentially the same constitutional violation," resolution by a means other than a class action "has little reason." *Fobbs v. Hunt*, No. 3:21cv26 (DJN), 2021 U.S. Dist. LEXIS 87094, at *54-55 (E.D. Va. May 5, 2021). This is especially true in the case of inmates who are incarcerated "and would have substantial difficulties bringing individual actions on their own." *Id*. A class action is the most efficient device when the predominant issues "will be the existence and constitutionality of the defendants' alleged policies" since "the legality of the policies can be determined in one proceeding." *Parish v. Sheriff of Cook Cty*., No. 07 4369, 2008 U.S. Dist. LEXIS 87140, at * 15 (N.D. Ill. Oct. 24, 2008).

The Plaintiffs in the case *sub judice* allege that Defendants had and continue to have practices and policies that deprive Plaintiffs and the putative class members of their constitutional rights. The inmates and those formerly incarcerated would have little ability to pursue individual claims due to their confinement and/or limited resources. Indeed, the Court has recognized that Plaintiffs' counsel have undertaken representation of a class of Plaintiffs that may have been undesirable clients for many attorneys. Moreover, even the presence of individual damage issues

does not preclude certification as "Rule 23 [. . .] provides enough flexibility to deal with that while still certifying a class." *Parish* at * 16.

## III. The Proposed Classes Meet Requirements for One or More Issue-Based Classes under Federal Rule of Civil Procedure 23(c)(4).

Alternatively, if this Court should find that class certification is not appropriate, then Plaintiffs proposed defining the following issue-based classes:

### Issue Class 1

Did Wexford Defendants violate the Eighth and Fourteenth Amendment Rights of the Class by being deliberately indifferent to their serious medical needs through systemic and gross deficiencies in staffing, facilities, equipment, and/or procedures?

### Issue Class 2

Did Wexford Defendants breach the standard of care for correctional medical providers?

### Issue Class 3

Did the Defendants conspire with one another to violate the class members' constitutional Eighth and Fourteenth Amendment rights?

Federal Rule of Civil Procedure 23(c)(4) permits a class action to be maintained with respect to particular issues, such as Wexford's liability:

> Consistent with the text of Rule 23(c)(4), one commentator recently observed as follows: 'Although traditional claims brought under Rule 23(b) involve "an all-or-nothing decision to aggregate individual cases," Federal Rule of Civil Procedure 23(c)(4) allows litigants to resolve underline specific issues in a case on a class-wide basis.' Joseph Seiner, The Issue Class, 56 B.C. L. Rev. 121, 132 (2015) (quoting Jon Romberg, Half A Loaf Is Predominant and Superior to None: Class Certification of Particular Issues Under Rule 23(c)(4)(A), 2002 Utah L. Rev. 249, 251 n.96) (emphasis added).

> *Good v. Am. Water Works Co*., 310 F.R.D. 274, 295-96 (S.D. W. Va. 2015).

The separation of issues for decision is not unique to class actions. Federal Rule of Civil Procedure 42(a)(1) provides that "[i]f actions before the court involve a common question of law or fact, the court may join for hearing or trial any or all matters at issue in the action."

In the Fourth Circuit, "if the action includes multiple claims, one or more of which might qualify as a certifiable class claim, the court may separate such claims from other claims in the action and certify them under the provisions of subsection (c)(4)." *In re A.H. Robins Co.*, 880 F.2d 709, 728 (4th Cir. 1989) (citing 1 *Newberg on Class Actions*, § 4.20, pp. 310-1 (2d ed. 1985)). This procedure achieves economies of trial. *Id*. at 713. Each subclass on the separate issues under Rule 23(c)(4) are required to independently meet the requirements of Rule 23(a) and one of the categories in Rule 23(b). *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir. 1993).

Plaintiffs propose, if this Court determines that class certification is not appropriate for the entire action, that this Court certify one or more issue classes as previously delineated. Plaintiffs propose an issue class to determine whether the convicted inmates and pretrial detainees were subject to cruel and unusual punishment by virtue of the practices, policies, and actions of Wexford Defendants. A separate issue class is proposed to determine that issue with respect to Wexford Defendants' breach of the standard of care. A third and final issue class is proposed to ascertain whether medical defendants conspired with one another or with the former defendants to commit these violations. These three classes would allow this Court to separately address the differing standards under these counts of the Third Amended Complaint.

Plaintiffs detailed the facts supporting the conclusion that their motion for class certification should be granted. Those same facts are applicable to each issue class proposed by Plaintiffs providing the prerequisite factual findings to support each of the proposed issue classes.

All Plaintiffs were or are housed in one correctional facility and limited to Wexford Defendants as their sole method of receiving medical care. The issues created by understaffing and excessive overdue tasks are experienced by each of them. The Wexford Defendants' actions

toward Plaintiffs are the same. Adequate representation by the class representative exists as one cannot imagine any inmate desiring to be subjected to deliberately indifferent medical care which breaches the standard of care for correctional healthcare. Class counsel has been established as adequate. Resolution of any of the proposed issues will apply to all Plaintiffs and putative class members. The issues predominate each class and a single litigation is superior to any other form, including the filing of numerous separate lawsuits. Thus, certification would drive the economies of trial.

**CONCLUSION**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court GRANT *Plaintiffs' Motion for Class Certification as to Wexford Defendants* and enter an order certifying that this case may proceed against Wexford Defendants as a class action as set forth herein.

**PLAINTIFFS**
**By Counsel,**

*/s/ Stephen New*
Stephen P. New (WVSB No. 7756)
Emilee B. Wooldridge (WVSB 14310)
Stephen New & Associates
430 Harper Park Drive
Beckley, West Virginia 25801
Ph: (304) 250-6017
Fax: (304) 250-6012
steve@newtaylorlaw.com

Amanda J. Taylor (WVSB No. 11635)
Taylor, Hinkle & Taylor
115 ½ S. Kanawha St.
Beckley, WV 25801
304.894.8733 (P)
681.245.6236 (F)
amanda@thtwv.com

Timothy Lupardus (WVSB No. 6252)
The Lupardus Law Office

275 Bearhole Road
Pineville, West Virginia 24874
(304) 732-0250
office@luparduslaw.com

Zachary Whitten (WVSB No. 13709)
The Whitten Law Office
P.O. Box 753
Pineville, West Virginia 24874
zwhittenlaw@gmail.com

Robert Dunlap (WVSB No. 10012)
Robert Dunlap & Associates
208 Main Street
Beckley, West Virginia 25801
(304) 255-4762
robertdunlapesq@gmail.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION

**BRYAN STAFFORD, Executor of the**
**Estate of THOMAS FLEENOR, JR., et al.,**

        **Plaintiffs,**

**v.**                       **Civil Action No. 5:22-cv-00405**

**PRIMECARE MEDICAL, INC., et al.,**

        **Defendants.**

## <u>CERTIFICATE OF SERVICE</u>

Undersigned counsel for Plaintiffs does hereby certify that the foregoing *Memorandum of Law in Support of Plaintiffs' Motion for Class Certification as to Wexford Defendants* was filed with the clerk on <u>November 24, 2024</u> via the Court's CM-ECF Filing System which will provide electronic notification to all counsel of record.

                              <u>s/ Stephen P. New</u>

                              Stephen P. New (WVSB 7756)