UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MICHAEL D. ROSE,
ROBERT C. CHURCH, SR.,
NICOLE HENRY,
EDWARD L. HARMON,
WILLIAM BOHN,
TONYA PERSINGER,
*on behalf of themselves and*
*others similarly situated,*
BRYAN STAFFORD, *in his capacity*
*as Executor of the Estate of*
THOMAS FLEENOR, JR.,
JOHN CRABTREE,
STEVEN MARTIN,
GARY TOLER,
ELGIE ADKINS,
and SABRINA EAGLE,
*on behalf of themselves and*
*others similarly situated*,

      Plaintiffs,

v.                                                    CIVIL ACTION NO. 5:22-cv-00405

PRIMECARE MEDICAL, INC.,
PRIMECARE MEDICAL OF WEST VIRGINIA, INC.
THOMAS WEBER,
BRETT BAVINGTON,
TODD HESKINS,
KRISTA VALLANDINGHAM,
MELISSA JEFFERY,
BRANDY EASTRIDGE,
HELEN PERKINS,
JESSICA MILLER,
WEXFORD HEALTH SOURCES, INC.,
MARY STONE,
DANIEL CONN,
ELAINE GEDMAN,
JOHN FROELICH,
HUMAYAN RASHID, M.D.,

ANGELA NICHOLSON, MSN, APRN, FNP-C,
AMBER DUNCAN,
LISA MULLENS, LPN,
CASSEY BOLEN,
JOHN PENNINGTON, MA, LPC, NCC, NCSC,
KENNADI SMITH, LPN,
ASHLEY VALLANDINGHAM, LPN,
BRITTANI MARSHALL, RN,
ASHLEY STROUP, LPN,
JOHN AND JANE DOE
PRIMECARE AND WEXFORD EMPLOYEES.
and TAYLOR BROOKS,

       Defendants.

## MEMORANDUM OPINION AND ORDER

Pending are Plaintiffs' Motion for Class Certification as to PrimeCare Defendants [ECF 1181], filed November 22, 2024, and Plaintiffs' Motion for Class Certification as to Wexford Defendants [ECF 1185], filed November 25, 2024. Defendants responded on December 23, 2024, [ECFs 1208, 1209], and Plaintiffs replied on December 30, 2024, [ECF 1211]. The matter is ready for adjudication.

## I.

A critical guidepost is worth mentioning: "Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 510–11 (2011). The question in this class certification setting, however, has little to do with the merits of the underlying claims, some of which are quite substantial and undeniably serious. The matter for adjudication is, instead, whether the putative class drawn by the Plaintiffs warrants certification such that it might one day give rise to a viable final Judgment consistent with due process.

One troubling concern, expressed by Justice Scalia in his dissent in *Brown v. Plata*, 563 U.S. 493 (2011), is worthy of note as well:

> The second possibility is that every member of the plaintiff class has suffered an Eighth Amendment violation merely by virtue of being a patient in a poorly-run prison system, and the purpose of the class is merely to aggregate all those individually viable claims. This theory has the virtue of being consistent with procedural principles, but at the cost of a gross substantive departure from our case law. Under this theory, each and every prisoner who happens to be a patient in a system that has systemic weaknesses—such as "hir[ing] any doctor who had a license, a pulse and a pair of shoes," ante, at 1927 (internal quotation marks omitted)—has suffered cruel or unusual punishment, even if that person cannot make an individualized showing of mistreatment. Such a theory of the Eighth Amendment is preposterous. And we have said as much in the past: "*If . . . a healthy inmate who had suffered no deprivation of needed medical treatment were able to claim violation of his constitutional right to medical care . . . simply on the ground that the prison medical facilities were inadequate, the essential distinction between judge and executive would have disappeared: it would have become the function of the courts to assure adequate medical care in prisons.*"

*Brown*, 563 U.S. at 552–53 (quoting *Lewis v. Casey*, 518 U.S. 343, 350) (Scalia, J., dissenting) (emphasis added).

The question is not whether *some effort* at collective action might be permissible under binding precedent. It is whether *this effort* -- spearheaded by a sprawling, 77-page complaint with multivariant claims and relief seeking personal injury damages -- is a permissible means of going about it. The Court concludes it is not.

## II.

On September 22, 2022, Plaintiffs Michael D. Rose and Edward Harmon, former inmates and/or pre-trial detainees at Southern Regional Jail (hereinafter "SRJ") in Beaver, instituted this action on behalf of themselves and other similarly situated individuals. Plaintiffs' original Complaint asserted various claims against Defendants Betsy Jividen, Michael Francis, Larry Warden, and the County Commissions of Raleigh, Fayette, Greenbrier, Mercer, Monroe,

Summers, Wyoming Counties ("County Defendants"), and PrimeCare Medical of West Virginia, Inc. ("PrimeCare"), as well as several "John/Jane Does," challenging allegedly unconstitutional conditions of confinement, policies, and practices at the SRJ. [ECF 1].

On October 7, 2022, Plaintiffs amended the Complaint to assert claims against Wexford Health Sources, Inc. ("Wexford"), the current medical care provider for inmates at SRJ. [ECF 7 at ¶ 49]. On July 17, 2023, Plaintiffs filed a Second Amended Class Action Complaint adding six new Plaintiffs and two new Defendants. [ECF 433]. After various dismissals, *see* [ECFs 571, 590, 621, 908], Plaintiffs filed the operative Third Amended Class Action Complaint (the "Third Amended Complaint"), effective July 30, 2024, [ECF 946], adding seven new Plaintiffs and substituting 56 new Defendants.

The Third Amended Complaint alleges five claims. First, Plaintiffs allege that all Defendants violated the prohibition against cruel and unusual punishment under the Eighth Amendment as to convicted inmate Plaintiffs due to the conditions of confinement and Defendants' deliberate indifference to those Plaintiffs' serious medical needs. [*Id.* at ¶¶ 454–503]. Second, Plaintiffs allege that conditions of confinement and the alleged deliberate indifference to serious medical needs also violated the Fourteenth Amendment as to pretrial detainees. [*Id.* at ¶¶ 504–53]. Third, Plaintiffs bring two conspiracy claims against all Defendants, namely, conspiracy to commit Eighth and Fourteenth Amendment violations and common law civil conspiracy. [*Id.* at ¶¶ 554–69]. Fourth, Plaintiffs allege that the PrimeCare Defendants and Wexford Defendants were medically negligent under the West Virginia Medical Professional Liability Act ("WVMPLA"), [*id.* at ¶¶ 570–93], by failing to provide Plaintiffs with "constitutionally adequate healthcare which meets the applicable standard of care," [*id.* at ¶ 572]. Fifth, Plaintiffs bring negligence and prima facie negligence claims against the County Defendants for failing to ensure SRJ was maintained

4

at reasonable and acceptable standards as required by West Virginia law. [*Id.* at ¶¶ 594–618].

The County Defendants have now been dismissed, and Plaintiffs and the WVDCR Defendants reached a previously approved settlement. *See* [ECFs 948, 1202]. Plaintiffs and PrimeCare also recently professed they had arrived at a settlement, but the Court has received no formal documentation to that effect. The PrimeCare Defendants and Wexford Defendants thus remain.

Plaintiffs seek class certification as to the PrimeCare Defendants [ECFs 1181, 1205] and Wexford Defendants [ECFs 1185, 1206], proposing the following class definition:

> Generally, all current and former pretrial detainees and inmates at Southern Regional Jail from September 22, 2020[,] to present. As to PrimeCare Defendants, the proposed class period is September 22, 2020, to June 25, 2022. As to Wexford Defendants the proposed class period is June 26, 2022, to present.

[ECF 946 at ¶ 288].

Alternatively, Plaintiffs seek certification of the following three issue-based classes under Rule 23(c)(4):

**Issue Class 1**

Did [PrimeCare/Wexford] Defendants violate the Eighth and Fourteenth Amendment Rights of the Class by being deliberately indifferent to their serious medical needs through systemic and gross deficiencies in staffing, facilities, equipment, and/or procedures?

**Issue Class 2**

Did [PrimeCare/Wexford] Defendants breach the standard of care for correctional medical providers?

**Issue Class 3**

Did the Defendants conspire with one another to violate the class members' constitutional Eighth and Fourteenth Amendment rights?

[ECFs 1205 at 24; 1206 at 24]. Plaintiffs contend that "[t]hese three classes would allow the Court

5

to separately address the differing standards under these counts." [ECFs 1205 at 25; 1206 at 25].

The class member allegations respecting the Prime Care Defendants and Wexford Defendants are -- even on the fourth try -- remarkably general and troublingly sparse. As to Named Plaintiff Thomas Fleenor, Jr., it is alleged as follows:

> 313. Plaintiff Thomas Fleenor, Jr., was a Wyoming County pretrial detainee and/or inmate during the time periods identified herein.
>
> . . . .
>
> 315. Plaintiff Fleenor purports to represent a class of similarly situated PrimeCare patients.
>
> . . . .
>
> 327. During his time as a PrimeCare patient, Plaintiff Fleenor was under the care of Defendant Angela Nicholson MSN, APRN, FNP-C; Defendant Rashid; Esther Perkins; Amber Duncan; Lisa Mullens, LPN.
>
> 328. Defendants Nicholson, Rashid, Perkins, Ducan, and/or Mullens failed to ensure that Plaintiff Fleenor received proper and adequate detox checks, and that detox protocol was adhered to.
>
> 329. Defendants Nicholson, Rashid, Perkins, Duncan, and/or Mullens failed to ensure that Plaintiff Fleenor's medications were continued upon incarceration.
>
> 330. As a direct and proximate result of PrimeCare Defendants' actions and inactions, Plaintiff Fleenor suffered emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

[ECF 946 at ¶¶ 313, 315, 327–30]. Respecting Named Plaintiff Jonathan Crabtree, it is alleged as follows:

> 331.  Plaintiff Jonathan Crabtree was a Mercer County pretrial detainee and/or inmate during the time periods identified herein.
>
> . . . .
>
> 333.  Plaintiff Crabtree purports to represent a class of similarly situated PrimeCare patients.
>
> . . . .

342. During his time as a PrimeCare patient, Plaintiff Fleenor[1] was under the care of Defendant Cassey Bolen; Defendant John Pennington, MA, LPC, NCC, NCSC; and Defendant Rashid.

343. Defendants Bolen, Pennington, and Rashid failed to properly schedule and follow up on Plaintiff Crabtree's mental health appointment, resulting in, among other things, a seventy-nine day delay in mental health treatment.

344. Defendants Bolen and Rashid failed to ensure that Plaintiff's fourteen-day physical was performed at all.

345. Plaintiff Crabtree's fourteen-day physical task was entered on July 6, 2021, and deleted on October 15, 2021, a 101 day delay that resulted in a failure to perform the evaluation before Plaintiff Crabtree was released from SRJ.

346. As a direct and proximate result of PrimeCare Defendants' actions and inactions, Plaintiff Crabtree suffered emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

[*Id.* at ¶¶ 331, 333, 342–46]. Respecting Named Plaintiff Steven Martin, it is alleged as follows:

347. Plaintiff Steven Martin was a Mercer County detainee and/or inmate during the time periods identified herein.

    . . . .

349. Plaintiff Martin purports to represent a class of similarly situated Wexford patients.

    . . . .

356. During his time as a Wexford patient, Plaintiff Martin was under the care of Defendant Jessica Sparks; Defendant Haley Johnson; Defendant Lesley Green, LPN; Defendant Brittani Marshall; and Defendant Rashid.

357. Defendants Sparks, Johnson, Green, Marshall, and Rashid failed to timely conduct Plaintiff Martin's EKG.

358. Plaintiff Martin's EKG was abnormal when conducted.

359. As a direct and proximate result of Wexford Defendants' actions and inactions,

---

[1] Although the Amended Complaint refers to Plaintiff Fleenor here, the Court surmises that the allegation applies to Plaintiff Crabtree.

Plaintiff Crabtree[2] suffered emotional distress and increased risk of harm.

[*Id.* at ¶¶ 347, 349, 356–59]. Respecting representative Plaintiff Gary Toler, it is alleged as follows:

369. Plaintiff Toler was a Greenbrier County pretrial detainee and/or inmate during the time periods set forth herein.

. . . .

371. Plaintiff Toler purports to represent a class of similarly situated PrimeCare patients.

. . . .

378. During his time as a PrimeCare patient, Plaintiff Toler was under the care of Defendant Rashid and John/Jane Doe PrimeCare employees.

379. Defendants Rashid and John/Jane Doe failed to properly diagnose and provide follow-up care for Plaintiff Toler's stroke.

380. Plaintiff Toler suffered from a stroke in mid-August 2021.

381. Plaintiff Toler was transferred back to SRJ from Raleigh General Hospital for stroke treatment.

382. Plaintiff Toler was returned to SRJ with an order for physical therapy/ rehabilitation and/or neurology follow-up.

383. Plaintiff Toler was not sent to rehabilitation or a neurologist until October of 2021.

384. Plaintiff Toler only received six physical therapy, rehabilitation sessions and was discharged with no improvement.

385. As direct and proximate result of PrimeCare Defendants' actions and inactions Plaintiff Toler including being wheelchair bound, complete loss of use of his right side, frozen face, voice impairment, emotional distress, mental anguish, pain and suffering, and increased risk of harm.

[*Id.* at ¶¶ 369, 371, 378–85]. Respecting Named Plaintiff Elgie Adkins, it is alleged as follows:

---

2  Although the Amended Complaint refers to Plaintiff Crabtree here, the Court surmises that the allegation applies to Plaintiff Martin.

386. Plaintiff Adkins was a Fayette County pretrial detainee and/or inmate the time period set forth herein.

. . . .

388. Plaintiff Adkins purports to represent a class of similarly situated Wexford Patients.

. . . .

394. During his time as a Wexford patient, Plaintiff Adkins was under the care of Defendant Rashid; Defendant Kennadi Smith, LPN; Defendant Rachel Leedy, LPN; Brandy Eastridge, LPN; Ashley Vallandingham, LPN; Defendant Brittani Marshall, RN; Autmn Blair, R, HSA; Defendant Joye Martin, MD; Defendant Hannah White, LPN; Defendant Esther Perkins; and John/Jane Doe medical providers.

395. Defendants Smith; Leedy; Eastridge; Vallandingham; Marshall; Blair; Marin; White; Perkins; and John/Jane Doe failed to ensure that Plaintiff Adkins was sent out for proper medical care; failed to ensure that Plaintiff received timely and adequate dental care; failed to practice within their proper scope of practice when providing Plaintiff with care; and failed to conduct Plaintiff's 14-day physical.

396. On August 26, 2022, Plaintiff Adkins was admitted to SRJ.

397. At the time of admission, Plaintiff Adkins was scheduled for his 14-day physical.

398. On October 14, 2022, 49 days after Plaintiff Adkins was admitted, Defendant Perkins rescheduled the 14-day physical.

399. Plaintiff Adkins' 14-day physical was not completed during his 97 days at SRJ.

400. On August 26, 2022, Defendant Smith completed Plaintiff Adkins' medical screening. Defendant Smith noted that "Patient stated he sees Dr. White in Beckley, WV and is supposed to follow up within two weeks for hernia surgery."

401. On September 26, 2022, Plaintiff was scheduled for a nurse appointment by Hanna Corkrean, LPN.

402. The same date, Defendant Eastridge changed the appointment to indicate that Plaintiff Adkins was already on pain medication.

403. On September 27, 2022, Plaintiff was scheduled for [a] provider sick call by Beth Waugh, LPN.

404. The appointment description for that date indicates "[p]atient has hernia that has doubled in size since last week. Please see."

405. Over a month after being admitted to SRJ, on September 28, 2022, Defendant Rashid saw Plaintiff Adkins.

406. Dr. Rashid's notes reflect that Patient Adkins had a large abdominal wall, umbilical hernia and weak abdominal wall.

407. Dr. Rashid's plan for Plaintiff Adkins included getting a surgical opinion.

408. Plaintiff Adkins remained in SRJ until December 1, 2022, and for his entire 97 day stay, was never sent out for a surgical consult or received one otherwise.

409. On December 1, 2022, Plaintiff was transferred to South Central Regional Jail ["SCRJ"] where he remained through at least November 27, 2023.

410. At SCRJ, plaintiff Adkins remained under the continuous care of Wexford Defendants.

411. Through Plaintiff Adkins release date he was never sent out for a surgical consult for his hernia – he required surgical intervention for at least 458 days and received no such care.

412. Rather, Wexford gave Plaintiff an abdominal binder in January of 2023 and reordered another in September of 2023.

413. Plaintiff began putting in sick call requests for dental concerns on November 10, 2022.

414. Plaintiff placed three dental sick call requests before being seen.

415. At least one sick call did not receive a face-to-face encounter within the requisite 24-hour period.

416. Despite the dental sick call forms being marked "NSC with referral to doctor," the dental sick call was completed by Esther Perkins, RN, on November 20, 2022.

417. Esther Perkins was providing medical care outside the scope of her practice by completing a dental sick call appointment.

418. Plaintiff Adkins was never seen by a dentist at Southern Regional Jail.

419. Plaintiff Adkins was not seen by a dentist until February 16, 2023, a total of 98 days after placing his first dental sick call request.

420. When Plaintiff Adkins was seen by dental he was noted to require extractions in two weeks for multiple teeth.

421. Plaintiff Adkins was not seen by dental again until August 10, 2023, over 175 days after his initial dental appointment, and 273 days after his first dental sick call request.

422. As a direct and proximate result of Wexford's actions and inactions Plaintiff Adkins suffered emotional distress, mental anguish, physical pain and suffering, and increased risk of harm.

[*Id.* at ¶¶ 386, 388, 394–422]. Respecting Named Plaintiff Sabrina Eagle, it is alleged as follows:

431. Plaintiff Eagle was a Monroe County pretrial detainee and/or inmate for the time period set forth herein.

 . . . .

433. Plaintiff Eagle purports to represent a class of similarly situated PrimeCare patients.

 . . . .

442. During her time as a Wexford patient Plaintiff was under the care of Defendant Rashid; Defendant Ashley Stroup, LPN; Defendant Donna Dean-Chrivia; Defendant Brandy Eastridge, LPN; Defendant Brittani Marshall, RN; Defendant Taylor Brooks.

443. Defendants Stroup; Dean-Chrivia; Eastridge; Marshall; Brooks; and Rashid failed to ensure that Plaintiff Eagle received timely and adequate mental health care.

444. During her June 25, 2022, intake screening, Plaintiff Eagle indicated that she was under the care of a mental health provider and/or psychiatrist.

445. Plaintiff Eagle's intake was neither reviewed by an RN within twenty-four hours, as required by NCCHC standards, nor reviewed by an RN at all prior to her release on September 30, 2022.

446. Rather, Defendant Stroup, and LPN, reviewed Plaintiff's intake.

447. By reviewing Plaintiff's intake, Defendant Stroup was practicing outside the scope of practice and in violation of NCCHC standards.

448. On intake, Plaintiff Eagle was set for a mental health sick call on June 26, 2022.

449. Plaintiff's June 26, 2022, mental health appointment was rescheduled on August 11, 2022.

450. Plaintiff's record indicates that a mental health call was completed on August 18, 2023, but the "Mental Health Sick Call" portion of her record reflects that no such appointment was carried out.

451. Plaintiff's September 23, 2022, 90-day mental health follow up was deleted with the change note reflecting that she was released seven days later on September 30, 2022.

452. Plaintiff's mental health medications were not verified or administered during her 97[-]day incarceration.

453. As a direct and proximate result of Wexford Defendants' actions and inactions, Plaintiff Eagle suffered emotional distress, mental anguish, and increased risk of harm.

[*Id.* at ¶¶ 431, 433, 442–53].

The Named Plaintiffs for purposes of the claims against the PrimeCare and Wexford Defendants, along with their respective complaints, are summarized in the table that follows:

| Last Name | Treaters | Complaints/Course of Treatment |
|---|---|---|
| Fleenor | PrimeCare Defendants Nicholson, Rashid, Perkins, Duncan, and Mullens | (1) Failure to ensure proper and adequate detox checks, (2) failure to ensure proper detox protocol adhered to, and (3) failure to ensure medication continued upon incarceration. |
| Crabtree | PrimeCare Defendants Bolen, Pennington, and Rashid | (1) Failure to properly schedule and follow up on mental health appointment, and (2) failure to perform 14-day physical examination. |
| Martin | Wexford Defendants Sparks, Johnson, Green, Marshall, and Rashid | (1) Failure to timely complete EKG. |
| Toler | PrimeCare Defendants Rashid and John/Jane Doe PrimeCare Employees | (1) Failure to properly diagnose stroke, and (2) failure to provide adequate follow-up care, namely, failure to timely send to rehabilitation or neurologist and ordering discharge from rehabilitation after six sessions without improvement. |
| Adkins | Wexford Defendants Smith, Leedy, Rashid, | (1) Failure to send out for proper medical care for hernia, (2) failure to ensure timely and adequate dental care, (3) |

| | Eastridge, Blair, Martin, Valladingham, Marshall, White, Perkins, and John/Jane Doe Wexford Employees | failure to practice within proper scope of practice in providing care, and (4) failure to conduct 14-day physical examination. |
|---|---|---|
| Eagle | Wexford Defendants Rashid, Stroup, Dean-Chrivia, Eastridge, Marshall, and Brooks | (1) Failure to ensure timely and adequate mental health care, (2) failure of RN to review intake forms, and (3) failure to verify or administer mental health medications. |

### III.

"The class action device is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 202 (4th Cir. 2024) (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (internal citation and quotation marks omitted)); *see Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "The premise is that 'litigation by representative parties adjudicates the rights of all class members.'" *G.T.*, 117 F.4th at 202 (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998)). Thus, a party seeking class certification "must affirmatively demonstrate [its] compliance" with *Federal Rule of Civil Procedure* 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Rule 23 "contains an implicit threshold requirement that the members of a proposed class be readily identifiable[,]" commonly referred to as "ascertainability." *Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*, 91 F.4th 202, 206 (4th Cir. 2024) (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014)) (internal quotation marks omitted); *Kadel v. Folwell*, 100 F.4th 122, 160 (4th Cir. 2024) (recognizing "an implicit requirement" that "members of a proposed class be readily identifiable.") (internal quotation marks omitted). As such, "class

definitions must be written with specificity" to "provide proper detail to identify whether or not a prospective class member was injured and whether their claim coheres with the rest of the certified class." *Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 681–82 (4th Cir. 2024). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *EQT*, 764 F.3d at 358 (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)). If, however, the class members are ascertainable, the certification inquiry continues to Rule 23(a), which provides pertinently as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > (1) the class is so numerous that joinder of all members is impracticable;
> >
> > (2) there are questions of law or fact common to the class;
> >
> > (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> >
> > (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "[C]ertification is proper only if 'the trial court is satisfied . . . that the prerequisites of Rule 23(a) have been satisfied." *Dukes,* 564 U.S. at 350–51 (quoting *Falcon,* 457 U.S. at 160–61); *Comcast*, 569 U.S. at 33.

In addition to the subsection (a) requirements, a plaintiff seeking certification must also demonstrate the class action "fall[s] within one of the three categories enumerated in Rule 23(b)." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003); *see Stafford*, 123 F.4th at 678. Rule 23(b)(3), the applicable provision in this case, authorizes a class action where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see*

*Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 300 (4th Cir. 2024). In other words, "Rule 23(b)(3) has two components: predominance and superiority." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006); *see Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997) (describing predominance and superiority as part of "the qualification-for-certification list"); *Career Counseling*, 91 F.4th at 206. Rule 23(b)(3) sets forth the following factors to consider when deciding whether a class satisfies the predominance and superiority requirements:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties of managing a class action.

*Id.*

A district court has "broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)). "The party seeking class certification bears the burden of proof." *Id.* at 146 (citing *Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1267 (4th Cir. 1981)); *accord G.T.*, 117 F.4th at 202 (quoting *EQT*, 764 F.3d at 357) ("Merely pleading compliance with these requirements is not enough; rather, 'the party [seeking certification] must present *evidence* that the putative class complies with Rule 23.'") (emphasis added); *Stafford*, 123 F.4th at 679. When evaluating whether class certification is appropriate, the Court must "take a close look" at the "facts relevant to the certification question and, if necessary, make specific findings" relevant to certification. *Thorn*, 445 F.3d at 319 (citing *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365

(4th Cir. 2004)); *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019) (stating that "the district court must rigorously examine the core issues of the case at the certification stage"). This is necessary even if "the issues tend to overlap into the merits of the underlying case." *Thorn*, 445 F.3d at 319 (citing *Falcon*, 457 U.S. at 160); *Comcast*, 569 U.S. at 33–34 (stating that the court's analysis "will frequently entail 'overlap with the merits of the plaintiff's underlying claim' . . . because the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action'") (internal citations omitted). However, "courts may consider merits questions 'only to the extent necessary to verify that Rule 23 has been satisfied.'" *Williams v. Martorello*, 59 F.4th 68, 91 (4th Cir. 2023) (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 903 (4th Cir. 2015)); *see Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (stating that although class-certification analysis may overlap with the merits of a case, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage").

## IV.

As a threshold matter, the Court must determine whether the proposed class members are ascertainable. Plaintiffs propose defining the class as "all current and former pretrial detainees and inmates at Southern Regional Jail from September 22, 2020, to present." [ECF 946 at ¶ 288]. But that disregards what is perhaps the most relevant inquiry for ascertainability purposes as to Plaintiffs' constitutional claims: whether each person incarcerated or detained at SRJ on or after September 22, 2020, had a serious medical need. Answering that question will require extensive and individualized fact-finding into each class member's medical records and circumstances.

In *TransUnion LLC v. Ramirez*, 594 U.S. 413, (2021), the Supreme Court dealt with another matter that would appear to doom certification here. The High Court's rather momentous observations in *Ramirez* were reproduced in our Court of Appeals' recent decision in *Alig v. Rocket Mortg., LLC*, 126 F.4th 965, 973 (4th Cir. 2025):

> Then, as is important here, the Court applied those principles to class actions, observing that "standing is not dispensed in gross." It emphasized that federal courts lack "the power to order relief to any uninjured plaintiff, class action or not," and that, as a result, "[e]very class member must have Article III standing in order to recover individual damages[.]" Moreover, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." Finally, the Court also made clear that the form of relief sought matters when assessing the sufficiency of the alleged harm. Thus, while "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring," "the risk of future harm on its own does not support Article III standing for [a] damages claim[.]"

*Id.* at 973 (cleaned up).

It is unclear, without more extensive and individualized inquiry, whether each proposed class member has standing to sue under Article III. Article III standing consists of three elements, the first being "injury in fact." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Plaintiffs contend that all individuals housed at SRJ during the applicable time period "suffered harm and/*or were subjected to increased substantial risk of harm*" due to the Defendants' policies and procedures. [ECF 1206 at 15–16 (emphasis added)]. But given that Plaintiffs seek monetary damages rather than injunctive or declaratory relief, their belief that an increased risk of harm can confer standing is ill-founded. *See Fernandez*, 116 F.4th at 299 (concluding that "while a substantial and imminent risk of future

harm may satisfy [Article III standing's] concreteness requirement when a plaintiff seeks injunctive relief, it does not in a suit for damages"); *see also Ramirez*, 594 U.S. at 442 ("[A] plaintiff's standing to seek injunctive relief does not necessarily mean that the plaintiff has standing to seek retrospective damages.").

Inasmuch as the inquiry would require extensive and individualized fact-finding as to each proposed class member, the proposed class definition fails to satisfy the threshold requirement of ascertainability. The Court will, nonetheless, analyze the remaining Rule 23 requirements.

### A.    *The Proposed Class Also Fails to Satisfy the Requirements Set Forth in Rule 23(a)*

#### 1.    Numerosity and Commonality

Rule 23(a)(1) requires that the class be of sufficient size that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1). In determining whether joinder is impracticable, a court should analyze the factual circumstances of the case rather than relying on numbers alone. *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n,* 375 F.2d 648, 653 (4th Cir. 1967) (holding that "eighteen is a sufficiently large number to constitute a class in the existing circumstances" and noting that "[n]o specified number is needed to maintain a class action under Fed. R. Civ. P. 23"); *see also Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984). However, "[a]s a general guideline, . . . a class that encompasses fewer than 20 members will likely not be certified . . . while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." *In re Zetia (Ezetimibe) Antitrust Litigation*, 7 F.4th 227, 234 (4th Cir. 2021) (internal citation omitted).

Additionally, Rule 23(a)(2) requires a showing of the existence of "questions of

law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Although the rule speaks in terms of common questions, 'what matters to class certification . . . [is] the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *EQT*, 764 F.3d at 360 (quoting *Dukes,* 564 U.S. at 350); *Brown*, 785 F.3d at 909. "A single common question will suffice." *EQT*, 764 F.3d at 360 (quoting *Dukes,* 564 U.S. at 359). However, it "must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Duke*, 564 U.S. at 350. "Dissimilarities within the proposed class" have "the potential to impede the generation of common answers." *Id.* at 350 (internal quotation marks omitted); *see also Brown*, 785 F.3d at 909 ("[A] court must examine whether differences between class members impede the discovery of common answers.").

For the sake of expedience, the first two requirements are deemed satisfied. The Court would be remiss, however, in not mentioning grave concerns respecting commonality. There are various alleged policy failures, such as understaffing, failure to schedule appointments, failure to conduct 14-day physical examinations, and others. In the absence of common injuries, the Named Plaintiffs may pivot to these policy failures in an attempt to favorably drive the common-issues analysis. That approach would fail:

> As the Supreme Court explained in *Wal-Mart*, some common questions—like 'Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get?'—are 'not sufficient to obtain class certification' because they do not 'demonstrate that the class members . . . suffered the same injury.' 564 U.S. at 349–350, 131 S.Ct. 2541 (internal quotation marks omitted). . . . Without more, the assertion that all class members *were subject to the same inadequate policies is insufficient because their individual claims of harm stem from different alleged policy failures*.

*G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 208-09 (4th Cir. 2024) (emphasis added).

19

As in *G.T.*, the Named Plaintiffs cite multiple policy failures from Defendants, such as (1) failing to address chronic understaffing and overdue medical tasks, and (2) ensuring timely access to medical care. As in *G.T.*, it is insufficient to generally allege the class members were subject to these and other inadequate policies. This is so inasmuch as the individual harms they allege undoubtedly stem from different alleged policy failures. Specifically, if each putative class member -- and frankly each Named Plaintiff -- were examined respecting what harm they suffered (if any), and which policy failure resulted in the named harm, the responses provided might overlap on occasion, but they would unquestionably more often vary materially in naming different harms and responsible policies, not to mention shades of grey as to both the harms and policies identified. While the Named Plaintiffs suggest a palette consisting of primary colors, the proof would, in practice, be a kaleidoscope of every imaginable hue.

## 2.    Typicality

"The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiff[s'] claims." *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980). To meet this requirement, the claims of the named plaintiffs must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). As reiterated by the Supreme Court in *Dukes*,

> the commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

564 U.S. 349 n.5 (quoting *Falcon*, 457 U.S. at 157–58 n.13). Thus, "[t]he essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Deiter*, 436 F.3d at 466 (quoting *Broussard*, 155 F.3d at 340). "The

20

representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members." *Id.* at 466. While the claims of the named plaintiffs need not be "perfectly identical" to the claims of the class members, typicality is lacking where "the variation in claims strikes at the heart of the respective causes of actions." *Id.* at 467. Thus, "the appropriate analysis of typicality must involve a comparison of the plaintiffs' claims or defenses with those of the absent class members." *Id.*

      The Named Plaintiffs bring constitutional claims under both the Eighth and Fourteenth Amendments, as well as conspiracy and medical negligence claims. The elements vary for each cause of action, and not all Plaintiffs make all claims. For instance, the constitutional claims of convicted inmates arise under the Cruel and Unusual Punishment clause of the Eighth Amendment, whereas pretrial detainees' claims are examined under the Due Process clause of the Fourteenth Amendment. These claims have differing standards.

      An Eighth Amendment claim for deliberate indifference to serious medical needs includes both an objective and subjective element. *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021) (citing *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)); *Phoenix v. Amonette*, 95 F.4th 852, 859 (4th Cir. 2024). The objective element requires a "serious" medical condition either "diagnosed by a physician as mandating treatment" or otherwise "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)); *Depaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018). As to the subjective element, "the prison official must have acted with a 'sufficiently culpable state of mind.'" *Mays*, 992 F.3d at 300 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The required state of mind is that of "deliberate indifference . . . 'to inmate health or safety.'" *Scinto*, 841 F.3d at 225 (quoting *Farmer*, 511 U.S. at 834). "And

deliberate indifference requires that the official have 'had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction.'" *Mays*, 992 F.3d at 300 (quoting *Jackson*, 775 F.3d at 178); *Parrish ex. rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) ("[D]eliberate indifference requires a showing that the defendants . . . actually knew of and ignored a detainee's serious need for medical care." (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001))).

The Eighth Amendment "has no application" where there has "been no formal adjudication of guilt against [an incarcerated person] at the time [she] required medical care," *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983), so deliberate indifference claims for pretrial detainees arise under the Due Process Clause of the Fourteenth Amendment. *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)). To state such a claim, a pretrial detainee must show that,

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Short*, 87 F.4th at 611. Unlike an inmate bringing a claim under the Eighth Amendment, a pretrial detainee need not "show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." *Id.* Rather, "it is sufficient that the plaintiff show that . . . the defendant should have known of that condition and that risk, and acted accordingly." *Id.*

Further, although Plaintiffs' claims allegedly arise from the Defendants' same general conduct, the underlying facts supporting each claim vary substantially, sometimes enormously as indicated by the table *supra*. Other considerations merit discussion as well. First,

this case involves *dozens* of Defendants, some of whom, depending on the Named Plaintiff or class member, sit on a spectrum running the gamut from no wrongdoer activity all the way to primary wrongdoer culpability. Second, some Named Plaintiffs describe suffering from specific medical conditions, *see, e.g.,* [ECF 946 at ¶¶ 380, 406], while others do not. The alleged failures ascribed to Defendants also differ, including failure to provide physical examinations [*Id.* at ¶¶ 344, 399] or other tests [*Id.* at ¶ 327], to provide medications [*Id.* at ¶¶ 329, 452], to complete mental health sick calls [*Id.* at ¶ 450], or to send the inmates to outside medical providers [*Id.* at ¶¶ 383, 411 415], dentists [*Id.* at ¶ 418], or mental health providers [*Id.* at ¶ 343]. And, as discussed above, even the injuries allegedly sustained vary, with some Named Plaintiffs suffering actual harm, while others have only a risk of harm.

With such significant variations between the claims of the Named Plaintiffs, much less the putative class members, typicality is utterly nonexistent. Further, there are certain variations, such as whether a Plaintiff suffered from a medical condition, that "strike[] at the heart of the respective causes of actions." *Deiter*, 436 F.3d at 467. Accordingly, typicality is entirely absent.

### 3.    Adequacy

Rule 23(a)(4) requires that the class representative and class counsel adequately represent the class. These requirements "provide critical safeguards against the due process concerns inherent in all class actions." *Bell v. Brockett*, 922 F.3d 502, 511 (4th Cir. 2019); *Dukes*, 564 U.S. at 363 ("In the context of a class action predominantly for money damages[,] we have held that absence of notice and opt out violates due process."). Accordingly, "a district court may certify a class only if the class representative[s] 'will fairly and adequately protect the interests of

the class.'" *Sharp Farms v. Speaks*, 917 F.3d 276, 295 (4th Cir. 2019) (quoting *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010)). To this end, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)); *Dukes*, 564 U.S. at 348–49.

This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 780 (4th Cir. 2023) (quoting *Amchem*, 521 U.S. at 625)). Conflicts of interest that are "fundamental" and "go to the heart of the litigation" can prevent class certification. *Gunnells*, 348 F.3d at 430–31 (citations omitted). "A conflict is not fundamental when . . . all class members 'share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants]." *Ward*, 595 F.3d at 180 (quoting *Gunnells*, 348 F.3d at 431). Additionally, conflicts that are "merely speculative or hypothetical" will not defeat a representative's adequacy. *Gunnells*, 348 F.3d at 430.

The Named Plaintiffs do not share the same factual and legal positions as absent class members. In fact, they do not even share the same positions with each other or have the same interest in establishing Defendants' liability. As outlined above, those bringing Eighth Amendment claims will be required to satisfy both objective and subjective elements to succeed on their claims, while the others will not. Those proposed representatives bringing claims under the Fourteenth Amendment, therefore, cannot adequately represent the Eighth Amendment Plaintiffs. And the proof standards for each are obviously quite different.

Those differences, however, are minor when one more deeply scrutinizes the entirety of the putative class and the Named Plaintiffs. Some Named Plaintiffs suffered very

serious injuries while others suffered no injury whatsoever. One example suffices. Plaintiff John Crabtree suffered a failure (1) to properly schedule and follow up on a mental health appointment, and (2) receive a 14-day physical examination. He had no injury -- or certainly no lasting injury -- as a result. One of his fellow Named Plaintiffs, however, Gary Toler, suffered what appears to have been significant missteps to monitor and treat him for a stroke, resulting in serious, permanent injuries.

There are other sharp differences between how the Named Plaintiffs will approach and desire to prosecute the litigation. One could assemble quite a list in that regard, with the length and extent of discovery, settlement decision making, choosing between experts, and the order of trial being just a few. At bottom, the Named Plaintiffs' objectives are so different in so many ways, and the class definition fails to account for those differences. And when one considers the putative class in the mix, the differences are magnified exponentially.

For these and other reasons, the proposed class representatives cannot adequately represent the class, to the extent a cohesive class (discussed next) can even be identified.

**B.     *The Proposed Class Fails to Satisfy the Requirements Set Forth in Rule 23(b)(3)***

Rule 23(b)(3) provides that a class action may be maintained if "questions of law or fact common to class members predominate over any questions affecting only individual members, and [if] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

**1.     Predominance**

In a Rule 23(b)(3) class action, "the 'commonality' requirement of Rule 23(a)(2) is

'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over' other questions." *Lienhart*, 255 F.3d at 146 n.4 (quoting *Amchem*, 521 U.S. at 609); *1988 Tr. for Allen Children v. Banner Life Ins. Co.*, 28 F.4th 513, 522 (4th Cir. 2022). "While commonality serves to ask whether class-wide proceedings are even possible, predominance 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Stafford*, 123 F.4th at 679 (quoting *Amchem*, 521 U.S. at 623); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). To satisfy the predominance requirement, "questions of law or fact common to class members [must] predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods*, 577 U.S. at 453; *see Williams*, 59 F.4th at 86 (quoting *Krakauer*, 925 F.3d at 658).

Although there are questions of law and fact common to the class, many individualized and critical issues predominate: (1) did each class member have a serious medical need, (2) did Defendants know about that need, (3) was each class member actually harmed by Defendants' actions or inactions, and if so, how, and (4) did the medical provider Defendants fail to "exercise that degree of care . . . required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances?" W. Va. Code § 55-7B-3. These are, of course, just a sampling of the many obstacles to satisfying this certification prerequisite. In service of the rigorous certification inquiry the Undersigned is charged with undertaking vis-à-vis Rule 23, many more individualized inquiries are readily apparent, as follows:

The specific nature and severity of each inmate's medical condition.

Whether officials acted with deliberate indifference to any specific inmate's needs.

The extent and type of medical care each inmate received or was denied.

Whether treatment delays constituted deliberate indifference or were medically justified.

The causal link between the medical-care denial and the inmate's alleged injuries.

Whether each inmate exhausted all available administrative remedies.

Any differences in the timing of care, *e.g.*, emergency vs. chronic conditions.

Whether care was delayed due to institutional policies or individual negligence.

Whether the injury truly involved a systemic deficiency or, instead, an isolated incident.

Whether the inmate was subject to different medical personnel, protocols, or resources.

Whether the grievance system was accessible and functional for the particular inmate.

Any differences in the duration of exposure to inadequate medical care.

Any individual differences in preexisting conditions or vulnerability to harm.

Whether inmates were denied care due to individualized factors.

The levels of documentation or medical records available for each inmate.

Whether causation is impacted by differences in responses to medication or treatment.

Whether an inmate refused or did not comply with offered treatment.

Whether Defendants have qualified immunity defenses in individual instances.

Variability in each inmate's mental health needs, which may raise distinct legal standards.

Whether medical decisions involved professional judgment, shielding them from liability.

This list, limited only by the imagination, not only predominates but fully eclipses the common question regarding, for example, the existence of Defendant-based policies or customs.

Additionally, if they succeed on the merits of this case, Plaintiffs will likely have highly varied claims for damages. Our Court of Appeals has stated that "individualized damage

determinations cut against class certification under Rule 23(b)(3)." *Ward*, 595 F.3d at 180; *Doe v. Chao*, 306 F.3d 170, 183–84 (4th Cir. 2002) (affirming district court's denial of class certification because the class members' "emotional damages [were] likely to be so variable and fact-specific that damages issues overwhelm liability").

Due to the wide variations in the issues and claims presented by the Named Plaintiffs and the putative class, not to mention the types and amounts of damages sought, common issues do not predominate.

## 2.    Superiority

Rule 23(b)(3) requires that class action "be superior to other available methods for the fair and efficient adjudication of the controversy" so as to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (internal citation and quotation marks omitted). The Named Plaintiffs contend a class action is the superior method for resolving this action given that the allegations of such a large group of individuals center on the same constitutional violations. Moreover, they say, incarcerated individuals would face substantial difficulties in bringing individual actions.

To the extent the discussion to this point does not decisively establish a lack of superiority, one additional, monumental observation is warranted. The Named Plaintiffs' one-size-fits-all proposed class definition is fatally overbroad. It encompasses every individual who was detained or incarcerated at SRJ for over two years, regardless of each person's length of incarceration, physical or mental health status, or whether an actual injury occurred. Superiority is thus also absent.

Inasmuch as the Named Plaintiffs have failed to satisfy their Rule 23 burden as to most of the governing factors, the Motions for Class Certification under Rule 23(b)(3) are **DENIED**.

### C.    *The Proposed Class Also Fails to Satisfy the Requirements Set Forth in Rule 23(c)(4)*

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." *Fed. R. Civ. P.* 23(c)(4). "[T]his rule allows for certification of a class as to a particular cause of action, even where a lawsuit as a whole would not satisfy Rule 23(b)'s predominance requirement." *Marriott Int'l, Inc. v. Accenture LLP*, 78 F.4th 677, 688 (4th Cir. 2023) (citing *Gunnells*, 348 F.3d at 439–45). "If the action includes multiple claims, one or more of which might qualify as a certifiable class claim, the court may separate such claims from other claims in the action and certify them under the provisions of subsection (c)(4)." *In re A.H. Robins Co.*, 880 F.2d at 728 (internal citation omitted). This procedure achieves economies of trial. *Id.* at 713. Under this approach, each subclass is required to independently meet the requirements of Rule 23(a) and one of the categories in Rule 23(b). *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir. 1993); *Gunnells*, 348 F.3d at 449–50.

Plaintiffs alternatively seek certification of the following three, issue-based classes under Rule 23(c)(4):

**<u>Issue Class 1</u>**

Did [PrimeCare/Wexford] Defendants violate the Eighth and Fourteenth Amendment Rights of the Class by being deliberately indifferent to their serious medical needs through systemic and gross deficiencies in staffing, facilities, equipment, and/or procedures?

**Issue Class 2**

Did [PrimeCare/Wexford] Defendants breach the standard of care for correctional medical providers?

**Issue Class 3**

Did the Defendants conspire with one another to violate the class members' constitutional Eighth and Fourteenth Amendment rights?

[ECFs 1205 at 24; 1206 at 24].

The request is susceptible to summary disposition. All three proposed, issue-based classes suffer from the same infirmities as the class as a whole. Plaintiffs merely separated each claim into an issue-based class and posed an overly broad question comprised of the elements of each claim.

Inasmuch as each issue-based class is simply a claim from the operative Complaint, the same issues that plague the Rule 23(a) and (b)(3) analyses for the general class doom the issue-based classes. Only numerosity and commonality are possibly satisfied, although doubts remain about the latter. Ascertainability is lacking, as each issue will require extensive and individualized fact-finding to determine whether an individual qualifies under each issue-based class. Predomination, typicality, and adequacy are likewise left unsatisfied. As to Issues One and Three, the success of Plaintiffs' constitutional claims will turn on the predominate question of whether an individual class member had a serious medical need, not to mention an immense number of other potential issues. The answer to Issue Two will, likewise, depend on individualized findings, such as the medical treatment at issue, the needs of the patient, and other information that is disuniform between each claim. These individual inquiries are necessary to Plaintiffs' claims, predominate over any other common questions, and illustrate just how atypical each Named Plaintiffs' claims are and why the Named Plaintiffs are not adequate to represent the class.

Accordingly, Plaintiffs' Motions for Class Certification are also **DENIED** as to the proposed issue-based classes.

## V.

In the end, the certification request is not much different from the many other ill-fated certification efforts made in the institutional setting, especially where damages were sought. For example, in *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890 (7th Cir. 2012), the United States Court of Appeals for the Seventh Circuit affirmed a district court certification refusal. In that case, the subject jail provided inadequate medical care and exposed inmates to inhumane living conditions. The Seventh Circuit was entirely aligned with the district court judgment that preceded the appeal:

> The district court denied class certification with respect to the reduction based on a failure to satisfy the typicality requirement. The court explained: "[c]laims of inadequate medical care by their nature require individual determinations, as the level of medical care required to comport with constitutional and statutory standards will vary depending on each inmate's circumstances, such as preexisting medical conditions."

*Id.* at 893. There are many other cases to the same effect. *See, e.g.*, *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 608–09 (7th Cir. 2021) ("The defendants' policies may be uniform throughout the jail, but the reasonableness of those policies . . . still depends on the specific circumstances of the plaintiffs or class members challenging the policies.") (cleaned up); *McFields v. Dart*, 982 F.3d 511, 518 (7th Cir. 2020) (class certification denied where detainee and proposed class were denied adequate dental care and Seventh Circuit noting, among other things, the following defect: "Each class member . . . presents fundamentally unique circumstances. And these differing situations are not the mere 'factual distinctions' that arise in most any case; these are overwhelming factual distinctions that defeat any 'essential characteristics' across the claims."); *Elizabeth M. v.*

*Montenez*, 458 F.3d 779, 782 (8th Cir. 2006) (certification denied where former patients in residential medical facilities accused the providers, *inter alia*, of failing to adequately treat their mental illnesses and developmental disabilities, and court noting "[b]y certifying a single class action to litigate this broad array of claims and prayers for relief, the district court has essentially conferred upon itself jurisdiction to assert control over the operation of three distinct mental health facilities, a major component of Nebraska state government. A federal court may not lightly assume this power."); *Sabata v. Nebraska Dep't of Corr. Servs.*, 337 F.R.D. 215, 223–24 (D. Neb. 2020) (denying certification in putative class action against Nebraska Department of Correctional Services facilities for civil and constitutional harms arising out of perceived deficiencies in the Nebraska prison healthcare system ("NDCS") inasmuch as, *inter alia*, "inmates' individual medical needs run the gamut from no health issues at all to significant illnesses and conditions requiring frequent and considerable treatment. The proposed solutions to the alleged deficiencies in NDCS's healthcare system are likewise diverse, broad, and would require individualized rather than classwide application."); *Farmer v. Wexford Health Sources, Inc.*, No. CV PWG-17-346, 2017 WL 6388614, at *8 (D. Md. Dec. 13, 2017) ("To the extent numerous other individuals have claims regarding medical care at the prison, those claims require proof of a serious medical need individual to each litigant and proof that those needs were met with subjective, deliberate indifference. Claims regarding medical care are highly individualized and without evidence that there is a policy in place that requires blanket denial of medical care for a specific medical condition, a class action is not the appropriate approach."); *Sawyer v. Noble*, 708 F. Supp. 2d 591, 594 (W.D. Va. 2010) (class certification denied for a class of incarcerated inmates who have been or will be denied adequate medical treatment by being denied narcotic pain medication, with district court observing, *inter alia*, "Even assuming that there are common questions of liability

among putative class members in this case, the compensatory damage issues would require individualized treatment, because of the unique medical situation for each inmate."); *Orr v. Elyea*, 279 F.R.D. 474, 475 (C.D. Ill. 2009) (certification denied with more narrow definition of plaintiff inmate class who at some point during their incarceration had Hepatitis C and elevated liver enzymes but received no Hepatitis C treatment and district court noting, in part, "While all the Plaintiffs' claims are ostensibly based on deliberate indifference to serious medical needs, none of the claims are typical. As pointed out by Defendants in their brief, every Plaintiff's individual circumstances are going to be different in terms of their particular genotype, length of sentence, whether they are candidates for treatment in the first place, whether they were offered treatment, whether they refused treatment, and whether there was a gap in incarceration. The claims are not typical.").

Having conducted the rigorous analysis required by binding precedent, certification is transparently inappropriate.

## VI.

Based upon the foregoing discussion, the Court **DENIES** Plaintiffs' Motions for Class Certification [**ECFs 1181, 1185**].

The Clerk is **DIRECTED** to transmit a copy of this written opinion and order to all counsel of record and to any unrepresented party.

ENTER:        May 15, 2025

Frank W. Volk
Chief United States District Judge